**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **MATCH GROUP, LLC** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 6:18-cv-00080** |
| **v.** | § | |
| | § | |
| **BUMBLE TRADING INC.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

**PLAINTIFF MATCH GROUP, LLC'S ORIGINAL COMPLAINT**

**I.     INTRODUCTION**

Match Group, Inc. is the worldwide leader in online dating, with multiple popular brands of matchmaking services, including Match, Plenty of Fish, OkCupid, and more.  Plaintiff Match Group, LLC, a wholly-owned subsidiary of Match Group, Inc., owns Tinder and its related intellectual property.  Tinder is one of Match's flagship brands.  When released, it launched a cultural revolution in social networking and online dating.  Tinder is famously characterized by a stack of swipeable cards containing photographs of potential matches nearby.  If a user is interested in the person shown, the user swipes right.  If not, the user swipes left.  If two users swipe right on each other, a match has been made, and the users are permitted to communicate with one another through the app.  The app has become so well-known that an entire generation is often described as the "Tinder generation."

Match, through Tinder, spent significant time and effort developing and implementing the inventions embodied in versions of the Tinder app and claimed in a recently issued utility patent.  Match, through its Tinder team, has spent significant time and money advertising the

Tinder brand, including Tinder's unique card-based swipe design.  Match has also spent significant time and money designing an attractive, artistic app, protected by both design patents and copyrights.  And Match has spent significant time and money on confidential internal research and development, including brainstorming potential feature roll-outs.  As a result of all of these efforts, Match has significant intellectual property rights related to the Tinder application and the Tinder brand.  This is a case about infringement and misappropriation of that intellectual property.

Bumble, founded by three ex-Tinder executives, copied Tinder's world-changing, card-swipe-based, mutual opt-in premise.  As acknowledged by third-party publications upon its release, Bumble is "virtually identical" to Tinder in its functionality and general look-and-feel.  The competitive reason is obvious.  Bumble sought to mimic Tinder's functionality, trade off of Tinder's name, brand, and general look and feel, meet user expectations that Tinder itself and its brand created, and build a business entirely on a Tinder-clone, distinguished only by Bumble's women-talk-first marketing strategy.  Compounding matters, Bumble has released at least two features that its co-founders learned of and developed confidentially while at Tinder in violation of confidentiality agreements.  All of these actions infringe upon Match's valid and enforceable intellectual property rights.

To be clear, this case is not about any Bumble personnel's personal history with anyone previously at Tinder.  This case is not about feminism or a business marketed based on feminist themes; Match applauds Bumble's efforts at empowering women, both in its app and offline, and Match cares deeply both about its women users and about women's issues generally.  Rather, this case is simply about forcing Bumble to stop competing with Match and Tinder using

Match's own inventions, patented designs, trademarks, and trade secrets.  Match brings this complaint to stop Bumble's unlawful use of this intellectual property.

## II.     THE PARTIES

1.      Plaintiff Match Group, LLC ("Match") is a Delaware Corporation with a principal place of business in Dallas, Texas at 8750 N. Central Expressway, Suite 1400.

2.      Bumble Trading Inc. ("Bumble") is a Delaware corporation with a principal place of business at 1105 W 41st St., Austin, TX 78756.

3.      Although Bumble Trading Inc. continues to conduct business in Texas, as of the date of filing this complaint, Bumble has failed to comply with Texas's franchise tax laws.

4.      As of March 16, 2018, Bumble Trading Inc. forfeited its charter and corporate privileges under Section 171.309 of the Texas Tax Code.

## III.    JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over Bumble Trading Inc. consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute.  Bumble conducts business, maintains an established place of business, and has committed acts of patent infringement and/or has induced and/or has contributed to acts of patent infringement by others in the Western District of the Texas, the State of Texas, and elsewhere in the United States.  In addition, Bumble's headquarters and principal place of business is located in Austin, Texas, within the District.

6.      This Court has original subject matter jurisdiction over Match's claims for patent infringement pursuant to the Federal Patent Act, 35 U.S.C. § 101 *et seq.* and 28 U.S.C. §§ 1331 and 1338(a).  This Court has original subject matter jurisdiction over Match's federal trade secret claim pursuant to 18 U.S.C. §§ 1836-39 *et seq.* ("Defend Trade Secrets Act") and 28 U.S.C. §§ 1331 and 1343.  The Court also has supplemental jurisdiction over the state law claims pursuant

to 28 U.S.C. § 1367.

7.      Venue is proper in this District for Bumble Trading Inc. under 35 U.S.C. § 1400(b) because Bumble Trading Inc. has a regular and established place of business in Austin, Texas and has committed acts of infringement in the District by making, using, and selling the Bumble app in the District.  Venue is also proper for Match's remaining claims against Bumble under 28 U.S.C. § 1391 because Bumble resides in the District, has its principal place of business in the District, is subject to personal jurisdiction in this District, and a substantial part of the events or omissions giving rise to the claim(s) occurred within the District.

8.      The Waco Division of the Western District of Texas is convenient for both parties.  The Waco Federal Courthouse is less than 100 miles as the crow flies from both Bumble's Austin-based headquarters and Match's Dallas-based headquarters.

9.      Match also has a significant server deployment in the Waco area.

10.     Bumble, meanwhile, employs at least four people at Baylor University.  One campus director, along with three campus ambassadors, plan events on and around the Baylor campus to promote the Bumble app amongst Baylor University students.

