**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **MATCH GROUP, LLC,** | |
| **Plaintiff,** | **Civil Action No.  6:18-cv-00080** |
| **v.** | **<u>JURY TRIAL</u>** |
| **BUMBLE TRADING INC.,** | |
| **Defendant.** | |

<u>**DEFENDANT BUMBLE TRADING INC.'S MOTION TO DISMISS MATCH GROUP,
LLC'S FIRST AMENDED COMPLAINT**</u>

# Table of Contents

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. MATCH'S UTILITY PATENT CLAIMS SHOULD BE DISMISSED BECAUSE THE '811 AND '023 PATENTS ARE DIRECTED TO PATENT-INELIGIBLE SUBJECT MATTER .......................................................................................... 2

   A.  Factual Background ................................................................................. 2

      1.  The '811 Patent ........................................................................... 2

      2.  The '023 Patent ........................................................................... 3

   B.  Applicable Law ....................................................................................... 4

      1.  Abstract Ideas Are Not Eligible for Patent Protection.............................. 4

      2.  Patent Eligibility is Determined Using the Two-Step Test in *Alice* .......... 4

      3.  Rule 12(b)(6) Permits Dismissal................................................... 5

   C.  Legal Argument ...................................................................................... 6

      1.  The '811 Patent is Patent Ineligible ................................................ 6

         a.  *Alice* Step One – The '811 Patent is Directed to an Abstract Idea............................................................................... 6

         b.  *Alice* Step Two – The '811 Patent Lacks an Inventive Concept ...................................................................... 11

      2.  The '023 Patent is Patent Ineligible ............................................. 13

         a.  *Alice* Step One – The '023 Patent is Directed to an Abstract Idea............................................................................. 13

         b.  *Alice* Step Two – The '023 Patent Lacks an Inventive Concept ...................................................................... 16

III. MATCH'S TRADE SECRET CLAIM SHOULD BE DISMISSED AND PARAGRAPHS 201-208 OF THE FIRST AMENDED COMPLAINT SHOULD BE STRICKEN.......................................................................................... 17

   A.  Factual Background ............................................................................... 17

   B.  Applicable Law ..................................................................................... 18

   C.  Argument .............................................................................................. 19

      1.  The "Unimplemented Features" of Tinder's Public "Undo" Function are Not Trade Secrets.......................................................... 19

      2.  Match's Trade Secret Claim is Time-Barred ................................. 20

      3.  Paragraphs 201-208 Should be Stricken as Immaterial and Impertinent ................................................................................ 20

**Table of Contents**
(continued)

**Page**

IV.   CONCLUSION .................................................................................................... 20

**Table of Authorities**

Page

**CASES**

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*,
   728 F.3d 1336 (Fed. Cir. 2013)................................................................................... 11

*Affinity Labs of Texas LLC v. Amazon.com Inc.*,
   Case No. 6:15-cv-0029-WSS-JCM, 2015 WL 3757497 (W.D. Tex. June 12, 2015) ............... 6

*Affinity Labs of Texas, LLC v. DIRECTV LLC*,
   838 F.3d 1253 (Fed. Cir. 2016)............................................................................. 10, 12

*Alice Corp. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014)................................................................................... passim

*Apple Inc. v. Ameranth, Inc.*,
   842 F.3d 1229 (Fed. Cir. 2016)............................................................................. 5, 14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................. 6

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
   133 S. Ct. 2107 (2013)......................................................................................... 4

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)................................................................................. 5

*Bilski v. Kappos*,
   561 U.S. 593 (Fed. Cir. 2010)............................................................................... 4, 5

*BSG Tech LLC v. BuySeasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018)............................................................................... 16

*Cleveland Clinic Found. v. True Health Diags.*,
   859 F.3d 1352 (Fed. Cir. 2017)................................................................................. 5

*Content Extraction v. Wells Fargo Bank, et al.*,
   776 F.3d 1343 (Fed. Cir. 2014)............................................................................... 11

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011)................................................................................. 4

*Doe v. Robertson*,
   751 F.3d 383 (5th Cir. 2014)................................................................................... 6

*Educ. Mgmt. Servs., LLC v. Tracey*,
   102 F. Supp. 3d 906 (W.D. Tex. 2015)........................................................................ 18

*Fairwarning IP, LLC v. Iatric Sys., Inc.*,
   839 F.3d. 1089 (Fed. Cir. 2016)................................................................ 3, 4, 9, 12

*Guidry v. Bank of LaPlace*,
   954 F.2d 278 (5th Cir. 1992) ..................................................................... 6

*I/P Engine, Inc. v. AOL, Inc.*,
   576 F. App'x 982 (Fed. Cir. 2014) ............................................................ 6

*In re TLI Commc'ns LLC Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016)................................................................... 16

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
   792 F.3d 1363, 1368 (Fed. Cir. 2015)……………………………………12

*Intellectual Ventures I, LLC v. Capital One Financial Corp.*,
   850 F.3d 1332 (Fed. Cir. 2017).................................................................. 11

*Intellectual Ventures I, LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016).................................................................. 7

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
   876 F.3d 1372 (Fed. Cir. 2017).................................................................. 10

*Jedi Technologies, Inc. v. Spark Networks, Inc.*,
   Case No. 1:16-cv-1055, 2017 WL 3315279 (D. Del. Aug. 3, 2013)......................... 6

*Jones v. Alcoa, Inc.*,
   339 F.3d 359 (5th Cir. 2003) ..................................................................... 19

*Lumen View Tech. LLC v. Findthebest.com*,
   984 F. Supp. 2d 189 (S.D.N.Y. 2013)......................................................... 7

*Maxon, LLC v. Funai Corp., Inc.*,
   Case No. 2017-2139, 2018 WL 1719101 (Fed. Cir. Apr. 9, 2018) ......................... 12

*Mayo Collaborative Servs. v. Prometheus Labs.*,
   132 S. Ct. 1289 (2012)............................................................................ 5, 15

*Morales v. Square, Inc.*,
   75 F. Supp. 3d 716 (W.D. Tex. 2014).......................................................... 6

