# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **MATCH GROUP, LLC** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **No. 6:18-cv-00080-ADA-JCM** |
| **v.** | § | |
| | § | |
| **BUMBLE TRADING INC.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

## PLAINTIFF MATCH GROUP, LLC'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ........................................................................................................ 1

II.  THE ASSERTED UTILITY PATENTS RECITE PATENT-ELIGIBLE
     SUBJECT MATTER............................................................................................... 1

     A.  The Asserted '023 and '811 Patents Embody Tinder's Innovative
         Development. .................................................................................................. 2

     B.  The Court Applies the Two-Step *Alice* Process to Evaluate Subject
         Matter Eligibility on a Motion to Dismiss....................................................... 4

     C.  The '023 Patent's Claims Are Subject Matter Eligible. ................................. 5

         1.  The '023 Patent's Claims Are Directed to an Improved Matchmaking
             User Interface, Not an Abstract Idea........................................................... 5

         2.  Bumble Has Failed to Establish the Lack of an Inventive Concept. ....... 12

     D.  The '811 Patent's Claims Are Subject Matter Eligible. ............................... 15

         1.  The '811 Patent Claims Are Directed to an Improved Matchmaking
             User Interface, Not an Abstract Idea......................................................... 15

         2.  Bumble Fails to Establish the Lack of an Inventive Concept
             in the '811 Patent. .................................................................................... 17

     E.  Neither the '023 Patent Nor the '811 Patent Present Any Significant
         Preemption Concerns. .................................................................................... 17

III. THE COURT SHOULD DENY BUMBLE'S MOTION TO DISMISS
     MATCH'S TRADE SECRETS CLAIM............................................................... 17

     A.  Bumble Misappropriated a Trade Secret that Derived Economic Value
         from Being Secret........................................................................................... 18

     B.  Bumble Has Failed to Establish a Limitations Defense. ............................... 19

     C.  The Court Should Not Strike Allegations Regarding Bumble's Related
         Idea Theft. ..................................................................................................... 20

IV.  CONCLUSION ..................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*
 882 F.3d 1121 (Fed. Cir. 2018) ("*Aatrix I*") ................................................................. 4, 5, 13

*Aatrix Software, Inc. v. Green Shades Software, Inc.*
 890 F.3d 1354 (Fed. Cir. 2018) ("*Aatrix II*") ................................................................. 13, 14

*Alice Corp. v. CLS Bank International*
 573 U.S. __, 134 S. Ct. 2347 (2014) ................................................................................ 1, 4

*Apple, Inc. v. Ameranth, Inc.*
 842 F.3d 1229 (Fed. Cir. 2016)……………………………………………...………12

*Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.*
 306 F.2d 862 (5th Cir.1962) ............................................................................................... 20

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*
 827 F.3d 1341 (Fed. Cir. 2016)……………………………………………………………14

*Berkheimer v. HP Inc.*
 881 F.3d 1360 (Fed. Cir. 2018) ..................................................................................... 5, 9, 14

*Briskin v. Ernst & Ernst*
 589 F.2d 1363 (9th Cir. 1978) ............................................................................................ 20

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*
 880 F.3d 1356 (Fed. Cir. 2018) .................................................................................... passim

*Data Engines Techs. LLC v. Google LLC*
 2017-1135 (Fed. Cir. Oct. 9, 2018) ............................................................................... passim

*Dodson v. Hillcrest Sec.*
 95 F.3d 52 (5th Cir. 1996) (unpub.) ................................................................................... 19

*Enfish, LLC v. Microsoft Corp.*
 822 F.3d 1327 (Fed. Cir. 2016) ..................................................................................... 4, 5, 11

*Finjan, Inc. v. Blue Coat Sys., Inc.*
 879 F.3d 1299 (Fed. Cir. 2018) ........................................................................................... 12

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*
 342 F.3d 714 (7th Cir. 2003) ............................................................................................... 18

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*
 566 U.S. 66 (2012) ................................................................................................. 5

*McRO, Inc. v. Bandai Namco Games Am., Inc.*
 837 F.3d 1299 (Fed. Cir. 2016) .......................................................................... 10

*Move, Inc. v. Real Estate All. Ltd.*
 721 F. App'x 950 (Fed. Cir. 2018) ................................................................. 1, 15

*Phillips v. AWH Corp.*
 415 F.3d 1303 (Fed. Cir. 2005) .......................................................................... 12

*Pyramid Instrumentation & Electric Corp. v. Hebert*
 2018 WL 1789325 (W.D. La. Mar. 14, 2018) ...................................................... 19

*Teva Pharm. USA, Inc. v. Sebelius*
 595 F.3d 1303 (D.C. Cir. 2010) .......................................................................... 18

*Trading Techs. Int'l, Inc. v. CQG, Inc.*
 675 F. App'x 1001 (Fed. Cir. 2017).............................................................. passim

*United States v. Cent. Gulf Lines, Inc.*
 974 F.2d 621 (5th Cir. 1992)............................................................................... 19

*X2Y Attenuators, LLC v. Int'l Trade Comm'n*
 757 F.3d 1358 (Fed. Cir. 2014) ............................................................................ 3

**Other Authorities**

1 Roger M. Milgrim, Milgrim on Trade Secrets § 1.05[4] (2002) ............................... 18

# I.    INTRODUCTION

Tinder, a mobile and web-based online dating application owned by Plaintiff Match Group, LLC ("Match"), is one of the most popular applications in the world.  When released in 2012, the Tinder app revolutionized the world of online dating and created a cultural phenomenon.  Match Group has worked to protect the innovations embodied by its flagship application.

