IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **MATCH GROUP, LLC,** | | |
| **Plaintiff,** | | |
| **v.** | | Civil Action No. 6:18-cv-00080-ADA |
| **BUMBLE TRADING, INC., and BUMBLE HOLDING, LTD.** | | |
| **Defendants.** | | |

## <u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>

**Table of Contents**

Page

I.     INTRODUCTION ................................................................................................ 1

II.    OVERVIEW OF THE ASSERTED PATENTS ................................................ 1

III.   LEGAL STANDARDS ....................................................................................... 4

    A.     Claim Construction ................................................................................... 4

    B.     Indefiniteness .......................................................................................... 5

IV.    DISPUTED CLAIM TERMS ............................................................................. 5

    A.     the "graphical representation" terms ...................................................... 6

    B.     "social networking platform" ................................................................ 11

    C.     "without allowing" ................................................................................ 13

    D.     "prevent[ing] communication" ............................................................. 16

    E.     "associated" ........................................................................................... 18

    F.     "the text area" ....................................................................................... 21

V.     CONCLUSION ................................................................................................. 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agfa Corp. v. Creo Prods. Inc.*,
451 F.3d 1366 (Fed. Cir. 2006)..................................................................13

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
340 F.3d 1298 (Fed. Cir. 2003)..............................................................7, 12

*Capital Security Sys., Inc. v. NCR Corp.*,
752 Fed. Appx. 952 (Fed. Cir. 2018)..........................................................25

*Cat Tech LLC v. TubeMaster, Inc.*,
528 F.3d 871 (Fed. Cir. 2008)....................................................................18

*Comark Commc'ns, Inc. v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998)..............................................................7, 12

*Cordis Corp. v. Boston Sci. Corp.*,
658 F.3d 1347 (Fed. Cir. 2011)..................................................................18

*Cordis Corp v. Medtronic Ave, Inc.*,
511 F.3d 1157 (Fed. Cir. 2008)..................................................................13

*Desper Prods., Inc. v. QSound Labs, Inc.*,
157 F.3d 1325 (Fed. Cir. 1998)............................................................18, 20

*ePlus, Inc. v. Lawson Software, Inc.*,
700 F.3d 509 (Fed. Cir. 2012)......................................................................8

*Imaginal Systematic, LLC v. Leggett & Platt, Inc.*,
805 F.3d 1102 (Fed. Cir. 2015)..................................................................13

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001)....................................................................9

*InterDigital Commc'ns, Inc. v. ZTE Corp.*,
711 Fed. Appx. 998 (Fed. Cir. 2017)..........................................................13

*Kaneka Corp. v. Xiamen Kingdomway Grp.*,
790 F.3d 1298 (Fed. Cir. 2015)............................................................19, 20

*Markman v. Westview Instrs., Inc.*,
517 U.S. 370 (1996)......................................................................................7

*Media Rights Techs., Inc. v. Capital One Financial Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015)................................................................23

*Mesh Comm, LLC v. PEPCO Energy Servs.*,
    No. 09-cv-2804, 2010 Markman 5463934 (D. Md. Dec. 29, 2010) .......................22

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004)................................................................7

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) .......................................................................4, 8

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..............................................................7, 12

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)................................................................7

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001)...............................................................15

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995).................................................................7

*Starhome GmbH v. AT&T Mobility LLC*,
    743 F.3d 849 (Fed. Cir. 2014).................................................................8

*Teleflex, Inc. v. Ficosa North Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)...............................................................12

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)...............................................................14

*Versata Software, Inc. v. Internet Brands, Inc.*,
    No. 08-cv-313-WCB, 2012 Markman 15861 (E.D. Tex. Jan. 4, 2012)...................22

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).................................................................7

**Statutes**

35 U.S.C. § 112 ..................................................................................8

# I.    INTRODUCTION

Bumble Trading, Inc. and Bumble Holding, Ltd. (collectively, "Bumble") respectfully submit that there are four claim terms in need of construction and two claim terms that are indefinite.  While Bumble proposes constructions appropriately giving the four non-ambiguous claim terms the meaning they have in view of the intrinsic record and relies on extrinsic evidence *consistent* with the intrinsic record, Plaintiff Match Group, LLC attempts to alter the scope and meaning of the terms contrary to the intrinsic evidence or punts to "plain meaning."  Contrary to the fundamental principles of patent law, Plaintiff's proposals turn a blind-eye toward the intrinsic evidence, as well as what the patentee claimed as its invention and represented to the PTO. Accordingly, the Court should adopt Bumble's proposed constructions.

