# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| MATCH GROUP, LLC<br><br>        Plaintiff,<br><br>v.<br><br>BUMBLE TRADING INC. and<br>BUMBLE HOLDING, LTD.,<br><br>        Defendants. | No. 6:18-cv-00080-ADA<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF MATCH GROUP, LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................... 1

II.  RESPONSIVE ARGUMENT CONCERNING CLAIM CONSTRUCTION ..................... 1

   A.  "Graphical Representation" ................................................................................ 1

   B.  "Social Networking Platform" .......................................................................... 7

   C.  "Without Allowing Communication" ............................................................... 10

   D.  "Preventing Communication" .......................................................................... 13

III.  ARGUMENT CONCERNING INDEFINITENESS ......................................................... 18

   A.  Bumble Has Not Shown that Any "Associated" Term Is Indefinite. ........................... 18

      1.  The Term "Associated" has a Common and Well-Understood Meaning,
         and that Meaning Is Not What Bumble Says It Is. .................................... 19

      2.  Bumble Fails to Establish Indefiniteness of Any "Associated"-
         Related Term. ........................................................................................ 20

   B.  "Text Area" Is Also Not Indefinite. ................................................................. 23

IV.  CONCLUSION ...................................................................................................... 27

## **TABLE OF AUTHORITIES**

**Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*
  725 F.3d 1315 (Fed. Cir. 2013) ................................................................. 8

*3rd Eye Surveillance, LLC v. City of F.t. Worth & E-Watch Corp.*
  No. 6:14-CV-00725, Dkt. No. 120 (E.D. Tex. June 8, 2016) .................... 19

*Acromed Corp. v. Sofamor Danek Grp., Inc.*
  253 F.3d 1371(Fed. Cir. 2001) ............................................................... 22

*Acumed LLC v. Stryker Corp.*
  483 F.3d 800 (Fed. Cir. 2006) ................................................................ 26

*Apple Inc. v. Motorola, Inc.*
  757 F.3d 1286 (Fed. Cir. 2014) ................................................................ 3

*Application of Gardner*
  427 F.2d 786 (C.C.P.A. 1970) ................................................................ 21

*Bicon, Inc. v. Straumann Co.*
  441 F.3d 945 (Fed. Cir. 2006) .................................................................. 3

*CyWee Grp., Ltd. v. Huawei Device Co.*
  No. 217CV00495WCBRSP, 2018 WL 6419484 (E.D. Tex. Dec. 6, 2018) ........... 22

*Evicam Int'l, Inc. v. Enf't Video, LLC*
  No. 4:16-CV-105, 2016 WL 6470967 (E.D. Tex. Nov. 2, 2016) ........... 21

*GE Light Solutions, LLC v. Apple Inc.*
  758 F.3d 1362 (Fed. Cir. 2014) ................................................................ 7

*Helmsderfer v. Bobrick Washroom Equip., Inc.*
  527 F.3d 1379 (Fed. Cir. 2008) ........................................................... 9, 11

*Intamin Ltd. v. Magnetar Techs., Corp.*
  483 F.3d 1328 (Fed. Cir. 2007) ................................................................ 7

*Invitrogen Corp. v. Clontech Labs., Inc.*
  429 F.3d 1052 (Fed. Cir. 2005) .............................................................. 12

*Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*
  No. 1:14-CV-00134, 2015 WL 4937464 (W.D. Tex. Aug. 18, 2015) .................. 19

*Massachusetts Inst. of Tech. v. Shire Pharm., Inc.*
   839 F.3d 1111 (Fed. Cir. 2016) ................................................................. 16

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*
   7 F.3d 1571 (Fed. Cir. 1993) .................................................................... 23

*Nautilus, Inc. v. Biosig Instruments, Inc.*
   572 U.S. 898 (2014) ............................................................................ 22, 23

*Pause Tech., LLC v. TiVo, Inc.*
   419 F.3d 1326 (Fed. Cir. 2005) .................................................................. 3

*Phillips v. AWH Corp.*
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................... 9, 19, 20

*PPG Indus. v. Guardian Indus. Corp.*
   156 F.3d 1351 (Fed. Cir. 1998) ................................................................ 27

*Purdue Pharm. Prod. L.P. v. Actavis Elizabeth LLC*
   No. CIV.A. 12-5311 JLL, 2015 WL 5032650 (D.N.J. Aug. 25, 2015) ................ 22

*Sonix Tech. Co. v. Publications Int'l, Ltd.*
   844 F.3d 1370 (Fed. Cir. 2017) ................................................................ 21

*Tech. Props. Ltd. v. Huawei Techs. Co.*
   849 F.3d 1349 (Fed. Cir. 2017) ................................................................ 15

*Thomas Swan & Co. v. Finisar Corp.*
   No. 2:13-CV-00178-JRG, 2014 WL 2885296 (E.D. Tex. June 25, 2014) ............ 23

*Thorner v. Sony Computer Entertainment America LLC.*
   669 F.3d 1362 (Fed. Cir. 2012) ......................................................... 7, 9, 21

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*
   529 F.3d 1364 (Fed. Cir. 2008) .................................................................. 7

*Warsaw Orthopedic Inc. v. Nuvasive, Inc.*
   778 F.3d 1365 (Fed. Cir. 2015) ................................................................ 23

*Williamson v. Citrix Online, LLC*
   792 F.3d 1339 (Fed. Cir. 2015) .................................................................. 3

## I.     INTRODUCTION

Bumble's Opening Claim Construction Brief transparently seeks to re-define words in the claims to suit its preferred invalidity and non-infringement arguments.  Rather than argue based on the well-settled rules of claim construction—*i.e.*, that terms may only be redefined upon clear and unmistakable lexicography or disclaimer—Bumble simply sets forth a proposal and purports to support that proposal with a smattering of intrinsic and extrinsic "evidence."  For the reasons described in Match's Opening Brief and in more detail below, Bumble's proposed constructions are untenable.  The Court should reject them and adopt Match's proposals.

