**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **MATCH GROUP, LLC,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 6:18-cv-00080-ADA |
| **BUMBLE TRADING, INC., and BUMBLE HOLDING, LTD.** | |
| **Defendants.** | |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

# <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     DISPUTED CLAIM TERMS ............................................................................... 2

      A.      the "graphical representation" terms ...................................................... 2

      B.      "preventing communication" and "without allowing communication" ................ 8

      C.      "social networking platform" ................................................................ 18

      D.      "associated" ......................................................................................... 22

      E.      "the text area" ..................................................................................... 24

III.    CONCLUSION ................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*3rd Eye Surveillance, LLC v. City of Fort Worth & E-Watch Corp.*,
   No. 6:14-cv-00725, 2016 WL 3951335 (E.D. Tex. June 8, 2016) ......................................... 22

*Absolute Software, Inc. v. World Comput. Security Corp.*,
   No. 09-cv-142, 2014 Markman 496879 (W.D. Tex. Feb. 6, 2014) ........................................ 15

*Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*,
   No. 05-1280, 2006 WL 1478513 (Fed. Cir. May 26, 2006) ..................................................... 13

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*,
   132 F.3d 701 (Fed. Cir. 1997) .................................................................................................... 7

*CBT Flint Partners, LLC v. Return Path, Inc.*,
   654 F.3d 1353 (Fed. Cir. 2011) ................................................................................................ 25

*Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*,
   206 F.3d 1440 (Fed. Cir. 2000) ................................................................................................ 19

*Comark Commc'ns, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) ................................................................................................ 19

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   No. 2:14-CV-0911, 2015 WL 6769049 (E.D. Tex. Nov. 5, 2015) ......................................... 17

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
   438 F.3d 1374 (Fed. Cir. 2006) ................................................................................................ 20

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*,
   93 F.3d 766 (Fed. Cir. 1996) .................................................................................................... 19

*Globetrotter Software.  Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*,
   362 F.3d 1367 (Fed. Cir. 2004) ................................................................................................ 17

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ............................................................................................ 9, 18

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) ................................................................................................ 20

*Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*,
   No. 1:14-cv-00134, 2015 WL 4937464 (W.D. Tex. Aug. 18, 2015) ....................................... 23

**Table of Authorities**
(continued)

**Page(s)**

*Laitram Corp. v. Morehouse Indus., Inc.,*
    143 F.3d 1456 (Fed. Cir. 1998)..................................................................................... 12

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.,*
    395 F.3d 1364 (Fed. Cir. 2005)..................................................................................... 18

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
    357 F.3d 1340 (Fed. Cir. 2004)..................................................................................... 12

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
    134 S. Ct. 2120 (2014)................................................................................................... 24

*Novo Indus. L.P. v. Micro Molds Corp.,*
    350 F.3d 1348 (Fed. Cir. 2003)..................................................................................... 25

*Nystrom v. Trex Co., Inc.,*
    424 F.3d 1136 (Fed. Cir. 2005)..................................................................................... 13

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................................... 13

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
    182 F.3d 1298 (Fed. Cir. 1999)..................................................................................... 18

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.,*
    473 F.3d 1173 (Fed. Cir. 2006)..................................................................................... 21

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)....................................................................................... 21

**Statutes**

35 U.S.C. § 112............................................................................................................. 19, 20

## I.      INTRODUCTION

Bumble relies on the basic tenets of claim construction in arriving at its proposed constructions for those terms that both parties contend are definite.  As explained in Defendants' Opening Claim Construction Brief, ("Bumble's Opening Brief," D.I. 76), Bumble's constructions appropriately analyze the claim language in view of the entire intrinsic record and are consistent with extrinsic evidence.

Plaintiff's proposed constructions, in contrast, run afoul of the most basic canons of claim construction.  First, with respect to "graphical representation," Plaintiff ignores relevant claim language, the context of the claims, and pertinent disclosures in the specifications of the asserted patents in an improper effort to narrow the term to avoid invalidating prior art.  Likewise, for the similar "without allowing communication" and "prevent[ing] communication" limitations in the '854 and '811 Patents, respectively, Plaintiff's construction contravenes well-established precedent that all claim terms are presumed to have meaning.  Instead, Plaintiff's constructions render these limitations superfluous and, as with "graphical representation," Plaintiff either ignores or downplays germane intrinsic evidence, including the patentee's statements during prosecution of the '811 Patent.  These fundamental missteps are also embedded in Plaintiff's proposed construction for "social networking platform," because this construction too turns a blind-eye to the claim language itself.  Accordingly, the Court should adopt Bumble's proposed constructions.

As to the two terms Bumble identifies as indefinite, Plaintiff fails to provide any specific definition or construction for the terms that would provide any clarity or notice of what Plaintiff purports the patents claim.  For "associated," Plaintiff agrees that the term "appears in numerous contexts" and should be analyzed in the "context" of the claims, but fails to provide a clear meaning of the term in these numerous contexts.  For "the text area," Plaintiff does not address Bumble's

basis for indefiniteness, instead focusing on curing of an antecedent basis issue that Bumble does

not dispute.  For these reasons, the Court should find these terms and the claims containing them

indefinite.

