# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| **MATCH GROUP, LLC,** | |
| **Plaintiff,** | |
| v. | |
| **BUMBLE TRADING INC. and BUMBLE HOLDING, LTD.,** | Civil Action No. 6:18-cv-00080-ADA |
| **Defendants.** | **JURY TRIAL** |
| **BUMBLE TRADING INC. and BUMBLE HOLDING, LTD.,** | |
| **Cross/Counter-Plaintiffs,** | |
| v. | |
| **MATCH GROUP, LLC and IAC/INTERACTIVECORP,** | |
| **Cross/Counter-Defendants.** | |

**DEFENDANTS/COUNTER-PLAINTIFFS BUMBLE TRADING, INC. AND BUMBLE HOLDING, LTD.'S OPPOSITION TO PLAINTIFF/COUNTER DEFENDANT MATCH GROUP, LLC AND CROSS-DEFENDANT IAC/ INTERACTIVE CORP.'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS UNDER RULES 12(b)(1), 12(b)(2), 12(b)(6) AND 12(f)**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................ 1

II. ARGUMENT REGARDING BUMBLE'S TORT COUNTERCLAIMS ........................ 3

    A. The Court has Subject Matter Jurisdiction ............................................. 3

    B. The Court Can Exercise Personal Jurisdiction over IAC ...................... 5

    C. The Court Should Not Consider the Documents From Outside the
        Complaint that Match Relies on. ......................................................... 8

    D. Bumble has Alleged Claims Against Match Group, LLC. .................... 9

    E. Bumble has Alleged Actionable False Representations on the part of
        Match and IAC. .............................................................................. 10

        1. Bumble has alleged actionable promises of future conduct .................... 10

        2. The Motion's definiteness argument applies only to Bumble's
            allegations of false promises. ........................................................ 11

    F. Bumble has Alleged Fraudulent Intent. ............................................... 13

        a. Bumble has alleged fraudulent intent with regard to
            Match/IAC's false promises. ........................................................ 13

        b. Bumble has alleged fraudulent intent with regard to
            Match/IAC's other misrepresentations. ......................................... 15

    G. Bumble has Pled Reliance on Match/IAC's False Representations. .................. 15

        1. Match/IAC's fraudulent scheme was convincing. .................................. 15

        2. Match/IAC's arguments regarding reliance are unavailing. .................... 16

III. ARGUMENT REGARDING BUMBLE'S TRADEMARK CLAIMS ......................... 20

    A. This Court Has the Authority to Enjoin Match From Seeking Registration
        of the "SWIPE" Applications. ......................................................... 20

    B. There is no Basis for the Court to Decline Declaratory Judgment
        Jurisdiction Over the Relief Sought. ................................................ 22

    C. Match Created a Case and Controversy in Connection with the
        "Unasserted, Pending-Registration Marks" by Alleging Broad Rights in
        "SWIPE" and its Variants, and by Seeking Broad Relief ..................... 24

IV. ARGUMENT REGARDING BUMBLE'S AFFIRMATIVE DEFENSES. .................. 25

V. LEAVE TO AMEND ..................................................................................... 29

VI. CONCLUSION ............................................................................................ 30

**Page(s)**

**Cases**

*Access Telecom, Inc. v. MCI Telecomms. Corp.*,
   197 F.3d 694 (5th Cir. 1999) ................................................................................7

*Addicks Services, Inc. v. GGP-Bridgeland, LP*,
   596 F.3d 286 (5th Cir. 2010) ..............................................................................10

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*,
   525 F.3d 8 (D.C. Cir. 2008) ................................................................................21

*Amy's Ice Creams, Inc. v. Amy's Kitchen, Inc.*,
   60 F. Supp. 3d 738 (W.D. Tex. 2014)......................................................20, 21, 24

*BCOWW Holdings, LLC v. Collins*,
   No. SA-17-CA-00379-FB-ESC, 2017 WL 4082686 (W.D. Tex. Sept. 15,
   2017) ...............................................................................................................26, 27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................9

*Belstone Capital, LLC v. Bellstone Partners, LLC*,
   No. 2:16-cv-01124 KJM-GGH, 2017 WL 1153111 (E.D. Cal. Mar. 28, 2017).....................21

*BP Am. Prod. Co. v. Zaffrini*,
   419 S.W.3d 485 (Tex. App. 2013).......................................................................15

*Bullion v. Gillespie*,
   895 F.2d 213 (5th Cir. 1990) .................................................................................5

*Central Freight Lines Inc. v. APA Transport Corp.*,
   322 F.3d 376 (5th Cir. 2003) .............................................................................7, 8

*Crownover v. Crownover*,
   No. DR-15-CV-132-AM, 2016 WL 11522978 (W.D. Tex. Sept. 20, 2016)............................7

*Crucci v. Seterus, Inc.*,
   No. EP-13-CV-317-KC, 2013 WL 6146040 (W.D. Tex. Nov. 21, 2013)................................9

*CSL Silicones Inc. v. Midsun Grp. Inc.*,
   170 F. Supp. 3d 304 (D. Conn. 2016)..................................................................20

*Durox Co. v. Duron Paint Mfg. Co.*,
320 F.2d 882 (4th Cir. 1963) ..............................................................20

*E.E.O.C. v. Courtesy Building Servs., Inc.*,
No. 3:10-cv-1911-D, 2011 WL 208408 (N.D. Tex. Jan. 21, 2011).......................29

*Ensley v. Cody Resources, Inc.*,
171 F.3d 315 (5th Cir. 1999) ..............................................................13, 14

*Exxon Corp. v. Emerald Oil & Gas Co.*,
348 S.W.3d 194 (Tex. 2011)...............................................................12, 15

*First State Bank Cent. Texas v. Liberty Mutual Ins. Co.*,
No. W-12-CV-155, 2012 WL 12875361 (W.D. Tex. Oct. 5, 2012)........................8

*Forever 21, Inc. v. Gucci Am., Inc.*,
CV 17-04706 SJO (Ex), 2018 WL 5860684 (C.D. Cal. Feb. 9, 2018).............21, 24

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors Inc.*,
960 S.W.2d 41 (Tex. 1998).................................................................11

*FTC v. Think All Publ'g, L.L.C.*,
564 F. Supp. 2d 663 (E.D. Tex. 2008).....................................................27

*Garcia v. Glob. Dev. Strategies, Inc.*,
44 F. Supp. 3d 666 (W.D. Tex. 2014).....................................................24

*Guidry v. U.S. Tobacco Co.*,
188 F.3d 619 (5th Cir. 1999) ..............................................................6

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*,
270 F.3d 298 (6th Cir. 2001) ..............................................................27

*Hill Country Bakery, LLC v. Honest Kitchens Grp., LLC*,
No. 5:17-cv-334-DAE, 2017 WL 9362706 (W.D. Tex. Dec. 11, 2017) ..........26, 29

*IAS Servs. Grp., LLC v. Jim Buckley & Assocs. Inc.*,
900 F.3d 640 (5th Cir. 2018) ..............................................................15, 17, 18

*Joe Hand Promotions, Inc. v. Izalco, Inc.*,
No. H-16-3696, 2017 WL 3130581 (S.D. Tex. July 24, 2017) ........................29

*Kaye v. Lone Star Fund V (U.S.), L.P.*,
    453 B.R. 645 (N.D. Tex. 2011)...................................................................................8

*Landa v. LTD Fin. Servs. I, Inc.*,
    No. SA-05-CA-1040-FB, 2006 WL 8484209 (W.D. Tex. Jan. 4, 2006)...........................26, 27

*Magna Equities II, LLC v. Heartland Bank*,
    2018 WL 4080496 (S.D. Tex. Aug. 27, 2018) .........................................................18

*Mercedes-Benz USA, LLC v. Carduco, Inc.*,
    No. 16-0644, 2019 WL 847845 (Tex. Feb. 22, 2019) .....................................18, 19

*Montgomery Industries International, Inc. v. Thomas Construction Co.*,
    620 F.2d 91 (5th Cir. 1980) .............................................................................10

*Mosser v. Aetna Life Ins. Co.*,
    No. 4:15-cv-00430-ALM-KPJ, 2018 WL 3301808 (E.D. Tex. Mar. 9, 2018).................25, 26

*Mullins v. TestAmerica, Inc.*,
    564 F.3d 386 (5th Cir. 2009) .............................................................................6

*Officeware Corp. v. Dropbox, Inc.*,
    No. 3:11-cv-1448-L, 2012 U.S. Dist. LEXIS 112812 (N.D. Tex. Aug. 10,
    2012) ......................................................................................................25

*Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*,
    No. 17-c-923, 2017 WL 4340123 (N.D. Ill. Sept. 29, 2017)...................................28