## IV.    FACTUAL ALLEGATIONS

### A.    The Creation of Tinder

11.     The Tinder app was first conceived at and created by "Hatch Labs," a technology incubator owned by Match's ultimate parent company, InterActive Corp ("IAC").  Sean Rad, Justin Mateen, Jonathan Badeen, Joe Munoz, Chris Gulczynski, Whitney Wolfe-Herd, and others formed the early Tinder team that conceived, designed, developed, and conducted initial marketing efforts for the Tinder app.

12.     Chris Gulczynski's position as Tinder was "Lead Designer" or "Chief Creative." Gulczynski was integral in designing the general look and feel of the earliest iterations of the

Tinder app.

13.     Whitney Wolfe-Herd's position with Tinder was "Vice President of Marketing." She assisted in promoting the app and encouraging users to sign up in the app's early days.

14.     Sarah Mick joined Tinder in 2013, after Tinder's initial launch.  Mick's title was "Vice President of Design" and she assisted Gulczynski on various design aspects of the Tinder interface.

15.     Released in September 2012 for iPhone devices, Tinder revolutionized online dating services.  From its earliest days, the premise of Tinder has been fundamentally the same. Tinder users are shown other users ("potential match(es)") based on certain parameters, including age range and geographic location.  The user is shown a card with a photo of a potential match nearby.  The user is then given a choice to indicate interest (or lack thereof) in the potential match merely by swiping the card right (if interested) or left (if not).  Although the earliest iterations of Tinder did not include the ability to swipe left or right, once implemented, swiping on Tinder became a cultural sensation.

16.     Tinder is now one of the most popular apps in the world.

### B. Match's Tinder-Related Intellectual Property

17.     Match has been awarded a utility patent, U.S. Patent No. 9,733,811 (the "'811 Patent"), entitled "Matching Process System and Method," in connection with the functional innovations embodied in versions of the Tinder app.  The '811 Patent is attached as Exhibit A.

18.     Match has also been awarded numerous design patents related to ornamental aspects of the Tinder app.  One such patent, United States Patent No. D798,314  (the "'314 Patent"), entitled "Display Screen or Portion Thereof With a Graphical User Interface of a Mobile Device," issued September 26, 2017.  The '314 Patent is attached hereto as Exhibit B.

19.     Match also has a federally registered trademark, Reg. No. 4,465,926, for "swipe"

in connection with computer application software for mobile devices, namely, software for social

introduction and dating services.  Tinder first used this mark in commerce on or around March

28, 2013.  The registration for Tinder's "swipe" mark is attached as Exhibit C.

20.     Match is also currently seeking federal registration for "swipe left" and "swipe

right" in connection with mobile applications for social introduction and dating services.

21.     Match also has common law trademark rights. For example, Match, through

Tinder, has used the marks "swipe left" and "swipe right" in connection with mobile applications

for social introduction and dating services nationwide.  It first used these marks in commerce on

or around March 28, 2013.

22.     "Swipe," "swipe left," and "swipe right" have become synonymous with the

Tinder app.

23.     For example, the Telegraph listed "swipe" as a 2015 "word of the year," writing

that its choice "reflect[ed] the popularity of the dating app Tinder, in which users can swipe their

finger across the screen to approve or dismiss would-be dates."

24.     The English Oxford Dictionary also specifically defines the terms "swipe right"

and "swipe left" in connection with the Tinder brand:



**Phrases**
**swipe right (or left)**
_informal_ (on the online dating app Tinder) indicate that one finds someone attractive (or
unattractive) by moving one's finger to the right (or left) across an image of them on a
touchscreen.

_'I swiped right, but sadly for me, she swiped left'_

25.     The English Oxford Dictionary also indicates that "swipe right (or left) of dating

app Tinder fame" was consistently one of the dictionary's most "popular look-ups" in 2017.

26.     Indeed, Tinder's wordmarks have been famous since before Bumble even existed.

For example, in a February 2014 article in TIME Magazine, TIME described the swipe in Tinder

as "iconic."

27.     Similarly, in February 2015, a CIO.com article described Tinder's "swipe right" as a "trademark" of Tinder.

28.     In fact, the Atlanta Hawks, in connection with Tinder, hosted a highly publicized "Swipe Right Night" at an Atlanta Hawks game in January 2015, reflecting the then-existing fame of the mark.

29.     Match, through Tinder, also has legally protectable trade dress.  For example, the ornamental design claimed in US D798,314 is a non-functional design element with source-identifying significance, either because it is inherently distinctive or has acquired secondary meaning.

30.     Match, through Tinder, regularly advertises this design, showing a user's card being swiped left or right.

 

31.     Third-party Internet publications have recognized that this design is synonymous with Tinder, describing the "Tinder swipable cards interface" as "famous" and as taking "the app store by storm."

32.     This card swipe interface has also been described as "iconic."

33.     Indeed, this interface is so well-known and iconic that, when other businesses use similar interfaces in connection with non-social network, non-dating apps, third-party publications describe such uses as making the app look like Tinder.

34.     As reflected by the United States Patent and Trademark Office's decision to grant the '314 Patent, this card-swipe design is non-functional.

35.     Similarly, Match has protectable trade dress in its "It's a Match!" screen, shown below:





36.     As with the swipeable card interface, this screen has distinctive trade dress source-identifying significance.

37.     Match, through Tinder, also regularly uses this screen as a source-identifier in various advertising materials, including in the Apple App Store, the Google Play Store, and on YouTube.