*Mortgage Grader, Inc. v. First Choice Loan Services Inc.*,
   811 F.3d 1314 (Fed. Cir. 2016).................................................................. 10

*Move, Inc. v. Real Estate All. Ltd.*,
   Case No. 2017-1463, 2018 WL 656377 (Fed. Cir. Feb. 1, 2018)......................... 14

*MySpace, Inc. v. Graphon Corp.*,
    672 F.3d 1250 (Fed. Cir. 2012).................................................................................. 13, 17

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015)........................................................................................ 6

*Planet Bingo, LLC v. VKGS LLC*,
    576 F. App'x 1005 (Fed. Cir. 2014)…………………………………………………14, 16

*Pyramid Instrumentation & Electric Corp. v. Hebert*,
    Case No. 17-cv-1358, 2018 WL 1789325 (E.D. Tex. Mar. 14, 2018) .................................... 19

*RecogniCorp v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017)...................................................................................... 11

*SAP Am., Inc. v. Investpic, LLC*,
    Case No. 2017-2081, 2018 WL 2207254 (Fed. Cir. May 15, 2018) ........................................ 15

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) .......................................................................................... 6

*Symantec Corp. v. Zscaler, Inc.*,
    Case No. 17-cv-04426-JST, 2018 WL 3537201 (N.D. Cal. Jul. 23, 2018) ...................... 13, 17

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016)........................................................................................ 5

*Taylor v. Books A Million, Inc.*,
    296 F.3d 376 (5th Cir. 2002) ........................................................................................... 6

*U.S. ex. Rel. Lam v. Tenet Healthcare Corp.*,
    481 F. Supp. 2d 673 (W.D. Tex. 2006)............................................................................ 18

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014).......................................................................................... 14

*Versata Dev. Grp. v. SAP Am.*,
    793 F.3d 1306 (Fed. Cir. 2015)........................................................................................ 11

*Visual Memory LLC v. NVIDIA Corp.*,
    867 F.3d 1253 (Fed. Cir. 2017)........................................................................................ 10

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
    887 F.3d 1376 (Fed. Cir. 2018)........................................................................................ 14

*Walker Digital, LLC v. Google, Inc.*,
    66 F. Supp. 3d 501 (D. Del. 2014).................................................................................... 7

*Wellogix, Inc. v. Accenture, LLP*,
  716 F.3d 867 (5th Cir. 2013) ................................................................. 18

## STATUTES

18 U.S.C. § 1836(b)(1) ............................................................................ 18

18 U.S.C. § 1836(d) ........................................................................... 19, 20

18 U.S.C. § 1839 ..................................................................................... 19

35 U.S.C. § 101 ..................................................................................... 4, 16

Tex. Civ. Prac. & Rem. Code § 134A.002 ............................................... 18

Tex. Civ. Prac. & Rem. Code § 134A.002(6)(B) ...................................... 19

Tex. Civ. Prac. Rem. Code § 16.010 .................................................. 19, 20

## I.    INTRODUCTION

Over the last year, Match Group, LLC ("Match") has made multiple attempts to acquire Bumble Trading Inc. ("Bumble") for below fair value.  Having failed in its attempts to acquire Bumble, and facing competition from other interested buyers willing to pay more, Match filed this lawsuit on March 16, 2018 without warning.  Match alleges a litany of meritless intellectual property claims, including 1) utility patent infringement, 2) design patent infringement, 3) trademark infringement under 15 U.S.C. § 1114(a), 4) trademark infringement under 15 U.S.C. § 1125(a), 5) trade dress infringement, 6) trademark dilution, 7) Texas unfair competition, and 8) trade secret misappropriation.  Although each of these claims lack merit, Match's utility patent infringement and trade secret misappropriation allegations can be dismissed on their face.

This motion seeks to narrow the litigation as the claims of U.S. Patent Nos. 9,733,811 ("the '811 patent") and U.S. Patent No. 9,959,023 ("the '023 patent") are patent ineligible under 35 U.S.C. § 101 because they are directed to the abstract concepts of matchmaking and picking certain cards out of a stack.  In particular, the asserted claims of the '811 patent attempt to monopolize the fundamental economic practice of connecting people with potential matches based on mutual attraction or not connecting them in the absence of mutual attraction.  As claimed in the '811 patent, this longstanding business practice is carried out on the Internet by generic computers including handheld electronic devices.  The '023 patent merely claims performing the abstract concept of looking through a stack of dating match profile cards one at a time and expressing interest in a match by moving a card to the right on a generic processing device.  The claims do not address or solve any unique technological problem to overcome their abstract nature.  Accordingly, under the Supreme Court's framework established in *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the '811 and '023 patents are invalid for lack of patentable subject matter.

Match's trade secret misappropriation claim relates to a purported mock-up of an "undo"

feature that Tinder declined to implement.  Specifically, Match claims that its "undo" feature allowed "all users three 'undos'" that would be replenished after a "certain period of time" or by "promoting that app via social media" (hereinafter "the Unimplemented Features").  (First Amended Complaint (D.I. 10) (hereinafter "FAC") at ¶ 191.)  Match has not and cannot establish that its "undo" feature is a trade secret.  Match admits that Tinder publicly implemented its own "rewind" or "undo" functionality before Bumble released its backtrack feature.  (*See* FAC at ¶ 194.)  With respect to the "Unimplemented Features," Match cannot plausibly plead that this information derives independent economic value from "not being generally known" to the public—a prerequisite to trade secret status.  In other words, the replenishment of a feature or access to a feature in connection with a requested user action such as social media promotion is a generic marketing practice that has never been used by Match.  In addition, Match's trade secret claim is time-barred because Match filed its original complaint more than three years after Bumble released its "backtrack" feature.  Match fails to state a claim for trade secret misappropriation and accordingly Match's Ninth Cause of Action should be dismissed.[1]

## II.   MATCH'S UTILITY PATENT CLAIMS SHOULD BE DISMISSED BECAUSE THE '811 AND '023 PATENTS ARE DIRECTED TO PATENT-INELIGIBLE SUBJECT MATTER

### A.   Factual Background

#### 1.   The '811 Patent

The '811 patent includes three independent claims, each of which is reproduced in Match's FAC.  (FAC at ¶¶ 74-76.)  Claim 1 is a method claim; claim 4 is directed to "a non-transitory computer readable medium"; and claim 7 is directed to a "system for profile matching."  (*See id.*)

---

[1] To the extent Match's trade secret claim is not dismissed in its entirety, Paragraphs 201-208 should be stricken under Rule 12(f) because these allegations are related to a photo messaging feature and are immaterial and impertinent to Match's trade secret claim which is directed solely to the "undo" feature.