Bumble Trading Inc. ("Bumble") was founded by three former Tinder executives.  Rather than innovate, these executives released an app that has been described as "virtually identical" to Tinder.  Match filed this lawsuit because it should not have to continue to compete against its own ideas and inventions.

The Court should deny Bumble's motion.  The claims of the '023 and '811 Patents (attached as Exhibits A and B) are directed to an improved user interface, not an abstract idea.  Further, Match's trade-secret claim is based on Bumble's theft of a concept that had significant economic value and is not time-barred.  This case should proceed to discovery and to trial.[1]

# II.   THE ASSERTED UTILITY PATENTS RECITE PATENT-ELIGIBLE SUBJECT MATTER.

The claims of the '023 and '811 Patents reflect inventive insights from entrepreneurs developing a computer-based system and discovering the best way to implement that system.  Unlike the many "aspirational" software-based patents that courts have invalidated in the wake of the Supreme Court's *Alice* decision, *see Move, Inc. v. Real Estate All. Ltd.*, 721 F. App'x 950, 954 (Fed. Cir. 2018), these claims recite a specific physical and visual interface protocol that improves user experience in matchmaking apps, facilitates faster decision-making, and thereby

---

[1] Despite Bumble's claim, made in a retaliatory lawsuit it filed in Texas state court, that Match's entire case is "frivolous," Bumble's motion seeks dismissal of only three of Match's nine causes of action.  The lion's share of this case will remain regardless of the Court's decision here.

drives user engagement.  Ex. C, *Data Engines Techs. LLC v. Google LLC*, 2017-1135 (Fed. Cir. Oct. 9, 2018), Slip Op. at 13 (holding claims reciting "highly intuitive, user-friendly interface with familiar notebook tabs" non-abstract).  Indeed, far from seeking a patent on an aspiration, the inventors of these patents built their ideas into Tinder, which is now a multi-billion-dollar brand.  For the reasons described below, these claims recite eligible subject matter.

### A.     The Asserted '023 and '811 Patents Embody Tinder's Innovative Development.

Match.com, another brand owned by Match Group, pioneered online dating beginning in 1995.  In 2007, well before Tinder was conceived, three Match.com employees came up with new ideas related to matchmaking services.  In December 2007, Match.com filed a provisional application on these ideas, disclosing two primary innovations: (1) importing information from social networks into the system, e.g., to increase the ease of signing up for service; and (2) calculating a "score" for users based on various considerations and improving search results by taking those scores into account.  *See* Ex. D, 2007 Provisional at 32:23-25; 39:30-40:4.  The 2007 application also disclosed other improvements.  It described receiving "positive" and "negative" "preferences" concerning users and taking those "preferences" into account when showing search results, *see* Ex. D at 36:10-25 (describing algorithm considering whether "Match result entity has expressed a preference for the user); *id.* at 37:13-18 (describing removing entities for which user has expressed negatives preferences).  This application ultimately became U.S. Patent No. 8,566,327 (not asserted in this case).  *See* Ex. E, '327 Patent.

In 2012, Tinder was born.  With its double-blind mutual opt-in system, performed on a specific, draggable-card-based user interface, Tinder changed the online-dating world forever.  The Tinder app has been described as "famous," "brilliant," and "iconic."  FAC ¶¶ 28, 33, 45. After it was released, Tinder sought patent protection for these groundbreaking innovations.

Tinder is affiliated with Match.com.  Because the Tinder app used innovations from the provisional application, and because Match.com and Tinder were affiliates, Match prosecuted the Tinder innovations as a continuation-in-part ("CIP") of the Match.com application.  While claims of the CIP include innovations from the 2007 application, the claims are directed to new material.[2]  *See X2Y Attenuators, LLC v. Int'l Trade Comm'n*, 757 F.3d 1358, 1366 (Fed. Cir. 2014) ("[S]ome subject matter of a CIP application is necessarily different . . . .").

The CIP portions of the specification focus on improving prior art matchmaking systems in two relevant ways: (1) not allowing communication unless and until both sides have indicated a mutual positive preference; (2) a card-based interface characterized in part by a specific gesture, labeled in the patents as a "swipe."[3]  *See, e.g.*, '811 Patent at 22:57-60; *id.* at 21:54-22:22:1.  Exemplary embodiments are shown in Figs. 8 and 10:





---

[2] In fact, in prosecution, one of the inventors swore behind 2012 prior art.  This highlights that the asserted claims are directed to innovations disclosed in the new material.  Ex. F at 93-97.