Moreover, the asserted claims recite ambiguous limitations that render them indefinite under the Supreme Court's *Nautilus* standard.  A main driver behind this standard was that "absent a meaningful definiteness check, we are told, patent applicants face powerful incentives to inject ambiguity into their claims."  The present claims do just that.  Under *Nautilus*, the two claim terms "associated" and "the text area" are indefinite for failing to provide clear notice of what is claimed. For this reason, the Court should find these terms and the claims containing them indefinite.

# II.    OVERVIEW OF THE ASSERTED PATENTS

The asserted patents, U.S. Patent No. 9,733,811 (the "'811 Patent"), U.S. Patent No. 9,959,023 (the "'023 Patent"), and U.S. Patent No. 10,203,854 (the "'854 Patent") (Exs. 1-3),[1] generally relate to methods and systems for profile matching.  The asserted patents are directed to presenting information from suggested matches' profiles to users, navigating through the set of presented matches by a simplistic user action, such as "swiping," and/or allowing or preventing

---

[1] Each exhibit referenced herewith is attached to the Declaration of Rose Whelan.

communication between users based on whether or not mutual interest exists. All three patents are directly related, share an identical specification, and both the '023 and '854 Patents are continuations of the '811 Patent.

All of the claims of each patent require online dating profiles. (*See* '811 Patent, '023 Patent, '854 Patent, all claims (claiming "user online-dating profile[s]").) Each profile "compris[es] traits of a respective user." ('811 Patent, 1:66-2:1.[2]) Figure 1F of the patents (reproduced below) depicts an embodiment of a display of a dating profile as a "presentation of details of a match result entity to a user." (*Id.*, 2:65-67.)



FIG. 1F

The asserted patents further disclose that these profiles are imported from a "social networking platform." (*Id.*, 19:45-67, 20:35-37; *see also id.*, cls. 1, 4, 7; '854 Patent, cls. 2, 5, 8, 11.)

Once a potential match's information is displayed to a user, the user "may navigate through the set of presented users by swiping" and "express approval" and "disapproval" by performing a right or left "swipe gesture," respectively. ('811 Patent, 21:59-66.) Alternatively, a user may "express[] approval and disapproval" by "[p]ressing [a] like button" to indicate approval and

---

[2] Because the specifications of the '811, '023, and '854 Patents are identical, for ease, the citations hereafter refer only to the '811 Patent. These disclosures, however, also apply to the '023 and '854 Patents.

interest or by "[p]ressing [a] dislike button" to indicate disapproval and "not want[ing] to communicate." (*Id.*, 21: 28:-36.) After a user does so, the system determines whether to allow or prevent communication. Figures 10 and 11 (reproduced below) are flowcharts illustrating a method for making this decision. (*Id.*, 22:61-23:59.)



FIG. 10

FIG. 11

Though each patent includes these figures and associated disclosures in the specification regarding communication between users, the '023 Patent does not claim communication. (*See* '023 Patent, all claims.) Rather, the claims of the '023 Patent narrowly focus on presenting a graphical representation of an online dating profile to a user on a graphical user interface, swiping, and, in response to swiping, "automatically" presenting a graphical representation of a second profile and "automatically" removing the graphical representation of the first. (*See, e.g.*, *id.*, cl. 1.)

## III.    LEGAL STANDARDS

### A.    Claim Construction

The principles of claim construction are well established.  Claim construction is a matter of law to be determined by the Court.  *Markman v. Westview Instrs., Inc.*, 517 U.S. 370, 384, 390 (1996).  Claim terms are construed by giving words of the claim the meaning they would have to one of ordinary skill in the art "in view" of the intrinsic record consisting of the claims, specification, and file history.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-1314 (Fed. Cir. 2005) (sources for claim construction include "the words of the claims themselves, the remainder of the specification, the prosecution history"); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "The starting point for any claim construction must be the claims themselves." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).  Once a court has examined the claim language, it may then consider the rest of the intrinsic evidence, beginning with the specification and concluding with the prosecution history.  *Vitronics Corp*, 90 F.3d at 1582.

The Court, however, cannot construe the claims to cover subject matter broader or narrower "than that which the patentee itself regarded as comprising its inventions and represented to the PTO."  *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004).  In doing so, the Court must not read limitations from the specification into the claims, which is forbidden. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998).

Similarly, "evidence extrinsic to the patent and prosecution history, such as expert testimony, cannot be relied on to <u>change</u> the meaning of the claims when that meaning is made clear" in the intrinsic record.  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995) (emphasis added).  Nonetheless, courts may also consider extrinsic evidence, such as a

dictionary definition or expert testimony, that "'does not contradict any definition found in or ascertained by a reading of the patent documents.'" *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) (quoting *Phillips*, 415 F.3d at 1322-23.)