## II.     RESPONSIVE ARGUMENT CONCERNING CLAIM CONSTRUCTION

### A.     "Graphical Representation"

| Claim Term | Match's Proposal | Bumble's Proposal |
|---|---|---|
| Graphical representation<br><br>Graphical representation of a [first, second, third, etc.] potential match<br><br>Graphical representation of a first [second] online dating profile associated with a first [second] user<br><br>Graphical representation of a first item of information<br><br>Graphical representation of the first [second] user | Pictorial portrayal<br><br>Pictorial portrayal of a [first, second, third, etc.] potential match<br><br>Pictorial portrayal of a first [second] online dating profile associated with a first [second] user<br><br>Pictorial portrayal of a first item of information<br><br>Pictorial portrayal of the first [second] user. | summary of information displayed on a graphical user interface<br><br>summary of information displayed on a graphical user interface representing a [first, second, third, etc.] potential match<br><br>summary of information displayed on a graphical user interface representing a first [second] online dating profile associated with a first [second] user<br><br>summary of information displayed on a graphical user interface representing a first item of information<br><br>summary of information displayed on a graphical user |

| | | interface representing the first [second] user. |
|---|---|---|
| | | |

The claims themselves make clear that various features are displayed on a graphical user interface.  In all but two claims, the words "graphical user interface" are expressly recited.  And all claims also recite touch screen gestures, which inherently assume a graphical user interface as opposed to a strictly textual command-line one.  Yet over and above these "graphical user interface" requirements, the claims *also* require that there be "representations" of various terms and that those representations must be *graphical* representations.  In other words, the claims recite representations of a particular thing (an online dating profile, an item of information, or a potential match) *and* of a particular type (a *graphical* representation).

Bumble's Opening Brief admits that it asks the Court to construe "graphical representation" so as to render the adjective modifier "graphical" superfluous.  In a footnote, Bumble acknowledges that each patent recites that the "*graphical* representation" must be displayed on a "graphical user interface."[1]  Dkt. 76 at 6 n.6.  Bumble proposes that, for these terms—*i.e.*, 25 of the 27 asserted claims—the Court can simply construe "graphical

_____

[1] Bumble sheepishly acknowledges this situation exists as to "some" claims.  The truth is that it exists in every claim of every patent except independent claim 3 of the '023 Patent and its dependent, which merely recite an "interface" rather than a "graphical user interface."  Yet even these claims implicitly require a "graphical user interface" since the limitations require the use of touch screen gestures, functionality that is not possible in a command-line user interface.

representation" as a "summary of information" rather than "summary of information displayed

on a graphical user interface" in order "to avoid unnecessary repetition." *Id.*  With this

suggestion, Bumble concedes that its construction of "graphical representation" gives no effect

to the "graphical" modifier.  Allowing such a construction would violate numerous binding

Federal Circuit precedents.[2]

      Beyond its admission that it seeks to read the word "graphical" out of the claimed

"graphical representation," Bumble's Opening Brief primarily attacks a straw man, implying that

Match's proposal requires that the graphical representation be "limited to . . . a picture," or "just

[a] picture."  *See* Schmandt Declaration ¶ 29 (characterizing "pictorial portrayal" construction as

required "a picture of the user."); *Id.* ¶ 30 (opining that "a person or ordinary skill in the art

would not understand a graphical representation to be limited to a picture.").  This is not Match's

proposal.  Rather, a construction that a "graphical representation" should mean "pictorial

portrayal" means only that the term requires a "portrayal, including some pictorial component,

of" the various claim terms. [3]  *See, e.g.* Dkt. 77-8 Jones Decl. ¶ 21 ("[A] POSITA would

understand from this context that the term graphical representation indicated a pictorial

component").  If Match's proposed construction was intended to mean "a picture of [various

claim terms]," Match would have proposed that.  Thus, these arguments are irrelevant.

---

[2] *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1305 (Fed. Cir. 2014) (rejecting proposed construction because it rendered word meaningless and thus "contradict[ed] the claim language"), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (rejecting proposed construction because "claims are interpreted with an eye toward giving effect to all terms in the claim."); *Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) (rejecting construction because it "attache[d] no significance" to a particular term).

[3] To the extent the Court believes there is any difference in scope between the two proposals, Match has no objection to this alternative proposal.

When not attacking this straw man, Bumble's Opening Claim Construction Brief defends its position on four grounds.  None of these arguments warrant adopting Bumble's construction or rejecting Match's proposal.

**First**, Bumble contends that a "graphical representation" cannot be a "pictorial portrayal" because the claims recite "graphical representation[s]" of "online dating profiles" and the specification describes user profiles as *potentially* including "height, weight, age location, and ethnicity."  Dkt. No. 76 at 6-7 (citing '811 Patent at 20:21-24).  But describing what traits might be included in a *user profile* says nothing about what makes something a *graphical representation* of that profile; it merely describes what a profile could include, and nothing in the specification suggests these elements could not be depicted graphically.

**Second**, Bumble contends that a "graphical representation" cannot be a "pictorial portrayal" because the  specification describes "display[ing] to a user the profile information of a second user" and, in some embodiments, further describes that "user 14 may be presented with a summary of information regarding a suggested user," which the specification describes as "one or more of: a picture, an icon, name, location information, gender, physical attributes, hobbies, or other profile information."  *Id.* at 7 (citing '811 Patent at 21:18-22).  Nothing about this description, however, equates the described "summary of information" (which merely "may be presented" to user 14) with a "graphical representation" of any of the categories to which that term attaches.  Further, the specification also describes a display that "may show an *image* of a suggested user and one or more aspects of the suggested user's profile information," and that "the combination of image and one or more aspects of profile information" may be displayed as a "card." '811 Patent at 21:13-15.  This suggests that the inventors contemplated multiple ways that profiles, matches, and items of information could be represented.  And then they claimed a

specific way: a *graphical* representation.  This is different from just any representation displayed

on a graphical user interface because it requires that the representation include some pictorial

component instead of, or in addition to, text.  Indeed, pictorial objects can often include text.

And as Match's Opening Brief made clear, the patents-in-suit do specifically disclose

embodiments where profiles and potential matches are portrayed by something that includes a

pictorial component.  Dkt. 77 at 9.

   ***Third***, Bumble contends that its proposal is supported by the "extrinsic evidence."  Dkt.

78 at 8-9.  But review of the allegedly confirmatory "extrinsic evidence" reveals that Bumble

relies solely on its expert's say-so.  No dictionary supports Bumble's proposal.  Instead, the

"extrinsic evidence" is only the unsupported declaration of Bumble's expert, Mr. Schmandt.  Mr.