## II.   DISPUTED CLAIM TERMS

### A.   the "graphical representation" terms

| Bumble's Construction | Plaintiff's Construction |
|---|---|
| "summary of information [displayed on a graphical user interface]" | "pictorial portrayal" |
| "summary of information [displayed on a graphical user interface] representing a [first, second, third, etc.] potential match" | "pictorial portrayal of a [first, second, third, etc.] potential match" |
| "summary of information [displayed on a graphical user interface] representing a [first, second] online dating profile" | "pictorial portrayal of a [first, second] online dating profile" |
| "summary of information [displayed on a graphical user interface] representing a [first, second] item of information" | "pictorial portrayal of a [first, second] item of information" |
| "summary of information [displayed on a graphical user interface] representing the [first, second] user" | "pictorial portrayal of the [first, second] user" |

Plaintiff improperly seeks to narrow its own broad term "graphical representation" to

"pictorial portrayal."  (D.I. 77 at 10 ("the inventions claimed are limited to pictorial portrayals").)

But, the patentee chose the term "graphical representation," not "pictorial portrayal," in its claims

in conjunction with "potential match[es]," "online dating profile[s]," and "item[s] of information."

('811 Patent, cls. 1, 4, 7; '023 Patent, cls. 1, 2, 3, 5; '854 Patent, cls. 1, 4, 7, 10.)  The patentee did

not claim a "pictorial portrayal," or "picture" of "potential match[es]," "online dating profile[s],"

and "item[s] of information."   Indeed, the claims themselves suggest that "graphical

representation" cannot be limited to "pictorial portrayal" because a "dating profile" or an "item of

information" are not necessarily capable of being represented by a picture, and the intrinsic record

does not teach otherwise.  For this reason, the term "graphical representation," as used in the asserted claims clearly cannot mean simply a "pictorial portrayal."

Consistent with the claim language, the specification discloses that "[u]ser 14 may be presented with a summary of information regarding a suggested user," which "may include **one or more of**: a picture, an icon, name, location information, gender, physical attributes, hobbies, or other profile information." ('811 Patent, 21:18-22 (emphasis added).)  This aspect of the intrinsic record undermines Plaintiff's proposed construction of "graphical representation," as a picture is not required to be connected with a dating profile or an item of information.

Additionally, the specifications disclose profiles depicted on graphical user interfaces by both pictures and text, when pictures are part of a dating profile, as shown in Figure 1F, reproduced below.



*FIG. 1F*

*FIG. 6*

Figure 6, reproduced above, is another embodiment of an online dating profile that includes a "card 88," which consists of a picture and text.  (*Id.*, 21:1-15.)  In Figure 6, the "graphical representation" is not the picture alone, but instead the entire card 88, which consists of a both a picture and the users' name.  (*Id.*)  As stated in the specification and acknowledged by Plaintiff in its brief, "**this card 'represent[s] the suggested user**.'"  (D.I. 77 at 9 (quoting '811 Patent, 21:14-15) (emphasis

3

added).)  The card metaphor itself is a graphical representation and would be so whether a picture or some other summary of information regarding a user or online dating profile was included on card 88.  (D.I. 76-1, ¶ 30.)

In addition, Plaintiff turns to the extrinsic record to dissect the term "graphical representation" and analyze the meaning of the words "graphic," "graphical," and "representation" alone to create the false dichotomy of "pictures" versus "text."  This is improper for several reasons.

**First**, the term "graphical representation," taken as a whole, has meaning to one of ordinary skill in the art.  A person of ordinary skill in the art would understand a "graphical representation" to be a representation that appears on a graphical user interface.  (*Id.*, ¶ 27.)  Though a "graphical representation" can optionally include more than text, which would appear on a text- or command line-interface, a "graphical representation" could also comprise of symbols, icons, graphs, images, text, etc.  (*Id.*)  The field of graphic design is pertinent to the creation of "graphical representations" displayed on graphical user interfaces, as well as to the general creation of displays on graphical user interfaces.  (Declaration of Christopher M. Schmandt in Support of Defendants' Responsive Claim Construction Brief ("Schmandt Decl."), ¶ 7.)  Graphic design is similarly not limited to just pictures or images.  (*Id.*)  Instead, graphic design pertains to how one creates a layout as a whole, and this layout can comprise of, individually or in combination, logos, text boxes, pictures, or icons.  (*Id.*)  These items may then be laid out in a specific way, including as cards, if preferred.  (*Id.*)

**Second**, the meaning of "graphical" is broader than "pictorial."  Looking first at the intrinsic evidence, the use of "graphical" in other claim limitations such as "graphical user interface" and "graphical notification" informs the use and understanding of "graphical" in

4

"graphical representation."  These uses of the term do not necessarily require pictures.  For example, it is clear from everyday use of touchscreens, such as smartphones, that a **graphical** user interface is not limited to displaying only images or pictures.  (D.I. 76-1, ¶ 27.)  Thus, a graphical user interface is not limited to a "pictorial" user interface.

Similarly, the claim language "graphical notification" in certain dependent claims further demonstrates that the word "graphical" is used to represent, among other things, text.  ('811 Patent, cls. 2, 5, 8; '854 Patent, cls. 3, 6, 9, 12.)  The claims teach that the "graphical notification" in the '811 and '854 Patents "indicat[es] that a match exists between the first user and the second user." (*Id.*)  In the '811 Patent, the "graphical notification" further comprises a user interface control, while in the '854 Patent, the "graphical notification" provides an option for the first user to communicate with the second user.  (*Id.*)  The specification describes the notification process in relation to Figure 9.  ('811 Patent, 22:19-44.)  As seen in that figure, reproduced below, the claimed "graphical notification" includes text saying "It's a match!"  (*Id.*, 3:18-21; Fig. 9.)