*Panda Brandywine Corp. v. Potomac Electric Power Co.*,
    253 F.3d 865 (5th Cir. 2001) .............................................................................7

*PHC, Inc. v. Pioneer Healthcare, Inc.*,
    75 F.3d 75 (1st Cir. 1996)...............................................................................25

*Prize Energy Res. LP v. Cliff Hoskins, Inc.*,
    345 S.W.3d 537 (Tex. App. 2011).............................................................15, 16, 19

*RCC Ventures, LLC v. Am. DG Energy, Inc.*,
    No. 17-cv-3007 (AJN), 2018 WL 1415219 (S.D.N.Y. Mar. 19, 2018)..................28

*Reinforced Earth Co. v. T & B Structural Sys.*,
    No. 3:12-cv-2704-N, 2013 WL 10989994 (N.D. Tex. Jan. 30, 2013)...............25, 28

*Resolution Trust Corp. v. Fite*,
  No. SA-92-CA-196, 1993 WL 463252 (W.D. Tex. Mar. 29, 1993)........................................27

*Roberts v. United New Mexico Bank at Roswell*,
  14 F.3d 1076 (5th Cir. 1994) ...................................................................................................19

*Scanlan v. Texas A&M Univ.*,
  343 F.3d 533 (5th Cir. 2003) .....................................................................................................8

*SecurityProfiling, LLC v. Trend Micro Am., Inc.*,
  No. 6:16-cv-01165-RWS-JDL, 2017 WL 5150682 (E.D. Tex. Mar. 21, 2017).....................29

*Seisa Med., Inc. v. Asia Capital Advisor, Ltd.*,
  No. EP-18-CV-79-KC, 2018 WL 5020226 (W.D. Tex. Sept. 20, 2018)..................................6

*Shandong Yinguag Chemical Industries Joint Stock Co. v. Potter*,
  607 F.3d 1029 (5th Cir. 2010) ..................................................................................................13

*Sherwin-Williams Co. v. Holmes Cty.*,
  343 F.3d 383 (5th Cir. 2003) ....................................................................................................23

*Southmark Corp. v. Life Investors, Inc.*,
  851 F.2d 763 (5th Cir. 1988) ......................................................................................................7

*Spoljaric v. Percival Tours, Inc.*,
  708 S.W.2d 432 (Tex. 1986)................................................................................................13, 14

*St. Paul Ins. Co. v. Trejo*,
  39 F.3d 585 (5th Cir. 1994) ......................................................................................................22

*State Auto. Mut. Ins. Co. v. Quantum Machining, LLC*,
  No. SA-14-CA-720-OLG, 2015 WL 11669643 (W.D. Tex. Jan. 14, 2015) ...........................26

*Teirstein v. AGA Med. Corp.*,
  No. 6:08-cv-14, 2009 WL 704138 (E.D. Tex. Mar. 16, 2009) ................................................28

*Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*,
  333 F. Supp. 2d 975 (D. Or. 2004), *aff'd sub nom.*, 465 F.3d 1102 (9th Cir.
  2006) .........................................................................................................................................23

*Trenholm v. Ratcliff*,
  646 S.W.2d 927 (Tex. 1983)......................................................................................................12

*In re TriVita, Inc.*,
  783 F.3d 872 (Fed. Cir. 2015)..................................................................................22

*United Mine Workers v. Gibbs*,
  383 U.S. 715 (1966).................................................................................................5

*United States v. Shah*,
  44 F.3d 285 (5th Cir. 1995) .............................................................................12, 13

*Vantage Trailers, Inc. v. Beall Corp.*,
  No. H-08-0361, 2008 U.S. Dist. LEXIS 86895 (S.D. Tex. Oct. 27, 2008) ............25

*Water Craft Mgmt., L.L.C. v. Mercury Marine*,
  361 F. Supp. 2d 518 (M.D. La. 2004)....................................................................19

*Weston Grp., Inc. v. Sw. Home Health Care, LP*,
  No. 3:12-CV-1964-G, 2014 WL 940329 (N.D. Tex. Mar. 11, 2014)...............13, 14

*Wind Turbine Indus. Corp. v. Jacobs Wind Elec. Co.*,
  No. CIV. 09-36 MJD SRN, 2010 WL 4723385 (D. Minn. Nov. 16, 2010) ............20

*Woodfield v. Bowman*,
  193 F.3d 354 (5th Cir. 1999) .................................................................................28

*Yeti Coolers, LLC v. RTIC Coolers, LLC*,
  No. 1:15-cv-00597-RP, 2016 WL 5956081 (W.D. Tex. Aug. 1, 2016) ..................28

**Statutes**

15 U.S.C.
  § 1119..................................................................................................................20, 21
  § 1127.......................................................................................................................27

**Other Authorities**

Wright & Miller, 13D Fed. Prac. & Proc. Juris. § 3567.1 (3d ed.)................................5

Restatement (Second) of Conflict of Laws, § 37 ..........................................................6

## I.        INTRODUCTION

Match Group, LLC ("Match") and its corporate parent InterActiveCorp/IAC ("IAC"; collectively with Match, "Match/IAC") move to dismiss Bumble Trading, Inc. and Bumble Holding, LTD.'s (collectively, "Bumble") counter and cross-claims and to strike Bumble's Affirmative Defenses ("Motion" or "Mot."). The Motion should be denied in its entirety.

### Bumble's Tort Counterclaims

Bumble has alleged that Match/IAC engaged in a fraudulent scheme to harm Bumble. The scheme worked as follows: Match/IAC learned that Bumble was engaged in talks with third-party buyers regarding a possible acquisition of Bumble, but Match/IAC did not want such an acquisition to close. So Match/IAC devised a plan in which they would enter negotiations of their own with Bumble. These negotiations would be a sham, as Match/IAC had no intention of actually closing a deal under any terms. Instead, the negotiations would string Bumble along with misrepresentations of interest and false promises of a compelling bid in the immediate future—a bid that would never materialize.

The goal was to convince Bumble to hold off on closing a deal with a third party *just long enough*. At the same time, Match/IAC would prepare an eight-count lawsuit to file against Bumble, alleging that Bumble had violated a range of Match's intellectual property rights and seeking extensive damages and harmful injunctive relief. Match/IAC knew that once filed, this lawsuit would suppress the interest of third parties in acquiring Bumble, but Match/IAC had to make sure a deal did not close before it was ready to litigate. Match executed this plan in early 2018, keeping Bumble's interest during fake negotiations through late January, February, and early March and ultimately filing the present lawsuit on March 16.

The plan worked like clockwork: Bumble relied on the representations from Match that it should wait just a little longer and held off on closing concrete and actionable offers from third

parties as a result. If Match/IAC were not involved in the process, Bumble could have closed a deal with another interested party before Match filed suit. Bumble brings the present claims to remedy its injury from this fraudulent and unfair course of conduct. Specifically, Bumble brings claims under Texas law for fraud, negligent misrepresentation, promissory estoppel, unfair competition, and interference with economic advantage (collectively, the "Tort Counterclaims").

The Motion fails to raise any real challenge to Bumble's Tort Counterclaims on the pleadings for the following reasons: (1) This Court has subject matter jurisdiction to hear the claims, as Match itself previously asserted; (2) this Court has personal jurisdiction over IAC, as IAC directed its fraudulent conduct at Texas; (3) Bumble has alleged actionable false representations, as it has alleged both definite promises of future action and specific representations of facts that were false when made; (4) Bumble has alleged fraudulent intent, alleging extensive facts that show a scheme to defraud and harm Bumble; and (5) Bumble has alleged reliance on Match/IAC's convincing sham.

## Bumble's Trademark Claims

In an effort to secure a monopoly of the generic industry term "swipe," Match now seeks to compound the parties' costs and multiply proceedings by demanding that this Court consider only issues concerning trademark filings for the standalone SWIPE mark, and dismiss any relief sought in connection with variations of the mark. As grounds for dismissal, Match argues that this Court (1) lacks authority under the Lanham Act to enjoin Match from obtaining registrations in connection with pending "SWIPE"-mark applications other than Serial No. 86/680,914 (the "SWIPE Applications"); (2) should decline Declaratory Judgment jurisdiction because the relief sought will not necessarily settle the issue of registrability; and (3) in any case, at least as to the applications for SWIPE UP, SWIPE LIFE, and SWIPE SESSIONS, the Court lacks Declaratory

Judgment jurisdiction, or should decline jurisdiction under the Primary Jurisdiction Doctrine. Each of these arguments is meritless.

Match put its purported trademark rights at issue in this case when it alleged that the terms "SWIPE," "SWIPE LEFT," and "SWIPE RIGHT" are "synonymous with the Tinder app," and "have been famous since before Bumble even existed." Further, Match sought a broad order from this Court "restraining Defendants, and their agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with them, from *directly or indirectly* violating Match Group LLC's… *rights under the Lanham Act* [and] *common law unfair competition*."