38.     Finally, Match, like most companies, has trade secrets related to confidential business planning and research and development efforts.

39.     Match Group, LLC owns all rights to the intellectual property identified above.

**C.     Whitney Wolfe-Herd, Chris Gulczynski, and Sarah Mick Leave Tinder and Create a Tinder Copycat, Bumble.**

40.     As discussed above, the early Tinder team included Sean Rad, Justin Mateen, Jonathan Badeen, Joe Munoz, Chris Gulczynski, Whitney Wolfe-Herd, and others.  In December 2013, Chris Gulcznyski and Sarah Mick left Tinder.  Wolfe-Herd left Tinder shortly thereafter.  Exactly one year after the effective date of Chris Gulczynski and Sarah Mick's severance agreements, Gulcznyski, Mick, Wolfe-Herd, and Andrey Andreev, the founder and CEO of Badoo, another online dating competitor, launched "Bumble."

41.     Like Tinder, Bumble is a mobile dating app that relies on a blind mutual opt-in premise before users communicate.  For those seeking opposite gender relationships, Bumble requires the female user to send the first message.

42.     In the words of the publication TechCrunch, Bumble is "almost *identical* to Tinder, complete with the design of the profile pages, setting, and swipe functionality." (emphasis in original).

43.     Texas Monthly recently wrote of Bumble: "the app looked suspiciously like Tinder. . . .  [I]t has that famous swipe-right-to-match function, a piece of game play so brilliant it had become a cultural reference point."

44.     Multiple other publications, such as BGR and the Los Angeles Business Journal, have described Bumble as a "Tinder-lookalike."

45.     Like Tinder, Bumble users interact with "cards" containing photos of other users, as shown below.



46.     Like Tinder, Bumble users swipe left and right on cards containing user photos to indicate whether or not the user is interested in the person shown.

 

47.     Like Tinder, swiping left indicates a user is not interested in the person shown while swiping right indicates that the user is interested in the person.

48.     Like Tinder, two users cannot communicate over Bumble until they both indicate interest in one another.

49.     Like Tinder, if two users both indicate interest, a screen is shown indicating a

"match."

50.     Bumble's "match" screen is nearly identical to Tinder's.  At the top of the screen is a large exclamatory phrase set off in a font other than the app's default font.  Below that, text indicating that the users have expressed a mutual interest is displayed in the app's default font. Below that, two circles, enclosed in white borders, display the photographs of the matched users. Below that, both apps include similarly sized and shaped buttons first presenting the option to either send a message and then, below that, giving the option to return to the swipe screen.  Both "match screens" are placed against a dark background.  These similarities are shown in the pictures below:

 

51.     The "match queue" screen, where users can find new matches and ongoing conversations with other matches, is also essentially identical.  The screens include circle contacts of various users at the top indicating matches for which no messages have been sent. These contacts can be scrolled through horizontally.  Below that is a "messages" or "conversations" navigation menu, situated for vertical scrolling, where ongoing conversations are selectable:

 

52.     One third-party publication noted when reviewing Bumble's user interface that this "match queue" is "mostly lifted from Tinder."

53.     The look and feel within the chat screen is also nearly identical, as shown below:

 

54.     Compounding the confusion from the copycat looks of the Bumble app, Bumble also makes extensive use of Tinder's registered "swipe" mark as well as its "swipe left" and "swipe right" word marks.

55.     For example, in its "About Us" section of its website, Bumble describes itself as

an app that "shows you the people you want to see and lets you connect by a mutual opt in by swiping right."

56.     On its preview in the Apple App Store and Google Play Store, Bumble indicates that it is an "industry-leading app [that] empowers users to swipe through potential connections across three different modes . . . ."

57.     Bumble's "July 2017 Press Stats Visual," located on its website, describes the number of "swipes per month" Bumble receives in its app.

58.     Bumble's "the Beehive" blog also contains dozens of instances of Bumble using the "swipe" term in connection with online or mobile matchmaking services.

59.     Additionally, Bumble includes a section of "Frequently Asked Questions" inquiring as to (1) why a user "r[a]n out of people to swipe on"; (2) why a user can't "start a conversation with somebody [the user has] swiped right on"; and (3) whether a user can "go back" if the user "swiped the wrong way."  Bumble describes its "Backtrack" feature as a way to deal with the situation where a user "accidentally swiped left."

60.     Bumble's "backtrack" screen also makes prominent use of the swipe and swipe left marks, asking a user to "confirm below to bring someone back that you swiped left on" and to "swipe to backtrack":



61.     In press interviews, Bumble's CEO repeatedly references "swipes," "swipe lefts" and "swipe rights."  For example, in a CNBC interview, located at

https://www.youtube.com/watch?v=jyOMHVrVrZo, Bumble's CEO discusses "swiping for opportunity," "swiping to network," "swipe left for no," "swipe right for yes," and that Bumble was getting "a lot of swipes."

62.     Similarly, Bumble's CEO described in a Fox Business interview on November 23, 2015, located at https://www.youtube.com/watch?v=m5Ej92-mKkg, that on Bumble "you swipe on one another, and so if you both mutually opt in to have a match . . . you swipe right on her, she swipes right on you, it's a connection."