Each of these claims is remarkably similar in scope.  In fact, although Match recites each of these claims separately in its FAC, the infringement allegations associated with each claim are identical. (*See id.* at ¶ 77 ("Bumble's servers practice all of the limitations of these claims, as set forth in the example below."); *see also id.* at ¶¶ 77-90.)   Match's analysis focuses on Bumble's alleged performance of the claimed method steps.  (*See id.* at ¶¶ 77-90.)  Claim 1 of the '811 patent is reproduced in a chart at pages 7-9, below.  Although not expressly drafted as "method" claims, the limitations of claim 4 and claim 7 mirror the method steps of claim 1 and provide little additional substance.  Where, as here, system or non-transitory computer-readable medium claims "merely graft generic computer components onto otherwise-ineligible method claims," "the conclusion of ineligibility is inescapable." *Fairwarning IP, LLC v. Iatric Sys., Inc.,* 839 F.3d 1089, 1096 (Fed. Cir. 2016) (citation omitted).  Accordingly, claim 1 is representative of claims 4 and 7.  (*Compare* '811 patent at 24:51-25:56 *with id.* at 26:7-27:11 and 27:28-28:42.)[2]

### 2.    The '023 Patent

The '023 patent is a continuation of the '811 patent.  Like the '811 patent, the '023 patent relates to organizing online dating, but its claims focus on a user interface for online dating.  The '023 patent also includes three nearly identical independent claims.  Claim 3 is a system claim reproduced in the chart on pages 14-15, below.  Claim 1 is a "method claim of navigating a user interface" and claim 5 is a "non-transitory computer readable medium" claim.  Both claims recite

---

[2] Just as independent claims 1, 4, and 7 mirror each other, dependent claims 2, 5, and 8 are substantially the same.  Claim 2 recites generally causing a display of a notification "that a match exists."  Claims 5 and 8 recite "instructions configured to" and a "processor further operable to" perform essentially the same step recited in claim 2.  ('811 patent at 25:56-66, 27:12-21, 28:43-51.)  Accordingly, claim 2 is representative of claims 5 and 8.  (*See id.*)  Dependent claims 3, 6, and 9 all limit the set of potential matches that may be presented to the first user based on the geographical locations of the matches.  (*See id.* at 26:1-6, 27:22-27, 28:53-58.)  Claim 3, therefore, is representative of claims 6 and 9.  (*See id.*)

the same substance as claim 3.  ('023 patent at 24:63-25:29, 25:37-26:10, 26:18-53.)[3]  Accordingly,

claim 3 is representative of claims 1 and 5.

### B.      Applicable Law

#### 1.      Abstract Ideas Are Not Eligible for Patent Protection

Patent eligibility is defined by § 101 of the Patent Act, which provides:

> Whoever invents or discovers any new and useful process, machine,
> manufacture, or composition of matter, or any new and useful
> improvement thereof, may obtain a patent therefor, subject to the
> conditions and requirements of this title.

35 U.S.C. § 101.  In construing the scope of this section, the Supreme Court has recognized certain

firm exceptions.  "Laws of nature, natural phenomena, and abstract ideas are not patentable."

*Alice*, 134 S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.

Ct. 2107, 2116 (2013)).  The abstract ideas exception includes mental processes and traditional

ways of analyzing information, *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371

(Fed. Cir. 2011); *Fairwarning IP,* 839 F.3d. at 1097, "[f]undamental economic practice[s] long

prevalent in our system of commerce," "longstanding commercial practice[s]," and "method[s] of

organizing human activity," *Alice*, 134 S. Ct. at 2356.

#### 2.      Patent Eligibility is Determined Using the Two-Step Test in *Alice*

Following *Alice*, courts apply a two-step framework to decide whether claims are patent

eligible.  The first step is to "determine whether the claims at issue are directed to . . . patent-

ineligible concepts," such as abstract ideas.  *Alice*, 134 S. Ct. at 2355.  "The § 101 inquiry must

focus on the language of the Asserted Claims themselves."  *Synopsys, Inc. v. Mentor Graphics*

---

[3] The '023 patent's three dependent claims 2, 4, and 6 are also substantively the same.  Each claims
"present[ing] user interface controls such that all user interface controls configured to cause
another item of information of the plurality of items of information to be displayed are associated
with performing an action on the first item of information."  ('023 patent at 25:32-36, 26:12-16,
26:56-60.)  Claim 4 is representative of claims 2 and 6.

*Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) (internal citations omitted).  For computer-based claims, this first step asks whether the claims focus on a "specific means or method that improves the relevant technology," which may pass muster under § 101, or on a "result or effect that itself is the abstract idea and merely invoke generic processes and machinery," which cannot.  *Apple Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (internal citations omitted).  If the claims are directed to an abstract idea, then the inquiry proceeds to a second step.  In step two, the court must consider the elements of the claim both individually and as an ordered combination to determine whether the claims contain an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application."  *Alice*, 134 S. Ct. at 2355.  To survive the second step, a claim must include "additional features" ensuring that the claim does "more than simply stat[e] the abstract idea while adding the words apply it."  *Id.* at 2357 (quotations, citation and brackets omitted).  A claim that adds only "well-understood, routine, conventional activity" does not constitute an "inventive concept."  *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1294 (2012); *see also Alice*, 134 S. Ct. at 2358 ("[M]ere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.").