[3] Because Tinder pioneered the use of this gesture in connection with dating applications, Tinder's name for the gesture also came to be uniquely associated with Tinder; it is now a registered trademark in the dating-app context.  To avoid confusion between use of the SWIPE trademark and the gesture claimed in the patents, this brief, when not quoting from the patents, refers to the relevant gesture as a "dragging gesture."

The claims of the '811 and '023 Patents all require the use of the dragging gesture. The '811 Patent's claims also all require the system to "prevent communication" between users unless two users mutually expressed positive preferences.

The '811 Patent issued on August 15, 2017.  The '023 Patent issued on May 1, 2018.  In each case, the Patent Office had the guidance of the Supreme Court's 2014 *Alice* decision and a significant body of Federal Circuit case law interpreting that decision.  The '023 Patent also expressly overcame a subject-matter-eligibility rejection before issuance.  *See* Ex. G at 87-94 (rejecting prior versions of claims under Section 101).

**B.     The Court Applies the Two-Step *Alice* Process to Evaluate Subject Matter Eligibility on a Motion to Dismiss.**

The Court evaluates subject matter eligibility via a two-step process.  *Alice*, 134 S. Ct. at 2355.  The first is determining whether the claims are directed to a patent-ineligible concept like an abstract idea.  *Id.*  If the claims are not directed to an ineligible concept, the inquiry ends—the claims are eligible.  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016).  If the Court believes that the claims are "directed to" an ineligible concept like an abstract idea, it moves onto the second step.  In that part of the analysis, the Court considers whether the claim's limitations, alone or as an ordered combination, contain an "inventive concept" applied to the identified idea to which the claims are directed—i.e., whether the claims contain "something more" than what was routine or conventional in the industry at the time of the invention.  *Alice*, 134 S. Ct. at 2355.  If so, the claims are eligible.

Determining subject matter eligibility can call for a number of factual determinations in both steps of the analysis.  *Data Engines*, Slip Op. at 14 (relying on newspaper articles at step 1); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) ("*Aatrix Software I*") (describing procedure for evaluating pleadings at step 2).  To support a

finding of invalidity, a defendant has the burden to establish all facts "pertinent" to the analysis by clear and convincing evidence. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). On a motion to dismiss, the defendant must discharge that burden using only the allegations in the complaint and evidence capable of judicial notice. *Aatrix Software I*, 882 F.3d at 1128.

### C.   The '023 Patent's Claims Are Subject Matter Eligible.

#### 1.   The '023 Patent's Claims Are Directed to an Improved Matchmaking User Interface, Not an Abstract Idea.

Determining whether a claim is directed to an abstract idea is a "meaningful" step. *Enfish*, 822 F.3d at 1335. It is not sufficient that that claims "involve" an abstract idea because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)). A claim directed to a computer-device improvement, rather than an "abstract idea" that invokes computers "merely as a tool," is patent eligible. *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018). To make this determination, courts typically look to the claims as well as the intrinsic evidence, including prosecution history. *See, e.g.*, *id.* at 1362-63; *Data Engines*, Slip Op. at 14 n.2.

The claims of the '023 Patent recite "an interface" that presents a "graphical representation of [a first online dating profile] as a first card in a stack of cards," with a processor to "detect a gesture," the gesture "corresponding to a positive preference indication," and where the system can detect a "right swiping direction" associated with the positive gesture. *See, e.g.*, Claim 3. In response to detecting the gesture, the interface automatically both presents a second graphical representation of a profile and removes the first. *Id.*

These claims are clearly directed to a non-abstract improvement in user interface technology for particular use in a matchmaking app. The claimed inventions provide an easy-to-

navigate system that both allows and encourages users to make more efficient binary preference choices in using computer-based dating systems.  FAC ¶¶ 102-106; 124-128.  By use of this specific physical and visual interface protocol, it also requires users to make those choices before moving on, rather than deferring those choices—a protocol that promotes speed of decision-making and drives user engagement by facilitating more matches.  This is not abstract.  *See Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001, 1005 (Fed. Cir. 2017) ("Abstraction is avoided or overcome when a proposed new application or computer-implemented function is not simply the generalized use of a computer as a tool to conduct a known or obvious process, but instead is an improvement to the capability of the system as a whole.").

The Federal Circuit has repeatedly confirmed that concrete improvements to user interfaces recite patent-eligible computer improvements.  For example, in *Core Wireless*—a case notably absent from Bumble's brief—the Federal Circuit addressed a claim related to a menu display.  88 F.3d 1356.  The menu included an "application summary" that could be reached "directly from the menu" containing data from one or more applications.  *Id.* at 1359.  The application summary menu could then be used to launch the application and "enable the selected data to be seen" within the application.  *Id.*

The inventors of the *Core Wireless* patent did not invent "menus."  They did not invent summaries, applications, launching applications, data, or summarizing data.  Nevertheless, the Federal Circuit concluded that the claims were subject matter eligible at step one because this combination of elements claimed "an improved user interface for electronic devices, particularly those with small screens."  *Id.* at 1362.  Although the claims could be easily characterized as directed to the concept of an "application data summary menu" reachable from a main menu, this was not an ineligible idea because it was not abstract.  Instead, it solved interface-based

problems.  Prior interfaces could "seem slow, complex and difficult to learn," as users would have to "drill down through many layers to get to desired data" and would be required to "scroll around and switch views" to find what they needed.  *Id.* at 1363.  The claimed menu, in contrast, improved "the speed of a user's navigation through various views and windows" by disclosing a "specific manner of displaying a limited set of information to the user."  *Id.*