## B. Indefiniteness

"[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). All claims must satisfy the definiteness standard of 35 U.S.C. § 112. The Supreme Court has made clear that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). A claim is thus indefinite if one of ordinary skill cannot reasonably determine the scope of the claim. *Id.* at 2129-30. Moreover, "a patent must be precise enough to afford clear notice of what is claimed, thereby "'appris[ing] the public of what is still open to them.'" *Id.* at 2129 (citing *Markman*, 517 U.S. at 373 (citation omitted)).

## IV. DISPUTED CLAIM TERMS

The parties dispute the scope and meaning of the following claim terms. Bumble's constructions are well rooted in the intrinsic record.

## A.    the "graphical representation" terms

| Bumble's Construction[3] | Plaintiff's Construction |
|---|---|
| "summary of information [displayed on a graphical user interface][4]" | "pictorial portrayal" |

Bumble's proposed construction is fully supported by the intrinsic record, whereas Plaintiff's proposed construction improperly restricts the term "graphical representation" to a "pictorial portrayal," reading out disclosed embodiments and express teachings of the patents.

Claim construction begins with the claims themselves.  *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to particularly point out and distinctly claim the subject matter which the patentee regards as his invention.") (internal quotations omitted).  Each asserted patent claims a "graphical representation," and the claims use the term in connection with the display of something, such as an online dating profile or an item of information.  ('811 Patent, cls. 1, 4, 7; '023 Patent, cls. 1, 2, 3, 5; '854 Patent, cls. 1, 4, 7, 10.)  An online dating profile or an item of information, according to the specification, can include information "such as height, weight, age,

---

[3] The claims recite "a graphical representation of a [first, second, third, etc.] potential match", "a graphical representation of a [first, second] online dating profile associated with a [first, second] user", and "a graphical representation of a [first, second] item of information."  ('811 Patent, cls. 1, 4, 7; '023 Patent, cls. 1, 2, 3, 5; '854 Patent, cls. 1, 4, 7, 10.)  Bumble proposes construing these claims as: "a summary of information displayed on a graphical user interface representing a [first, second, third, etc.] potential match"; "a summary of information displayed on a graphical user interface representing a [first, second] online dating profile associated with a [first, second] user"; and "summary of information displayed on a graphical user interface representing a [first, second] item of information," respectively.

[4] A person of ordinary skill would understand the term "graphical representation" to mean "summary of information displayed on a graphical user interface."  Because some of the claim limitations that contain this term make it clear that the graphical representation is displayed on a graphical user interface, (*see, e.g.*, '811 Patent, cl. 1 ("cause[s] the display of a graphical representation . . . to the first user of a graphical user interface")), the un-bracketed portion may be inserted into the claim language to avoid unnecessary repetition.

location, income and ethnicity." ('811 Patent, 20:21-23.) Thus, a "graphical representation" of an online dating profile or an item of information need not contain a picture.

While the term "graphical representation" is never mentioned in the specifications, the specifications mention "displaying to a user the profile information of a second user," when displaying a first potential match. (*Id.*, 3:13-14 (emphasis added).) The specifications further disclose that when the system displays a potential match, "[u]ser 14 may be presented with a summary of information regarding a suggested user." (*Id.*, 21:18-19 (emphasis added).) This "summary may include one or more of: a picture, an icon, a name, location information, gender, physical attributes, hobbies, or other profile information." (*Id.*, 21:19-22 (emphasis added).) In light of this disclosure, the "graphical representation" displayed can then be a number or combination of these items, and is not limited to nor does it necessarily include a picture or "pictorial portrayal." (*Id.*) For example, a "graphical representation" could include an icon, name, and gender displayed on a graphical user interface. The specifications also refer to Figure 1F (reproduced below), which depicts one embodiment of a profile or item or information and is more than just a picture of the potential match, including information such as the match's birthday, hometown, likes, and dislikes as a card-based metaphor for display on a graphical user interface. (*Id.*, 6:12-22, Figure 1F; *see also* Declaration of Christopher Schmandt ("Schmandt Decl.")[5], ¶¶ 28-30.) This entire card, not just the picture, is one embodiment of a "graphical representation" of "Jane Doe." (Schmandt Decl., ¶ 30.)

---

[5] The Declaration of Mr. Christopher Schmandt in Support of Defendants' Opening Claim Construction Brief is filed herewith.



*FIG. 1F*

This intrinsic evidence undermines Plaintiff's proposal. Bumble's proposal, on the other hand, captures the proper breadth of the term as informed by the specifications; a "graphical representation" is a "summary of information" displayed on a graphical user interface regarding a "potential match," "online dating profile," or "item of information."