Schmandt initially points out the (largely irrelevant) distinction between command-line

interfaces and graphical user interfaces.  Schmandt Decl. ¶ 27.  He then cites to portions of the

specification indicating ways profiles may be displayed.  *Id.* ¶ 28.  He then concludes that "a

person of ordinary skill in the art would understand this disclosure to correspond to the claimed

'graphical representation.'"  *Id.*  But if that conclusion is based on anything, it is based on his

own unsupported say-so that a person of ordinary skill would understand the terms "graphical

representation of [term] . . ." to mean any and all "representation[s] of [terms]" displayed on any

interface other than a command line interface.  *Id.* ¶ 27.  There is nothing else supporting the

conclusion.  And Mr. Schmandt does not even address the fact that this definition of "graphical

representation" would render the "graphical" modifier superfluous.[4]

_____

[4] Attempting to cover up its lack of support for its position, Bumble cites numerous definitions of
the term "graphical user interface."  But that is pure misdirection; the definition of "graphical user
interface" is not equivalent to definitions of "graphical representation[s] of [various terms]."  There
is no legitimate dispute that a graphical user interface can display "text, icons, images, and some

***Finally***, Bumble contends that the Court should reject Match's proposal because it would "interpret claims terms in a way that excludes disclosed examples in the specification." Dkt. 76 at 11. This is wrong. For one, Match's proposal does not exclude Fig. 6, as Bumble contends; Match agrees that "card 88" provides an example of a graphical representation of a potential match, online dating profile, or an item of information.[5] But in any event, the specification does not expressly define "graphical representation" or link any teaching expressly to the term. Match's construction of "graphical representation," consistent with its ordinary meaning, would not "exclude disclosed examples [of the graphical representation term] in the specification," Dkt. 76 at 11, when the specification does not expressly define the term. Bumble's circular argument to the contrary depends only on its own definition of "graphical representation" and its own say-so about what constitutes a "graphical representation" in the specification. But as Match's Opening Brief made clear, claim terms need not capture every embodiment disclosed in the

---

combination therefore." Dkt. 77 at 8 n.6. The point is that Bumble's proposal would mean that *anything* on a GUI that represents something, including simply displaying a word, is a "graphical representation" of that thing, rendering the "graphical" language meaningless.

[5] Bumble also argues that the Match's proposal would exclude Figure 1F. But Bumble's argument depends on the premise that Match's proposal encompasses *only* pictures and not logical structures that include both pictures and text. As discussed above, that is a mischaracterization, or at least a misinterpretation, of Match's position. Further, Bumble also misinterprets the figure. Mr. Schmandt concludes that the "entire figure [1F] is a card-based metaphor for a potential match," and that "the **entire card**, not just Jane Doe's picture, is the 'graphical representation' of 'Jane Doe.'" Schmandt Decl. ¶ 30. The problem for Bumble is that Fig. 1F does not disclose a "card" of any sort. Instead, the box labeled "12" is a "display," which can be "a computer monitor" or "projector, speaker, or other device that allows user 14 to appreciate information that system **100** transmits." '811 Patent at 4:12-15. The "box" is not a visual line within an GUI reflecting a "card metaphor," it is simply an outline of the computer monitor itself. The Court need not determine whether a figure that Bumble redrafted to disclose something other than it actually does would fall into the scope of the term "graphical representation." After concluding that the "graphical representation" terms require the existence of a portrayal of the various claim terms that includes at least a pictorial component, remaining questions of what would "read" on the term (for infringement) or "teach" it (for invalidity) should be questions of fact.

specification.  Dkt. 77 at 8-9 (citing *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) and *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1337 (Fed. Cir. 2007)).  Therefore, not every representation in the specification need be a "graphical" one.

In sum, the inventors here elected to use the phrase "graphical representation of" various terms while also repeatedly claiming that the display must occur on a "graphical user interface" and reciting other requirements inherently indicating that the inventions require a "graphical user interface."  In the context of the claims, Bumble's proposal reads the modifier "graphical" out of the claim and instead replaces it with a totally unrelated "summary of information" clause without any legitimate support.  The Court should adopt Match's construction and reject Bumble's competing proposal.

### B.    "Social Networking Platform"

| Claim Term | Match's Proposal | Bumble's Proposal |
|---|---|---|
| "Social networking platform" | Plain and ordinary meaning; no construction necessary | "Social networking platform independent of the system for profile matching" |

The ordinary meaning of "social networking platform" is not limited to a specific type of social networking platform.  Bumble offers no evidence or argument to the contrary.  Mr. Schmandt does not opine on the term. *See generally* Dkt. 76-1.  And since "social networking platform" is unambiguously not only the specific type of platform proposed, Bumble's construction must show either that the inventors acted as their own lexicographers or clearly disavowed claim scope. *Thorner v. Sony Computer Entertainment America LLC.*, 669 F.3d 1362, 1367 (Fed. Cir. 2012).  These standards are "exacting," and require a showing that makes it "clear and unmistakable" that the inventors intended to surrender claim scope. *GE Light*

*Solutions, LLC v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014).  In other words, "[w]here an applicant's statements are amenable to multiple reasonable interpretations," *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013), no limitation on the full scope of the term is appropriate.  Yet despite having this burden, Bumble's Opening Brief does not even mention the relevant standard to make such showings.

Bumble points out two circumstances that it contends support its limiting construction. *First*, Bumble contends that because the inventors used the words "system for profile matching" and "social networking platform" separately, they must be independent of one another.  Dkt. 76 at 11.  But the inventors' use of the terms "system of profile matching" as including profiles "associated with a social networking platform" does not require that the "social networking platform" be independent of the system of profile matching.  While the use of distinct words may describe different concepts, different does not necessarily mean *independent*.  For example, a "room" is different from a "house," but a "room" is not *independent of* a "house."  Here, the claims recite systems and methods for "profile matching," and recite that these inventions include "profiles" and that some of those profiles are "associated with a social networking platform."  Nothing about the structure of these claims requires that the "social networking platform" be "independent of" the system for profile matching.

*Second*, Bumble points out that that specification contemplates the existence of social networking profiles existing outside the matching system and describes some benefits of these embodiments.  Dkt. 76 at 12-13.  But nothing in the specification warrants Bumble's proposed limiting construction.  As Match's Opening Claim Construction Brief makes clear, the inventors did not disavow claim scope.  Dkt. 77 at 21-22.  To the contrary, the patent expressly contemplates the matching system to be utilized entirely within the contemplated "social

networking platform." '811 Patent at 16:14-19.  Beyond that, the specification also describes the possible use in some embodiments of "*other* social networking systems," '811 Patent at 2:42-44, 2:44-46, and 19:38-44, highlighting that the profile matching invention could also itself be considered a social networking platform (or at least part of one).  In such circumstances, the correct construction should be broad enough to encompass these broader disclosures.  *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("[O]ur court has cautioned against interpreting a claim term in a way that excludes disclosed embodiments, when that term has multiple ordinary meaning consistent with the intrinsic record.")