*FIG. 9*

Figure 9 also includes buttons to "send a message" or "keep playing." (*Id.*, *see also id.*, 22:19-31.) The "send a message" button is the claimed option for communicating, which is included in the "graphical notification." This button, along with the "[i]t's a match" text are separate from the pictures of the match. Based on the claim language and these disclosures, the "graphical notification" is not only a picture. It encompasses the entire screen displayed in Figure 9 on the graphical user interface; the "graphical notification" includes images, buttons, and text. (*Id.*, 22:19-31, Fig. 9.) Thus, the term "graphical" used to modify "notification" is in no way limited to a picture.

In sum, the term "graphical," when used with other terms in the claims, does not necessarily refer to a picture or image as understood by one of skill on the art, particularly upon consideration of the patent specification.

**Third**, even the extrinsic evidence cited by Plaintiff does not limit "graphical" to the display of a picture. For example, the Oxford Dictionary of English defines "graphical" as "related to visual art or computer graphics." (D.I. 77-8, ¶ 15.) As explained by Mr. Schmandt, computer graphics and graphic design are not limited to the presentation and creation of pictures. (Schmandt Decl., ¶ 7.) To the contrary, computer graphics, visual art, and graphic design can involve numerous things, such as symbols, text, icons, logos, pictures, or the like. (*Id.*, ¶¶ 6-7.) Plaintiff and Plaintiff's expert, Dr. Jones, also cite to the Oxford Dictionary of English's definition of "graphic," "in reference to computing, as 'relating to or denoting a visual image.'" (D.I. 77 at 7, 10; D.I. 77-8, ¶ 15.) A "visual image," however is also not equivalent to a picture. (Schmandt Decl., ¶ 6.) Instead, "visual images" may be created based on principles of graphic design, and thus can involve text, typefaces, shapes, colors, and characters arranged in a specific way. (*Id.*)

Plaintiff argues that Bumble's proposed construction is redundant because the claims "indicate that the representation will be displayed on a graphical user interface." (D.I. 77 at 8.) This argument has no merit. First, it inaccurately asserts that every claim of the three patents that includes the phrase "graphical representation" also recites a "graphical user interface." Independent claim 3 of the '023 Patent does not include such a specifically defined interface. Second, even where the claims recite a "graphical user interface," in some instances, it appears that the patentee is claiming a specific graphical user interface. For example, in claims 1 of the '811 and '854 Patents, the "graphical representation" is displayed "on a graphical user interface of the first electronic device" and subsequent limitations refer to "the graphical user interface." ('811 Patent, cl. 1; '854 Patent, cl. 1.).

Finally, the presence of the recitation of the graphical user interface in the same claim would not change how a person of ordinary skill in the art, from the context of this claim language, would understand the term "graphical representation" especially in view of the various embodiments within the specification that are consistent with that understanding. (D.I. 76-1, ¶¶ 26-30.) Nothing in the intrinsic record undermines this understanding either. Therefore, any potential redundancy would be understood to have arisen simply as a drafter's choice, intentional or otherwise. In the end, the person of ordinary skill in the art would still conclude that a "graphical representation" is a "summary of information displayed on a graphical user interface." (*Id.*) *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 707 (Fed. Cir. 1997) (rejecting arguments that a proposed construction would render terms superfluous, because "defining a state of affairs with multiple terms should help, rather than hinder, understanding," and the two terms were "mutually reinforcing definitions rather than being superfluous"). Thus, any potential

redundancy, which can be eliminated when importing the constructions to the claims, should not deter the Court from adopting Bumble's proper construction.

The intrinsic and extrinsic evidence all point to "graphical representation" being accorded a broader definition than "pictorial portrayal." Plaintiff's admitted attempt to narrow and limit the meaning of the term to avoid invalidating prior art is highly improper. Accordingly, this Court should adopt Bumble's construction of "graphical representation," which is simply "a summary of information [displayed on a graphical user interface]" representing a potential match, user, online dating profile, or item of information.

**B.    "preventing communication"[1] and "without allowing communication"[2]**

| Bumble's Construction | Plaintiff's Construction |
|---|---|
| "an affirmative act to ensure no communication between two users" | No construction necessary/plain and ordinary meaning |

Bumble addresses Plaintiff's arguments regarding "without allowing communication" and "prevent[ing] communication" together below, because Plaintiff's arguments for the two terms are nearly identical. (D.I. 77 at 10-15 ("without allowing"), 15-19 ("prevent[ing] communication").)

"Without allowing communication" first appears in the independent claims of '854 Patent—a patent Plaintiff applied for after the commencement of this suit ostensibly to expand the scope of its asserted claims.[3] ('854 Patent, cls. 1, 4, 7, 10.) Initially, Plaintiff only asserted claims

---

[1] Plaintiff criticizes Bumble's construction as not fitting grammatically within the claims. Consistent with Bumble's proposal, the Court could construe the broader phrase "prevent[ing] communication between the first and the third [fourth] user" as "perform[ing] an affirmative act to ensure no communication between the first and the third [fourth] user."

[2] Plaintiff criticizes Bumble's construction as not fitting grammatically within the claims. Consistent with Bumble's proposal, the Court could construe the broader phrases "without allowing communication between the first user and the third [fourth] user" and "without allowing the first user to communicate with the third user" as "upon performing an affirmative act to ensure no communication between the first user and the third [fourth]."