Bumble is simply responding to Match's allegations. As to each permutation of the purported "SWIPE" mark, the relief sought by Bumble raises the same question: Can Match claim rights in the generic or, at least, merely descriptive, term "swipe" for goods and services related to Match's mobile dating apps and services? The Court is perfectly well-equipped to answer that question and should do so in the context of this action.

<u>Bumble's Affirmative Defenses</u>

Match also seeks to strike a range of Bumble's affirmative defenses asserted in its Answer. However, given the severe consequences, motions to strike affirmative defenses are strongly disfavored in this Circuit. And Match's arguments are spurious. Bumble has asserted reasonable affirmative defenses necessary to protect its interests, each of which is supported by the pleadings.

## II. ARGUMENT REGARDING BUMBLE'S TORT COUNTERCLAIMS.

### A. The Court has Subject Matter Jurisdiction.

Bumble sought to file its Tort Counterclaims in Texas state court. Match refused to consent and this Court ordered, in the parallel 18-cv-00350 action, that Bumble move the Court for leave to file its claims in Dallas County ("Motion for Leave to File"). (*See* 18-cv-00350 December 10,

2018 Hearing Tr. at 13:21-14:16.) Bumble did so, attaching to its Motion for Leave to File a "Proposed Petition" containing **verbatim** identical claims to those presently at issue.[1] (18-cv-00350 Dkt. No. 59-1.) Match **opposed** the Motion for Leave to File, arguing that this Court had subject matter jurisdiction to hear Match's state-law claims. (18-cv-00350 Dkt. No. 60 at 2-6.) Match argued, *inter alia*, that "Bumble's pursuit of [its Texas-law claims] in a state court action would amount to the most wasteful brand of claim-splitting" (*id.* at 2), and that "Contrary to Bumble's argument, the Court also has federal jurisdiction over these newly alleged [Texas-law] claims" (*id.* at 5). That is to say, Match argued that the exact claims now at issue not only should be argued before this Court, **but had to be**.

Before the Court ruled on Bumble's Motion for Leave, Match and Bumble agreed among other things, as Match had requested, that Bumble would file the claims included in Bumble's Proposed Petition as counterclaims in this action. (*See* 18-cv-00350 Dkt. No. 68.)

Match now seeks to dismiss these very claims on the ground that this Court lacks subject matter jurisdiction to hear them. (Mot. at 5-8.) This is a complete reversal from Match's previous position and Bumble now stands in the same position as Match previously did, asserting that there is supplemental jurisdiction.[2]

Putting Match's machinations aside, this Court does have subject matter jurisdiction. As Match itself has argued with regard to Bumble's earlier claims, because the scheme to defraud Bumble culminated in the present lawsuit, Match's intellectual property claims and Bumble's Tort

---

[1] The Counterclaims here are exactly the same claims that Bumble included in its "Proposed Petition," supported by exactly the same allegations.

[2] Bumble's position in the Motion for Leave was that there was no original jurisdiction over the claims, such that if Bumble had filed them in state court, Match would have no basis to remove them. That is a separate inquiry from whether this Court could exercise supplemental jurisdiction over the claims in connection with the present litigation.

Counterclaims share a common nucleus of operative facts. (*See* 18-cv-00350 Dkt. 46 at 11.) Match explained: "Bumble itself thus alleged that Match's intellectual property lawsuit was part of a common 'campaign' or 'scheme' to acquire alleged secrets and devalue Bumble [by faking interest in an acquisition]. Match's patent allegations, which are allegedly part of that 'scheme,' therefore arise from the same facts as Bumble's claims for liability arising out of it." (*Id.* (quotations and citations omitted).)

This is enough to establish supplemental jurisdiction over Bumble's Texas-law claims, as state-law claims are part of the same case and controversy as their federal counterparts, and therefore supplemental jurisdiction is proper, if they arise from a common "nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). This test requires only a "loose factual connection" and "should be applied with a pragmatic appreciation of the efficiency promoted by supplemental jurisdiction." Wright & Miller, 13D Fed. Prac. & Proc. Juris. § 3567.1 (3d ed.). Here, as Match has argued repeatedly, efficiency is served by a single, consolidated litigation before this Court.

### B. The Court Can Exercise Personal Jurisdiction over IAC.

Bumble has pled a *prima facie* case that this Court has personal jurisdiction over IAC. *See Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990). Bumble has alleged that IAC engaged in a fraudulent scheme with its corporate subsidiary to interfere with the sale of Bumble Trading, a corporation headquartered and based in Austin, Texas. (*E.g.*, Counterclaims ¶ 46.) Bumble has alleged that, as part of this fraudulent scheme, IAC's officers made false statements to Bumble's representatives at JPMorgan regarding a proposed acquisition. (Counterclaims ¶¶ 63, 67.) Bumble has further alleged that IAC did so with the specific intent of fraudulently disrupting the sale of Bumble to a third party. (Counterclaims ¶ 56 ("Match and IAC devised a plan to prevent . . . Bumble's sale to . . . any of the Potential Investors.").)

These allegations alone are enough for this Court to exercise personal jurisdiction at the pleadings stage, as Bumble has alleged IAC committed tortious acts outside the state that were intended to cause serious harm to Bumble in Texas. *See Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999) ("[A]n act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct."); *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 400 (5th Cir. 2009) (same); *see also* Restatement (Second) of Conflict of Laws, § 37, Comment e ("When the act was done with the intention of causing the particular effects in the state, the state is likely to have judicial jurisdiction though the defendant had no other contact with the state."). Bumble has alleged the requisite serious harm by alleging that IAC's intentional and tortious conduct caused Bumble to lose out on an acquisition at a valuation potentially exceeding a billion dollars. (Counterclaims ¶ 77); *Seisa Med., Inc. v. Asia Capital Advisor, Ltd.*, No. EP-18-CV-79-KC, 2018 WL 5020226, at *10 (W.D. Tex. Sept. 20, 2018) (finding out-of-state tortious conduct that was alleged to have interfered with contractual relations and caused $1,000,000 in damages to be sufficient to establish serious harm and therefore minimum contacts).

The Motion accepts, as it must, that out-of-state tortious conduct can create personal jurisdiction when it causes in-state harm. (Mot. at 10.) The Motion instead argues that the defendant must additionally have "direct[ed] [] specific acts toward the forum." (*Id.* (citation omitted).) But Bumble has alleged such direction. The specific acts here are (1) the scheme to use one Texas-based entity to defraud another with IAC's involvement and / or at IAC's direction and (2) the specific statements IAC made to representatives of a Texas entity with the intent they would be relied on in Texas. This conduct was directed at this forum, even if the conduct itself

occurred out-of-state. *See Crownover v. Crownover*, No. DR-15-CV-132-AM, 2016 WL 11522978, at *10 (W.D. Tex. Sept. 20, 2016) (finding out-of-state fraudulent conduct that interfered with contractual relationships in Texas sufficient for minimum contacts).[3]

The cases IAC relies on to argue otherwise do it no service. The *Panda Brandywine Corp. v. Potomac Electric Power Co.*, 253 F.3d 865, 870 (5th Cir. 2001) and *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773 (5th Cir. 1988) courts found that there was no nexus between the allegedly tortious conduct and Texas, other than that the plaintiff in each case happened to reside in Texas. That is not the case here, as one of the counter-defendants is resident in Texas— Match—and Bumble alleges a fraudulent scheme that adversely, and intentionally, affected another Texas entity. That is, Texas is the "focal point" of the fraudulent scheme in every meaningful sense. *See Southmark Corp.*, 851 F.2d at 773. Even if IAC's conduct was not in Texas, its alleged fraud was in furtherance of the false narrative that a company in Dallas (that it owned) was going to bid to buy a company in Austin.

In *Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 383–84 (5th Cir. 2003), another case IAC relies on, the Court found it *did* have specific jurisdiction over a foreign entity as a result of that entity's out-of-state conduct. There, defendant was alleged to have

---

[3] IAC's use of its Match subsidiary to engage in the sham negotiations does not change this analysis. IAC is Match's corporate parent and Bumble has alleged that IAC coordinated with Match to deceive Bumble. (*E.g.*, Counterclaims ¶ 46 ("Match and its parent company, IAC, devised a plan.").) IAC argues that it and Match are separate entities (Mot. at 9), but IAC's ultimate purpose in the scheme was to cause tortious harm in Texas. Even if the Court finds that IAC used Match for all in-state conduct at issue, that does not shield IAC from jurisdiction. *See Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 718-19 (5th Cir. 1999) (finding foreign defendant "working through" third parties to conduct activity in-state, without acting in-state directly, enough to show action directed at forum state, despite defendants attempt to conduct business "with Texas through contracts carefully drafted to avoid subjecting [defendant] to general personal jurisdiction"). Here, the scheme itself was directed toward Texas, even if the in-state conduct was executed by Match.

tortuously interfered with the business relationship of two Texas entities by virtue of conduct in New Jersey, and the fact that the interference involved a relationship between two Texas entities was sufficient to tie the litigation to Texas. *Id.* Here, the second Texas entity, Match, is a co-tortfeasor, rather than a nonparty, but nonetheless, the alleged fraudulent scheme is centered around the business relationship and sham negotiations between two Texas entities, giving rise to personal jurisdiction over IAC in Texas.