63.     In another interview, from CNN Money on February 11, 2016, Bumble's CEO described Bumble's app as "swip[ing] right or left on potential matches."

64.     Bumble's official advertising also makes use of the "swipe right" term.  In an advertisement where two Bumble personnel provide tips for writing dating "bios," one of the "doctors" indicates that she would "swipe right" on a bio she found particularly clever.

65.     In fact, it appears Bumble has taken additional, affirmative steps since its initial release to co-opt Match's trademarks and trade dress and trade off of Tinder's powerful brand.

14

As discussed, in both apps, when two users express a mutual preference, a "match screen is shown."

66.     Bumble's *original* match screen looked similar to Tinder's match screen, but it had some notable differences, including the location of the of the message and "keep playing" buttons:



67.     Moreover, the screen previously animated the circle photographs to pop out and drop below the "keep playing" and "start a chat" buttons, a feature not included in Tinder's match screen.

68.     Bumble has since updated to its app to mirror Tinder's.  Moreover, Bumble decided to change the phrase "you both liked each other" to "you both swiped each other."



69.     In July 2017, Bumble also released a paid feature, the "SuperSwipe."

**FIRST CAUSE OF ACTION: UTILITY PATENT INFRINGEMENT BY BUMBLE**

70.     Match incorporates by reference the preceding paragraphs as if fully set forth herein.

71.     Bumble directly infringes the '811 patent by making and using a system that practices the claims of Tinder's patent.

72.     Claim 1 of the '811 Patent claims:

A computer implemented method of profile matching, comprising:

> electronically receiving a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform;

> electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device;

> determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

> causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

> determining that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface;

> in response to determining that the first user expressed the positive preference indication regarding the first potential match, automatically causing the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match;

> determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match;

> determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed

the positive preference indication regarding the first user;

in response to determining to enable initial communication between the first user and the second user, causing the graphical user interface to display to the first user the graphical representation of the first potential match;

determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user;

preventing communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user;

determining that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and

preventing communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user.

73.     Claim 4 of the '811 Patent claims:

A non-transitory computer-readable medium comprising instructions that, when executed by a processor, are configured to:

electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform;

electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device;

determine a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

cause the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

17

determine that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface;

in response to the determination that the first user expressed the positive preference indication regarding the first potential match, automatically cause the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match;

determine that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match;

determine to enable initial communication between the first user and the second user in response to the determination that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;

in response to the determination to enable initial communication between the first user and the second user, cause the graphical user interface to display to the first user the graphical representation of the first potential match; determine that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user;

prevent communication between the first user and the third user after determining that both the first user has expressed the negative preference indication regarding the second user and the second user;

determine that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and

prevent communication between the first user and the fourth user after

determining that the fourth user has expressed a negative preference indication regarding the first user.

74.     Claim 7 of the '811 Patent claims:

A system for profile matching, comprising:

an interface operable to:

electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user associated with a social networking platform;

electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device; and a processor coupled to the interface and operable to:

determine a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

cause the interface to display a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

determine that the interface has received a positive preference indication from the first user regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface;

automatically cause the interface to remove the presentation of the first potential match from the graphical user interface in response to detecting the gesture and cause the interface to present, on the graphical user interface, a second potential match of the set of potential matches to the first user;

determine that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match; and

determine to enable initial communication between the first user and the second user in response to the determination that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive

preference indication regarding the first user;

in response to the determination to enable initial communication between the first user and the second user, cause the graphical user interface to display to the first user both the graphical representation of the first potential match;

determine that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user;

prevent communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user;

determine that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and prevent communication between the first user and the fourth user in response to determining that the fourth user has expressed a negative preference indication regarding the first user.

75.     Bumble's servers practice all of the limitations of these claims, as set forth in the example below.  For example, Bumble's servers electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform.  When a Bumble app user downloads and initially accesses the application, the user device is required to set up a Bumble account that is associated with the user's Facebook account:



76.     Through the account setup process, Bumble receives from each user an online profile comprising traits of respective users. For example, the Frequently Asked Questions on Bumble's website indicates that Bumble "use[s] Facebook to help build your profile by importing your name, age, school, and/or occupation."

77.     Bumble's servers also perform the step of electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device.  For example, after authorizing his or her Facebook account, the Bumble user is taken to the screen where he or she can indicate positive and negative preferences for various potential matches.  At a point before those potential matches are shown, Bumble has received a request for matching.

78.     Bumble's servers also perform the step determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request.  In response to receiving the parameters set forth in the request for matching contained in the Bumble app user request, Bumble determines a set of potential matches for the requesting user based on parameters such as location, age, and gender:



79.      Bumble's servers also perform the step of causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user.  Bumble causes the display of potential matches of other Bumble app users to appear on the first Bumble app user's graphical user interface.  The potential matches shown correspond with the determination of potential matches described in ¶ 78 above:



80.     Bumble's servers also perform the step of determining that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphic user interface.  A Bumble app user may affirmatively select (or reject) another Bumble app user by swiping gestures.  Bumble makes a determination based on this Bumble app user indication (e.g., swipe right or swipe left).  Bumble determines whether a first Bumble app user has made a positive preference indication in the form of a first swiping gesture:



81.     Bumble's servers also perform the step of in response to determining that the first user expressed the positive preference indication regarding the first potential match, automatically causing the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match.  After determining that the first Bumble app user has expressed a positive preference via a swiping gesture (swipe right), Bumble automatically presents a second potential match:



82.    Bumble's servers also perform the step of determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match.  Bumble compares the selected preference of each potential match (i.e., of a first Bumble app user and a second Bumble app user), including making a determination whether the first Bumble app user and the second Bumble app user each expressed a positive preference for each other.