### 3.      Rule 12(b)(6) Permits Dismissal

Patent eligibility under § 101 is ultimately a question of law.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).  It is a "threshold" issue considered before other conditions of patentability.  *See Bilski v. Kappos*, 561 U.S. 593, 602 (Fed. Cir. 2010).  Accordingly, the Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced."  *Cleveland Clinic Found. v. True Health Diags.*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).[4]  Indeed, early resolution serves to "spare both

---

[4] Patent ineligibility at the pleading stage may be determined by examining the face of the patent. *See Alice*, 134 S. Ct. at 2356; *Affinity Labs of Texas LLC v. Amazon.com Inc.*, Case No. 6:15-cv-

litigants and courts years of needless litigation." *I/P Engine, Inc. v. AOL, Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014) (Mayer, J., concurring).

**C.     Legal Argument**

> **1.     The '811 Patent is Patent Ineligible**

>> **a.     *Alice* Step One – The '811 Patent is Directed to an Abstract Idea**

The asserted claims of the '811 patent are directed to an abstract idea.  Each claim of the '811 patent distilled to its core relates to the business practice of matchmaking: connecting people with potential matches based on their mutual attraction to each other or not connecting them in the absence of mutual attraction.  Yet long-standing, well-known methods and business practices involving the mere organization of human activity are not patentable.  *See Alice*, 134 S. Ct. at 2356 (mitigating settlement risk); *Bilski*, 561 U.S. at 611-12 (hedging); *Morales v. Square, Inc.,* 75 F. Supp. 3d 716, 724-26 (W.D. Tex. 2014) ("a claim is directed to an abstract idea when it describes a fundamental concept or longstanding practice.").

Courts have consistently found that matchmaking is the type of organizational practice that typically falls within the proscription of § 101.[5]  Indeed, humans performed the abstract idea of

---

0029-WSS-JCM, 2015 WL 3757497, at *5 (W.D. Tex. June 12, 2015); *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) (explaining that the Court should consider "the face of the complaint, materials incorporated into the complaint by reference, and matters of judicial notice.").  At the motion to dismiss stage all well-pleaded facts are accepted as true and viewed in the light most favorable to plaintiff.  However, "[t]o avoid dismissal, the pleadings must show 'specific facts, not mere conclusory allegations.'"  *Affinity*, 2015 WL 3757497, at *3 (quoting *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir. 1992)).  The Court is not obligated to accept as true "conclusory allegations or legal conclusions masquerading as factual conclusions," *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002), "'naked assertions devoid of further factual enhancement,'" *Doe v. Robertson*, 751 F.3d 383, 387 (5th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), or "unwarranted deductions," *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal citation omitted).

[5] *Jedi Technologies, Inc. v. Spark Networks, Inc.*, Case No. 1:16-cv-1055, 2017 WL 3315279, at *20-21 (D. Del. Aug. 3, 2013) (invalidating patent directed to "matching people based on criteria such as personality traits or location" because "[t]he concept of matchmaking is certainly not novel

matchmaking claimed in the '811 patent long before the advent of computers—an indication that the claims are directed to an abstract idea.  *See Intellectual Ventures I, LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) ("[W]ith the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with a pen and paper.").  As shown below, a traditional human matchmaker could perform the essence of each of the claimed elements of Claim 1 of the '811 patent:

| Claim 1 | Matchmaker |
|---|---|
| A computer implemented method of profile matching, comprising: | A matchmaker |
| electronically receiving a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform; | A matchmaker has numerous clients and collects pictures and other information about each client from various social media sites. |
| electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device; | A matchmaker receives a request for matching from Client A. |
| determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request; | The matchmaker looks at other clients and determines a set of potential matches for Client A. |
| causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user; | The matchmaker meets with Client A and presents the client with a stack of pictures of potential matches.  The matchmaker first shows a picture of a first potential match to Client A with a few details about the first potential match. |
| determining that the first user expressed a positive | The matchmaker instructs Client A to put |

and has been performed by humans for a very long time" and matchmaking is "the type of concept that falls within the proscriptions of § 101"); *Walker Digital, LLC v. Google, Inc.*, 66 F. Supp. 3d 501, 508-09 (D. Del. 2014) (claims held abstract, finding "none of these [claim] limitations adds anything meaningful to the basic concept of controlled exchange of information about people as historically practiced by matchmakers and headhunters . . ."); *Lumen View Tech. LLC v. Findthebest.com*, 984 F. Supp. 2d 189, 198, 200 (S.D.N.Y. 2013) (invalidating patent directed to the abstract idea of "bilateral and multilateral matchmaking using a computer in the context of a financial transaction or an enterprise" because matchmakers have received preference data from potential matches "for millennia").

| Claim 1 | Matchmaker |
|---|---|
| preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface; | the picture of the first potential match in a separate pile on the right if interested in the first potential match.  Client A is interested in the first potential match so the client moves the picture to the pile on the right. |
| in response to determining that the first user expressed the positive preference indication regarding the first potential match, automatically causing the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match; | When Client A moves the picture of the first potential match to the separate pile, Client A sees the picture of a second potential match that had been underneath the picture of the first potential match. |
| determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match; | Having learned that Client A is interested in the first potential match, the matchmaker reaches out to the first potential match and shares information regarding Client A with the first potential match.  The first potential match expresses to the matchmaker an interest in Client A. |
| determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user; | The matchmaker decides to provide Client A and the first potential match with each other's contact information because mutual interest is confirmed. |
| in response to determining to enable initial communication between the first user and the second user, causing the graphical user interface to display to the first user the graphical representation of the first potential match; | The matchmaker provides Client A with a card showing the first potential match to take home so the client can keep track of potential matches who expressed an interest. |
| determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user; | The matchmaker instructs Client A to put the picture of a third potential match in a separate pile on the left if client is not interested in the third potential match. Client A is not interested in the third potential match so the picture is moved to the pile on the left. |
| preventing communication between the first user and the third user after determining that the first user has expressed the negative preference indication | The matchmaker does not provide Client A and the third potential match with each other's contact information because Client |

| Claim 1 | Matchmaker |
|---|---|
| regarding the third user; | A was not interested in the third potential match. |
| determining that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and | The matchmaker determines that Client A is interested in the fourth potential match because Client A moves the picture of the fourth potential match to the pile on the right. |
| preventing communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user. | Having learned that Client A is interested in the fourth potential match, the matchmaker reaches out to the fourth potential match and shares information regarding Client A with the fourth potential match.  The fourth potential match expresses to the matchmaker a lack of interest in Client A, so the matchmaker does not provide Client A and the fourth potential match with each other's contact information. |