The Federal Circuit also found a user interface claim eligible at step 1 in *Trading Technologies*, 675 F. App'x 1001.  The claims at issue there recited "a method for displaying market information" related to commodity trading.  Specifically, the claims recited an interface that displayed dynamic quantity bid and ask information alongside static pricing information so traders could better trade commodities more quickly, while ensuring that their trades were made at their preferred price.  *Id.* at 1003.  Again, the inventors did not invent static pricing, dynamic quantities, bid prices, or ask prices.  But the interface was a claimed improvement upon prior art modes, where, on prior interfaces, a price could change based on changing market conditions while the trade was being executed.  *Id.* at 1006.

Two days ago, the Federal Circuit reiterated these principles in *Data Engine Technologies v. Google*, concluding that an improvement in spreadsheet interfaces was directed to eligible subject matter.  The eligible inventions recited the addition of "notebook tabs" to existing three-dimensional spreadsheet interfaces to navigate between pages.  Slip Op. at 7-8.  Despite the facts that three-dimensional spreadsheets preexisted the claimed inventions and "humans [had] long used tabs to organize information," Slip Op. at 20, the Federal Circuit held that the representative claim recited a patentable improvement to user interface technology.  Specifically, it solved problems in existing interface technology by providing a "highly intuitive, user-friendly interface with familiar notebook tabs for navigating the three-dimensional work-

sheet environment," Slip Op. at 13, and was therefore patent eligible.  In fact, the notebook tab improvement solved computer-based problems specifically because "it include[d] user-familiar objects, i.e., paradigms of real-world objects which the user already knows."  Slip Op. at 4.

The claims of the '023 Patent are indistinguishable from the claims in *Core Wireless*, *Trading Technologies*, and *Data Engine*.  Like those eligible patent claims, the claims here are directed to a new user interface—in this case, for a dating application.  *See, e.g.*, Claim 1 (reciting a "method of navigating a user interface"); Claim 3 (reciting "a system," comprising "an interface" presenting graphics in a particular way).  The application is characterized by a "stack of cards," that are "graphical representations of [] online dating profile[s]," and user preferences regarding those cards are detected by virtue of a "gesture," where the "positive preference" gesture is determined by "detecting a right swiping direction."  When a user performs the gesture, the interface is modified to both show a new item of information and to automatically remove the first.  These innovations improve existing interface technology.

For example, rather than the user viewing potential matches through a scrollable list of potential matches, the claimed interface provides the graphical representation as a "first card" "in a stack."  The expression of preferences via a "gesture" that is observed by detecting a "right swiping direction"—combined with removal of the first card and display of another card in response to detecting the gesture—improves existing interface technology to increase "the speed of a user's navigation through [potential matches]."  *Core Wireless*, 880 F.3d 1363; FAC at ¶¶ 103-105; 125-128.  As in *Core Wireless*, these advantages over prior user interfaces are particularly advantageous in small screen or mobile devices, where scroll-based interfaces can be difficult to navigate.  Moreover, like *Data Engine*, the claims' recitation of a stack of cards and acting on those cards in a particular way facilitates ease of use by "including user-familiar

objects . . . which the user already knows how to use." *Data Engine*, Slip Op. at 4.[4]  These claims recite eligible inventions.

Bumble fails to establish otherwise.  Bumble contends that the claims are directed to the idea of "looking through a stack of dating match profile cards one at a time and expressing interest in a match by moving a card to the right," as applied on a computer, using computers "merely as a tool."  Dkt. No. 23 at 13-14.  For several reasons, this is wrong.

First, Bumble's arguments are flawed because the "directed to" inquiry is more than simply finding a catch-phrase with which to describe concepts in the claims.  To show ineligibility, "[i]t is not enough . . . to merely trace the invention to some real-world analogy." *Data Engine*, Slip Op. at 20.  Yet that is all Bumble attempts to do here.  It makes no sense to say the claims are "directed to" moving a card to the right when that idea has no independent utility outside of the technological field.  The general concept of a stack of cards, with specific additional limitations omitted by Bumble's hypothetical idea, is *applied* in a particular way.  *See id.* at 4 (application of notebook tabs concept to spreadsheets non-abstract).

This formulation of the alleged idea also fails to capture critical limitations of the claims and ignores the inventive context.  For one, the claims do not recite "moving a card to the right." The claims recite a "gesture," where a "right swiping direction" must be associated with the "gesture."  The specification also describes the relevant "gesture" as a "touch input" performed "by moving a finger or other suitable object across the screen."  '023 Patent at 19:35-3; 19:35-39; 21:66-22:3.  This physical interaction is narrower than picking up a card and setting it off to

---

[4] There is also no legitimate dispute that these improvements are recited in the claims. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1370 (Fed. Cir. 2018) (distinguishing between benefits achieved by limitations in the claims and benefits merely described in the specification).

the side, is native to the claims' technology, and—in the context of the claimed system—facilitates more efficient decision-making. The claims further require automatically displaying a second profile graphic and automatically removing the first in response to the gesture. Again, this is narrower than simply looking one-at-a-time through physical cards because the claimed interface is designed to limit the ability to reconsider preference indications and accelerate moving on to new ones. This improved style of interface drives user engagement and facilitates more matches by allowing quick preference indications and precluding deferred ones.