The extrinsic evidence further supports Bumble's proposed construction and comports with the intrinsic evidence. (*See id.*, ¶¶ 26-30.) According to Mr. Schmandt, a person of ordinary skill in the art would interpret a "graphical representation" to be anything that appears on a graphical user interface.[6] (*Id.*, ¶ 27.) Some combination of a picture, an icon, location information, gender,

---

[6] The claims require that the "graphical representation" be displayed "on a graphical user interface." (*See, e.g.*, '811 Patent, cl. 1 ("causing the display of a graphical representation of a first potential match of the set of potential matches to the first user <u>on a graphical user interface</u>") (emphasis added).) The dictionaries provided by Plaintiff provide further support for Bumble's definition and is consistent Mr. Schmandt's opinion of the understanding of a person with ordinary skill in the art. The dictionaries define a "graphical user interface" as: "computing a visual way of interacting with a computer by using items such as windows, icons, and menus, used by most modern operating systems" (Ex. 4, Oxford Dictionary of English at 1406); "a user interface that is graphical in nature; that is, the user can enter commands by using a mouse, icons, and windows" (Ex. 5, The Authoritative Dictionary of IEEE Standards Terms, 7th Ed., at 487); and "a computer program designed to allow a computer user to interact easily with the computer typically by making choices from menus or groups of icons" (Ex. 6, Merriam Webster's Collegiate Dictionary, 11th Ed., at 545). None of these definitions limit a graphical user interface as that which displays only a "pictorial portrayal." Rather, consistent to these definitions, a graphical user interface can display text, icons, images, and some combination thereof.

physical attributes, or text would fit this definition. (*Id.*, ¶¶ 28-30.) Thus, the meaning of "graphical representation" is not limited to an image or a "pictorial portrayal" to one of ordinary skill in the art. (*Id.*, ¶¶ 26-30.)

With its proposal, Plaintiff commits a "cardinal sin" of claim construction—reading an embodiment from the specification into the claims. *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1324, 1327-28 (Fed. Cir. 2002) (finding the district court erred by importing limitations from the specification into the claim); s*ee also Anchor Wall Sys.*, 340 F.3d at 1306-07 ("Notwithstanding the fact that the claim language must be examined in light of the written description, limitations may not be read into the claims from the written description . . . .") (emphasis added); *Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments") (emphasis added); *see also Comark Commc'ns*, 156 F.3d at 1187. The specifications include Figure 6 (reproduced below), and explicitly state that Figure 6 "shows one embodiment of system 100 displaying to a user the profile information of a second user." ('811 Patent, 21:1-2 (emphasis added), Figure 6.) Moreover, even Figure 6 shows an embodiment that where an online dating profile is graphically represented by more than just a picture. The entire "card 88" in Figure 6 is the claimed "graphical representation," and it also includes text. ('811 Patent, 21:12-15, Figure 6.; *see also* Schmandt Decl., ¶ 30.)



*FIG. 6*

Hence, while the specifications mention an image of a suggested user, they also make it clear that this is just one embodiment. *InterDigital Commc'ns, Inc. v. ZTE Corp.*, 711 Fed. Appx. 998, 1003 (Fed. Cir. 2017) (finding it proper not to limit the scope of claim term to one of two preferred embodiments where the claim language was broad enough to cover both embodiments); *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1376-77 (Fed. Cir. 2006). Accordingly, it would be incongruous to adopt the example of a picture or an image as the construction of "graphical representation."

There is no mention of "pictorial portrayal" in any of the claims. (*See* '811 Patent, cls. 1, 4, 7; '023 Patent, cls. 1, 2, 3, 5; '854 Patent, cls. 1, 4, 7, 10.) And, inserting Plaintiff's proposal into the claims renders them nonsensical; it is unclear exactly what would comprise a "pictorial portrayal" of an "item of information." Additionally, if the inventors intended to cover solely a "pictorial portrayal" of matches, they could have done so in the claims by unequivocally doing so and using that language. *Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, 805 F.3d 1102, 1109-10 (Fed. Cir. 2015) (district court properly refused to limit a claim limitation since nothing in the intrinsic evidence showed that the patentee acted as his own lexicographer and limited the scope of the term); *Cordis Corp v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1174 (Fed. Cir. 2008). Instead, the inventors opted to use the broader term "graphical representation" and so the claims must be

afforded the broader meaning implicated by the term, as understood in light of the specification as a whole.

As discussed above, the specification provides support for a broader definition and provides examples beyond a picture for a "graphical representation," such as one or more of: "an icon, name, location information, gender, physical attributes, hobbies, or other profile information." ('811 Patent, 21:19-22.) It is inappropriate to "interpret claim terms in a way that excludes disclosed examples in the specification." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007). Hence, construing "graphical representation" to mean a "pictorial portrayal" improperly narrows the scope of the term. For this reason, Plaintiff's construction should be rejected.