But even assuming for sake of argument that the specification did not expressly contemplate integration with the social network, Bumble *still* would not meet its burden to limit claim scope.  Even if—contrary to fact—the specification only contemplated separate social networks, an accused infringer cannot show disavowal simply because the patentee disclosed a single embodiment.  *Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patents must be construed as being limited to that embodiment.").  And while the written description does describe some benefits of this embodiment, this is not a disavowal of others.  Even assuming a description of advantages of one embodiment could be considered criticism of a different one, "mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is [also] not sufficient to rise to the level of clear avowal."  *Id.* at 669 F.3d at 1365-66.  Particularly where the specification describes the matching system fully contained and integrated within the social networking platform and where the inventors describe other social networking systems, the

Court may not limit the ordinary scope of "social networking platform" to Bumble's preferred

type of "social networking platform."  No construction is necessary.

C.      **"Without Allowing Communication"**

| Claim Term | Match's Proposal | Bumble's Proposal |
|---|---|---|
| "Without allowing [communication]" | Plain and ordinary meaning; no construction necessary | An affirmative act to ensure no communication between two users. |

The plain and ordinary meaning of "without allowing" does not require an affirmative

act, particularly in the context of a claims recites "allowing communication . . . in response to"

positive preference indications.  *See, e.g.*, '854 Patent, Claim 1.  As discussed in Match's

Opening Claim Construction brief, one settled meaning of "allow" is "permit."  Dkt. 77 at 12

(citing Jones Decl. ¶ 23).  "Without [permitting]" plainly does not require an affirmative action

in this context; in fact, it connotes the opposite.  This is also consistent with the intrinsic

evidence.  Figure 10 shows a flowchart in which the system evaluates preferences.  If a mutual

positive preference is detected, the system allows communication.  If no mutual preference is

detected, it "do[es] not allow" communication.  In describing this figure, the specification makes

clear that "not allow[ing]" communication need not require an affirmative action:

> If matching server 20 detects a mutual expression of approval then a match is
> made between first and second users 14.  Then, at step 1012, matching server 20
> allows private communication between first and second users 14.  If a mutual
> expression of approval is not detected at step 1010, then matching servers 20
> stores the preference of first user 14 regarding the presented user profile for future
> comparison and continues to step 1016 where private communication are not yet
> allowed.

'811 Patent at 23:21-30; *see also id.* at 23:14-16 ("If first user 14 disapproves of the presented

user profile then a match is not made and, at step 1016, matching server 20 will not allow

communication between the two users.").  These descriptions unequivocally suggest a definition

10

of "without allowing" akin to "without permitting," which clearly does not require any affirmative act. They contemplate an "allowed" status that exists upon meeting certain conditions and a "not allowed" status that exists when such certain conditions are not met. Bumble's limiting construction is inappropriate. *Helmsderfer*, 527 F.3d at 1383 (noting that construction should encompass all disclosures where an ordinary meaning is broad enough to do so).

Bumble again conspicuously fails to offer Mr. Schmandt's opinion on a skilled artisan's understanding of "without allowing." Tacitly acknowledging the weakness of its "ordinary meaning" position, Bumble instead falls back on two disclaimer-like arguments. But again, Bumble never even mentions, let alone meets, the "exacting" standard for the Court to find disclaimer.

First, Bumble contends that "without allowing" communication requires an "affirmative act" because the specification's flowcharts include a box with the words "do not allow communication." Citing to no evidence or legal authority, Bumble contends that the "inclusion of these steps in the flowcharts indicates that the profile matching system must affirmative take these steps."[6] Dkt. 76 at 15. This is wrong.

The flowchart in Figure 10 discloses a YES/NO decision ("Is there a mutual positive preference?") and the resulting outcome based on that decision. Because the flowchart describes results from both the YES decision and the NO decision, it is unsurprising that it would show the results of the determinations even where a NO decision merely maintains a default

_____

[6] Bumble also contends that Figure 10 teaches "not allowing communication in response to receiving and storing user preferences." Dkt. 76 at 14-15. But nothing about the flowchart indicates that not allowing communication is done "in response to" anything, nor do any of the claims of any of the three asserted patents.

communication-not-allowed status.  The specification's description of Figure 10 further undermines any "affirmative act" requirement.  Figure 10 discloses the status flow where one user has indicated a YES and another user has not yet indicated any preference.  When describing this scenario where "a mutual expression of approval is not detected," the patent discloses an embodiment where the matching server then "stores the preference of first user 14 regarding the presented user profile *for future comparison* and continues to step 1016 where private communications are *not yet allowed*." '811 Patent at 23:25-30.  In the flowchart, this is still the "do not allow communication" box even though communication remains possible depending on the second user's preference indication.  Reading this, a skilled artisan would understand that the patent contemplates embodiments where communication is an on/off mechanism that is defaulted to "off" until a "mutual expression of approval is detected." *See, e.g.* Dkt. 77-8, Jones Decl. ¶ 27-28.  In other words, the "do not allow communication" means only that communication has not been allowed.

Second, Bumble makes a prosecution history disclaimer argument.   Bumble contends that Match made statements concerning the "prevent[ing] communication" limitation in connection with the '811 Patent, that these statements disclaimed claim scope as to the "preventing" limitation, and that these statements should also apply to the "without allowing" limitation.  This is also wrong.  As discussed *supra* in the context of the "preventing" limitation, there was no disclaimer.  But even if there was, these arguments were directed at the '811 Patent, with claim limitations related to the word "preventing."  Match's statements concerning different language in a different patent do not apply to the "without allowing" term simply because the '854 Patent is a continuation.  *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078

(Fed. Cir. 2005) ("[T]he prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application.").

Beyond its disclaimer arguments, Bumble contends that "without allowing" requires an affirmative act because one definition of "allow" is "to forebear or neglect to restrain or prevent." Dkt. 77 at 16. "Logically," according to Bumble, that means "without allowing" is necessarily understood as "restrain[ing] or preventing." *Id.* But Bumble simply ignores that its *own dictionary* indicates that the "allow" can also mean "permit" or to "to make a possibility." Dkt. 76-8 at 33. And it makes no argument that the "permit" definition is outside the ordinary scope of the term. Logically, then, "without allowing" would mean "without permitting" or "without making a possibility." Under these more accurate definitions that are more firmly rooted in the intrinsic evidence, no affirmative act is required.