[3] Plaintiff filed the present suit on March 16, 2018. (D.I. 1 at 45.) The '854 Patent was filed on April 3, 2018. ('854 Patent.)

from the '811 Patent, which claims "prevent[ing] communication."  (D.I. 1; '811 Patent, cls. 1, 4, 7.)

Plaintiff's core argument relies on the unfounded proposition that the phrases "without allowing" and "prevent[ing] communication" require no action and instead define a "default" condition.  (D.I. 77 at 11-14, 15-19.)  This position is illogical.  Based on Plaintiff's interpretation, so long as one is not taking any step to "allow communication," one would practice these limitations of the '854 and '811 Patents.  (*See id.* at 12, 16.)  Plaintiff's understanding is also contrary to the tenet of claim construction that provides that each claim term should be interpreted to have meaning.  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("all claim terms are presumed to have meaning in a claim") (internal citation omitted).  The '854 Patent's claims recite:

> **determine to allow the first user to communicate** with the second user in response to receiving from the first electronic device of the first user the first positive preference indication regarding the second user and receiving from the second electronic device of the second user the positive preference indication regarding the first user;
>
> \*        \*        \*
>
> receive from a third electronic device of the fourth user a second negative preference indication associated with a graphical representation of the first user; and
> **without allowing communication** between the first user and the fourth user, receive from the first electronic device of the first user a third positive preference indication associated with a graphical representation of a fifth potential match . . . .

(*See, e.g.*, '854 Patent, cl. 1 (emphasis added).)  Similarly, the '811 Patent's claims recite:

> **determining to enable initial communication** between the first user and the third user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;
>
> \*        \*        \*

> **preventing communication** between the first user and the third user
> after determining that the first user has expressed the negative
> preference indication regarding the third user . . . .

(*See, e.g.*, '811 Patent, cl. 1 (emphasis added).)  If Plaintiff was correct that "without allowing" and "prevent[ing]" do not require any action to ensure no communication occurs, the claims would not need to include these limitations, because they would provide no real limitation.  Under this interpretation, the patentee would only need to include the "determine to allow" and "determining to enable initial communication" limitations, respectively.  Yet, this is not the case.

To support this position with respect to "without allowing," Plaintiff notes that "[t]he claims distinguish between 'allow[ing]' or 'determin[ing] to allow,' which are done 'in response to' mutual opt-in, and 'without allowing'—which is not claimed 'in response to' anything."  (D.I. 77 at 11.)  Similarly, with respect to "prevent[ing] communication," Plaintiff argues that "[e]ach claim of the '811 Patent requires a 'determination' to enable initial communication," but "are silent on any determination required to practice the claimed 'prevention.'"  (*Id.* at 17.)  Notably, although the specific term "determining" is not used in connection with "preventing," the '811 Patent requires "prevent[ing] communication" "**after**" a **determination** that a user has expressed a negative preference indication. ('811 Patent, cls. 1, 4, 7.)  Similarly, "without allowing" in the '854 Patent always follows a negative preference indication.  ('854 Patent, cls. 1, 4, 7, 10.)  This further demonstrates that "prevent[ing] communication" and "without allowing" are real limitations that occur when users express negative preference indications that must have meaning in the context of the claims.

Contrary to Plaintiff's vague assertions that Bumble's proposed construction somehow excludes embodiments, Bumble's proposed construction is fully supported by the intrinsic record.  (*See* D.I. 77 at 13, 17-18; D.I. 77-8, ¶¶ 25, 33.)  Looking at Figure 10, reproduced below, "do not allow communication" is a separate step (step 1016) included in the flowchart for the system to

take.



*FIG. 10*

As the specifications describe Figure 10, "at step 1016, matching server 20 will not allow communication between the two users" if the first user disapproves of the presented profile at step 1008.  ('811 Patent, 23:14-16.)  Similarly, at step 1014, "matching server 20 stores the preference of first user 14 regarding the presented user profile for future comparison and **continues to step 1016** where private communications are not yet allowed."  (*Id.*, 23:25-30 (emphasis added).)  The system continues to and takes step 1016 to ensure communications between the users are not allowed.  This is an affirmative step to "not allow communication" and is no different from the claim language.  This disclosure, however, undermines Plaintiff's position.  Under Plaintiff's reading of the term, if the second user did not like the first user, the matching server would store the preference of the first user and would stop there.  There would be no need for the server to

11

"continue[] to step 1016." In sum, the intrinsic record confirms that the claims require an affirmative act to ensure no communication.

Plaintiff's referral to disclosures about "blocking" in the '854 and '811 Patents' specifications are inapposite. (*See* D.I. 77 at 13, 17.) Bumble is not improperly equating "without allowing" and "blocking" or "prevent[ing]" and "blocking." These refer to different aspects of the claimed matching system—the system does "not allow" communication between two users if both users do not provide the system with a positive preference indication for the other user and the system allows users to "block" users so that they do not appear as a potential match in the first place. (*Compare, e.g.,* '854 Patent, 23:26-46 *with id.*, 6:60-66.) Nonetheless, "without allowing," "prevent[ing]," and "blocking" all require the system to take affirmative steps.

Moreover, the prosecution history of the '811 Patent is relevant and reinforces Bumble's construction for both these terms. As the Federal Circuit has explained, "[a]ny statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004). This is particularly true where the related patents share a common written description. *See Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1460 n.2 (Fed. Cir. 1998) (applying the prosecution histories of two sibling patents, which shared a common written description, to one another). Here, the '811 and '854 Patents share an identical specification and the claims are substantially similar. As noted in Bumble's Opening Brief, the specifications do not use the terms "preventing" or "without allowing;" rather, the identical specifications use "not allow[ing]" and equate this to both "prevent[ing]" and "without allowing." (D.I. 76 at 14-17.)