### C.    The Court Should Not Consider the Documents From Outside the Complaint that Match Relies on.

Match/IAC treat their motion as a motion for summary judgment. They openly admit that they "rely on several documents technically outside the pleadings." (Mot. at 3 n.4.) Specifically, they attach and rely on a contract document, between nonparties to the litigation, that is never mentioned in Bumble's Counterclaims. (Mot. Ex. C.) They also attach a letter, again sent from a nonparty to another nonparty, that is also never mentioned in Bumble's Counterclaims (the "Swidler Letter"). (Mot. Ex. D.) The Court should not consider either document. *See Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) ("In determining whether to grant a motion to dismiss, the district court must not go outside the pleadings[.]"); *First State Bank Cent. Texas v. Liberty Mutual Ins. Co.*, No. W-12-CV-155, 2012 WL 12875361, at *1 (W.D. Tex. Oct. 5, 2012) ("While documents attached to a motion to dismiss may be considered if they are referred to in a party's pleading and are central to a claim, the documents attached to Plaintiff's Motion to Dismiss go beyond this exception.").

The law in this Circuit is that a document must both be referenced in a complaint *and* central to the claims to be incorporated for purposes of a motion to dismiss. *See Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011) ("Thus, for a document to be incorporated into the pleadings . . . , it must (1) be attached to a defendant's motion to dismiss, (2) be referred

to in the plaintiff's complaint, ***and*** (3) be central to the plaintiff's claims." (emphasis added)).

Match/IAC's cited case on this issue, *Crucci v. Seterus, Inc.*, No. EP-13-CV-317-KC, 2013 WL 6146040, at *4 (W.D. Tex. Nov. 21, 2013), sets out the same standard. Match/IAC, however, have failed to demonstrate that these documents are both referred to in Bumble's pleading and central to the claims: (1) Match/IAC admit that Exhibit C is not "expressly referenced" in the Counterclaims; and (2) with respect to Exhibit D, Match/IAC argue that it is related to Bumble's Counterclaims because the Counterclaims reference a communication from Mr. Swidler from the same day as the letter is dated, but offer nothing more than attorney argument to connect the dots. As a result, the Court should not consider them in ruling on this motion.

### D. Bumble has Alleged Claims Against Match Group, LLC.

Bumble has alleged, in non-conclusory terms, specific false statements made by Match Group, LLC that were part of a fraudulent campaign to deceive Bumble. (*E.g.*, Counterclaims ¶¶ 55-78.)[4] It is black letter law that the Court must take these allegations as true for purposes of the present motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) ("Under rules of procedure that have been well settled . . . a judge ruling on a defendant's motion to dismiss a complaint must accept as true all of the factual allegations contained in the complaint." (quotations and citations omitted)). Yet, Match brazenly argues that Bumble's state-law claims should be dismissed because, contrary to Bumble's allegations, it is a different member of the Match Group corporate family that is the proper defendant in this litigation. (Mot. at 12.) Match makes this argument without citation to evidence or authority of any kind—that is, Match's attorneys simply assert in a brief that Bumble's factual allegations are wrong, without more. That is not enough to sustain a motion to dismiss.

---

[4] Bumble's Counterclaims describe the conduct of "Match," a term that Bumble defines to refer specifically to Match Group, LLC. (*See* Dkt. No. 66 at 1.)

E.     **Bumble has Alleged Actionable False Representations on the part of Match and IAC.**

1.     **Bumble has alleged actionable promises of future conduct.**

Bumble has alleged that Match/IAC made specific false promises regarding future actions, giving rise to a claim for promissory estoppel. (Counterclaims ¶¶ 182-88.) The Motion argues that these promises are too "vague" and "contingent" to be actionable under Texas law. (Motion at 12-13.) For this argument, the Motion relies exclusively on *Addicks Services, Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 301 (5th Cir. 2010) and *Montgomery Industries International, Inc. v. Thomas Construction Co.*, 620 F.2d 91, 97 (5th Cir. 1980), two cases that considered claims for promissory estoppel (but not any other claim Bumble brings). These cases do not defeat Bumble's claim for promissory estoppel, let alone Bumble's other claims.

*Addicks Services, Inc.*, concerned a contractor that sought payment for work completed for a developer. 596 F.3d at 301. At summary judgment, the Court found that statements made by the developer that payment would be dealt with "at a later date" and that the developer would "get" the contractor "paid" were too indefinite and vague to compel payment under a theory of promissory estoppel because they were not "a commitment to perform specific acts." *Id*.[5] The promises alleged here are not the same. Bumble alleges specific and definite promises of future conduct that are not in any way contingent. These include:

- That when Bumble provided specific sensitive business data, it would be used to revise Match's economic models and thereafter narrow the price range for a bid for the acquisition of Bumble that had previously been provided by Match. (Counterclaims ¶ 65.)

---

[5] As for *Montgomery Industries International, Inc. v. Thomas Construction Co.*, 620 F.2d 91, 97 (5th Cir. 1980), that case did not analyze the pleading standard for promissory estoppel and does not otherwise stand for the proposition it is cited for.

- That the Match board would analyze an updated proposal for the acquisition of Bumble at its meeting in Spring 2018. (*Id*. ¶ 69.)

- That Match would provide a revised offer for the acquisition of Bumble in the immediate future. (*E.g.*, *id*. ¶ 64.)

The Motion ignores these promises and appears to be confused on what Bumble is alleging. (Motion at 13.) Bumble does not argue that Match made a definite offer ***for the purchase of Bumble*** that it should be bound by. (*See id*.) Instead, Match made specific and definite promises about its future actions in the negotiation process itself, including how it would use requested business information and that it would consider and provide revised, more definite bids on specific timelines. (*E.g.*, Counterclaims ¶¶ 64, 65, and 69.) These promises were not "contingent, qualified statements" that were subject to further "due diligence and internal discussion," as the Motion argues. (Mot. at 13.) They were instead definite and specific promises to conduct due diligence, hold internal discussions, and then make an offer of some type.

Match/IAC never intended to follow through on these promises, as the negotiations were a sham. (*E.g.*, Counterclaims ¶ 47.) Unaware of Match/IAC's true intent, Bumble relied on these promises to its detriment, giving rise to a claim for false promises. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) (explaining a future promise is an actionable misrepresentation if there was "no intention of performing at the time it was made").

      **2.      The Motion's definiteness argument applies only to Bumble's allegations of false promises.**

Match argues that the promises of future action Bumble alleges were too vague or contingent to be actionable, citing to cases that analyze claims for promissory estoppel. (*See* section I.E.1, *supra*.) However, this argument has no bearing on the majority of false

representations that Bumble's other claims rely on; even if accepted by the Court, the argument can only reach Bumble's claim for promissory estoppel. This is because while Bumble does allege actionable promises of future conduct, Bumble *also* alleges specific false representations Match/IAC made of the then-current state of affairs. *See Trenholm v. Ratcliff*, 646 S.W.2d 927, 931 (Tex. 1983) (distinguishing "direct representations of present facts" from assertions about the future and finding the former actionable).

Bumble alleges Match/IAC lied about the ***present status*** of their interest in an acquisition in no uncertain terms (*e.g.*, Counterclaims ¶¶ 63, 66, 71, 72), ***in addition*** to making promises about future conduct. *See United States v. Shah*, 44 F.3d 285, 293 (5th Cir. 1995) (falsely stating intent "is a false statement of an existing fact, because it falsely represents the state of [the declarant's] mind, and the state of his mind is a fact." (quotations and citations omitted)). Beyond just lying about their then-present level of interest, Match/IAC falsely represented specific actions they were then taking. For example, Bumble alleges that Match made false statements about not only how it would use Bumble's sensitive business information in the future, but also how it was ***already*** using such information to revise its acquisition valuation model. (*E.g.*, Counterclaims ¶ 74 (alleging Match represented it was "close to done" with adjusting its model to revise its bid).)

Because these false statements about then-present facts were material, false, and intended to be relied on, Bumble has alleged a claim for, amongst other things, common law fraud. *See, e.g., Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011) (listing elements of fraud). Match/IAC cite no case holding that such misrepresentations of present facts are not actionable. Accordingly, Bumble's fraud-based claims should survive.