83.    Bumble's servers also perform the step of determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user.  In the event that the determination described in the immediately preceding paragraph results in a mutual positive preference indication, Bumble determines to enable initial communication between the first Bumble app user and the second Bumble app user.  In the same-gender case, either participant may communicate.  In an opposite-gender case, Bumble makes the determination to enable initial communication by allowing the female user to message the male user.

84.     Bumble's servers also perform the step of in response to determining to enable initial communication between the first user and the second user, causing the graphical user interface to display to the first user the graphical representation of the first potential match.  For example, upon determining that mutual positive preference gestures have been made, Bumble presents the following graphical representation of the first potential match:

 

85.     Bumble's servers also perform the step of determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user.  Bumble determines whether the first Bumble app user expressed a negative preference for a third Bumble app user by determining whether the first Bumble app user swiped left:



86.     Bumble's servers also perform the step of preventing communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user.  For example, if the first Bumble app user expressed a negative preference for a third Bumble app user, the Bumble app will not allow the first and third Bumble app users to communicate through the app.

87.     Bumble's servers also perform the step of determining that the first user expressed a positive preference indication regarding a fourth potential set of matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user.  A Bumble user may affirmatively select (or reject) another Bumble app user by swiping gestures.  Bumble makes a determination based on this Bumble user indication (i.e., swipe right or swipe left).  Bumble determines whether a first Bumble app user has made a positive preference indication in the form of a first swiping gesture.

88.     Finally, Bumble's servers perform the step of preventing communication between the first user and the fourth user after determining that the fourth user has expressed a negative

preference indication regarding the first user.  Upon a determination that a fourth Bumble app user expressed a negative preference for a first Bumble app user, Bumble will prevent communication between those users.

89.    At least some servers perform this method in the United States.

90.    Bumble also indirectly infringes the '811 patent by inducing infringement by others, such as end-user customers, by, for example, encouraging and instructing end-user customers to install and use the Bumble app in the United States.

91.    Bumble took the above actions intending to cause infringing acts by others.

92.    Bumble was also aware of the '811 patent.  For example, on a February 7, 2018 earnings call, Match Group CEO Mandy Ginsberg discussed the '811 Patent.

93.    That same day, an online publication Axios indicated that it had reached out to Bumble for a comment about the '811 Patent.

94.    Additionally, it was well-publicized that Tinder was seeking a patent related to its swipe functionality.  For example, a June 22, 2015 article in Adweek indicated that Tinder was prosecuting a patent related to swipe functionality.

95.    Moreover, Whitney Wolfe-Herd, Chris Gulcznyski, and Sarah Mick were all still at Tinder when the application maturing into the '811 Patent was filed in October 2013.

96.    If Bumble did not know that the actions it encouraged constituted infringement of the '811 Patent, Bumble nevertheless subjectively believed there was a high probability that others would infringe the '811 patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

97.    Bumble also indirectly infringes the '811 patent by contributing to infringement by others, such as end-users, by providing within the United States software components for

operating Bumble's app and interacting with the servers associated with Bumble's app.  These software components are, for example, the Bumble app, and the download package that contains the Bumble app for interacting with Bumble's servers.  Bumble's end-user directly infringed the '811 Patent by, for example, installing and using the Bumble app in the United States to use the Bumble system in the United States and Bumble servers in the United States.  These software components are known by Bumble to be especially made or adapted for use in Bumble's infringing system.

98.     Bumble has known these components to be especially made or especially adapted for use in infringement of the '811 patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Bumble subjectively believed there was a high probability that these components were especially made or especially adapted for use in an infringement of the '811 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use but took deliberate steps to avoid confirming the same.

99.     Bumble's infringement of the '811 Patent is and has been willful.  Bumble at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '811 Patent.  For example, as discussed above, Bumble is and has been aware of the '811 Patent.  To Match's knowledge, Bumble has not attempted to avoid infringement of the patent or to design around it. Bumble designed its app to mirror Tinder and its swipe functionality specifically to compete with Tinder and avoid a barrier to entry in the market by mimicking Tinder's swipe functionality in connection with an online matchmaking app.

100.    The inventions claimed in the '811 patent are not directed to an abstract idea. Instead, the claims are directed to an improvement in computer and user interface functionality as well as in online social networking.

101.    Specifically, the inventors of the continuation-in-part aspect of the '811 patent set out to improve the user interface functionality in dating and other matchmaking apps.  The swipe on a graphical representation of a user equals positive, different swipe on the photographic representation equals negative, in connection with a mutual opt-in matchmaking app, was a non-conventional, concrete improvement in how touch screen user interfaces interact with users sifting through and making binary choices, such as indicating positive or negative preferences related to potential matches.  To be sure, the general gesture of swiping may have been known in the prior art.  But the specific application to a graphical representation of a user in the specific matchmaking context claimed, in order to make binary choices expressing a preference or lack thereof regarding potential matches, was unknown and unconventional.

102.    This interface improvement allows users to sift through more information, more quickly than previous interfaces addressing similar binary choice user decisions.  These efficiencies to user interaction revolutionized the world of online dating.