Notably, the specification of the '811 patent expressly characterizes the patent's purported inventions as a computerization of steps performed by a human matchmaker, such as the presentation of paper cards to clients.  For example, the patent describes embodiments that use a graphical representation of each match in the form of a "'card' representing the suggested user." ('811 patent at 21:12-15.)  "A set of suggested users may be displayed as 'stack of cards.'"  (*Id.* at 21:15-16.)  This underscores the non-technical and abstract nature of the claims.

The dependent claims are similarly abstract.  (*See* '811 patent at claims 2, 5 and 8); *see also Fairwarning*, 839 F.3d. at 1096.  Claims 2, 5, and 8 are directed to the abstract idea of notifying a person of a match based on mutual attraction, which is something traditional human matchmakers have done for years.  Claims 3, 6, and 9 are directed to the abstract idea of providing potential matches within a set geographic distance from the user.  Claims 3, 6, and 9 are entirely

abstract, and could be performed by a matchmaker who provides a client with matches located within a 10-mile radius of the client's home based on the client's recorded preference.

In *Mortgage Grader, Inc. v. First Choice Loan Services Inc.*, the Federal Circuit explained that "meritorious" §101 defenses after *Alice* are "most likely to occur with respect to patent claims that involve implementations of economic arrangements using generic computer technology," as the claims do here with respect to the standard economic practice of matchmaking. 811 F.3d 1314, 1322 (Fed. Cir. 2016). Like in *Mortgage Grader*, the '811 patent's claims are directed to an "economic arrangement" implemented using "generic computer technology," as further discussed *infra*. "These issues were significant, if not determinative, of the Court's holding in *Alice*." *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1379 (Fed. Cir. 2017). As in *Inventor Holdings*, "the patent claims here are directed to a fundamental economic practice, which *Alice* made clear is, without more, outside the patent system." *Id.* The '811 patent's claims violate *Alice*'s clear proscription against attempting to monopolize fundamental economic arrangements.

The asserted claims of the '811 patent are directed to an abstract idea for the additional reason that they are not directed to a specific technological improvement to computer functionality. Indeed, the claims are not directed to technology at all—but rather a non-technical method of matchmaking implemented on a generic computer. (*See, e.g.*, '811 patent, claim 1 ("a computer implemented method of profile matching"), claim 7 ("a system for profile matching").) The claims focus on the abstract idea of matching individuals and allowing communication based on preference indications, and not improving the functionality of a computer.[6] Merely limiting the

---

[6] *See Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017); *Affinity Labs of Texas, LLC v. DIRECTV LLC*, 838 F.3d 1253, 1259-60, 1263 (Fed. Cir. 2016) (finding patent directed to an abstract idea where specification lacked technical detail regarding the recited functions); *Elec. Power Grp.*, 830 F.3d at 1354 (claims abstract where "the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that

'811 patent's alleged invention to a particular technological environment does "not make [its] abstract concept any less abstract under step one." *Intellectual Ventures I, LLC v. Capital One Financial Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017).

Accordingly, the claims of the '811 patent are clearly directed to the abstract idea of matchmaking and thus fail part 1 of the *Alice* test.

> **b.** *Alice* **Step Two – The '811 Patent Lacks an Inventive Concept**

The second step in the *Alice* analysis requires the Court to determine whether the claims "contain[] an inventive concept sufficient to transform the claimed abstract idea into a patent eligible application." *Alice*, 134 S. Ct. at 2357 (internal quotations and citation omitted). "To save a patent at step two, an inventive concept must be evident in the claims." *RecogniCorp v. Nintendo Co.*, 855 F.3d 1322, 1326-27 (Fed. Cir. 2017); *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013). Nothing in the asserted claims of the '811 patent saves the claims under *Alice* step two.

Here, the asserted claims do not recite any inventive concept, but instead merely recite the performance of the abstract idea using previously invented generic computer, smartphone, and internet features such as "a computer," "online-dating profiles, "a social networking platform," an "electronic device," "a graphical user interface," "swiping," "a non-transitory computer readable medium," "a processor," and "an interface." ('811 patent at claims 1, 4, and 7.) These are nothing more than generic descriptions of computer components and functions that do not rise to the level of an inventive concept, either individually or as an ordered combination. *See Content Extraction v. Wells Fargo Bank, et al.*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (quoting *Alice*, 134 S. Ct. at

---

use computers as tools"); *Versata Dev. Grp. v. SAP Am.*, 793 F.3d 1306, 1335 (Fed. Cir. 2015) (invalidating claims where "the claims are not directed to improving computer performance and do not recite any such benefit").

2357 (a computer in a computer-implemented invention "must involve more than performance of 'well-understood, routine [and] conventional activities previously known to the industry'" to be meaningful)). Courts have repeatedly rejected as non-inventive claims that recite similar generic components.[7] Like in these cases, none of the generic computer components and functions recited in the '811 patent's claims transforms the claimed abstract idea into "something more." *See Alice*, 134 S. Ct. at 2354.