Bumble's argument also assumes that anything that *could be* performed by a human is abstract. But the Federal Circuit has rejected this contention. "[P]rocesses that automate tasks that humans are capable of performing are patent eligible if properly claimed." *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). A librarian could show a patron a summary of data from other sources and then, upon request, take the patron to the sources themselves. *Cf. Core Wireless*, 880 F.3d at 1362-63. A commodities broker could, with a pencil and paper, calculate bid prices, ask prices, and various quantities and display them in a manner in which the broker changed the quantities but did not change the prices. *Cf. Trading Techs.*, 675 F. App'x at 1003. An animator could use rules rather than subjective considerations to lip sync animations. *Cf. McRO, Inc.*, 837 F.3d at 1313. And a matchmaker could give a client a stack of cards with potential matches, require the client to move his finger across the cards one at a time, and immediately remove a card after it had been dragged to the right. But why? There is no evidence that this has been done; doing so would also not serve a purpose. *See McRO*, 837 F.3d at 1314 ("Defendants provided no evidence that the process previously used by animators is the same as the process required by the claims."). Meanwhile, in a computer-based matchmaking environment, the claimed invention has specific tangible benefits.

Bumble also contends that these claims must be directed to an abstraction rather than improved interface technology because the specification does not expressly describe a "technological problem" to which it proposes a solution.  This is a red herring.  While express recitations of computer-specific benefits in the specification exist in some eligibility cases, they are not required.  And the intrinsic record of the '023 Patent is just as compelling as an express acknowledgement that the claims are directed to the above-mentioned benefits.

As discussed above, Match.com filed a 2007 provisional application disclosing a particular matchmaking system.  Those inventions and evaluation of their subject matter eligibility are not at issue in this case.  In 2012, the Tinder inventors created the groundbreaking Tinder app and filed an application for innovations underlying it.  They added new material to improve upon the preexisting Match.com system concepts, including by improving the interface with the draggable stack of cards embodiment, which is claimed in every claim of the '023 Patent.  These improvements are not routine or conventional limitations "added post-hoc to a fundamental practice."  *Enfish*, 822 F.3d at 1340.  They were specific improvements built into and embodied by an extremely successful commercial application.  Further, these additions are significant distinctions over the prior art.  Indeed, after previously rejecting the claims for subject matter eligibility reasons, the Examiner expressly concluded in its "reasons for allowance" that the "closest cited references" failed to teach "detecting a right swiping direction" and "automatically presenting a graphical representing [*sic*] of a second dating profile . . . in response to detecting the [right swiping] gesture . . . as well as the previous intervening limitations in order to remove irrelevant entities to the searcher. . . ."  Ex. G at 16-17; *see also, e.g. Data Engine*, Slip Op. at 13 (looking at claims in view of prior art).  The specification need not discuss each of every benefit flowing from this new matter because the purpose of the specification is to

"teach and enable those of skill in the art to make and use the invention," *Phillips*, 415 F.3d at 1323, not to describe all benefits flowing from it.  The prosecution history itself confirms the '023 Patent is directed to that new interface and related interaction, not an abstraction related to a system of matchmaking.

Finally, Bumble complains that the patent fails to identify "'a particular way of programming or designing the software' to perform the recited claims."  Dkt. No. 23 at 16 (quoting *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016)).  This argument is also meritless.  These claims do not simply describe "a result."  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018) (describing *Ameranth* decision as meaning only that "a result, even an innovative result, is not itself patentable").  The claims provide a way of reaching the desired result of an improved interface and user experience.  As just one example, they recite a tangible improvement over search and scroll-based matchmaking interfaces similar to the one disclosed in the 2007 Match.com application.  *See, e.g.*, Ex. D at Figs. 1E, 1F.

The claims of the '023 Patent recite concrete improvements to existing graphical user interfaces in dating applications.[5]  They are non-abstract and thus patent eligible.

2.   <u>Bumble Has Failed to Establish the Lack of an Inventive Concept</u>.

To the extent the Court believes the claims are directed only to the idea of "looking through a stack of dating match profile cards one at a time and expressing interest in a match by moving a card to the right," and that this idea is within the realm of the abstract, the Court should nevertheless deny Bumble's motion.  Even inventions "directed to" abstract ideas are patent

---

[5] To give the appearance that any patent related to matchmaking is necessarily invalid, Bumble makes a passing reference to a few cases related to the "abstractness" of "matchmaking."  *See* Dkt. No. 23 at 6 n.5.  None of these cases address interface improvements.  Instead, these cases address claims that recite only controlled exchange of information and generic analysis of that information on a computer.

eligible if the claims contain limitations on any abstraction that "involve more than the performance of well-understood, routine, and conventional activities previously known to the industry." *Aatrix I*, 882 F.3d at 1128 (quotations and citations omitted).  Unless contradicted by the patent specification itself, the Court must accept any factual allegations about the non-conventionality of a limitation or combination of limitations as true.  *Aatrix I*, 882 F.3d at 1125; *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1356 (Fed. Cir. 2018) ("*Aatrix II*") (Moore, J., concurring in denial of petition for rehearing en banc, joined by Dyk., J., O'Malley, J., Taranto, J., and Stoll, J.,) (reasoning that a pleading-based dismissal is appropriate only where specification admits that an alleged inventive concept was conventional).