Accordingly, the Court should adopt Bumble's construction, which is supported by the intrinsic record.

**B.    "social networking platform"**

| Bumble's Construction | Plaintiff's Construction |
|---|---|
| "social networking platform independent of the system for profile matching" | No construction necessary/plain and ordinary meaning |

The intrinsic evidence makes it clear that the "social networking platform" referred to in the '811 and '854 Patents' claims is independent from the system for profile matching. ('811 Patent, cls. 1, 4, 7; '854 Patent, cls. 2, 5, 8, 11.) First, the claims of the patents themselves refer to a system for profile matching separate from the claimed "social networking platform." (*Id.*) As an example, claim 7 of the '811 Patent begins with claiming "[a] system for profile matching, comprising:" and then recites "a_social networking platform" separately and independently from the profile matching system. ('811 Patent, cl. 7.) Claim 5 of the '854 Patent also illustrates this demarcation of the system for profile matching and the "social networking platform": the "system of claim 4," which is the "system for profile matching" is separate from "a social networking

platform." ('854 Patent, cl. 5.)  The claims never conflate the system for profile matching and the "social networking platform."

Second, "an examination of the written description and drawings is necessary to determine whether the patentee has disclaimed subject matter or has otherwise limited the scope of the claims."  *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342-43 (Fed. Cir. 2001).[7]  The specifications of the patents here further support Bumble's proposed construction and make clear that the "social networking platform" is separate from the system for profile matching.  Figure 4 of the '811 and '854 Patents (reproduced below) depicts "matching server 20, with pool 30" of the system for profile matching as "configured to interact with <u>another</u> platform, such as social networking platform 50, containing a set 52 of users."  ('811 Patent, 15:54-67 (emphasis added).)



FIG. 4

Several other disclosures in the specifications emphasize that the social networking system is independent from the profile matching system.  The "summary" of the invention refers to "importing user profiles from <u>other</u> social-networking systems."  (*Id.*, 2:42-44 (emphasis added).) Each disclosed embodiment is consistent with the summary of invention.  For example, users "link their user profiles" on the system for profile matching "to an existing profile within social

---

[7] Unlike Plaintiff, which attempts to improperly import limitations into its construction of "graphical representation," here, Bumble's reliance on the specification aligns with the inventors' use of "social networking platform" in the claims.

networking platform." (*Id.*, 19:45-67.) Additionally the patents make clear that the system for profile matching connects to the social networking platform through an application programming interface, further highlighting that they are not one and the same. (*Id.*, 19:54-59.)

Moreover, the specifications highlight motivation and justification for interacting with a separate social networking platform. (*Id.*, 16:1-6 ("This level of integration provides the advantage of users not having to learn and sign up for a different platform."), 19:38-44 ("This level of integration provides the advantage of users only having to update their profile information in one place. For example, when user 14 updates his profile within social networking platform 50, matching server 20 is also able to access the updated profile information."), 20:2-6 ("For example, creating a user profile on matching server 20 containing false information becomes harder when the information must come from another verifiable and peer monitored source such as social networking platform 50.").) In sum, overwhelming evidence in the intrinsic record supports Bumble's proposed construction for "social networking platform" as a "social networking platform independent of the system for profile matching."

### C.    "without allowing"

| Bumble's Construction | Plaintiff's Construction |
|---|---|
| "an affirmative act to ensure no communication between two users" | No construction necessary/plain and ordinary meaning |

The term "without allowing" only appears in the claims of the '854 Patent, which were drafted after the filing of this lawsuit. ('854 Patent, cls. 1, 4, 7, 10.) Claim 1, for example, recites

> receiv[ing] from the first electronic device of the first user a first negative preference indication associated with a graphical representation of a third potential match on the graphical user interface . . .;
> **<u>without allowing</u>** communication between the first user and third user, receive from the first electronic device of the first user a second positive preference indication associated with a graphical representation of a fourth potential match on a graphical user interface. . . .

(*See, e.g.*, *id.*, cl. 1.) Though the specification does not use the term "without allowing," it does discuss "allow[ing]" and "not allow[ing]" communication between users. (*Id.*, 23:26-33, 24:1-4.) As an example, with respect to Figure 10 the specification discloses that if a user "disapproves of the presented user profile then a match is not made, and, at step 1016, <u>matching server 20 will not allow communication between the two users</u>." (*Id.*, 23:30-33 (emphasis added).) Likewise, for Figure 11, if "matching server 20 determines the suggested matching proposal is not valid, <u>matching server 20 does not create a match and does not allow communication between second and third users</u> 14 at step 1108." (*Id.*, 24:1-4 (emphasis added).)