The Court should reject Bumble's proposed construction and determine that no construction is necessary.

### D.    "Preventing Communication"

| Claim Term | Match's Proposal | Bumble's Proposal |
|---|---|---|
| "Prevent[ing] communication" | Plain and ordinary meaning; no construction necessary | An affirmative act to ensure no communication between two users. |

As discussed in Match's Opening Brief, the independent claims of the '811 Patent cover a method, a computer-readable medium, and a system according to one embodiment of the invention. Again, for example, Claim 7 recites a system that:

> determine[s] to enable initial communication between the first user and the second user in response to the determination that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user; . . . and

> ***prevent[s] communication*** between the first user and the third user after determining
> that the first user has expressed a negative indication regarding the third user . . .

An ordinary reading of this claim covers a system that can enable communication, but where

communication is disabled or unavailable unless and until both users express positive

preferences for each other.  Dkt. 77-8, Jones Decl. ¶¶ 27-28, 31-33.  Again, Mr. Schmandt

conspicuously declines in this case to opine in support of Bumble's proposal.

This omission is not surprising; in Bumble's IPR petition against the '811 Patent, Mr.

Schmandt's opinion indicates that "preventing" does not require an "affirmative act."  There Mr.

Schmandt purported to describe how  the "Chang" prior art reference meets the "preventing"

limitations:  "Figure 3 shows that if the user and the selected candidate member are not mutually

interested . . .  the system disclosed in Chang will not display the marriage suitability questions

interfaces . . .  Without proceeding to steps [related to exchanging marriage suitability

questions] . . . communication between two members is prevented."  Ex. C (Schmandt '811 IPR

Decl.) at ¶ 248.  Nowhere does Mr. Schmandt identify an "affirmative act to ensure no

communication between two users," or even opine that such an action might be necessary.

Instead, he maps the absence of proceeding to certain communication steps as the claimed

"preventing."

Not dissuaded by its own inconsistency, Bumble nevertheless attempts to limit the scope

of the term from its full ordinary meaning.  Bumble's primary argument is another

disclaimer-like position—though again, Bumble declines to address or mention the relevant

standard.  Bumble contends that Match amended it claims in a manner that "reinforce[s] the

understanding that the matching system must take affirmative steps to prevent users from

communicating."  Dkt. 76 at 17.  Selectively pointing out that Match described "enabling and

disabling communication" in prosecution when distinguishing from a prior art system with "open

communication" prior to "linking," Bumble contends that "preventing" requires an affirmative act.  Again, Bumble is wrong.

Prosecution history disclaimer will not occur unless the alleged disclaimer is "both clear and unmistakable to one of ordinary skill in the art." *Tech. Props. Ltd. v. Huawei Techs. Co.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017).  When determining whether an applicant has disclaimed claim scope, the Court must "consider the statements in the context of the entire prosecution," and "[i]f the challenged statements are ambiguous or amenable to multiple reasonable interpretations," no disclaimer occurred.  *Id.*  Here, there was no disclaimer.

In prosecution, the Examiner initially rejected the applied-for claims based on the Janssens reference.  At the time of the initial rejection, the claims recited in relevant part only "determine to enable communication . . . in response to the determination that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user."  Match amended its claims to recite "preventing" limitations.[7]  *See, e.g.*, Dkt. 76-10 at MTCH-0000591.  In describing the impact of those limitations, however, Match objected to the fact that, in Janssens, "users could communicate before being linked" and that this teaching in Janssens was unlike the "*claimed* manner of enabling and disabling communication" where "users are *prevented* from communicating *until the conditions specified in the claim are met*."  Dkt. 76-10 at MTCH-0000594.  In other words, the applicant indicated its ordinary use of "prevent" to mean a default status prior to meeting the conditions specified in the claim.

---

[7] While the limitations were initially drafted to occur "in response to" a negative preference indication, the claims were amended to recite that "preventing" must occur "after" the negative preference indication.  *See, e.g.*, Dkt. 77-10 at 2-4.

In these discussions, Match used the phrase "enabling and disabling communication" to describe the on/off requirements of the claims related to communication.  For example, Match indicated that the "claimed manner of enabling and disabling communication" meant that "users are prevented from communicating until the condition specified in the claim are met."  *Id.*  It described the claimed manner of "enabling and disabling communication" as requiring "a particular set of factors to allow for communication between users."  *Id.* at MTCH-0000595. Further, Match argued that Janssen did not teach "enabling and disabling communication in the manner claimed" because Janssens "disclosed that users exist in the chart list (and communicate with each other) before they are linked."  *Id.* at MTCH-0000594.  In other words, the description of "enabling and disabling" communication did not equate "preventing" with "disabling," nor did it indicate that "disabling" required any affirmative act.  Rather, Match consistently used the phrase to describe the overall contemplated system, which described a default state of non-communication that was allowed or enabled upon mutual opt-in.  And it did so in the context of describing then-pending claims that required both some level of "determining to enable" communication in response to mutual opt-in and "preventing" communication when no mutual opt-in existed.  *Massachusetts Inst. of Tech. v. Shire Pharm., Inc.*, 839 F.3d 1111, 1120 (Fed. Cir. 2016) (reasoning that statements made in prosecution should be considered in the context of prosecution history as a whole and status of then-pending claims).  Particularly where the claims already recited "determining to enable initial communication," in response to a mutual opt-in, these statements plainly do not rise to a clear and unmistakable" statement to a person of ordinary skill that Match intended to limit the scope of "preventing" to only "affirmative acts."

Bumble also supports its argument based on three additional arguments: (i) the structure of the claims; (ii) the flowchart in Figures 10 and 11 showing a box with the words "do not allow

communication," and (iii) cherry-picked dictionary definitions.  None of these arguments fare any better.

 First, Bumble contends that an affirmative act is required because the claims recite "prevent[ing] communication" . . . "in response to determining that" a user has expressed a negative preference indication.  This is simply wrong.  The Certificate of Correction in the '811 Patent makes clear that the "preventing communication" need only occur "*after* determining" that a user has expressed a negative preference indication.[8]  This correct language undermines Bumble's proposal because it acknowledges a state of communication that must remain, rather than an "affirmative" action that the system must perform.

Bumble next contends that "preventing" communication requires affirmative action because Figures 10 and 11 show a box with the phrase "do not allow communication."  As discussed above concerning the "without allowing" term, this argument is baseless; the flowchart describes the state of communication based on a YES/NO decision point for the existence of mutual positive preferences and simply describes the relevant state upon a NO decision.