Additionally, during the prosecution of the '854 Patent, the examiner rejected the '854

Patent for obviousness type double patenting in light of the '811 Patent.  (Ex. 11[4], '854 Patent Prosecution History, at MTCH-1228-36.)  In this rejection, the examiner lined up and compared the limitations of claim 4 of the '811 Patent to those of claim 1 of the '854 Patent, and found all the limitations of the '854 Patent disclosed in the '811 Patent.  (*Id.*)  In this comparison, the examiner equated "*without allowing* communication" from the '854 Patent to "*prevent* communication" from the '811 Patent.  (*Id.* at MTCH-1231-36.)  To overcome this rejection, the patentees filed a terminal disclaimer during prosecution of the '854 Patent.  (D.I. 76, Ex. 7 at MTCH-1189.)

All of this strongly suggests that both "prevent[ing]" and "without allowing" communication then mean the same thing in the context of the claims of the asserted patents, as Bumble proposes, and the prosecution history of the '811 Patent is instructive as to the construction of both.  *See Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, No. 05-1280, 2006 WL 1478513 at *7-*8 (Fed. Cir. May 26, 2006) (construing different terms similarly across patents based on disclaimers in prosecution history of one patent where asserted patents used terms synonymously); *Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("[d]ifferent terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper") (internal citation omitted); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (claim interpretation dictates that like terms should be construed consistently across related claims).

In its brief discussion of the '811 Patent's prosecution history, Plaintiff glosses over

---

[4] All exhibits referenced herewith previously not filed with Bumble's Opening Brief are attached to the Declaration of Rose Whelan.

important disclosures.  As explained in Bumble's Opening Brief, the prosecution history makes it

clear that applicants added the claim limitation of "prevent[ing] communication" between users in

an attempt to overcome a rejection in light of U.S. Patent App. Pub. No. 2014/0040368 A1 to

Janssens.  (D.I. 76, Ex. 8, '811 Patent Prosecution History, at MTCH-585 (adding limitations in

bold); *see also* Ex. 12, '811 Patent Prosecution History, at MTCH-604-617 (December 9, 2015

final rejection in view of Janssens).)   In response to the final rejection in light of Janssens,

applicants amended the claims:

> 23. (**Currently Amended**) A computer implemented method of profile matching, comprising:
>
> \* \* \*
>
> determining to enable communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;
>
> in response to determining to enable communication between the first user and the second user, causing the graphical user interface to display to the first user both the graphical representation of the first potential match~~; and a text area, the text area configured to receive text inputted by the first user to send to the second user; and~~
>
> ~~wherein the first user is identified using a first social networking platform and the second user is identified using a second social networking platform that is different than the first social networking platform.~~
>
> <u>determining that the first user expressed a negative preference indication regarding a second potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the second potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the second potential match corresponding to a third user;</u>
>
> <u>determining to ==prevent communication== between the first user and the third user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;</u>

14

> **determining that the first user expressed a positive preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the third potential match corresponding to a fourth user; and**
> **determining to prevent communication between the first user and the fourth user in response to determining that the fourth user has expressed a negative preference indication regarding the first user.**

(D,I, 76, Ex. 8 at MTCH-584-85 (highlighting added).)   This is the very first appearance of "prevent communication" in the claims.   Previously, the claims only disclosed "determining to enable communication."   (*Id.* at MTCH-584.)

In so amending their claims, applicants described their invention as "**enabling and disabling** communication."   (*Id.* at MTCH-594 (emphasis added).)   Whereas Plaintiff attempts to explain away "enabl[ing]" communication, Plaintiff does not even acknowledge applicants' description of their invention as "disabling communication."   (*See* D.I. 77 at 14, 18.)   Nor does Plaintiff address applicants' statements that their invention "exclude[s] all other communication between the users," made in an effort to overcome prior art.   (D.I. 76, Ex. 8 at MTCH-450, MTCH-174; *see* D.I. 76 at 15.)   These statements are highly relevant to the constructions of "without allowing" and "prevent[ing] communication" and underscore that the terms invoke performing an affirmative act, such as "disabling" or "exclud[ing]."

*Absolute Software, Inc. v. World Comput. Security Corp.*, another case from this district, is analogous to the case here.   No. 09-cv-142, 2014 Markman 496879, at *7-*8 (W.D. Tex. Feb. 6, 2014).   There, the Court construed two different terms identically, based on disclaimers from the patentee during the prosecution of one of the asserted patents.   *Id.* at *8.   Like patentees here, Absolute Software amended claim language to overcome prior art and in its office action response, distinguished the prior art from the invention by describing the claim limitation at issue.   *Id.*   The

Court found this statement from patentees "provided in Plaintiff's amendment to Claim 1 of the '863 Patent, explaining to the examiner what is meant to be claimed, applies to the similar Claim 72 of the '758 Patent." *Id.* Thus, the Court construed the two different, but synonymous, terms identically. This same reasoning applies to the claim construction dispute here. Accordingly, based on the relevant intrinsic evidence, including the '811 Patent's prosecution history, both "without allowing communication" and "prevent[ing] communication" should be construed consistently as Bumble proposes.