F.    **Bumble has Alleged Fraudulent Intent.**

    a.    **Bumble has alleged fraudulent intent with regard to Match/IAC's false promises.**

The Motion's argument that Bumble has failed to allege intent with regard to Match/IAC's false promises is unavailing. While it is true that alleging ***only*** nonperformance of a promise is insufficient to state the requisite intent, a plaintiff need not allege much more to survive a motion to dismiss as even "'slight circumstantial evidence' beyond the failure to perform" will carry the claim past the pleadings. (Mot. at 14.) Courts have interpreted this standard generously in favor of the pleading party, accepting a wide range of allegations as sufficient. For example, fraudulent intent "may be inferred from the party's subsequent acts after the representation is made." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) (citations omitted). Moreover, factual misrepresentations made at the time of the unfulfilled promise can establish fraudulent intent. *See Weston Grp., Inc. v. Sw. Home Health Care, LP*, No. 3:12-CV-1964-G, 2014 WL 940329, at *5 (N.D. Tex. Mar. 11, 2014). Even the close proximity of the nonperformance to the promise can establish fraudulent intent, as a promise made and shortly after broken suggests such intent. *See Shah*, 44 F.3d at 293 n.14 ("[W]here only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances, an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred.") (citations omitted)).

Match/IAC rely heavily on *Shandong Yinguag Chemical Industries Joint Stock Co. v. Potter*, where the only allegations of intent were conclusory ***and*** the nonperformance was otherwise explainable and separated from the promise by multiple years. 607 F.3d 1029 (5th Cir. 2010). Match/IAC also rely on *Ensley v. Cody Resources, Inc.*, but that case, which did not consider the pleading standard but rather the standard of proof, found only that none of the

supporting allegations plausibly suggested fraudulent intent at the time the promise was made, as compared to malicious intent at the time of nonperformance. 171 F.3d 315, 323 (5th Cir. 1999).

The allegations here are easily distinguishable, as Bumble has alleged a bevy of factual allegations beyond non-performance that satisfy the standard for pleading actionable false promises. Bumble alleges that Match/IAC became aware that Bumble was entertaining acquisition offers from third parties. (Counterclaims ¶ 56.) Bumble further alleges that Match/IAC had financial and marketplace motives to disrupt these offers. (*Id*.) And Bumble alleges a scheme in which Match and IAC sought to string Bumble along to prevent Bumble from consummating a deal and then failed to perform within weeks of their false promises. (*Id*. ¶¶ 57-60.) Moreover, Bumble has alleged numerous other patently false representations beyond promises of future performance—allegations which must be taken as true and which further show fraudulent intent. *See Weston Grp., Inc.*, 2014 WL 940329, at *5.

These allegations alone exceed what is required to state a claim, but even if they did not, Mach and IAC's subsequent conduct would. *See Spoljaric*, 708 S.W.2d at 435. Match and IAC convinced Bumble that they were just about to make an offer in early 2018. But at the same time they were instead, and in secret, preparing an eight-count complaint that Match filed on March 16, 2018 (that initiated the present lawsuit). (Dkt. No. 1.) In other words, at the same Spring board meeting Match/IAC promised to discuss an updated bid to acquire Bumble, Match/IAC were presumably planning their aggressive litigation strategy against Bumble instead.[6]

---

[6] While the Court should not consider the Swidler Letter for the reasons discussed in Section I.C, *supra*, if the Court decides otherwise, that document only emphasizes Match/IAC's deceptive intent. The Swidler Letter states that Match expected a deal could be closed by "March 15, 2018," the day before Match filed this lawsuit. (Mot. Ex. D at 2.) Match's scheme was simple and effective—string Bumble along just long enough to prepare and file a lawsuit that would kill any interest from third parties in an acquisition deal.

### b. Bumble has alleged fraudulent intent with regard to Match/IAC's other misrepresentations.

Just as with Match's arguments concerning the definiteness of the alleged representations, Match's arguments concerning the standard for pleading intent apply only to alleged false promises. Match argues that nonperformance *of a promise* is insufficient to establish fraudulent intent for purposes of showing *a fraudulent promise*. But, as argued in Section I.E.2, *supra*, Bumble alleges many misrepresentations that cannot be characterized as false promises of future actions. The Motion does not challenge at all whether these allegations meet the general standard for pleading fraudulent intent (i.e. outside the context of a promissory estoppel claim).[7]

### G. Bumble has Pled Reliance on Match/IAC's False Representations.

### 1. Match/IAC's fraudulent scheme was convincing.

Bumble must plead reliance to state claims for fraud. *See, e.g.*, *Exxon Corp.*, 348 S.W.3d at 217. As an initial matter, under Texas law, reliance is a fact-intensive inquiry based upon a party's "characteristics, abilities, and appreciation of facts and circumstances[.]" *IAS Servs. Grp., LLC v. Jim Buckley & Assocs. Inc.*, 900 F.3d 640, 650-51 (5th Cir. 2018) (citations omitted); *see also Prize Energy Res. LP v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 583-84 (Tex. App. 2011). For this reason, courts are reluctant to rule on reliance before trial where there is even a "scintilla of evidence" supporting reliance. *See, e.g.*, *BP Am. Prod. Co. v. Zaffrini*, 419 S.W.3d 485, 504 (Tex. App. 2013) (finding affidavit stating party relied upon misrepresentation, thereby denying it of the benefit of its bargain, was adequate to survive summary judgment on challenge to justifiable reliance). Here, there is much more than a scintilla, as Bumble has alleged numerous facts that support its claim of reliance.

---

[7] To the extent the Court examines this issue regardless, Bumble has clearly alleged fraudulent intent for the same reasons sent out in Section I.F, *supra*.

Match/IAC's scheme was thorough, crafty, and well executed. To start, Bumble was inclined to believe that Match/IAC had a genuine interest in purchasing Bumble based on Match's prior attempt to do so the year before, which appeared to be in good faith. (Counterclaims ¶¶ 44, 50-54.) More generally, an acquisition offer from Match/IAC made sense, given that Match/IAC are heavily invested in Bumble's industry, including through their ownership of Bumble's competitors Match.com, Tinder, and others. (*Id*. ¶¶ 11-12.)

Match/IAC's fraudulent representations were also continuous and convincing. Match repeatedly asked for additional business information, which gave the impression that Match was refining a valuation model. (*Id*. ¶¶ 62, 65, 67-70, 73.) And Match/IAC's officers repeatedly stressed their interest in a deal—Match's CEO even traveled to dine with Bumble's CEO to affirm this interest. (*Id*. ¶ 72.) And when Bumble's representatives expressed concern about the slow pace of the negotiations, Match/IAC always had an answer and the promise of a bid in the immediate future. (*E.g.*, *id*. ¶ 66.)

Bumble had no reason to think that Match/IAC would blatantly lie about their interest in acquiring Bumble and engage in a two-month sham negotiation, as Bumble was wholly unaware that: (1) at the same time, Match/IAC were preparing a lawsuit; and (2) that the negotiations were meant only as a stalling tactic to prevent Bumble from closing another deal before Match/IAC could file. *See Prize Energy Res.*, 345 S.W.3d at 585 (finding bank may have justifiably relied on operators' misrepresentations where the operators "had superior access" to relevant information and "the Bank had no reason to disbelieve the representation"). These allegations support reliance.

### 2. Match/IAC's arguments regarding reliance are unavailing.

Match argues that (1) reliance is negated by contractual and other disclaimers; and (2) reliance was unjustified given the types of representations at issue and "red flags." Neither of these arguments is convincing.

**First**, Match/IAC's disclaimer arguments are deeply flawed. To start, the contract Match/IAC relies on (Mot. Ex. C) is not properly before the Court, as it was never mentioned in the pleadings. (*See* Section I.C, *supra*.) Match/IAC's attempt to litigate this motion as a pre-discovery motion for summary judgment should be denied. Regardless, the alleged contract language cannot serve Match/IAC's purposes, even if considered. It is an agreement between two **nonparties** to the present litigation. (*See* Mot. Ex. C at 1.) Moreover, it relates to negotiations that took place in 2017 (*ibid.*) and Match/IAC present no properly considered facts to support their assertion that it governs the sham negotiations at issue here, which took place a year later. Even putting aside these issues, it does not preclude the alleged reliance.