103.    That the inventions are directed toward new computer-specific user interface technology is confirmed by the surrounding limitations.  The inventions claim a specific computer method, system, and computer-readable medium of matchmaking where parties are not permitted to communicate until a match is made, user profiles are specifically "online-dating profiles" and those profiles must be "associated with a social networking platform," a type of platform that is itself computer specific.  The claims further describe various actions of a graphical user interface that provide certain information at certain times in response to certain

types of inputs.  This is not conventional post-solution activity in order to monopolize an abstract idea of matchmaking or even mutual opt-in matchmaking.  Instead, these limitations recite a particularly advantageous computer embodiment of a matchmaking process that also solves computer-specific problems related to the ease of making fake accounts and profiles, the inconvenience of filling out profiles, and the problem of certain online dating users being inundated with messages.  This particularly advantageous online matchmaking method may have been known prior to the inventions claimed.  However, this method was not so pervasive as to be "conventional."

104.    Moreover, even if that matchmaking method was conventional, the inventions are directed to an improved interface for that method.

### SECOND CAUSE OF ACTION: DESIGN PATENT INFRINGEMENT

105.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

106.    Bumble's app also infringes Match's Design Patent, D798,314.

107.    U.S. Patent D798,314 claims an ornamental aspect of Tinder's app design related to swiping left or right on cards containing photographs.

108.    The '314 Patent claims the ornamental design shown in Figures 1 and 2 of that patent:

 

FIG. 1                              FIG. 2

109.    As the patent makes clear, only the solid lines illustrate the ornamental design claimed.  The broken lines are for illustrative purposes only.

110.    As discussed above, Bumble looks "virtually identical" to Tinder and infringes on this ornamental design.

111.    Specifically, Bumble's app includes an ornamental design where photographic cards are swiped left or right, as shown below:

 

112.    The resemblance between the two apps is such as to deceive an ordinary observer to believing that Bumble's design is the same as Match's patented design.

113.    Bumble has actual notice of the '314 Patent.  Chris Gulczynski, a co-founder of Bumble and Bumble's former Chief Product Officer, is a named inventor on the patent from his time at Tinder.  Gulczynski previously assigned his rights to the patent (and all other relevant to intellectual property) to Match.

114.    Bumble's infringement of the '314 Patent is and has been willful.  Bumble at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '314 Patent.  Specifically, Bumble, at least because of its relationship with Chris Gulczynski, who designed aspects of the user interfaces of both Tinder and Bumble, knew that the ornamental design claimed in the '314 Patent was likely infringed by Bumble's substantially identical card swipe ornamental design in the Bumble app.

### THIRD CAUSE OF ACTION: TRADEMARK INFRINGEMENT
### UNDER 15 U.S.C. § 1114(a)

115.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

116.    Match has received a federal registration for the mark "swipe" in connection with computer application software for mobile devices—software for social introduction and dating services.

117.    Match, through Tinder, first used the mark "swipe" in commerce on or around March 28, 2013 and continues to do so.

118.    Bumble, by using Match's "swipe" mark to compete with Tinder in the market for software for social introduction and dating services," violated 15 U.S.C. § 1114.  As discussed above, Bumble is prominently using Match's "swipe" mark throughout its app and promotional

activities.  Bumble's activities are causing, and unless enjoined, will continue to cause a likelihood of confusion and deception of members of the public, and, additionally, injury to Match and Tinder's reputation and goodwill as reflected in the "swipe" mark.  Bumble's use of the swipe mark will also actually deceive the public or is at least likely to deceive the public regarding the source, sponsorship, and/or affiliation of Bumble's app.

119.    These actions have also materially damaged the value of Match's registered "swipe" mark.

120.    As a proximate result of Bumble's actions, Match has suffered damages, including, but not limited to, lost revenue and loss of goodwill associated with its Tinder app.

121.    At least because of the prior affiliation of Bumble officers with Tinder and because of Bumble's competition with Tinder, Bumble's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with Match and Tinder's "swipe" mark.

## FOURTH CAUSE OF ACTION: TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1125(a)

122.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

123.    Match is the owner of word marks "swipe left" and "swipe right" in connection with internet-based dating and matchmaking and similar services since at least on around March 28, 2013.  Match has used and continues to use these marks throughout the United States.

124.    These marks are valid and enforceable and in full force and effort.

125.    As described above, Bumble uses Match's "swipe left" and "swipe right" marks prominently.  Bumble's doing so is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Bumble app.

126.    At least because of the prior affiliation of Bumble officers with Tinder and because

of Bumble's competition with Tinder, Bumble's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with the "swipe right" and "swipe left" word marks.

127.    These actions have caused damages to Match, including lost Tinder revenue as well as damages to Tinder's brand and associated goodwill.

### FIFTH CAUSE OF ACTION: INFRINGEMENT OF TRADE DRESS UNDER 15 U.S.C. § 1125(a)

128.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

129.    Match is also the owner of legally protectable trade dress.  For example, the non-functional, ornamental design claimed in the '314 Patent is a design that is either inherently distinctive or has acquired secondary meaning designating Match and Tinder as the source of the product.

130.    As described above, this card-based swipe interface has been described as "famous" or "iconic" by multiple third-party publications.

131.    This interface was first used in commerce some time before September 1, 2012.

132.    By including this same non-functional ornamental design, Bumble's app is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Bumble app.