The specification of the '811 patent confirms that such features are generic and fail to provide an inventive concept. For example, the specification describes the "social networking platform" generically as "a service which stores profiles of its users." ('811 patent at 16:7-8.) Similarly, the "interface" (or graphical user interface) is shown in the specification as a generic box. ('811 patent at Fig. 1B at box 16.) According to the specification, the graphical use interface "may be provided in conjunction with" numerous electronic devices, such as "a cellular telephone, an electronic notebook, a laptop, a personal digital assistant (PDA) or any other suitable device (wireless or otherwise...)." (*Id.* at 3:64-4:3.) The interface itself "may [] comprise any suitable interface for a human user such as a video camera, a microphone, a keyboard, a mouse, or any other appropriate equipment according to particular configurations and arrangements" (*id.* at 4:4-7) or additionally may comprise "a touch screen interface operable to detect and receive touch input such as a tap or a swiping gesture." (*Id.* at 19:35-38.) Such language underscores the lack

---

[7] *E.g.*, *Alice*, 134 S. Ct. at 2357-60 (rejecting argument that recitation of a "data processing system," "communications controller," or "data storage unit" conferred patentability); *Fairwarning*, 839 F.3d at 1096 ("non-transitory computer-readable medium" and "microprocessor"); *Affinity Labs of Texas, LLC*, 838 F.3d at 1262 ("graphical user interface"); *Mortg. Grader*, 811 F.3d at 1324-25 ("interface," "network," and "database"); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) ("*e.g.*, a database, a user profile . . . and a communication medium"); *Maxon, LLC v. Funai Corp., Inc.*, Case No. 2017-2139, 2018 WL 1719101, at *2 (Fed. Cir. Apr. 9, 2018) ("processor" and "computer-readable medium").

of technological invention within the patent's claims.

The FAC emphasizes the use of "swiping" in the context of online dating, a concept that is not inventive.  Match concedes that "the general gesture of swiping may have been known in the prior art."  (FAC at ¶ 103; D.I. 1 at ¶ 101.)  Indeed, the '811 patent confirms the well-known, conventional nature of "swiping" as one way in which a user can interact with a computer system.  (*See* '811 patent at 19:35-38, 21:59-22:7, 22:37-39.)  As such, the specification contains no detailed technical description of "swiping" or how to implement it.  The Federal Circuit has explained that "[a]n inventor is entitled to claim in a patent what he has invented, but no more." *MySpace, Inc. v. Graphon Corp.*, 672 F.3d 1250, 1256 (Fed. Cir. 2012).  If something is not detailed in the specification, it cannot be something that the patentee invented and cannot serve as an inventive concept.  *See id.*; *Alice*, 134 S. Ct. at 2357-58; *see also Symantec Corp. v. Zscaler, Inc.*, Case No. 17-cv-04426-JST, 2018 WL 3537201, at *3 (N.D. Cal. Jul. 23, 2018) (collecting cases finding patents ineligible as a matter of law where the specification is silent on the alleged inventive concept).  Because the specification of the '811 patent discloses no algorithm, design, or means of implementing "swiping," it must necessarily involve only conventional and routine steps of the type that cannot confer patent eligibility.

In sum, the elements of the claims of the '811 patent do not include any inventive concept that would render any of the claims patent eligible.

### 2.      The '023 Patent is Patent Ineligible

#### a.      *Alice* Step One – The '023 Patent is Directed to an Abstract Idea

The claims of the '023 patent are directed to an abstract idea.  Like the '811 patent, the '023 patent relates to matchmaking, and is specifically directed to the abstract idea of looking through a stack of dating match profile cards one at a time and expressing interest in a match by moving a card to the right.  *See Elec. Power Grp.*, 830 F.3d at 1353.  The '023 patent claims a

method of organizing human activity and is similar to other abstract ideas found to be patent ineligible.[8]  The claims involve generic functions of automatically presenting/removing graphical images, "detecting a gesture," and "storing a preference indication."  (*See generally* '023 at 24:63-26:60.)  "[N]ot only can these steps be 'carried out in existing computers long in use,' but they can also" be performed by a traditional human matchmaker working with a client. *See Planet Bingo*, 576 F. App'x at 1008.  As shown below, a traditional human matchmaker could perform the essence of each of the claimed elements of Claim 3 of the '023 patent:

| Claim 3 | Matchmaker and Client |
|---|---|
| A system, comprising: | A matchmaker |
| an interface operable to:<br><br>present a graphical representation of a first item of information of a plurality of items of information, the first item of information comprising a graphical representation of a first online dating profile associated with a first user, wherein the interface is further operable to present the graphical representation of the first item of information of the plurality of items of information as a first card of a stack of cards; | A matchmaker produces a stack of cards containing pictures and information about potential matches.<br><br>The matchmaker stacks the cards one on top of each other, so the client can only see the first profile card. |
| a processor coupled to the interface and operable to:<br><br>detect a gesture associated with the graphical representation of the first item of information, the gesture corresponding to a positive preference indication associated with the first item of information, the positive preference indication associated with the first item of information comprising an expression of | The matchmaker tells the client to take the card of any match he is interested in and place it in a separate pile on the right. |

---

[8] *See, e.g.*, *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1384-86 (Fed. Cir. 2018) (voting, verifying the vote, and submitting the vote for tabulation); *Move, Inc. v. Real Estate All. Ltd.*, Case No. 2017-1463, 2018 WL 656377, at *3-4 (Fed. Cir. Feb. 1, 2018) ("collecting and organizing information about available real estate properties and displaying this information on a digital map that can be manipulated by the user.") (internal citation omitted); *Apple Inc.*, 842 F.3d at 1240-45 (generating menus on a computer); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (using advertising as currency); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007-09 (Fed. Cir. 2014) (organizing a game of bingo).

| Claim 3 | Matchmaker and Client |
|---------|----------------------|
| approval for the first user associated with the first online dating profile, wherein the processor is further operable to detect a right swiping direction associated with the gesture; | |
| store the positive preference indication associated with the first item of information in response to detecting the gesture; and | The matchmaker notes in the client's file which cards the client places in the separate pile on the right. |
| the interface further operable to:<br><br>automatically present a graphical representation of a second item of information of the plurality of items of information in response to the processor detecting the gesture, the second item of information comprising a graphical representation of a second online dating profile associated with a second user; and | When the client moves the first card to the pile on the right, the client can see the second card in the original stack of match profile cards. |
| automatically remove the graphical representation of the first item of information in response to detecting the gesture. | When the client moves the card to the pile on the right, it is removed from the original stack of match profile cards. |