As discussed above, the patent claims include limitations beyond Bumble's posited idea.  The card has to be "automatically removed," not simply set off to the side.  The preference has to be one detected by a "gesture" in the "right swiping direction"—which the specification makes clear is associated with touch screens—not simply by a move to the right.  And in the dependent claims, the claims specifically recite that the user must perform an action on the first profile before he or she can move through the rest.  This combination of limitations improves on existing dating interface technology by allowing and encouraging "users to sift through more information, more quickly than previous interfaces addressing similar binary choice decisions" and thereby "revolutionized the world of online dating."  FAC ¶104.  The claims limit second-guessing and foster quick decision-making, which drives user engagement and improves the system.  As pleaded in the FAC, these improvements were non-conventional and non-routine at the time of the invention, *id.* at ¶¶ 103-05—as Tinder's (and Bumble's) subsequent astonishing success confirms.  If the Court even proceeds to step 2 (which it should not), these factual allegations end the Court's inquiry.

Bumble asks the Court to ignore established precedent in favor of its own proposed standard.  Specifically, Bumble advocates for a retroactive requirement that, unless a computer-related invention expressly describes the problems, solutions, and computer-based benefits in its specification, it must be dismissed on the pleadings—regardless of whether those problems, solutions, and computer-based benefits exist.  No such requirement exists.  On a motion to dismiss, the Court is required to take all facts pleaded as true and make reasonable inferences in Match's favor.  It is Bumble's burden here to *contradict as a matter of law* the pleaded facts. This can occur only where the specification *admits* that an alleged combination is merely routine. *Aatrix II*, 890 F.3d at 1356.  Where the specification is silent about the inventiveness of a limitation or combination of limitations, the Court must credit the Complaint's well-pleaded facts.  *Id.*  Nothing in the '023 specification here admits that an interface in which a user expresses preferences via a dragging gesture on a card that is removed and replaced after the gesture is detected was routine or conventional matchmaking interface technology.

Bumble also contends that the claims cannot contain an inventive concept because "swiping" was "known" in the prior art.  This fails on two accounts.  First, "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art."  *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).  Second, it is not enough to point out that some particular gesture may have existed on some screen in some piece of prior art.  *See Berkheimer*, 881 F.3d at 1369 ("Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art.").  Regardless of whether software detected similar gestures on touch screens, Bumble offers no evidence whatsoever that the ordered combination of limitations which distinguishes the claimed invention existed in the prior art at all, much less that the

limitations or their combination is used in only a routine and conventional manner.  Nor could it.

The claims involve more than a dragging gesture and more than moving cards to express

preferences; they recite specific physical and visual interactions with a matchmaking user

interface.  To the extent the claims are directed to Bumble's posited "idea," they nevertheless

improve existing interface technology for the reasons already described.[6]

**D.    The '811 Patent's Claims Are Subject Matter Eligible.**

1.    The '811 Patent Claims Are Directed to an Improved Matchmaking User
       Interface, Not an Abstract Idea.

The '811 Patent is eligible for many of the same reasons as the '023 Patent.  Like the

'023 Patent, it describes a system employing an interface with graphical representations of online

dating profiles.[7]  It describes indicating preferences by use of a "swiping gesture."  It describes

removing one profile and showing another profile after receiving a gesture.  *See, e.g.*, Claim 7

("[A]utomatically cause the interface to remove the presentation of the first potential match . . .

and cause the interface to present . . . a second potential match . . . .").  It thus recites non-

abstract subject matter in much the same manner as the '023 Patent.  The '811 Patent in fact

describes narrower functionality and more specifics about the flow of the improved interface and

system.  For example, the Patent recites that a removed profile will reappear in response to a

---

[6] The Federal Circuit's decision in *Move, Inc. v. Real Estate Alliance Ltd.*, 721 F. App'x 950 (Fed. Cir. 2018) does not support Bumble's analysis.  The patentee there alleged that a "zoom feature" was an inventive concept in claims directed to the idea of collecting and organizing information about available real estate properties and displaying the information on a map.  *Id.* at 957.  But the zoom feature was merely an aspirational result; nothing about the feature was described, and the notion of getting closer to or further away from something is anything but computer-specific.  The claims here are not of the aspirational, results-based type.

[7] Unlike the '023 Patent, the '811 Patent does not require the graphical representations to be "cards." The claims also do not require the "swiping gesture" be in the "right-swiping direction."  Instead, the claims recite that "swiping gesture[s]" corresponding to positive and negative preferences must be different from one another.  The claims are broader in this respect but narrower in others.

determination to "enable communication"—which occurs only after both users corresponding to the profiles have expressed a positive preference. *See* Claim 7.  This is a specific arrangement of screens and information, engaged with in a particular way, to make a better computer-based matchmaking system—a system that has been immensely successful.