Moreover, both Figures 10 and 11 (reproduced below) are flowcharts depicting methods for enabling communication between two users of the matching system. (*Id.*, 23:10-39, 23:46-24:8, Figs. 10 & 11.)



As described in the specification, both Figures 10 and 11 include the steps 1016 and 1108, respectively, of "not allow[ing] communication" between users in response to receiving and

storing user preferences. (*Id.*) This inclusion of these steps in the flowcharts indicates that the profile matching system must affirmatively take these steps, just as it must take the others included in the flowcharts.

The '854 Patent is a continuation of the '811 Patent, and both patents share an identical specification. During prosecution of the '854 Patent, applicants filed a terminal disclaimer. (Ex. 7, '854 Patent Prosecution History, at MTCH-0001189.) The prosecution history of the related '811 Patent is instructive. *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1356 n.5 (Fed. Cir. 2011) ("Arguments made in the course of prosecuting the '128 application are relevant, however, because a disclaimer in the parent application carries forward into the construction of the same claim term in the child.") (internal citation omitted); *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 886 (Fed. Cir. 2008) (construing claims based on prosecution history of parent, which "showed that the patentee relied on" certain facts "to distinguish over the prior art").

During prosecution of the '811 Patent, applicants added analogous claim limitations of "prevent[ing] communication" in an attempt to overcome prior art. In doing so, applicants described their invention as "enabling and disabling communication." (Ex. 8, '811 Patent Prosecution History, at MTCH-594.) Unlike the prior art, which allowed "open communication" and for users to "communicate with each other prior to the 'linking,'" according to applicants, their invention "exclude[s] all other communications between the users when both users have not liked each other." (*Id.* at MTCH-450, MTCH-174.) Applicants' statements during prosecution demonstrates that their invention takes affirmative steps to prevent users from communicating. *See Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1337 (Fed. Cir. 1998) ("[p]rosecution history is an important source of intrinsic evidence in interpreting claims because it is a contemporaneous exchange between the applicant and the examiner").

Extrinsic evidence in the form of dictionary definitions confirms that "without allowing" is commonly understood to require an affirmative step, as Bumble proposes. Merriam Webster defines "allow" as "to forebear or neglect to restrain or prevent." (Ex. 9, Merriam Webster Collegiate Dictionary, 11th Ed., at 33.) Logically, "without allowing" then means "restrain[ing] or prevent[ing]," both of which require action. This understanding, supported by extrinsic evidence, is congruent to the meaning of the term in light of the intrinsic evidence. *Kaneka Corp. v. Xiamen Kingdomway Grp.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) ("Extrinsic evidence, such as dictionary definitions, for example, may be useful when construing claim terms, 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'") (citing *Phillips*, 415 F.3d at 1322-23).

D.      **"prevent[ing] communication"**

| Bumble's Construction | Plaintiff's Construction |
|---|---|
| "an affirmative act to ensure no communication between two users" | No construction necessary/plain and ordinary meaning |

The intrinsic and extrinsic evidence, taken together, support Bumble's proposed construction for "prevent[ing] communication." Claims 1, 4, and 7 of the '811 Patent claim "prevent[ing] communication" between users "in response to determining that" a user has expressed a negative preference indication regarding another user. ('811 Patent, cls. 1, 4, 7.) The specification never uses the term "prevent" and instead discusses "allow[ing]" and "not allow[ing]" communication between users. (*Id.*, 22:61-23:30, 23:42-59.) The '811 Patent provides Figures 10 and 11, which depict methods for enabling communication between two users of the matching system, as well. (*Id.*, 22:61-64, 23:31-34, Figs. 10 & 11.) Both figures include the step of "not allow[ing] communication." The specification further discusses that if a user "disapproves of the presented user profile then a match is not made, and, at step 1016, matching server 20 will not allow communication between the two users." (*Id.*) Because "not allow[ing]

communication" is a separate step in the flowcharts containing other steps the system must take, "not allow[ing] communication" too is an affirmative act the system must perform.

During prosecution, the asserted claims did not include this aspect of applicants' invention and were rejected as invalid in light of the prior art. Applicants then relied on this aspect of its invention to add the claim limitation of "prevent[ing] communication" between users in attempt to overcome the prior art. (Ex. 8 at MTCH-585 (adding limitations in bold).) In doing so, applicants described their invention as "enabling and disabling communication." (*Id.* at MTCH-594 (emphasis added).) Unlike the prior art, which allows "open communication" and for users to "communicate with each other prior to the 'linking,'" according to applicants, the claimed system "has to exclude all other communications between the users when both users have not liked each other." (*Id.* at MTCH-450, MTCH-174.) Applicants' statements during prosecution thus further reinforce the understanding that the matching system must take affirmative steps to prevent users from communicating. *See Desper Prods.*, 157 F.3d at 1337.