Finally, Bumble contends that the dictionary definition of "prevent" requires affirmative action.  But Bumble cites no dictionary definition indicating that "prevent" *requires* an affirmative action any time something can be said to "prevent" something.  A system can keep something from happening or existing by simply not having it happen or exist.  This is exactly what Mr. Schmandt understood the term to mean in connection with Bumble's pending IPR proceedings.  Indeed, even where prevent "implies taking advance measures," Dkt. 76 at 17, this does not require an "affirmative action" every time something prevents something else.  For

---

[8] To the extent there is any confusion, Bumble's own claim listing in the IPR petition concerning the '811 Patent confirms that "after determining language" is accurate.  *See* Ex. A.

example, a static roof prevents rain from entering a house, but it is simply the preexisting design that prevents the rain from entering.  Similarly, as previously discussed, the Court prevents an oral argument by not scheduling one.  In both situations, the prevention is achieved without an affirmative action because of preexisting states or system designs.  Here again, the claims describe both enabling communication in response to a certain condition and then preventing after a scenario in which that certain condition does not exist.

Fundamentally, Bumble seeks a construction that requires an affirmative act to enable communication and then *another* affirmative act to prevent communication.  But any skilled artisan would recognize that a system that requires "initial communication" to be "enable[d]" in response to a mutual  opt-in is a system that does not default to communication and that the claimed prevention "after" non-mutual opt-in could be accomplished by maintaining that default state.  Dkt. 77-8, Jones Decl. ¶ 32.  The Court should reject Bumble's proposal.

## III.   ARGUMENT CONCERNING INDEFINITENESS

### A.   Bumble Has Not Shown that Any "Associated" Term Is Indefinite.

| Patent Claims | Match's Proposal | Bumble's Proposal |
|---|---|---|
| '811 patent, claims 1, 3 4, 6, and 7  '023 patent, claims 1-6  '854 patent, claims 1, 2, 4, 5, 7, 8, 10, and 11 | Not indefinite; No construction necessary / plain and ordinary meaning | Indefinite |

1.    The Term "Associated" Has a Common and Well-Understood Meaning, and that Meaning Is Not What Bumble Says It Is.

Although the term is found in innumerable patents, Bumble cites to zero cases finding the term "associated" to be indefinite.[9]  This is not surprising; the term has a common and well-understood meaning.

Bumble purports to identify that meaning as a term that "is generally used to describe a relationship between two things."  *See* Dkt. 76 at 18 ("'Associated' is generally used to describe a relationship between two things."); *accord* Schmandt Decl. at ¶ 32 ("The term 'associated' is generally used relationally—to describe a relationship between two different things.").[10]  But this contention is supported by nothing—no dictionary definition, no specification citation, and no case law.  And it is also simply wrong.

The ordinary meaning of associated is not "generally used to *describe* a relationship." Dkt. 76 at 18 (emphasis added).  Instead, it is generally used to refer to fact that there *is* a relationship.  *See* Dkt. 77-8 at ¶ 41; *See* Jones Resp. Decl. at ¶¶ 11-15.  Reading the claims in light of the intrinsic evidence, a POSITA would understand that the patents are claiming that there is a relationship/connection between the claim elements.  They would further understand

---

[9] As Match explained in its opening brief, courts have rejected indefiniteness challenges against the term "associated" and noted that it is well-understood.  *See* Dkt. 77 at 26 (citing *Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*, No. 1:14-CV-00134, 2015 WL 4937464, at *8 (W.D. Tex. Aug. 18, 2015) and *3rd Eye Surveillance, LLC v. City of F.t. Worth & E-Watch Corp.*, No. 6:14-CV-00725, Dkt. 120 at 6 (E.D. Tex. June 8, 2016)); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

[10] Despite Bumble's representation that it was seeking construction of "associated" alone, *see* Ex. B (Apr. 4, 2019 email from N. Soni to J. Summers), the rest of Bumble's argument is about other terms that happen to include the word "associated."

that there might be multiple ways to design a software application or a system with such a relationship/connection.  *See* Jones Resp. Decl. at ¶¶ 14, 18-20; *see also* '811 patent at FIGS. 6-9 (showing embodiment of claimed inventions).  Thus, an underlying premise of Bumble's argument—that the patents are claiming a specific type of relationship or connection—does not hold.

2.     <u>Bumble Fails to Establish Indefiniteness of Any "Associated"-Related Term.</u>

Armed with the false premise that "associated" must "describe" a relationship rather than indicate the existence of one, Bumble contends that the claims are indefinite by pointing out different types of possible associations.  Specifically, Bumble contends that each of the claims of Match's three patents must be invalid in light of Bumble's ability to have an internal debate about three limitations containing the word "associated": (1) a swiping gesture associated with a graphical representation; (2) a positive preference indication associated with an item of information; and (3) a preference indication associated with a graphical representation.  *See* Dkt. 76 at 18-19; Dkt. No. 76-1 at ¶¶ 31-32.  These arguments are insufficient to show indefiniteness.

First, Bumble has offered no competent evidence that a skilled artisan would consider the scope of the "associated" term as ambiguous in the context of the patents and claimed inventions.  While Mr. Schmandt purports to offer an opinion on that issue, the Court should give this opinion no weight.  For one, it is entirely conclusory.  Mr. Schmandt cites to no intrinsic or extrinsic evidence in support of his opinion on indefiniteness; he cursorily states that he reviewed the specification (*id.* at ¶ 32), but fails to provide any justification for his opinions other than *ipse dixit*.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc) ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").  Mr. Schmandt's opinion also contradicts his own IPR opinions for the '811 and '023 Patents.  In those sworn declarations, Mr. Schmandt understood and applied these

20

"associated" terms without mentioning any difficulty in evaluating their scope.[11]   As the Federal

Circuit has done before, the Court should find that these actions reflect that Bumble understands

the term despite its current argument.   *See Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d

1370, 1380 (Fed. Cir. 2017) (reversing a finding of indefiniteness and noting that "[a]ppellees'

other actions during litigation also reflect that they understood [the term]").   In any event, Mr.

Schmandt's conclusory declaration is entitled to no weight and certainly cannot support a finding

of indefiniteness by clear and convincing evidence.

Bumble's evidence fails to support a finding of indefiniteness even if considered.

Bumble contends that the term is indefinite because a skilled artisan could theorize different

ways for something to be associated.   But two of Bumble's hypothesized definitions are simply

incorrect.   They are inconsistent with a skilled artisan's understanding of the ordinary meaning

of the word "associated."   Jones Resp. Decl. ¶¶ 17-18.   Instead, Bumble has identified multiple

possible ways a product might infringe the claim.   But that does not mean the claim is indefinite.