The extrinsic evidence Plaintiff cites also cuts against Plaintiff's understanding of these terms as a default position. Plaintiff and Plaintiff's expert, Dr. Jones, agree that the "scope of the term 'allowing' in its ordinary sense plainly reaches merely 'permit[ting] communication' or 'neglect[ing] to restrain' communication." (D.I. 77 at 12; D.I. 77-8, ¶ 23 (citing Merriam-Webster's Collegiate Dictionary (11th Ed. 2014).) Bumble pointed to this very same definition in its Opening Brief, and as explained there, if "allowing" means "neglect[ing] to restrain," as the parties agree it does, then conversely, "not allowing" means "restraining." (D.I. 76 at 16.) "Restraining" involves taking action and doing something. It is not passively doing nothing. Similarly, for "preventing," the dictionaries Plaintiff cites include definitions such as "hinder, stop; to impose an obstacle" and also state that "prevent implies taking **advance measures** against something." (D.I. 77 at 16; *see also* D.I. 76 at 17 (both citing Merriam Webster's Collegiate Dictionary) (emphasis added).)

The cases Plaintiff cites regarding the construction of "prevent[ing]" are also inapposite. In *Core Wireless Licensing*, the court was construing the term "preventing the receiving of," in the broader contexts of "automatically allowing or preventing receiving of the electronic information" and "preventing the receiving of the electronic information . . . if the filtering parameter denotes

the electronic information as information whose receipt is to be prevented." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-0911, 2015 WL 6769049, at *24 (E.D. Tex. Nov. 5, 2015). Based on these contexts, the court found that there might be defaults because no affirmative action needed to be taken if preventing was happening "automatically" or if the filtering parameter was "set to default to reject all messages." *Id.* The present context is different from those in *Core Wireless*, because there is no default assumed by the claims or provided in the intrinsic evidence.

The disclosures and claims of the '811 Patent are unlike those in *Globetrotter Software*. *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1379-81 (Fed. Cir. 2004). There, the court was construing the term "returning a run-prevention message where no available license is found." *Id.* at 1379. Thus, the issue the court was considering was "whether the message itself must actively stop the requesting program from running or whether the message can merely be a signal that keeps the requesting program from running when it is received." *Id.* at 1380. There, "prevention" was being used as an adjective to describe a message. *Id.* Here, "prevent" is used as a verb, and the construction from *Globetrotter Software*, requiring "only a message that results in the program's being prevented from running" is inapposite. As indicated by the intrinsic evidence for the '811 Patent, "prevent[ing]" is a separate step taken by the system, akin to disabling or excluding.

Thus, taken as a whole, the intrinsic and extrinsic evidence support Bumble's proposed constructions for "without allowing communication" and "prevent[ing] communication" over Plaintiff's interpretation, which would render these claim limitations meaningless.

C. **"social networking platform"**

| Bumble's Construction | Plaintiff's Construction |
|---|---|
| "social networking platform independent of the system for profile matching" | No construction necessary/plain and ordinary meaning |

"The starting point for any claim construction must be the claims themselves." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Yet, despite noting which claims recite a "social networking platform," Plaintiff does not examine the claim language. (*See* D.I. 77 at 19.)  Doing so reveals the fallacy in Plaintiff's argument premised on the notion that "the matching system itself is (or can be) a social networking platform."  (*Id.* at 22.)

Regardless of whether one might consider the profile matching system a "social networking platform", Bumble's Opening Brief clearly explains that the asserted patents claim a "social networking platform" as a specific element that is separate from and in addition to a "system for profile matching."  (D.I. 76 at 11-12; *see also, e.g.*, '811 Patent, cl. 7; '854 Patent, cl. 5.)  For example, the independent claims of the '811 Patent claim "electronically receiv[ing] a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with **a social networking platform**." ('811 Patent, cls. 1, 4, 7 (emphasis added).)  The language clearly indicates that the claimed system or method is receiving something ("profiles") that are associated with something distinct from the method or system itself ("a social networking platform").  To treat this recitation any differently, that is to find that the "system for profile matching" itself was the additionally claimed "social networking platform," would render this claim limitation meaningless, because every profile in the system for profile matching would be inherently "associated with a social networking platform." *Innova/Pure Water, Inc.*, 381 F.3d at 1119; *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.") (internal citation omitted); *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766,

770 (Fed. Cir. 1996) (rejecting the district court's claim construction because it rendered superfluous claim requirements).

The flaw in Plaintiff's reasoning is further highlighted by the claims of the '854 Patent, where "a social networking platform" is only recited in the dependent claims and the system for profile matching is claimed in the independent claims.  For example, claim 5 recites "[t]he system of claim 4, wherein at least one or more of the plurality of user on-line dating profiles is associated with a social networking platform."  ('854 Patent, cl. 5.)  Once again, this indicates that the system and the "social network platform" are distinct entities.  If, instead, the system for profile matching was the "social networking platform" itself, *all* of the user on-line dating profiles would be "associated with a social networking platform," rendering dependent claims 2, 5, 8, and 11 of the '854 Patent redundant and meaningless.  This is contrary to Federal Circuit precedent prohibiting the construction of claims in a manner that would create redundancy.  *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000) ("it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims"); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) ("[w]hile we recognize that the doctrine of claim differentiation is not a hard and fast rule of construction, it does create a presumption that each claim in a patent has a different scope.").  This is particularly true where, as here, Plaintiffs' interpretation of the claims would lead to dependent claims 2, 5, 8, and 11 having the same scope as independent claims 1, 4, 7 and 10:

> Indeed the [patent] statute stresses that a dependent claim must add a limitation to those recited in the independent claim.  *See* 35 U.S.C. § 112, ¶ 4 (2000) ("[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a *further limitation of the subject matter claimed*.") (emphasis added).  Thus, reading an additional limitation from a dependent claim into an independent claim would not only make that additional limitation superfluous, it might render the dependent claim invalid.