Match/IAC rely on the following language: "each party [could] at any time terminate any discussions or negotiations regarding the Proposed Transaction that may be taking place, and only those terms and conditions which are made in a final definitive agreement, when and if executed, will have any legal effect." (Mot. at 16 (citing Mot. Ex. C at § 10.2).) If applicable here (which it is not), this language may preserve Match's right to ultimately decide not to execute an acquisition and may preclude Bumble from claiming that any offer of terms or pricing is contractually binding.[8] But Bumble does not allege that it relied on specific terms to its detriment or that any offer from Match constitutes an executed contract term. It instead alleges that the **entire** 2018 negotiation was a sham and a fraudulent scheme by Match/IAC. (*E.g.*, Counterclaims ¶ 47.) Nothing in the cited contract language allows Match/IAC to execute such a fraud, lie about its interest in an acquisition or its actions during negotiations, or make false promises of future action. *See IAS Servs. Grp.*, 900 F.3d at 650 (holding contractual disclaimer can only preclude claim for

---

[8] Even these effects would be dependent on any number of unknowns, including whether the contract was novated, fraudulently induced, invalid for other reasons, or intended to mean something else—all questions that cannot be resolved on this Motion.

fraud if it expressly and "unequivocally" does so and finding that any ambiguity defeats a ruling against claim for fraud as a matter of law).

Match's own cases make this distinction clear. Match cites *Magna Equities II, LLC v. Heartland Bank* for the proposition that a "preliminary term sheet" was "***an indication of interest only,***" not recognizing that Match's repeated false indications of interest are the very fraudulent statements at issue here. (Mot. at 17-18 (citing *Magna Equities II, LLC v. Heartland Bank*, 2018 WL 4080496, at *12 (S.D. Tex. Aug. 27, 2018)) (emphasis in original).) Match also cites *Mercedes-Benz USA, LLC v. Carduco, Inc.*, No. 16-0644, 2019 WL 847845, at *5 (Tex. Feb. 22, 2019). But there, the court found reliance improper where binding contractual terms "directly contradicted" the relied upon representations. *Id*. There is no equivalent "direct[] contradiction" here, as the contract language Match/IAC rely on does not state that the negotiations may be a sham or that Bumble should not presume an ulterior motive—far from it.

Match/IAC's use of the Swidler Letter fails for the same reason: It is (1) not properly before the Court (see Section I.C, *supra*); (2) not a communication between the parties to this litigation (*see* Mot. Ex. D at 1); and (3) does not disclaim the fraud at issue. The Swidler Letter states only that the letter itself, and other communications between the parties, cannot be deemed "a legally binding obligation, offer or agreement of any party" until a final agreement is entered. (*Id*. at 3.) This is far from an express and "unequivocal" disclaimer of liability for fraudulent representations during negotiations. *See IAS Servs. Grp.*, 900 F.3d at 650.

**Second**, Match/IAC's arguments regarding the type of representations at issue, and Bumble's supposed failure to investigate them, are also misplaced. (Mot. at 16-18.) Match would have the Court believe that a sophisticated party cannot rely on representations made during an arms-length business negotiation to state a claim for fraud. (Mot. at 17 ("Such representations are

simply not within the category of statements that sophisticated parties may rely upon in transactions like this one.").)  Match cites no cases that support such a position and it simply is not the law.  *See, e.g.*, *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 361 F. Supp. 2d 518, 563-64 (M.D. La. 2004) (finding that experienced marine dealers justifiably relied on manufacturer's misrepresentations during negotiations that it would not make a third party a dealer when manufacturer never intended to follow through on that promise); *Prize Energy Res.*, 345 S.W.3d at 585 (similar).  And even if Match/IAC's conduct could be termed "suspicious," which Match/IAC went to great lengths to avoid, it still would not preclude reliance on express representations.  *See Roberts v. United New Mexico Bank at Roswell*, 14 F.3d 1076, 1080 (5th Cir. 1994) (holding "circumstances that merely arouse suspicion" rather than facts that indicate an issue worth investigating do not preclude reliance).

The cases Match/IAC does cite in support of the supposed "red flags" they raised say something different and inapposite.  For example, Match cites *Mercedes Benz USA, LLC* to argue that Bumble could not "blindly rely[] upon [Match/IAC's] vague assurances." (Mot. at 18.)  But the alleged representations here were not mere "vague assurances."  (*See* Section I.E.1, supra.)  Moreover, the Court in *Mercedes Benz USA, LLC,* held only that a party can be "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated" if it "blindly" assumes the truth of assertions made to it during negotiations without conducting its own due "diligence."  *Id*. at *8.  That holding is inapposite here.  No "due diligence" would have allowed Bumble to discover that Match was secretly preparing a lawsuit or that Match/IAC had gone to such elaborate lengths to deceive Bumble—and Match/IAC do not identify any "due diligence" that would have done so.

For similar reasons, Bumble was not "negligent" for failing to discover or "test" Match/IAC's fraud in time. (Mot. at 18.) Match argues that Bumble could have counteroffered or given Match a deadline, before allowing its other offers to "expire." (*Id.*) But these offers did not "expire" and Match's "second-choice investors" did not "lose interest while Bumble waited on Match." (Mot. at 18.) These are inventions of Match's motion and are nowhere to be found in Bumble's pleading.

Match also cites, in footnotes, a long list of cases for the general proposition that expressions of interest in a business deal do not amount to promises to consummate a transaction. (Mot. at 17 n.9, 18 n.10.) This is just another instance of Match/IAC mischaracterizing Bumble's allegations. Bumble does not allege that Match committed fraud by expressing interest, but then deciding not to close a deal; rather, Bumble alleges that Match/IAC orchestrated a sham negotiation, lied about having any real interest in an acquisition, lied about their actions during the negotiations, and made false promises about future actions. (*See* Sections, I.E.1, *supra*.) None of Match/IAC's cases excuse or allow this conduct, and there were no red flags suggesting it.

## III.  ARGUMENT REGARDING BUMBLE'S TRADEMARK CLAIMS.

### A.  This Court Has the Authority to Enjoin Match From Seeking Registration of the "SWIPE" Applications.

Courts, including the Western District of Texas, routinely exercise authority over pending trademark applications. *See, e.g.*, *Amy's Ice Creams, Inc. v. Amy's Kitchen, Inc.*, 60 F. Supp. 3d 738, 744 (W.D. Tex. 2014); *CSL Silicones Inc. v. Midsun Grp. Inc.*, 170 F. Supp. 3d 304, 318 (D. Conn. 2016) (§ 1119 provides a district court with the power to order a refusal of a trademark application); *Wind Turbine Indus. Corp. v. Jacobs Wind Elec. Co.*, No. CIV. 09-36 MJD SRN, 2010 WL 4723385, at *11 (D. Minn. Nov. 16, 2010); *Durox Co. v. Duron Paint Mfg. Co.*, 320 F.2d 882, 886 (4th Cir. 1963). "[W]hen the pending applications are closely related to marks over

which a court *does* have jurisdiction, that court is permitted to make a determination regarding registrability." *Forever 21, Inc. v. Gucci Am., Inc.*, CV 17-04706 SJO (Ex), 2018 WL 5860684, at *3 (C.D. Cal. Feb. 9, 2018). Here, the pending applications cover marks that incorporate the purported SWIPE mark in its entirety, as well as goods and services that are directly or indirectly related to the offerings encompassed by the SWIPE Registration.

It is well established that district courts "have broad authority to review trademark decisions by the U.S. Patent and Trademark Office (PTO), both before and after the registration of a mark . . . [and] may authorize the PTO to register or to deny registration to a pending mark." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 12–13 (D.C. Cir. 2008); *see also Belstone Capital, LLC v. Bellstone Partners, LLC*, No. 2:16-cv-01124 KJM-GGH, 2017 WL 1153111, at *3 (E.D. Cal. Mar. 28, 2017) ("As provided by 15 U.S.C. § 1119, courts have the power to cancel a registered trademark, as well as 'any pending trademark applications relating to the [registered mark].'"). That is not to say that district courts are an alternative forum for *all* disputes implicating issues of trademark registrability. But courts properly claim authority over even unasserted applications where a related registration is invoked. *See Forever 21, Inc.*, 2018 WL 5860684, at *3; *Amy's Ice Creams, Inc.*, 60 F. Supp. 3d at 744-45 (finding authority to rule on registrability of pending applications and noting that the defendant's "applications [were] essentially an attempt to expand their registered marks to new products.").

Here, each of the SWIPE Marks incorporates the purported SWIPE mark in its entirety— indeed the SWIPE Marks are extensions of the purported SWIPE mark—and each covers goods and services that directly or indirectly concern those offerings covered by the SWIPE Registration. For example, Application Nos. 86/608,899 and 86/680,927 for SWIPE RIGHT, and Nos. 86/608,903 and 86/680,923 for SWIPE LEFT, cover mobile dating applications and online dating

services. These are the same goods and services covered by the SWIPE filings that Match acknowledges the Court has authority over. These applications thus share a sufficient nexus to the SWIPE Registration to fall within the ambit of the Court.