133.    Match is also the owner of trade dress related to Tinder's "It's a Match!" screen, shown here:




134.    The Tinder app has included this same or similar design since it was initially released.

135.    The "It's a Match Screen!" was first used in commerce on August 2, 2012.

136.    As described above, Tinder uses this screen in various advertising materials, including on the App Store, Google Play Store, and on YouTube.

137.    This overall design is non-functional.

138.    By including this same non-functional design, Bumble's app is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Bumble app.

139.    As also discussed above, Bumble's similar screen is virtually identical to Tinder's.

140.    By including this same non-functional design, Bumble's app is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Bumble app.

141.    At least because of the prior affiliation of Bumble officers with Tinder and

because of Bumble's competition with Tinder, Bumble's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with Match's trade dress.

142.     These actions have caused damages to Match in the form of lost Tinder revenue as well as damages to Tinder's brand and associated goodwill.

## SIXTH CAUSE OF ACTION: TRADEMARK DILUTION

143.     Match incorporates by reference the preceding paragraphs as if fully set forth herein.

144.     Certain of Bumble's actions also constitute trade mark and trade dress dilution by blurring under 15 U.S.C. § 1125(c).

145.     Match's wordmark "swipe right" is famous to the general public.

146.     As discussed above, the phrase "swipe right" is included in the Oxford English Dictionary, specifically associated with the Tinder app.

147.     "Swipe right," especially in the connection with "swipe left," is often described by third parties as a famous "cultural phenomenon."

148.     These third parties describe the cultural phenomenon specifically in reference to Tinder and the Tinder app.

149.     In light of Tinder's own extensive marketing as well as the descriptions of third-parties, "swipe right" has become effectively a "household name" identifying the Tinder brand and Tinder app.

150.     After Tinder's "swipe right" mark became famous, Bumble began using "swipe right" in connection with its app.  Bumble's routine use of the mark "swipe right" in connection with a direct competitor mobile dating service has caused and is likely to cause dilution by blurring, diluting the distinctiveness of "swipe right" as a brand signifier for Tinder and/or Match.

151.    These actions have harmed the reputation of goodwill associated with Tinder.

152.    Bumble's dilution of Tinder's "swipe right" mark has been done willfully and intentionally.

### SEVENTH CAUSE OF ACTION: TEXAS UNFAIR COMPETITION.

153.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

154.    As discussed above, Match's trademarks and trade dress are valid marks in full force and effect.

155.    Bumble knowingly and willfully used these marks and this trade dress in commerce through the promotion of its app and in the app itself.

156.    Bumble's actions are likely to cause consumer confusion, cause consumer mistake, and/or deceive ordinarily prudent consumers as to the affiliation, connection, association, sponsorship, or approval of Match and/or Tinder products because Bumble's actions suggest that its own app originates form, is sponsored by, is authorized by, or is otherwise connected with Tinder and/or Match.

157.    These actions have materially damaged the value of Match's Tinder marks and trade dress.

158.    As a result, Match has suffered damages, including lost Tinder revenue and damage to goodwill associated with Tinder.

159.    Bumble's actions have caused injury to Match, and Match is entitled to damages caused thereby, including punitive damages as a result of Bumble's malicious and willful actions.

## EIGHTH CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT AND THE TEXAS UNIFORM TRADE SECRETS ACT

160.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

161.    In connection with their employment at Hatch Labs/Tinder/Match, at least Chris Gulczynski and Sarah Mick were given access to certain confidential information related to proposed Tinder features.

162.    Gulczynski and Mick agreed as part of their employment to keep confidential all confidential information and to not disclose such information to anyone or to use such information for anyone's benefit other than Hatch Labs/Tinder/Match.

163.    While at Tinder, Gulcynski and Mick were involved in development for a potential "undo" function for the Tinder app.

164.    The concept of the "undo," as discussed internally at Tinder, involved allowing all users three "undos."  Once an "undo" was used, it would take a certain period of time for that "undo" to replenish.  If the user did not want to wait that time period for the undo to replenish, the user could speed up the process by promoting that app via social media.

165.    For example, the image below reflects an internal Tinder mock-up of the "undo" idea in which Gulcynski and Mick were involved:

38



166.    In March of 2015, Bumble implemented a nearly, if not literally, identical concept in its "Backtrack" feature.  In Bumble's own words on its website:



Can I go back if I swiped the wrong way?

If you've accidentally swiped left, you can shake your phone to Backtrack on your last decision. Keep in mind you only get three Backtracks at a time. Each Backtrack you use is restored after 3 hours. You can get more Backtracks by sharing your Bumble love on Facebook, Instagram, and Twitter.

167.    To be sure, Tinder had previously announced its "rewind" functionality before Bumble released its rewind feature.  But Tinder's "rewind" feature was different and remains different from this confidential concept misappropriated from Gulcyzsnki and Mick's time at Tinder.

168.    Tinder's rewind allows for "Tinder Plus" users to "rewind" errant left swipes in connection with a paid subscription.

169.    Bumble's backtrack feature, in contrast, plainly mirrors the three "undos" that replenish over time and/or with promoting the app on social media outlets.

170.    At least because of their confidentiality agreements, Gulczysnki and/or Mick knew or had reason to know at the time they began using these concepts that they were acquired

by improper means or under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the secret.