The dependent claims are similarly abstract. Claims 2, 4, and 6 are directed to the abstract idea of claim 3 in combination with the abstract concept of preventing a user from viewing successive cards in a stack before performing an action on the top card. Permitting someone to view only the top card in a deck is a commonly understood exercise. And looking through cards one at a time and picking cards based on match preferences is easily performed by humans, as explained above. Claims 2, 4, and 6 are limited to a narrow aspect of this abstract idea, which does not alter the patent-eligibility outcome. *See SAP Am., Inc. v. Investpic, LLC*, No. 2017-2081, 2018 WL 2207254, at *5 (Fed. Cir. May 15, 2018) (citing, *inter alia*, *Mayo*, 566 U.S. at 88-89).

In addition, the claims of the '023 patent are directed to performing human activities (e.g. looking at and moving cards based on preferences) on a computer, not a solution to a technological

15

problem. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612-13 (Fed. Cir. 2016). Underscoring the non-technical nature of the claims, the '023 patent "do[es] not claim a particular way of programing or designing the software" to perform the recited activities, but merely claims, at a high-level, the online dating system itself. *See Apple*, 842 F.3d at 1241.

       **b.**    ***Alice* Step Two – The '023 Patent Lacks an Inventive Concept**

The claims of the '023 patent do not provide an inventive concept. Like the '811 patent, the claims instead merely recite the performance of the abstract idea using generic computer, smartphone, and internet features such as an "online-dating profile," "a graphical user interface," "swiping," "a non-transitory computer readable medium," "a processor," and "a user interface." ('023 patent at claims 1, 3, and 5.) As discussed with respect to the '811 patent, *supra* at 11-12, Courts have repeatedly held that such generic components do not provide an inventive concept. Similarly, the "presenting," "detecting," "storing," and "removing" recited in the claims are generic computer functions. *See Planet Bingo*, 576 F. App'x at 1008. Where, as here, a "patent's recitation of a computer amounts to a mere instruction to 'implemen[t]' an abstract idea 'on . . . a computer,' . . . that addition cannot impart patent eligibility." *Alice*, 134 S. Ct. at 2358.

Displaying user profiles as a deck of cards cannot supply an inventive concept because this itself is abstract. *See BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290-1291 (Fed. Cir. 2018). Humans have been using cards for hundreds, if not thousands of years. Merely depicting well-known, non-technical objects on a generic computer is not inventive. Match's design patent asserted in this case, U.S. Patent No. 798,314, which claims a graphical user interface displayed as a deck of cards, underscores the non-technical, non-functional nature of the "deck of cards" user interface. Using a deck of cards to display user profiles cannot be both decorative (non-functional) and supply an inventive concept for the '023 patent. *Cf.* 35 U.S.C. § 101 ("Whoever invents or discovers any new *and useful* process, machine, manufacture . . . may obtain a patent . . . .").

As discussed above with respect to the '811 patent, "swiping" in the '023 patent does not provide an inventive concept either. As conceded by Match and evident from the face of the '023 patent, swiping was a known method of interacting with a touchscreen. (FAC at ¶¶ 103, 127; D.I. 1 at ¶ 101; '023 patent at 19:45-48, 22:4-22:19, 22:49-52.) Neither the claims nor the specification of the '023 patent contain a technical description of "swiping" or how to implement "swiping," therefore it cannot serve as an inventive concept. *See Move*, 2018 WL 656377, *5 ("zoom" feature found to be nothing more than an instruction to apply an abstract idea using a computer where neither the claims, nor the specification provide any implementation details.); *MySpace*, 672 F.3d at 1256; *Symantec*, 2018 WL 3537201, at *3; *see also Alice*, 134 S. Ct. at 2357-58.

In sum, the elements of the claims of the '023 patent do not include an inventive concept and are therefore patent ineligible.

## III. MATCH'S TRADE SECRET CLAIM SHOULD BE DISMISSED AND PARAGRAPHS 201-208 OF THE FIRST AMENDED COMPLAINT SHOULD BE STRICKEN

### A. Factual Background

Match asserts trade secret misappropriation under the Federal Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secret Act ("TUTSA"). (FAC at p. 46.) Match alleges that Chris Gulczynski and Sara Mick "were involved in development for a potential "undo" function for the Tinder App." (*Id.* at ¶ 190.) Match further alleges that the Unimplemented Features (as defined in Section I above) were "discussed internally" at Tinder:

> The concept of the "undo," as discussed internally at Tinder, involved allowing all users three "undos." Once an "undo" was used, it would take a certain period of time for that "undo" to replenish. If the user did not want to wait that time period for the undo to replenish, the user could speed up the process by promoting that app via social media.

(*Id.* at ¶ 191.)[9]  Match is clear that it is not asserting that the "undo" feature itself is a trade secret.

Match pleads that it "announced its 'rewind' functionality before Bumble released its rewind

feature", but that "Tinder's 'rewind' feature was different" from the Unimplemented Features

because Tinder's rewind allowed only users with a paid subscription to utilize the undo

functionality.  (*See id.* at ¶¶ 194-195.)  Match points to Bumble's introduction of its backtrack

feature in March 2015 as the alleged trade secret misappropriation.  (*See id.* at ¶¶ 196-200, 209-

211.)  Although Match is silent on precisely when in March 2015 Bumble introduced its Backtrack

feature, a contemporaneous industry article posted on "Tech Crunch.com" shows that the industry

had notice of Bumble's backtrack feature at least as early as March 11, 2015.[10]  Importantly, this

article, to which the Court can take judicial notice, publicly discloses Bumble's implementation of

its backtrack functionality:  "Bumble users each have three free backtracks, which refill after three

hours.  If a user needs more than three backtracks, that user can share Bumble on Instagram,

Facebook or Twitter and automatically refill all three backtracks immediately."  *See* Exhibit 1.