Other than coining a different purported "abstract idea" to which the claims are allegedly directed, Bumble makes identical arguments addressing the '811 Patent as it does the '023 Patent.  Those arguments fail for the same reasons.

Bumble's arguments against the '811 Patent fail for an additional reason as well.  Bumble contends that the claims of the '811 Patent are "directed to" the idea of "connecting people with potential matches based on their mutual attraction to each other or not connecting them in the absence of mutual attraction."  Dkt. No. 23 at 6.  Although the claims plainly involve that idea at a general level, they are not directed to it.  In fact, Bumble's highly generalized proposed idea was discussed and disclosed in the 2007 Match.com application. *See* Ex. C at 36:10-25.  Given the claims here include the *new* CIP material, the claims are necessarily directed to something more or different than this highly generalized mischaracterization.  For the same reasons that the '023 Patent is directed to an improved draggable one-at-a-time matchmaking interface that enables and encourages users to make binary choices more quickly, the '811 Patent recites an improved matchmaking system, implemented via an improved matchmaking interface.[8]

---

[8] The '811 Patent also describes another specific technological improvement to a known system: a way of avoiding unwanted communications.  In prior systems, users could have a "large number of unwanted communication requests [that] can become a nuisance to the user." '811 Patent at 1:56-62.  The specification solves this problem by allowing "initial communication" only between two users who mutually expressed a preference for one another and "prevent[ing] communication" if not.  This would allow users to "avoid browsing, deleting, or responding to unwanted messages." *Id.* at 2:58-60. *See Trading Techs.* 675 F. App'x at 1005.

2.   Bumble Fails to Establish the Lack of an Inventive Concept in the '811 Patent.

If the Court accepts Bumble's arguments about what the claims of the '811 Patent are "directed to," there is nevertheless an inventive concept in the '811 claims as well.  The limitations concerning the draggable interface also exist in the '811 claims, including where profiles are removed and replaced once a gesture is performed.  Match's Complaint alleges that these limitations provide computer-based improvements.  FAC ¶¶ 102-106; 124-128.  Nothing in the specification concedes or even suggests the conventionality of these improvements; they were anything but conventional.  At most, the specification highlights that this interface is a computer interface.  That does not prove ineligibility.

**E.    Neither the '023 Patent Nor the '811 Patent Present Any Significant Preemption Concerns.**

Bumble also contends that these patents "monopolize" the "practice of connecting people with potential matches based on mutual attraction or not connecting them in the absence of mutual attraction."  Dkt. No. 23 at 1.  This is also not true.  The claims recite a specific visual and physical improvement of a user interface.  There remain many other computer-based ways to connect people based on mutual attraction: scroll-based systems, grid-based systems, card-based systems that utilize buttons, non-dragging-gesture-based systems, and the list goes on.  Tinder invented a specific matchmaking system and interface.  The patent system is designed to reward innovations just like that.

**III.    THE COURT SHOULD DENY BUMBLE'S MOTION TO DISMISS MATCH'S TRADE SECRETS CLAIM.**

The Court should also deny the trade secrets portion of Bumble's motion.  First, Match has adequately alleged the misappropriated idea's economic value.  Second, Bumble has failed to establish a statute of limitations defense.

17

A.      **Bumble Misappropriated a Trade Secret that Derived Economic Value from Being Secret.**

Bumble unabashedly took a design concept developed in-house at Tinder and released it for its own product; that is not debatable.  This stolen idea had economic value to Match.

Bumble seeks dismissal based on a badly flawed understanding of trade secrets law. Bumble argues that the identified business concept it stole could not derive value from being a secret because, if implemented, it would not have been one.  Bumble is wrong.  Confidential, non-marketed design concepts are protectable trade secrets.  *See* 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.05[4], at 1–228 (2002) ("Until disclosed by sale the trade secret should be entitled to protection").  Indeed, in *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 729 (7th Cir. 2003), the Seventh Circuit reversed a district court for granting relief essentially equivalent to what Bumble requests here.  Although the district court concluded that "had [plaintiff] succeeded in producing . . . the [concept], the appearance of the [product] would have fully revealed [it]," the Seventh Circuit rejected this rationale.  "The district court was correct in one sense," the Seventh Court reasoned, "the [concept] could have been reverse engineered just by looking at it. However, the district court failed to appreciate the fact that [plaintiff's] concept *was not publicly available*."  *Id.* (emphasis added).

Businesses like Match expend significant resources in brainstorming ideas.  Even if not implemented, these business concepts derive economic value from not being known because that lack of knowledge forces competitors to expend their own resources to independently conceive their own ideas.  Moreover, absent misappropriation, there is value from secrecy because the idea itself is more valuable absent unauthorized disclosure.  Unless the idea is independently developed, the secret plan would obtain the well-known first-mover advantage even if implemented later.  *See Teva Pharm. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1311 (D.C. Cir.