Extrinsic evidence, in the form of dictionary definitions, provides further insight into the common understanding of "preventing" and further supports Bumble's proposal. For example, Merriam Webster defines "prevent" as "to keep from happening or existing; to hold or keep back: hinder, stop; to impose an obstacle," all of which encompass taking an affirmative action. (Ex. 9 at 984.) The dictionary also states that "prevent implies taking advance measures against something." (*Id.*) Collins English Dictionary defines "prevent" similarly and likewise notes that the word implicates action. (Ex. 10, Collins English Dictionary, at 1305 (defining "prevent" as "to keep from happening, especially by taking precautionary action; to keep someone from doing something; hinder, impede").) This extrinsic evidence is consistent with the use of the term "prevent[ing] communication" in the intrinsic record. *Kaneka Corp.*, 790 F.3d at 1304 (citing

*Phillips*, 415 F.3d at 1322-23). Taken together, the intrinsic and extrinsic evidence make clear that "prevent[ing] communication" involves an affirmative act to ensure no communication between users.

### E.    "associated"

| Bumble's Construction | Plaintiff's Construction |
|---|---|
| Indefinite | No construction necessary/plain and ordinary meaning |

The claims use the term "associated" in a different context throughout the asserted claims. Examples include:

- "a first swiping gesture associated with the graphical representation;"[8]

- "a positive preference indication associated with the first item of information;"

- "a first positive preference indication associated with the graphical representation"[9]

- "online-dating profiles . . . associated with a social networking platform;"

- "potential matches that are each associated with a geographic location;"

- "the first user associated with the first online dating profile;"

- "a right swiping direction associated with the gesture;" and

- "plurality of items of information to be displayed are associated with performing an action."

('811 Patent, cls. 1, 3, 4, 6, 7; '023 Patent, all claims; '854 Patent, cls. 1, 2, 4, 5, 7, 8, 10, 11.)

"Associated" is generally used to describe a relationship between two things.

---

[8] The claims include a similar limitation: "a second swiping gesture associated with a graphical representation." ('811 Patent, cls. 1, 4, 7.)

[9] The claims include similar limitations: "a first negative preference indication associated with a graphical representation;" "a second positive preference indication associated with a graphical representation;" "a second negative preference indication associated with a graphical representation;" and "a third positive preference indication associated with a graphical representation." ('854 Patent, cls. 1, 4, 7, 10.)

Courts have recognized that the definition of "associated" is not uniform and should be construed based on how the word is used in the claims, which results in a variety of context-based constructions. *See Versata Software, Inc. v. Internet Brands, Inc.*, No. 08-cv-313-WCB, 2012 Markman 15861, at *6 (E.D. Tex. Jan. 4, 2012) (construing "associated with" to mean "stored in the server and linked to an identification code for the user, such as a user name and/or password" based on the specific relationship between an "identification code" and "user" disclosed in the asserted patent); *Mesh Comm, LLC v. PEPCO Energy Servs.*, No. 09-cv-2804, 2010 Markman 5463934, at *8-*10 (D. Md. Dec. 29, 2010) (construing "associated with" as "wirelessly connected" based on the intrinsic record).

The use of the term in the claim limitations here—particularly in "a first swiping gesture associated with the graphical representation," "a positive preference indication associated with the first item of information," and "a first positive preference indication associated with the graphical representation"—render the term "associated" so vague that there is no discernable meaning to one of ordinary skill in the art. (Schmandt Decl., ¶¶ 31-36.)

With respect to each of these three limitations (and similar recited limitations), it is unclear how the term "associated" should be interpreted as is the actually-required association between the relevant claim language used in conjunction with the term. (*Id.*) For instance, with respect to "a first swiping gesture associated with the graphical representation," it is unclear whether the patents claim a gesture that acts upon the graphical representation or if the gesture is linked to the graphical representation in some way, or something else entirely. (*Id.*, ¶¶ 32-33.) This same ambiguity flows to the other limitations: is the preference indication acting upon the item of information or the graphical representation or is the preference indication correlated to the item of information or

the graphical representation.  (*Id.*, ¶ 34.)  How do the preference indications or gestures connect to the items of information and graphical representations?  (*Id.*)

Moreover, the claims recite user action on a graphical user interface without explaining how the user is interacting with the graphical representation.  (*Id.*, ¶ 35.)  For the claimed swiping gesture, for it to be "associated" with the graphical representation displayed on a graphical user interface, it is unclear how the user must interact with the graphical user interface.  (*Id.*)  Does the user need to swipe on top of the graphical representation or can they swipe anywhere on the graphical user interface?  (*Id.*)  It is therefore difficult to discern the meaning of "associated" in this context.  (*Id.*, ¶¶ 35-36.)  The same reasoning applies for the positive preference indication, which may be swiping, (*see, e.g.,* '811 Patent, 22:35-39), and the item of information or the graphical representation.  (Schmandt Decl., ¶¶ 35-36.)