Again, absent disclaimer or disavowal a term is given the full scope of its plain and ordinary

meaning.   *See Thorner*, 669 F.3d at 1367.   And as courts have repeatedly reaffirmed, "[b]readth

is not indefiniteness."   *Application of Gardner*, 427 F.2d 786, 788 (C.C.P.A. 1970).[12]   Although

---

[11] *See* Ex. C at 67, 72-75, 87-89, 102-03 124-29, 131-33, 145-46, 163-66 (Ex. No. 1002 -
Declaration of Christopher M. Schmandt, IPR2019-00842 as to the '811 patent); Ex. D at 62, 66-
68, 74-75, 77-78, 84-86, 88-92, 94-96, 109-10, 113, 115, 127-29, 131-33, 140-44, 152-56, 158 (Ex.
No. 1002 - Declaration of Christopher M. Schmandt, IPR2019-1000 as to the '023 patent); *Contra*
Ex. C at ¶ 292 (Ex. No. 1002 - Declaration of Christopher M. Schmandt, IPR2019-00842 as to
the '811 patent) (alleging that the term "text area" is vague, but then also providing a possible
meaning to a POSITA).

[12] *See, e.g., Evicam Int'l, Inc. v. Enf't Video, LLC*, No. 4:16-CV-105, 2016 WL 6470967, at *14
(E.D. Tex. Nov. 2, 2016) ("As to Defendant's remaining indefiniteness arguments, '[b]readth is
not indefiniteness.' Though the disputed term may be broad, Defendant has not demonstrated that
the term is unclear." (internal citations omitted)); *Purdue Pharm. Prod. L.P. v. Actavis Elizabeth*

Bumble has identified multiple ways that products *could practice* some of the limitations

containing the word "associated," it makes no legitimate argument that the specification

indicates that the claimed "associated" term *requires* a specific association, the scope of which is

unclear.  In such circumstances, a skilled artisan would understand the term in its broad sense;

they would understand that there are multiple ways to meet the term.[13]  *Cf. Acromed Corp. v.*

*Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1382 (Fed. Cir. 2001) (holding the term should be

construed broadly where specification broad enough to include all ways of meeting particular

term).

    In any event, reasonable debate about the scope of a term does not lead to a finding of

indefiniteness.  In *Nautilus, Inc. v. Biosig Instruments, Inc.*, the Supreme Court explained that the

definiteness requirement recognizes that "absolute precision is unattainable," "must take into

account the inherent limitations of language," and tolerates "some modicum of uncertainty."  *See*

572 U.S. 898, 909-10 (2014).  In doing so, the Supreme Court expressly declined to adopt

Nautilus's proposed definiteness standard that would render a claim invalid if the "claim is

---

*LLC*, No. CIV.A. 12-5311 JLL, 2015 WL 5032650, at *55 (D.N.J. Aug. 25, 2015) ("However, having a wide number of tests is not the standard to render a claim indefinite as '[b]readth is not indefiniteness.'") (citation omitted); *see also CyWee Grp., Ltd. v. Huawei Device Co.*, No. 217CV00495WCBRSP, 2018 WL 6419484, at *20 (E.D. Tex. Dec. 6, 2018) ("That the claim is drafted broadly enough to cover multiple embodiments does not render the claim indefinite.").

[13] Bumble also attempts to support its contention that the scope of "association" is unclear because, according to Bumble, the specification makes "inconsistent use" of the term.  Dkt. 76 at 20-21.  But Bumble cites only two snippets of the specification—totaling less than five lines of the description.  These do not demonstrate inconsistent usage of the term "associated."  First, Bumble cites to a use of the word "associated" as an adjective (citing '811 patent at 3:56-58) and then another use of the word "associate" as a verb (citing '811 patent at 3:56-58).  This is not inconsistency; these are different parts of speech.  In any case, these usages demonstrate that the specification uses the term "associated" according to its well-known and commonly understood meaning.

ambiguous, such that readers could reasonably interpret the claim's scope differently." *See id.* at 909 (internal quotations and citation omitted).  In other words, the mere possibility of reasonable minds wrestling over possible scope does not render a term indefinite; the term need only convey scope to a skilled artisan with "reasonably certainty." *See, e.g., Thomas Swan & Co. v. Finisar Corp.*, No. 2:13-CV-00178-JRG, 2014 WL 2885296, at *10 (E.D. Tex. June 25, 2014) ("Finally, the Court is not persuaded by Defendants' argument that because the term 'hologram' has different meanings in different contexts, the scope of alleged invention unascertainable to one of skill in the art."); *see also N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993) ("Thus, while the parties in the midst of a dispute have disagreed concerning the meaning of the claims, the claims are not so lacking in clarity as to be invalid under section 112.").  Here, each of the terms containing the word "associated" do so.

In sum, Bumble has failed to establish by clear and convincing evidence that a POSITA would not have been able to ascertain the claims' scope with reasonable certainty.  *See Warsaw Orthopedic Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1371 (Fed. Cir. 2015).  Accordingly, the Court should deny Bumble's motion for summary judgment of indefiniteness based on the term "associated."

**B.      "Text Area" Is Also Not Indefinite.**

| Patent Claims | Match's Proposal | Bumble's Proposal |
|---|---|---|
| '811 patent, claims 2, 5, 8 | Not indefinite.  "The text area" is an obvious typographical error that is subject to judicial correction.  "The text area" should read "a text area." | Indefinite |

Although Bumble indicates that it sought to declare the term "the text area" indefinite, its Opening Brief makes clear that it instead alleges that "text area" is indefinite, not "the text area."

23

("The text area" is a term that exists only in claims 2 and 5 of the '811 Patent, while "text area"

exists in claims 2, 5, and 8.)  Because Bumble identified the wrong term and previously alleged

that "the text area" had an antecedent basis problem, Match understood that Bumble based its

position only on an alleged lack of antecedent basis.  As Match made clear in its opening brief,

there is no such issue, and the Court may construe the "text area" terms consistently as "a text

area" throughout the three claims in which "text area" appears.

Bumble now contends that the term "text area" is indefinite simply because it is allegedly

vague.  Yet the Examiner expressly considered the term several times in connection with her

evaluation of prior art and never once objected on indefiniteness grounds.  In doing show, she

understood the scope of the term and that it connoted an area related to texting or chatting,

mapping the limitation to a "chat pane" in Janssens.  *See, e.g.*, Ex. E at 9 ("[C]licking the chat

button opens the chat pane is [*sic*] a text area enable [*sic*] the user to chat other users.").  This

alone shows the scope of the term is reasonably clear.