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) (citing 35 U.S.C. § 112, ¶ 4.)  For this reason, the "social networking platform" cannot be the same as the system for profile matching.

Rather than properly analyze or deduce the meaning of "social networking platform" in the context of the claims, Plaintiff spends the majority of its brief arguing about lexicography and disavowal.[5]  These arguments are not on point and inaccurately recount the parties' meet-and-confer of this claim phrase.

Moreover, Bumble's construction comports with the case law cited by Plaintiff.  Contrary to Plaintiff's assertions, Bumble is not requesting the Court to deviate from the clear language of the claims; in fact, Bumble starts with an analysis of the claim language to support its construction.  This is in-line with the proposition Plaintiff cites from *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("If the claim language is clear on its face, then our consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified.").  Bumble's construction is the plain and ordinary meaning of "social networking platform" based on the claim language.  Bumble only proposed the present construction for the term because Plaintiff's infringement contentions indicate that Plaintiff is construing the term more broadly than provided by the claims such that a construction is necessary to prevent Plaintiff from making improper and confusing broadening arguments to the jury.  (Ex. 13, Plaintiff's Infringement Contentions: Claim Chart for '811 Patent, at 9 ("Every Bumble profile also includes traits associated with Bumble, which is itself a social

---

[5] Plaintiff claims that "Bumble disclaimed reliance on theories that Match acted as a lexicographer or disavowed claim scope as to this phrase."  (D.I. 77 at 19.)  This is misleading.  On the parties' meet-and-confer discussing the parties' respective proposals, Bumble represented that its' proposal stems from the plain and ordinary meaning of the term in the context of the claims and the intrinsic evidence, including the specifications of the patents.  Bumble maintains this position.

networking platform."); Ex. 14, Plaintiff's Infringement Contentions: Claim Chart for '854 Contentions, at 71 (stating the same).)

Plaintiff's reliance on other case law, such as *Innova/Pure Water*, is misplaced.  There, the court was construing descriptive terms, such as "operatively connected," and relied on case law regarding terms such as "coupled" and "reciprocating."  *Innova/Pure Water*, 381 F.3d at 1118.  This is not the case here.  "Social networking platform" is not a descriptive term.  *Ventana Med. Sys.* is also inapposite.  There, the Court found that the claims reciting "[a] biological reaction apparatus for *dispensing* a selected reagent directly to a sample" in the preamble did not contain any other language limiting the "dispensing" to "direct dispensing."  *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1178, 1180-82 (Fed. Cir. 2006).  Indeed, because of the lack of other dispositive claim language, Biogenex did not "dispute that other types of dispensing, such as 'sip and spit' dispensing, also fall within the ordinary meaning of 'dispensing.'"  *Id.* at 1180.  Here, there is claim language that informs the meaning of the "social networking platform" in the context of the claims.  It does not limit it to a specific type of "social networking platform," but it does require that the present system for profile matching is distinct from the claimed "social networking platform."

It is a basic canon of claim construction that the Court first construes limitations in context of the claims and then the remainder of the intrinsic evidence, beginning with the specification and concluding with the prosecution history.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The same is true here of "social networking platform."  As explained above and in Bumble's Opening Brief, the meaning of "social networking platform", that is its relationship to the profile matching method and system, is clear from its use in the claims and the

specifications of the asserted patents.  (D.I. 76 at 11-13.)  The applicants claimed a "social networking platform" that is independent from the system for profile matching.

### D.    "associated"

| Bumble's Construction | Plaintiff's Construction |
|---|---|
| Indefinite | No construction necessary/plain and ordinary meaning |

Plaintiff starts its argument admitting "[t]he word 'associated' appears in numerous contexts throughout each of the asserted patents."  (D.I. 77 at 24.)  Moreover, Plaintiff acknowledges "[t]he word 'associated' should not be construed or analyzed in isolation but rather in the context of the surrounding claim language."  (*Id.* at 26.)  Plaintiff and Bumble thus agree that "associated" has a variety of meanings that depend on the surrounding claim language and the context of that language.  The claimed "association" or relationship between two elements therefore varies based on the context of the claim language.

Plaintiff, however, does not walk through the various claim limitations that use "associated" to identify the meaning of the term in those limitations.  For example, Plaintiff never explains what "associated" means in the context of, for example: "a first swiping gesture associated with the graphical representation;" "a positive preference indication associated with the first item of information;" or "a first positive preference indication associated with the graphical representation."  Plaintiff had the opportunity to do so in its brief, but did not.  (*See id.* at 24-27.) Indeed, Plaintiff did not provide any meaning for the term "associated" as used in any of the at least eight different contexts it is used in the asserted claims.  (*See* D.I. 76 at 18.)