As to those filings covering goods and services other than mobile dating applications and online dating services, Match asserts that "[r]esolution of facts as to SWIPE in connection with computer application software for mobile devices will say nothing about SWIPE RIGHT as to clothing or SWIPE SESSIONS as to entertainment services."[9] Match is wholly incorrect, however. In each instance "SWIPE" is a reference to the common touchscreen gesture utilized when operating Match's Tinder app. A determination that "SWIPE" is generic or merely descriptive for mobile dating apps will render the term similarly unprotectable for multimedia content or t-shirts that refer to the app or the touchscreen gesture. *See, e.g.*, *In re TriVita, Inc.*, 783 F.3d 872, 874 (Fed. Cir. 2015) (explaining that a mark is considered merely descriptive if it describes an ingredient, quality, characteristic, function, feature, purpose, or use of the specified goods or services). The question for each filing is the same: do consumers comprehend "swipe" and its variants as an indicator of source? The Court should answer this question once, rather than force the parties to re-litigate it before the Trademark Trial and Appeal Board or another court.

**B.     There is No Basis for the Court to Decline Declaratory Judgment Jurisdiction over the Relief Sought.**

Under the Declaratory Judgment Act, a district court has a measure of discretion in deciding whether to entertain the action, but this discretion is not "unfettered." *St. Paul Ins. Co.*

---

[9] Bizarrely, Match also asserts that "[t]he relevant consuming public differs for marks related to mobile applications for online dating versus those relating to entertainment services or clothing." SWIPE SESSIONS and SWIPE LIFE refer to content on the Tinder website, all of which is about Tinder, and targeted to Tinder customers. *See* https://swipelife.tinder.com/category/video/swipe-sessions/. Surely Match does not believe that those purchasing SWIPE RIGHT t-shirts and watching videos about the Tinder app are a different set of consumers than its app users.

*v. Trejo*, 39 F.3d 585, 590 (5th Cir. 1994). The Fifth Circuit has identified seven non-exclusive factors for a district court to consider in deciding whether to exercise discretion over a claim for declaratory relief. *See Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 388 (5th Cir. 2003). Rather than engage with these factors, Match contends that abstention is warranted because the relief sought by Bumble (1) will not necessarily resolve whether the SWIPE Applications are entitled to registration; and (2) may implicate third-party rights. However, neither party is asking the Court to make an affirmative decision regarding registrability. Match's arguments are thus non-sequiturs.

First, Match asserts that the Court should decline jurisdiction because the requested relief will not resolve the registrability dispute between the parties. According to Match, this is so because in the event that Bumble is unable to show that the subjects of the SWIPE Applications (the "SWIPE Marks") are not protectable and therefore ***not*** entitled to registration, the SWIPE Marks may still not be entitled to registration. But this is just a statement of fact. Bumble is seeking an order to the effect that Match's asserted rights in "SWIPE," in whatever form it takes, are not protectable. Bumble takes no position as to whether the SWIPE Applications should mature to registration in the event that Bumble's claims are unsuccessful, and there is no reason why it should have to.

Second, Match asserts that the Court should decline jurisdiction because the issues raised by Bumble implicate third-party rights. This argument is as misguided as the first, perhaps more so, because the two arguments are inconsistent. Third-party rights would only be implicated if either party were asking the Court to make an affirmative determination regarding registrability, which, unlike the decisions cited by Match, is not the case. *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 333 F. Supp. 2d 975, 980 (D. Or. 2004), *aff'd sub nom.*, 465 F.3d

1102 (9th Cir. 2006) (noting the plaintiff had requested that the court order the registration of its mark); *Amy's Ice Creams, Inc.*, 60 F. Supp. 3d at 744 (explaining that the Declaratory Judgment plaintiff had "asked the Court to determine the parties' respective rights to registration[.]"). Because neither party is asking the Court to issue registrations in connection with the SWIPE Applications, no third-party rights are implicated.

C. **Match Created a Case and Controversy in Connection with the "Unasserted, Pending-Registration Marks" by Alleging Broad Rights in "SWIPE" and its Variants, and by Seeking Broad Relief.**

As a last ditch effort to frustrate Bumble's ability to efficiently defend itself against Match's broad allegations, Match argues that any relief sought in connection with the "Unasserted, Pending-Registration Marks" is jurisdictionally deficient due to an absence of a corresponding case or controversy. Where declaratory relief is sought "[t]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Garcia v. Glob. Dev. Strategies, Inc.*, 44 F. Supp. 3d 666, 670 (W.D. Tex. 2014). Such controversy may be present in a trademark infringement dispute, even when specific filing are not expressly asserted in the complaint. *Forever 21, Inc.*, 2018 WL 5860684, at *3 (finding jurisdiction over unasserted registrations because the declaratory defendant put them at issue when it alleged infringement); *see also Garcia*, 44 F. Supp. 3d at 670 (finding Declaratory Judgment jurisdiction where plaintiff's allegations were "sweeping").

Match first argues that there is no Declaratory Judgement jurisdiction over the Unasserted, Pending-Registration Marks because Match did not assert them in the Complaint. However, a plain reading of the Complaint implicates the Unasserted, Pending-Registration Marks as Match's "rights under the Lanham Act" or "arising from common law unfair competition," whether "directly or indirectly." (Complaint at 43 ¶ 2.) If Match is now clarifying that Bumble's use of

"swipe," "swipe left," and "swipe right" does not infringe the Unasserted, Pending-Registration Marks, then it should stipulate to the same. Otherwise, Bumble has no choice but to defend itself against Match's broad claim of rights and request for relief.

In the alternative, Match posits that the Court should dismiss Bumble's claims for declaratory relief against Unasserted, Pending-Registration Marks under the doctrine of "primary jurisdiction." *See Vantage Trailers, Inc. v. Beall Corp.*, No. H-08-0361, 2008 U.S. Dist. LEXIS 86895, at \*13 (S.D. Tex. Oct. 27, 2008) (describing the doctrine as a "set of precedents that guide courts in deciding when an issue should be resolved in the first instance by an agency that has special competence to address it." (citation omitted)). However, "where the validity of a mark is attacked as a companion to an infringement claim, federal courts should hear both claims 'if the issues underlying the two claims overlap'" to the extent that a dual analysis is more efficient. *Id.* at \*14-15 (quoting *PHC, Inc. v. Pioneer Healthcare, Inc.*, 75 F.3d 75, 80 (1st Cir. 1996)); *see also Officeware Corp. v. Dropbox, Inc.*, No. 3:11-cv-1448-L, 2012 U.S. Dist. LEXIS 112812, at \*5 (N.D. Tex. Aug. 10, 2012) ("Several circuits have held that the rule of primary jurisdiction does not justify a federal court's deferral to a proceeding before the TTAB").

As discussed above, the issues concerning the "Unasserted, Pending-Registration Marks" are effectively identical to those issues concerning the other "SWIPE" filings. While Match would have the parties litigate the same issues in separate forums, Bumble seeks to address them all at once. In the interests of judicial economy and efficiency, the Court should not exercise its discretion to decline jurisdiction on the basis of the Primary Jurisdiction doctrine.

## IV.   ARGUMENT REGARDING BUMBLE'S AFFIRMATIVE DEFENSES.

The Court should not strike any of Bumble's affirmative defenses. "Motions to strike a defense are generally disfavored." *Mosser v. Aetna Life Ins. Co.*, No. 4:15-cv-00430-ALM-KPJ, 2018 WL 3301808, at \*2 (E.D. Tex. Mar. 9, 2018); *see also Reinforced Earth Co. v. T & B*

*Structural Sys.*, No. 3:12-cv-2704-N, 2013 WL 10989994, at *4 (N.D. Tex. Jan. 30, 2013) ("Courts disfavor Rule 12(f) motions and grant them only rarely."). Because striking a pleading is considered a "drastic remedy," courts only grant motions to strike "when the pleading to be stricken has no possible relation to the controversy." *BCOWW Holdings, LLC v. Collins*, No. SA-17-CA-00379-FB-ESC, 2017 WL 4082686, at *2 (W.D. Tex. Sept. 15, 2017) (citation omitted). The affirmative defenses identified in Match's Motion to Dismiss relate to the controversy and are not "insufficient." Fed. R. Civ. P. 12(f); *see also Mosser*, 2018 WL 3301808, at *2.