171.    Additionally, because Gulczysnki and Mick were co-founders and executives at Bumble, Bumble used this trade secret knowing or with reason to know that the secret was acquired by improper means, acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or was derived from a person (Gulczynski and/or Mick) who owed a duty to Match and Tinder to maintain the secrecy of the idea.

172.    Bumble's app, which uses this trade secret, is used in interstate commerce.

173.    In light of the totality of the circumstances between Match/Tinder and Bumble, this misappropriation was willful and malicious misappropriation, made with conscious disregard of the rights of Match and Tinder in the trade secret.

174.    Indeed, Bumble's misappropriation related to "backtrack" appears to reflect a pattern of disregard for Match's trade secret rights.

175.    While Gulczynski and Mick were still at Tinder, Sean Rad came up with an idea to implement picture messaging within the Tinder app.

176.    Although dating apps had been reluctant to include a direct picture messaging function because of concerns related to unsolicited lewd photographs, Rad conceived the idea of allowing direct photograph messaging but sending only a deliberately blurred photo that the photo recipient would be required to click before viewing an unblurred image.  In this way, anyone looking over your shoulder could not see the message unless the recipient clicked it. Further, the user recipient could, based on context, determine whether the sent picture was one the recipient was comfortable viewing in public (or ever).

177.    After Rad conceived of the idea, he asked Gulczynski to perform a mock-up of

the concept.  Below is a PDF screenshot of Gulczynski's design mock-up at Tinder:



178.    The two icons with the hands over them would, once clicked, display the full

photo.

179.    In February 2015, after Gulczynski and Mick left Tinder to work at Bumble,

Bumble implemented the identical concept, complete with same white hand surrounded by a

white circle over the blurred image:



41

180.    When Bumble released the feature, Bumble indicated that it was implementing a "Snapchat-like" feature, implying that Bumble was co-opting a feature from Snapchat.

181.    The truth is that Gulczynski and/or Mick took the idea from confidential development discussions at Tinder.

182.    These co-founders of Bumble that previously worked with Tinder have inappropriately used confidential information related to Bumble's backtrack function.

183.    It is currently unknown and unknowable to Match whether Bumble is using any algorithms or source code acquired at Tinder from Gulczysnki, Mick, and/or Wolfe-Herd's time at Tinder.  It is also unknown and unknowable to Match whether Bumble acquired or is using other confidential information acquired from Gulczysnki, Mick, and/or Wolfe-Herd's time at Tinder.

184.    Bumble's use of the backtrack/undo trade secret constitutes a misappropriation of trade secrets in violation of the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act.

185.    Bumble's misappropriation of the "undo" trade secret has caused damage to Match.  It has been forced to compete for users and revenue against a competitor implementing Match's own confidential idea, developed at Match, for Match, by personnel being paid by Match.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE,** Plaintiff prays for the entry of a judgment from this Court:

1.    Judgment in Plaintiffs' favor and against Defendant on all causes of action alleged herein;

2.      A preliminary and/or permanent injunction restraining Defendant, and its agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with them, from directly or indirectly violating Match's utility patent rights, design patent rights, rights under the Lanham Act, rights arising from common law unfair competition, and from any further misappropriation or unauthorized use of Match/Tinder's trade secrets.

3.      For damages in an amount to be further proven at trial, including:

    a.  Damages assessed against Defendant pursuant to the Defend Trade Secrets Act of 2016, including compensatory damages, unjust enrichment or restitution damages, reasonably royalty, and exemplary damages;

    b.  Damages assessed against Defendant pursuant to the Texas Uniform Trade Secret Act, including compensatory damages, unjust enrichment or restitution damages, reasonably royalty, and exemplary damages;

    c.  Damages assessed against Defendant pursuant to the Lanham Act, including compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits,

    d.  Damages under 35 U.S.C. § 284, including enhancement and including supplemental damages for any continuing post-verdict infringement up until entry of final judgment, with an accounting, as needed;

    e.  Damages under 35 U.S.C. § 289, including Bumble's total profit and revenue realized and derived from its infringement of U.S. Patent D798,314 and in an amount not less than a reasonable royalty.

      f.   Damages for Defendant's common law unfair competition, including punitive damages

4.      For Plaintiffs' reasonable attorney's fees;

5.      For costs of suit incurred herein, including all disbursements;

6.      For pre-judgment and post-judgment interest on the damages awarded;

7.      If an injunction is not granted, that Plaintiffs be awarded an ongoing licensing fee; and

8.      For such other and further relief (including any and all equitable relief) as the Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable of right by a jury.

DATED:  March 16, 2018

Respectfully submitted,

**CALDWELL CASSADY & CURRY**

Bradley W. Caldwell (*Admission Pending*)
Texas State Bar No. 24040630
Email:  bcaldwell@caldwellcc.com
John F. Summers
Texas State Bar No. 24079417
Email: jsummers@caldwellcc.com
Warren J. McCarty, III
Illinois State Bar No. 6313452
Email: wmccarty@caldwellcc.com
**CALDWELL CASSADY CURRY P.C.**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

*/s/ John P. Palmer*
John P. Palmer
State Bar. 15430600
Email: palmer@namanhowell.com
Naman, Howell, Smith & Lee, PLLC
400 Austin Avenue, 8th Floor
P.O. Box 1470
Waco, TX 76701
Telephone: (254) 755-4100
Facsimile: (254) 754-6331

**ATTORNEYS FOR PLAINTIFF
MATCH GROUP, LLC**