### B.   Applicable Law

To state a claim for trade secret misappropriation under the DTSA a plaintiff must plead (1) a

trade secret, (2) misappropriation, and (3) use in interstate commerce.[11]  18 U.S.C. § 1836(b)(1).

---

[9] Although Match claims "promoting" Tinder "via social media" was "discussed internally" the "mock-up" of the undo idea shows "inviting friends for an instant undo" not social media promotion.  (*See* FAC at p. 47.)

[10]   *See*   https://techcrunch.com/2015/03/11/bumbles-new-backtrack-feature-lets-you-take-back-accidental-left-swipes/ attached hereto as Exhibit 1.  This Court may take judicial notice of the Tech Crunch article.  *See U.S. ex. Rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) ("Pursuant to Rule 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles.")

[11] To state a claim for relief under the TUTSA a plaintiff must plead similar elements, specifically that (1) a trade secret existed; (2) the defendant acquired the trade secret through improper means; and (3) the defendant disclosed the trade secret without plaintiff's consent.  Tex. Civ. Prac. & Rem. Code § 134A.002; *Educ. Mgmt. Servs., LLC v. Tracey*, 102 F. Supp. 3d 906, 914 (W.D. Tex. 2015) (citing *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 874 (5th Cir. 2013).

Under both federal and Texas law, information may qualify as a trade secret only if the information "derives independent economic value . . . from not being generally known" to others.  18 U.S.C. § 1839; Tex. Civ. Prac. & Rem. Code § 134A.002(6)(B).  A claim for trade secret misappropriation must be brought no later than three years after the misappropriation is "discovered or by the exercise of reasonable diligence should have been discovered."  18 U.S.C. § 1836(d); Tex. Civ. Prac. Rem. Code § 16.010.  "A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003).

### C.   Argument

#### 1.   The "Unimplemented Features" of Tinder's Public "Undo" Function are Not Trade Secrets

Match fails to state a claim for trade secret misappropriation under either the DTSA or the TUTSA because the "Unimplemented Features" it alleges were misappropriated are not, in fact, trade secrets.  Match's FAC contains no allegation that the unimplemented Tinder "mock-up" derived independent economic value from not being known.  (*See* FAC at ¶¶ 187-212.)  Match cannot cure this silence by amendment.  An "undo" feature that is *intended to be user-facing* and encourages users to promote an app via social media derives no independent economic value from not being known.  On the contrary, to the extent the Unimplemented Features have any independent economic value at all, *that value could only be derived from disclosing the Unimplemented Features to the public*.  *See Pyramid Instrumentation & Electric Corp. v. Hebert*, Case No. 17-cv-1358, 2018 WL 1789325, at *3-*4 (E.D. Tex. Mar. 14, 2018) (dismissing trade secret claim relating to alleged misappropriation of "quality assurance and quality control manuals" finding that Plaintiff failed to show that the manuals have independent economic value in "not being generally known.").  In other words, as long as Match kept the Unimplemented

Features secret, those features had no economic value and therefore, those features are not trade secrets.[12]  Match's trade secret misappropriation claims should be denied without leave to amend.

### 2. Match's Trade Secret Claim is Time-Barred

Even if Match had a plausible trade secret misappropriation claim with respect to the Unimplemented Features—which it does not—that claim is time-barred.  A company exercising reasonable diligence would be aware of industry media coverage on new features its competitor introduced.  Accordingly, at least as of March 11, 2015, when the Tech Crunch article was posted, Match should have discovered Bumble's alleged use of the Unimplemented Features if it was exercising reasonable diligence.  *See* 18 U.S.C. § 1836(d); Tex. Civ. Prac. Rem. Code § 16.010.  Because Match filed its initial complaint on March 16, 2018—more than three years later—Match's trade secret claim should be dismissed as time-barred.  *See id.*

### 3. Paragraphs 201-208 Should be Stricken as Immaterial and Impertinent

Under Rule 12(f), the Court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Match's trade secret misappropriation claim is explicitly limited to "Bumble's use of the backtrack/undo" feature.  (*See, e.g.*, FAC at ¶¶ 209, 211-212.)  Paragraphs 201-208 discuss an entirely unrelated picture-messaging feature and the events set forth in these paragraphs form no basis of Match's trade secret misappropriation claim.  *See id.*  Accordingly, these paragraphs should be stricken as immaterial and impertinent.

## IV. CONCLUSION

For the reasons stated above, Bumble respectfully requests that the Court grant its motion in its entirety and dismiss Match's patent infringement and trade secret misappropriation claims.

---

[12] Match's ultimate decision to abandon the Unimplemented Features and adopt a paid subscription model in connection with its "rewind" feature further demonstrates the Unimplemented Features' lack of independent economic value.

Dated: September 27, 2018                    Respectfully submitted,

                                             /s/ Joseph M. Drayton
                                             Joseph M. Drayton (*Pro Hac Vice*)
                                             NY Bar No. 2875318
                                             COOLEY LLP
                                             1114 Avenue of the Americas
                                             New York, NY  10036
                                             Tel.:  212-479-6000
                                             Fax:  212-479-6275
                                             jdrayton@cooley.com

                                             Rose S. Whelan (*Pro Hac Vice*)
                                             DC Bar No. 999367
                                             COOLEY LLP
                                             1299 Pennsylvania Ave., N.W.
                                             Suite 700
                                             Washington, DC 20004
                                             Tel.: 202-842-7800
                                             Fax: 202-842-7899
                                             rwhelan@cooley.com

                                             Deron R. Dacus
                                             Texas Bar No. 00790553
                                             THE DACUS FIRM, PC
                                             821 ESE Loop 323, Suite 430
                                             Tyler, TX 75701
                                             Tel.: 903-705-1117
                                             Fax. 903-581-2543
                                             ddacus@dacusfirm.com

                                             **ATTORNEYS FOR DEFENDANT BUMBLE
                                             TRADING INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record on September 27, 2018.

/s/ <i>Joseph M. Drayton</i>

Joseph M. Drayton