18

2010) ("first mover advantage is a valuable asset").  In other words, had Tinder's "rewind" release failed, it could have implemented a feature like "backtrack" and still been the first-mover innovator.[9]  Yet Bumble released the misappropriated design *8 days* after Tinder rolled out its different-but-related feature, giving Tinder essentially no opportunity to change course while still being first to market.  *Compare* Ex. H (March 2, 2015 date for "rewind") *with* Dkt. No. 23-1 (March 11, 2015 date for "backtrack").

### B.     Bumble Has Failed to Establish a Limitations Defense.

Bumble has an even higher burden on its limitations-based arguments.  Time-bar is an affirmative defense, and the burden is on Bumble to prove that the claim is time-barred.  *United States v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 629 (5th Cir. 1992).  As Bumble admits, Match has three years from when it "should have discovered" the misappropriation "exercising reasonable diligence" in which to sue.  Dkt. No. 23 at 20.  "[T]he reasonableness of plaintiffs' actions . . .  is a fact question."  *Dodson v. Hillcrest Sec.*, 95 F.3d 52, *8 (5th Cir. 1996)(unpub.).

This case was filed three years ***and five days*** after the TechCrunch article on which Bumble relies was published.  Thus, the Court would have to find as a matter of law more than simply that a reasonably diligent company may be generally "aware of industry media coverage on new features its competitor introduced." Dkt. No. 23 at 20.  It would have to find that as a matter of law *all* reasonably diligent companies must be aware of ***all internet media coverage***, including by the plethora of online media outlets, within ***five days*** of publication or posting.  Particularly at the pleadings stage, there is no basis for such a judicial finding.  *Dodson*, 95 F.3d

---

[9] *Pyramid Instrumentation & Electric Corp. v. Hebert*, 2018 WL 1789325, at *3-4 (W.D. La. Mar. 14, 2018) is not on point.  The Court there found that the guides and manuals were not entitled to protection *because they had been disclosed to customers*—i.e., they were not secret.  *Id.* at *3 (citing arguments that the manuals "are presumably shared with those customers").

at *8 (refusing to hold that "a reasonably diligent investor would certainly read a single newspaper article on the day of its publication"); *accord Briskin v. Ernst & Ernst*, 589 F.2d 1363, 1367 (9th Cir. 1978) ("Knowledge of the paper's contents could not be conclusively imputed . . . unless a court can say as a matter of law that a reasonably prudent person will read all trade papers on the date they are received.")

### C. The Court Should Not Strike Allegations Regarding Bumble's Related Idea Theft.

Finally, citing to no case in support, Bumble strangely asks the Court to "strike" certain information from Match's pleading. Bumble's desire for the material to be stricken is understandable; paragraphs 201-208 of the FAC set forth additional facts highlighting another instance in which Bumble stole a confidential Tinder business concept. But matters should be stricken from pleadings only where they possess "no possible relation to the controversy." *Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.*, 306 F.2d 862, 868 (5th Cir.1962). In this case, Match alleges that Bumble intentionally infringes Match's patents, trademarks, and trade dress, and intentionally misappropriated trade secrets. Paragraphs 201-208 highlight Bumble's disrespect for the intellectual property created and developed at Tinder and owned by Match. The narrative highlights Bumble's lack of innovation and desire to freeride on Tinder and Match's work. It establishes motive to infringe, lack of mistake in implementing ideas designed at Tinder, opportunity to acquire trade secrets, and other related points. Whether or not Tinder asserts a claim based on these allegations, it is still relevant to the case and should remain in the complaint.

### IV. CONCLUSION

For the reasons stated above, the Court should deny Bumble's motion.[10]

---

[10] If the Court finds dismissal appropriate as to any claim, Match also requests leave to replead.

DATED:  October 11, 2018                  Respectfully submitted,

                                          **CALDWELL CASSADY & CURRY**

                                          */s/ Bradley W. Caldwell*
                                          Bradley W. Caldwell
                                          Texas State Bar No. 24040630
                                          Email:  bcaldwell@caldwellcc.com
                                          John F. Summers
                                          Texas State Bar No. 24079417
                                          Email: jsummers@caldwellcc.com
                                          Warren J. McCarty, III
                                          Texas State Bar No. 24107857
                                          Email: wmccarty@caldwellcc.com
                                          **CALDWELL CASSADY CURRY P.C.**
                                          2101 Cedar Springs Road, Suite 1000
                                          Dallas, Texas 75201

                                          Telephone: (214) 888-4848
                                          Facsimile: (214) 888-4849

                                          John P. Palmer
                                          State Bar. 15430600
                                          Email: palmer@namanhowell.com
                                          Naman, Howell, Smith & Lee, PLLC
                                          400 Austin Avenue, 8th Floor
                                          P.O. Box 1470
                                          Waco, TX 76701
                                          Telephone: (254) 755-4100
                                          Facsimile: (254) 754-6331

                                          **ATTORNEYS FOR PLAINTIFF**
                                          **MATCH GROUP, LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel registered as Filing Users on this 11th day of October, 2018.

                                          */s/ Bradley W. Caldwell*
                                          Bradley W. Caldwell