It is unclear what the relationship is between these things, such that one of ordinary skill in the art would not understand what is meant by the term "associated" in the claims.  *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (a claim term "is indefinite if its language 'might mean several different things and no informed and confident choice is available among the contending definitions'") (quoting *Nautilus*, 134 S. Ct. at 2130, n. 8).

Unlike the cases where "associated" has been construed, the intrinsic evidence here provides no clarity.  The specifications fail to provide any definition for "associated" that appropriately characterizes each claimed relationship.  Rather, the specifications of the asserted patents use "associated" in the same manner as the claim limitations—to indicate that there is a relationship between different things without defining what that relationship is.  ('811 Patent, 3:56-58 ("data (such as profiles, for example) associated with other users in order to make matching

decisions"), 13:44-45 ("matching server 20 will associate it with the profile and store it").) These disclosures demonstrate the inconsistent use of the term "associated" and underscore why the term as used in the claims is ambiguous, such that no meaning is reasonably certain to one of ordinary skill in the art.

### F. "the text area"

| Bumble's Construction | Plaintiff's Construction |
|---|---|
| Indefinite | "a text area" |

Though Plaintiff's proposal of "a text area" may cure an issue of lack of antecedent basis, the term "the text area" (or "a text area") is still vague and indefinite. As claimed in claims 2, 5, and 8 of the '811 Patent, the "text area" could refer to at least (1) an area depicting text on the screen or (2) a text input area, where users may enter text to communicate. (Schmandt Decl., ¶¶ 37-38.) Yet, as with other terms, "text area" never appears in the specification of the '811 Patent. Thus, the specification provides no guidance as to the meaning of the term.

At best, the specification alleges that Figure 12D depicts "an example communication interface between users of the matching system." ('811 Patent, 24:30-31, Fig. 12.) Supposedly, in Figure 12D, a user "is presented with chat box 1208 for each of the matches that exist for user 14" and the users "may communicate" with one another through that box. (*Id.*, 24:31-34, Fig. 12.) All Figure 12D shows is a place to see messages. (Schmandt Decl., ¶¶ 37-38.) Figure 12D (reproduced below) does not depict or actually disclose this "chat box" and it remains unclear whether the "text area" is the "chat box" or whether the text area is an area with text on the screen. (*Id.*)



*FIG. 12D*

Because the '811 Patent never defines, let alone uses, "text area" in the specification, it is not reasonably certain to one of ordinary skill in the art what exactly is the "text area." Therefore, a "text area" could be one of two things, and the specification fails to illuminate which definition is the correct one. (*Id.*) The intrinsic evidence fails to make the scope of the term "text area" clear and, thus, the term is indefinite. *Capital Security Sys., Inc. v. NCR Corp.*, 752 Fed. Appx. 952, 958-59 (Fed. Cir. 2018).

## V.    CONCLUSION

Bumble's proposed constructions give the proper weight to all of the intrinsic record, including the claims themselves, the specifications, and the prosecution history, while Plaintiff's proposed constructions fail to do so. Plaintiff's attempts at altering the asserted patents' claimed scope should be rejected as improper in light of the intrinsic, and where appropriate, extrinsic evidence.

Dated:  April 26, 2019                */s/ Joseph M. Drayton*       

Deron R. Dacus (TX 00790553)
**THE DACUS FIRM, PC**
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Telephone: (903) 705-1117
Facsimile:  (903) 581-2543
ddacus@dacusfirm.com

Joseph M. Drayton (*pro hac vice*)
NY Bar No. 2875318
**COOLEY LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
jdrayton@cooley.com

Michael G. Rhodes (*pro hac vice*)
CA Bar No. 116127
Matthew Caplan (*pro hac vice*)
CA Bar No. 260388
**COOLEY LLP**
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
mrhodes@cooley.com
mcaplan@cooley.com

Rose S. Whelan (*pro hac vice*)
DC Bar No. 999367
**COOLEY LLP**
1299 Pennsylvania Ave., N.W.
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
rwhelan@cooley.com

*Attorneys for Defendants Bumble Trading, Inc. and
Bumble Holding, Ltd.*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record on April 26, 2019.

*Joseph M. Drayton*
Joseph M. Drayton