The intrinsic evidence also provides substantial guidance on the meaning of the term.

The term "text area" appears in the context of the following exemplary dependent claim:

> The system of claim 7, the processor further operable to, in response to the
> [mutual positive preference determination], cause the display of a graphical
> notification, on the graphical user interface of the first electronic device, that a
> match exists between the first user and the second user, the graphical notification
> comprising a user interface control enabling a ***text area*** to be presented to the first
> user.

Based on this language, a skilled artisan would see that the "in response to" limitation in the

dependent claims is identical to the requirements necessary to "determine to enable initial

communication between the first user and the second user."  Jones. Resp. Decl. ¶ 29.  This would

inform them to look to the specification's descriptions concerning actions occurring upon mutual

positive preferences.  *Id.* ¶¶ 29-30.  He or she would then understand from reading the

24

specification that, upon mutual positive preference, "matching server 20 may immediately . . . present an option to users 14 that have been matched to engage in a communication session (e.g., a chat, an SMS message, an e-mail . . .," '811 Patent at 22:10-15, or that "[m]atching server 20 then enables Harry and Sally to directly communicate with each other (e.g., through a private chat interface)." *Id.* at 22:42-45; Jones Resp. Decl. ¶¶ 29-30, 36.  The skilled artisan would also understand that the "graphical notification . . . that a match exists" would map to Figure 9, and that "92" and "94" in Figure 9 would be "user interface controls."  Jones Resp. Decl. ¶¶ 30-31. They would see the "92" in Figure 9 is a button to "Send A Message."  *Id.*  The skilled artisan would also look the Figure 12D, "an example communication interface between users of the matching system," *id.* at 24:30-33, that includes a "chat box 1208 for each of the matches that exist." *Id.* ¶ 32.  They would know that the  icon at the time of the invention, labeled as "chat box 1208," denoted a chat or text messaging function.  Jones. Resp. Decl. ¶ 33.  And the skilled artisan would also know that ordinary meanings of the words "text" or "texting" could refer to the exchange of electronic messages between users.  Jones Resp. Decl. ¶ 28.  The skilled artisan would also see that the "graphical notification" in Figure 9 itself displays text, making the understanding of "text area" as any area displaying text particularly inappropriate when the claims recite "a user interface control enabling a ***text area*** to be presented to the first user." Jones Resp. Decl. ¶ 36.  Finally, the skilled artisan would know that prior versions of the claims recite "a text area, the text area configured to receive text inputted by the first user to send to the second user."  Dkt. 76-10 at MTCH-000584; Jones. Resp. Decl. ¶ 34.  All of this information would make the scope of this term as denoting an area related to texting or chatting reasonably clear.  Jones Resp. Decl. ¶¶ 21-37.

In an attempt to prove otherwise by clear and convincing evidence, Bumble musters only a cursory declaration from its expert opining that a skilled artisan could understand the phrase "text area" to mean either "an area where text is displayed" or "a text input area."  Schmandt Decl. ¶¶ 37-38.  Yet Mr. Schmandt himself indicates that a "text area" in light of the specification would conform with a "chat box" if a figure describing a "chat box" expressly showed a "text input area."  Schmandt Decl. ¶ 38 ("I see no place to enter text in Figure 12D. Figure 12D, *thus*, does not resolve any ambiguity for the term." (emphasis added)).  This analysis confirms that a skilled artisan would look to descriptions of messaging and chats in discerning the scope of "text area."  Beyond this, Mr. Schmandt fails to analyze any words of the claim other than the isolated term "text area."  This failure causes him to ignore the significant intrinsic guidance identified above.  In light of this significant support connecting the dependent claim itself with an area related to chat or text messaging, particularly when combined with the lack of description of any newly "enabled" area where text is merely displayed, a skilled artisan would not be confused and think the term "text area," in the context of the claims, might potentially mean any area displaying text.

The skilled artisan, however, would also not limit the term to a "text input area" either. The above intrinsic evidence, particularly when combined with the skilled artisan's typical understanding, does indicate that "text area" is intended to mean an area related to texting or chatting such as a chat interface or a text messaging interface.  A skilled artisan would understand, however, that the "text area" related to texting or chatting is not necessarily only a "text input area" but any such area related to texting or chatting.  Jones Resp. Decl. ¶ 37.  Thus, while the scope of the term is clear from the intrinsic evidence, neither of the two definitions Bumble's provides accurately capture it.  Beyond this, the Court need not decipher the full

contours of what would or would not constitute a "text area."  *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2006) (concluding that construction "need not always purge every shred of ambiguity" and that "some line-drawing problems . . . [are] properly left to the trier of fact"); *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("[A]fter the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact.").  The Court should deny Bumble's motion for summary judgment on indefiniteness.

## IV.    CONCLUSION

For the reasons stated above and in Match's Opening Claim Construction Brief, the Court should adopt Match's proposed constructions and deny Bumble's motion for summary judgment.

DATED:  May 15, 2019                    Respectfully submitted,

                                        Caldwell Cassady & Curry

                                        /s/ *Bradley W. Caldwell*
                                        Bradley W. Caldwell
                                        Texas State Bar No. 24040630
                                        Email:  bcaldwell@caldwellcc.com
                                        John F. Summers
                                        Texas State Bar No. 24079417
                                        Email: jsummers@caldwellcc.com
                                        Warren J. McCarty, III
                                        Texas State Bar No. 24107857
                                        Email: wmccarty@caldwellcc.com
                                        Caldwell Cassady Curry P.C.
                                        2101 Cedar Springs Road, Suite 1000
                                        Dallas, Texas 75201
                                        Telephone: (214) 888-4848
                                        Facsimile: (214) 888-4849

                                        John P. Palmer
                                        State Bar. 15430600
                                        Email: palmer@namanhowell.com
                                        Naman, Howell, Smith & Lee, PLLC
                                        400 Austin Avenue, 8th Floor
                                        P.O. Box 1470
                                        Waco, TX 76701
                                        Telephone: (254) 755-4100
                                        Facsimile: (254) 754-6331

                                        **ATTORNEYS FOR PLAINTIFF**
                                        **MATCH GROUP, LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel registered as Filing Users on this 15th day of May, 2019.

                                        /s/ *Bradley W. Caldwell*
                                        Bradley W. Caldwell