Though Plaintiff cites case law where the courts found "associated with" definite based on the relationship between the two claimed elements, here, that relationship is vague.  *See 3rd Eye Surveillance, LLC v. City of Fort Worth & E-Watch Corp.*, No. 6:14-cv-00725, 2016 WL 3951335 at *6-*7 (E.D. Tex. June 8, 2016) (finding "associated with" to describe a connection between a

computer system and a central station, a response agency, or a secured location); *see also Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*, No. 1:14-cv-00134, 2015 WL 4937464, at *8 (W.D. Tex. Aug. 18, 2015) (found the term "associated with" definite, in part, because of one of the parties' agreed definition, which included the phrase "parcel of land *associated with* the building"). That relationship is particularly ambiguous in light of the limitations discussed in Bumble's Opening Brief and identified above: "a first swiping gesture associated with the graphical representation;" "a positive preference indication associated with the first item of information;" or "a first positive preference indication associated with the graphical representation." (D.I. 76 at 18-21.)

Unlike *3rd Eye*, where the specification further described the relationship between the claimed elements, the specifications here are silent. *3rd Eye*, No. 2016 WL 3951335, at *6. In Plaintiff's brief, Plaintiff points to nearly every use of "associated" in the '023 Patent's specification. (D.I. 77 at 26.) These portions of the specification do not elucidate the claimed relationships between gestures, preference indications, graphical representations, and/or items of information. Instead, these sections of the specification discuss "association[s]" between data or information and users, ('023 Patent, 3:57-67); match results and view buttons, (*id.*, 5:59-64, 6:19-29, 10:28-32); ratings and dating profiles, (*id.*, 13:53-56); pairings and values "ascertain[ing] the quality of the pairing," (*id.*, 14:24-25); geographic positions and users, (*id.*, 20:40-43, 21:53-56); and swiping gestures and buttons, (*id.*, 22:16-20, 22:49-52). These portions of the intrinsic record are therefore irrelevant to understanding the meaning of "associated" in the context of at least "a first swiping gesture associated with the graphical representation;" "a positive preference indication associated with the first item of information;" and "a first positive preference indication

associated with the graphical representation."  Plaintiff has failed to provide any further clarity in the intrinsic record as to what "associated" actually means in the context of the claim limitations.

Nor has Plaintiff provided any further guidance from extrinsic evidence as to what "associated" means in the context of these claims.  Plaintiff simply states that these dictionary definitions "demonstrate the definiteness of the term."  (D.I. 77 at 26-27.)  The standard of indefiniteness is not whether a term has a dictionary definition, but rather whether the claims, "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).  The dictionary definitions provided by Plaintiff note that "associated" means "to join or connect together: combine," "to bring together or into relationship," "to combine or join with other parts," and "connected with something else." (D.I. 77-8 at ¶ 41.)  It is unclear, however, whether these definitions would apply to each and every use of "associated" in the claims, despite Plaintiff's own acknowledgement that the term has specific meanings depending on the context of the claim language.  These dictionary definitions thus do not provide any further clarity about the scope of the invention.  As such, the term, as used in the claims, is "ambiguous" and no meaning is reasonably certain to one of ordinary skill in the art.

### E.    "the text area"

| Bumble's Construction | Plaintiff's Construction |
| --- | --- |
| Indefinite | "a text area" |

Plaintiff's argument assumes that Bumble contends the term is indefinite only for lack of antecedent basis.  (D.I. 77 at 27-30.)  This is not the case.  Bumble does not dispute that the Court has the ability to correct an error in a patent claim when "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the

prosecution history does not suggest a different interpretation of the claims." *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (quoting *Novo Indus. L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) (internal quotations omitted).   Bumble nonetheless contends that "the text area" is indefinite on other grounds.  (D,I. 76 at 21-22.)

While Plaintiff's proposed correction cures any lack of antecedent basis, the term "a text area" is itself vague.  As explained in Bumble's Opening Brief, "a text area" in the context of the '811 Patent could refer to at least (1) an area depicting text on the screen, (2) an area with links to multiple conversations, or (3) a text input area, where users may enter text to communicate.  (*Id.*; *see also* D.I. 76-1, ¶ 38)  Thus, "a text area" is indefinite because the scope of the term is unclear to one of ordinary skill in the art.  Bumble will respond to any of Plaintiff's arguments regarding this issue in Bumble's forthcoming reply brief.

## III.   CONCLUSION

As demonstrated above and in its Opening Brief, Bumble's proposed constructions are supported by both the intrinsic and extrinsic record in contrast to Plaintiff's proposed constructions, which belie the language of the asserted claims themselves and contravene the intrinsic evidence.  For this reason, Bumble respectfully requests that the Court adopt its proposed constructions and render the identified vague terms indefinite.

Dated:  May 15, 2019                                  */s/ Joseph M. Drayton*

Deron R. Dacus (TX 00790553)
**THE DACUS FIRM, PC**
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Telephone: (903) 705-1117
Facsimile:  (903) 581-2543
ddacus@dacusfirm.com

Joseph M. Drayton (*pro hac vice*)
NY Bar No. 2875318
**COOLEY LLP**
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
jdrayton@cooley.com

Michael G. Rhodes (*pro hac vice*)
CA Bar No. 116127
Matthew Caplan (*pro hac vice*)
CA Bar No. 260388
**COOLEY LLP**
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222
mrhodes@cooley.com
mcaplan@cooley.com

Rose S. Whelan (*pro hac vice*)
DC Bar No. 999367
**COOLEY LLP**
1299 Pennsylvania Ave., N.W.
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
rwhelan@cooley.com

*Attorneys for Defendants Bumble Trading, Inc. and*
*Bumble Holding, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record on May 15, 2019.

*<u>Joseph M. Drayton</u>*
Joseph M. Drayton