First, Match avers that defenses 1, 4, 5, 8, 11, 15, 17, 18, 19, and 20 are "negative defense[s]" and redundant under Rule 12(f). (*See* Motion at 28.) Even if defenses 1, 4, 5, 8, 11, 15, 17, 18, 19, and 20 reiterate denials stated in the Answer, "Plaintiff has not established the asserted affirmative defenses may cause prejudice, nor has plaintiff established the affirmative defenses have no possible relation to the controversy." *State Auto. Mut. Ins. Co. v. Quantum Machining, LLC*, No. SA-14-CA-720-OLG, 2015 WL 11669643, at *6 (W.D. Tex. Jan. 14, 2015). Bumble's affirmative defenses raise a question of fact and/or law and, therefore, Match's motion to strike those defenses should be denied. *See, e.g., Mosser*, 2018 WL 3301808, at *2; *Landa v. LTD Fin. Servs. I, Inc.*, No. SA-05-CA-1040-FB, 2006 WL 8484209, at *1 (W.D. Tex. Jan. 4, 2006) (holding that striking affirmative defenses "at this early stage of the litigation" would be "improper").

Regarding Bumble's fifth affirmative defense, that Match has failed to state a claim, this Court has held that a "failure to state a claim defense does not sufficiently fall within the type of affirmative defenses that Rule 12(f) permits the Court to strike." *Hill Country Bakery, LLC v. Honest Kitchens Grp., LLC*, No. 5:17-cv-334-DAE, 2017 WL 9362706, at *5 (W.D. Tex. Dec. 11,

2017); *BCOWW Holdings*, 2017 WL 4082686, at *4 ("Defendants have simply placed Plaintiffs on notice that they may choose to file a motion to dismiss in the future.").

Finally, regarding Bumble's twentieth affirmative defense stating Match is not entitled to injunctive relief, Bumble simply "seek[s] to define the scope of relief that [Plaintiff] may obtain." *FTC v. Think All Publ'g, L.L.C.*, 564 F. Supp. 2d 663, 666 (E.D. Tex. 2008) ("these defenses fit comfortably within the residual clause of Rule 8(c) which requires a party to affirmatively set forth 'any [] matter constituting an avoidance or affirmative defense'" (citation omitted)).

Second, Match asserts that defenses 14 and 19 are "insufficient as a matter of law" and should be stricken. (Motion at 28-29.) Defenses deemed insufficient as a matter of law are those that "cannot succeed under any factual circumstances." *Resolution Trust Corp. v. Fite*, No. SA-92-CA-196, 1993 WL 463252, at *1 (W.D. Tex. Mar. 29, 1993); *see also Landa*, 2006 WL 8434209, at *1 (holding that insufficient as a matter of law means the defenses "would not constitute an affirmative defense even if they were meritorious").

Bumble's fourteenth affirmative defense concerns loss of trademark significance as a result of Match's failure to police infringement. The Lanham Act is clear that "abandonment" includes "when any course of conduct of the owner, including acts of omission as well as commission, causes the mark . . . to lose its significance as a mark." 15 U.S.C. § 1127. Although it may be unlikely that failure to enforce a mark can, on its own, establish abandonment, "it is possible that, in extreme circumstances, failure to prosecute may cause [trademark] rights to be extinguished by causing a mark to lose its significance as an indication of source." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 317 (6th Cir. 2001). Accordingly the fourteenth defense is legally sufficient.

Bumble's nineteenth defense should also not be stricken because it is legally sufficient. Match's Defense of Trade Secrets Act claim is not applicable to any alleged misappropriation occurring prior to the enactment of the act on May 11, 2016. *See RCC Ventures, LLC v. Am. DG Energy, Inc.*, No. 17-cv-3007 (AJN), 2018 WL 1415219, at *2 (S.D.N.Y. Mar. 19, 2018) (concluding "only misappropriations occurring after May 11, 2016 are actionable"). Because only some of the alleged misappropriations identified in the Complaint occurred after May 11, 2016, at most, Match would only be entitled to recovery for those alleged acts occurring after the enactment. *See Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17-c-923, 2017 WL 4340123, at *5 (N.D. Ill. Sept. 29, 2017) ("Partial recovery is available for misappropriation when some act of misappropriation occurs after the effective date.").

Third, Match claims that defenses 3, 7, 11, 12, 13, 14, and 21 do not provide Match with "fair notice." (Motion at 29.) "The Fifth Circuit has explicitly acknowledged that 'in some cases, merely pleading the name of the affirmative defense . . . may be sufficient' to give the plaintiff fair notice of the defense being advanced." *Teirstein v. AGA Med. Corp.*, No. 6:08-cv-14, 2009 WL 704138, at *2 (E.D. Tex. Mar. 16, 2009) (quoting *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999)). Furthermore, the recitation of these affirmative defenses accompanied by the factual background and counterclaims in Bumble's 63-page Answer provides sufficient notice such that Match is not a "victim of 'unfair surprise.'" *Yeti Coolers, LLC v. RTIC Coolers, LLC*, No. 1:15-cv-00597-RP, 2016 WL 5956081, at *8 (W.D. Tex. Aug. 1, 2016) (finding "within the context of [Defendant's] answer, affirmative defenses, and counterclaims," the affirmative defenses that "simply recite the names of defenses" put the Plaintiff on fair notice) (citation omitted); *Reinforced Earth*, 2013 WL 70989994, at *7 (noting that the 35-page answer and "significant amount of background material" provide sufficient fair notice).

Moreover, the cases Match points to in its Motion to Dismiss are inapposite. For the most part, the relevant affirmative defenses in the cited cases do not relate to the specific affirmative defenses at issue here: prosecution history estoppel, functionality, generic terms, third-party use, or prosecution laches. *See Hill Country Bakery, LLC*, 2017 WL 9362706, at *5; *SecurityProfiling, LLC v. Trend Micro Am., Inc.*, No. 6:16-cv-01165-RWS-JDL, 2017 WL 5150682, at *7-8 (E.D. Tex. Mar. 21, 2017); *Joe Hand Promotions, Inc. v. Izalco, Inc.*, No. H-16-3696, 2017 WL 3130581, at *3 (S.D. Tex. July 24, 2017); *E.E.O.C. v. Courtesy Building Servs., Inc.*, No. 3:10-cv-1911-D, 2011 WL 208408, at *4 (N.D. Tex. Jan. 21, 2011). Regarding the equitable defenses listed in the seventh affirmative defense, unlike the Defendants in the cases cited by Match, Bumble sufficiently articulated the basis in the paragraph supporting the seventh affirmative defense in its Answer. *See Joe Hand Promotions*, 2017 WL 3130581, at *3; *SecurityProfiling*, 2017 WL 5150682, at *7-8 ("[Defendant] merely names the affirmative defenses without providing any additional detail to give [Plaintiff] fair notice of the nature of the defenses. . . . [Defendant] must provide a minimum level of facts to provide [Plaintiff] sufficient notice of these defenses."). Bumble has provided Match with sufficient notice in this case.

Match has not established that Bumble's counterclaims are unrelated to the controversy, prejudicial, legally insufficient, or lack fair notice. Accordingly, Bumble's affirmative defenses should not be stricken.

## V.    LEAVE TO AMEND

In the event the Court is inclined to grant Match/IAC's motion in any respect, Bumble respectfully requests leave to amend its pleadings to address any required issues, including without limitation as to jurisdiction, affirmative defenses and pleading of its affirmative claims against Match/IAC.

## VI.    CONCLUSION

For the reasons discussed herein, Match/IAC's Motion should be denied in its entirety.


Dated: May 20, 2019                          Respectfully submitted,

                                             By:*/s/ Joseph M. Drayton*

        Joseph M. Drayton (*Pro Hac Vice*)
        NY Bar No. 2875318
        **COOLEY LLP**
        1114 Avenue of the Americas
        New York, NY 10036
        Telephone:  (212) 479-6000
        Facsimile:  (212) 479-6275
        jdrayton@cooley.com

        Rose S. Whelan (*Pro Hac Vice*)
        DC Bar No. 999367
        **COOLEY LLP**
        1299 Pennsylvania Ave., N.W.
        Suite 700
        Washington, DC 20004
        Telephone: (202) 842-7800
        Facsimile: (202) 842-7899
        rwhelan@cooley.com

        Michael G. Rhodes (*Pro Hac Vice*)
        CA Bar No. 116127
        Matthew Caplan (*Pro Hac Vice*)
        CA Bar No. 260388
        **COOLEY LLP**
        101 California Street, 5th Floor
        San Francisco, CA 94111-5800
        Telephone (415) 693-2000
        Facsimile: (415) 693-2222
        mrhodes@cooley.com
        mcaplan@cooley.com

Deron R. Dacus
Texas Bar No. 00790553
**THE DACUS FIRM, PC**
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Telephone: (903) 705-1117
Facsimile: (903) 581-2543
ddacus@dacusfirm.com

**ATTORNEYS FOR DEFENDANT
BUMBLE TRADING, INC.**

## CERTIFICATE OF SERVICE (for efilings)

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record on May 20, 2019.

*/s/ Joseph M. Drayton*
Joseph M. Drayton