IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| MATCH GROUP, LLC<br><br>Plaintiff,<br><br>v.<br><br>BUMBLE TRADING INC. and<br>BUMBLE HOLDING, LTD.,<br><br>Defendants. | No. 6:18-cv-00080-ADA<br><br>JURY TRIAL DEMANDED |

# PLAINTIFF MATCH GROUP, LLC'S REPLY CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. REPLY ARGUMENT CONCERNING CLAIM CONSTRUCTION ................................ 1

    A. "Graphical Representation" .................................................................................... 1

    B. "Preventing Communication" ................................................................................. 5

    C. "Without Allowing Communication" ..................................................................... 9

    D. "Social Networking Platform" ............................................................................. 12

III. ARGUMENT CONCERNING INDEFINITENESS ........................................................ 15

IV. CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Absolute Software, Inc. v. World Computer Security Corp.*
  2014 WL 406879 (W.D. Tex. Feb. 6, 2014) .................................................................. 11

*Am. Med. Sys., Inc. v. Biolitec, Inc.*
  618 F.3d 1318 (Fed. Cir. 2010) .................................................................................... 13

*Apple Inc. v. Motorola, Inc.*
  757 F.3d 1286 (Fed. Cir. 2014) ...................................................................................... 2

*Bell & Howell Document Management Co. v. Altek Systems*
  132 F.3d 701 (Fed. Cir. 1997) .................................................................................... 3, 4

*Core Wireless v. LG Elecs., Inc.*
  No. 2:14-CV-0911, 2015 WL 6769049 (E.D. Tex. Nov. 5, 2015) ............................. 8, 9

*Howmedica Osteonics Corp. v. Zimmer, Inc.*
  822 F.3d 1312 (Fed. Cir. 2016) .................................................................................... 14

*Invitrogen Corp. v. Clontech Labs., Inc.*
  429 F.3d 1052 (Fed. Cir. 2005) .................................................................................... 10

*Regents of Univ. of Minnesota v. AGA Med. Corp.*
  717 F.3d 929 (Fed. Cir. 2013) ...................................................................................... 10

*Saunders Grp., Inc. v. Comfortrac, Inc.*
  492 F.3d 1326 (Fed. Cir. 2007) .................................................................................... 10

*Verizon Servs. Corp. v. Vonage Holdings Corp.*
  503 F.3d 1295 (Fed. Cir. 2007) .................................................................................... 11

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*
  200 F.3d 795 (Fed. Cir. 1999) ........................................................................................ 7

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*
  853 F.3d 1272 (Fed. Cir. 2017) .................................................................................. 2, 3

*Williamson v. Citrix Online, LLC*
  792 F.3d 1339 (Fed. Cir. 2015) ...................................................................................... 2

I.  INTRODUCTION

Bumble's Responsive Claim Construction Brief only confirms its claim construction proposals' flaws. Bumble's proposals are inconsistent with the claim language, the intrinsic evidence, and how skilled artisans would understand the terms when not trying to manufacture non-infringement or invalidity positions. Again, the Court should adopt Match's proposals and reject Bumble's competing ones.

II.  REPLY ARGUMENT CONCERNING CLAIM CONSTRUCTION

A.  "Graphical Representation"

| Claim Term | Match's Proposal | Bumble's Proposal |
|---|---|---|
| Graphical representation of a [potential matches, online dating profile, item of information, or user] | Pictorial portrayal of a [potential match, online dating profile, item of information, or user] | summary of information displayed on a graphical user interface representing a [potential match, online dating profile, item of information, or user] |

The inventors did not claim an invention that reaches every representation of an online dating profile, item of information, or potential match that is displayed on a graphical user interface. Instead, they expressly limited their inventions to graphical representations of those categories themselves displayed "*on* a graphical user interface." This requires that the representations of whatever category is claimed must comprise some pictorial component. Dkt. 77-8 (Jones Decl.) ¶ 20.

Bumble's opposition to Match's construction is meritless. Bumble initially contends that a skilled artisan would believe any representation on a graphical user interface is a "graphical representation." But this is wrong for several reasons. First, it merely reiterates Bumble's entirely unsupported expert declaration. *See* Dkt. 82 at 5. Second, regardless of whether text placed in a particular location on a GUI in relation to images, icons, symbols, or the like is

1

somehow "graphical," the terms recite graphical representations *of something*. The claims recite, for example, a "graphical representation *of a potential match*." A comparison between GUIs and command-line interfaces, and opinions about the minimal threshold to make something "graphical" are thus inapposite. The relevant question is not whether text in a location is a "graphic design" or part of a "graphical user interface." Instead, the term requires that there be a representation of something (e.g., a potential match) and that the representation *of that something* must be a "graphical" one. To meet the limitation in the case of a "potential match," the structure representing the potential match must include some pictorial component.[1]

Bumble candidly acknowledges that its construction gives no meaning to the "graphical" modifier since it believes any representation on a GUI meets the claim. This admission dooms Bumble's construction. *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1305 (Fed. Cir. 2014) (rejecting proposed construction because it rendered word meaningless and thus "contradict[ed] the claim language"), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).

Despite the "highly disfavored" nature of its construction, Bumble contends that the Court may read the modifier "graphical" out of the claims for three purported reasons. First,

---

[1] Bumble also contends that "graphical" cannot mean "pictorial" because "graphical user interface" is more than a "pictorial user interface." But a "graphical user interface"—in addition to being separately recited in the claims—has its own meaning and refers to a particular type of interface. This is clear from the IEEE's defining the two terms separately. Dkt. 77-11 at 487. In any event, the appropriate definition of a "graphical user interface" indicates that this type of interface is defined by one that can display both text and *pictorial representations of data* (e.g., photographs, images, icons, menus, etc.) *Id.*; Dkt. 77-12 at 545; Dkt. 77-13 at 763. In other words, even in the GUI definition, the "graphical" modifier refers to the ability to display pictorial elements. This does not mean every representation on a GUI, including textual ones, is a graphical one.

Bumble observes that one independent claim does not *expressly* recite that the interface is a "graphical user interface." This observation is unhelpful because the proper interpretation still gives meaning to those words in claims that do include them. And in any event, that claim still requires touch screen gestures, which do not exist on command-line interfaces. The Court must give meaning to all words in all claims, and the fact that *any* claim separately recites both "graphical user interfaces" and "graphical representations" is far more meaningful to the Court's task.

Second, Bumble contends that its understanding of "graphical representation" is not redundant because "the patentee is claiming a specific graphical user interface." Dkt. 83 at 7. Regardless of whether the patentee is claiming a "specific user interface" in some claims, however, there would still be no need to modify "representation" to a "graphical representation" if every representation on a graphical user interface is a "graphical representation," as Bumble contends. This argument, if true, is simply irrelevant.

Finally, citing *Bell & Howell Document Management Co. v. Altek Systems*, 132 F.3d 701, 707 (Fed. Cir. 1997), Bumble contends that the "graphical" modifier to "representation" is meant merely to "reinforce[]" the "displayed on a graphical user interface" limitation and other limitations indicating the use of a GUI. Dkt. 83 at 7. According to Bumble, "any potential redundancy would be understood to have arisen simply as a drafter's choice." Dkt. 83 at 7. This is still inconsistent with Federal Circuit precedent. *Wasica*, 853 F.3d at 1288.

A review of the *Bell* decision confirms the incorrectness of Bumble's position here. In *Bell*, the Federal Circuit was tasked with construing a term requiring a "plurality of in situ ribs . . . *integrally bonded* thereto to form a unitary structure *free of adhesive*." 132 F.3d at 703 n.2. The parties' experts agreed that the term "integrally bonded" had an ordinary meaning to a

skilled artisan referring to how substances bonded at the molecular level. *Id.* at 706. But the intrinsic evidence indicated that the term "integrally bonded" referred to something different: the claimed improvement over the prior art that the "ribs" of the microfiche "jacket" were bonded to the panels without adhesive. *Id.* The "free of adhesive" portion of term "integrally bonded . . . free of adhesive" was also added to address an Examiner rejection that concluded that, without the "free of adhesive" limitation, the ribs could be "integrally bonded" to the panel in ways that were not "free of adhesive." *Id.* at 707. Given the specification's description of "integrally bonded" as meaning "free of adhesive" and the discussion of the "integrally bonded" term during prosecution, the Federal Circuit concluded that "integrally bonded . . . free of adhesive" was in fact only a single limitation and that "integrally bonded" and "free of adhesive" were mutually reinforcing terms describing a single "state of affairs." *Id.* at 707.

Here, in contrast, the vast majority of claims recite—and all claims require—the display of representations on a "graphical user interface." Unlike "integrally bonded," which could refer to bonds other than one "free of adhesive"—making the "free of adhesive" limitation clarifying and reinforcing—here Bumble advocates for an understanding of "graphical" that is inherent in the requirement that a "representation" be "displayed" on a "graphical user interface." If every representation on a GUI were a graphical representation, there would be nothing to "reinforce" or "clarify"; the term would be superfluous. Thus, Bumble's proposed construction deprives the word "graphical" in "graphical representation" of any meaning, and the Court should reject it.[2]

---

[2] Bumble also reiterates its position that Figure 6 is a "graphical representation" of a potential match. Match agrees. And that is not at all inconsistent with Match's construction. Similarly, Bumble makes arguments concerning Figure 9 and the dependent limitation requiring a "graphical notification . . . that a match exists." Again, Figure 9 is fully consistent with "graphical" indicating at least some pictorial component. The "graphical notification" indicating "that a match exists" comprises the full screen that includes both pictorial and textual components. This is within the scope of Match's construction.

4

B.  "Preventing Communication"

| Claim Term | Match's Proposal | Bumble's Proposal |
|---|---|---|
| "Prevent[ing] communication" | Plain and ordinary meaning; no construction necessary | An affirmative act to ensure no communication between two users. |

As Bumble's own expert opines in Bumble's IPR proceeding, "preventing communication" in the context of the claims does not require an "affirmative act." Dkt. 82 at 14. Unsurprisingly, this is consistent with how a skilled artisan would understand the term in the context of the claims. Dkr. 77-8 (Jones Decl.) ¶¶ 31-33. It is also consistent with how Bumble understood the claims when it moved to dismiss them. *See* Dkt. 23 at 8 (indicating that circumstance where "matchmaker *does not provide* Client A and the third potential match with each other's contact information" is how the matchmaker "prevent[s] communication" between Client A and the third potential match).

Bumble now disagrees with its own expert (and itself), maintaining that "preventing" requires "an affirmative act to ensure no communication between two users." Bumble's primary argument is now that "preventing communication" requires an affirmative act because giving the "preventing" term its full, ordinary meaning "would provide no real limitation." Bumble's argument simply ignores the claim language. Exemplary claim 7 is structured as follows:

> ***determine[s] to enable initial communication*** between the ***first user and the second user*** . . . and
>
> ***prevent[s] communication*** between ***the first user and the third user*** after determining that the first user has expressed a negative indication regarding the third user . . .

The claims are reciting the ON/OFF status of communication between *different users*. The "[e]nable initial communication" limitation makes clear that the invention enables communication between particular users—the first and second—upon particular conditions. The

5

"prevent communication" limitation makes clear that the invention prevents communication between different users—the first and third—upon different conditions.

Unlike Bumble's attempts to read the word "graphical" out of the "graphical representation" term, this limitation has an unmistakable meaning (one not requiring an affirmative act)—it describes the status of communication between specific users (the first and third) upon a specific condition (the first indicated a negative preference concerning the third). Without such a limitation—*i.e.*, how the claims were initially drafted—a system could meet the literal requirements of the previous claims even where communication was not possible by default but enabled across ***all*** users of the entire system merely upon the first user and second user's mutual positive preferences. To avoid this confusion, the "preventing" limitation was added to make clear that the default non-communication status is maintained for users other than those for which a mutual opt-in exists.

Bumble makes much of the fact that the "prevent" limitation was added in response to rejections concerning the Janssens reference. But this is irrelevant to Bumble's proposed "affirmative act" requirement. The amendments were made to address the Examiner's apparent understanding that enabling a specific way to communicate in a system where communication was already generally permitted taught the pre-amended claims. Match expressly informed the examiner what it meant by the additional "prevent" limitation, including what it meant by "enabling and disabling communication." As discussed in Match's opening brief, the claimed manner of "enabling and disabling communication" means that "users are *prevented* from communicating *until the conditions specified in the claim are met*," and that this "enabling and disabling" simply required a "particular set of factors to allow for communication between users." Dkt. 76-10 at MTCH-0000594. Although Bumble would prefer these explanations not

6

to exist, they make unmistakably clear that the claimed inventions—including the "prevent communication" term—contemplate a default communication status of OFF that is turned ON upon mutual positive preference indications. Having the "prevent communication" step occur "after" a determination of a negative positive preference confirms that, when a negative preference is indicated, the system maintains this default OFF communication status.[3]

Bumble also reiterates the position from its opening brief that Figure 10 requires an affirmative act in light of the flow chart stating, "Do Not Allow Communication," and its description of this as a "step." For the reasons in Match's response brief, this contention is meritless. *See* Dkt. 82 at 11-12. Even if the flowchart indicates that this is a "step," it is a step to *not do something*; no skilled artisan would read a flowchart indicating a "step" of "do not allow" to require an "affirmative act" to achieve the goal. Notably, the specification describes this "step" occurring even when the first user *expresses a positive preference* on another user if that other user has not yet expressed a preference. '811 Patent at 23:25-30. It would make no sense for the system to perform an "affirmative act to ensure no communication between two users" when User A has indicated it wants to meet User B and User B has simply not seen User A's profile. Similarly, Bumble's argument that the dictionary definition of prevention requires an affirmative act because it "implies taking advance measures" should be rejected because an

---

[3] Bumble also makes much of the claims reciting that the "preventing" limitation occurring "after" the system determines that a negative preference has occurred. Yet a limitation requiring the device to "prevent" communication "after" a particular time does not mean that the system cannot also prevent it before that time. Extra steps in claims including the phrase "comprising" do not negate infringement. *See, e.g.*, *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999) (reasoning that "comprising' is "generally understood to signify that the claims do not exclude the presence in the accused apparatus or method of factors in addition to those explicitly recited"). Moreover, the intrinsic evidence confirms that the "prevent" limitations were intended to occur both before and after if no mutual positive preference occurs. *See* Dkt. 76-10 at MTCH-0000594 (arguing that "users are *prevented* from communicating *until the conditions specified in the claim are met*" (emphasis added)).

7

"implication" is not a definition—and it is certainly not the full scope of the term. *See* Dkt. 77-2 (listing definitions of "to deprive of power," "to keep from happening"). In any event, a default design is an advance measure.

Bumble cannot cite a single case that required an affirmative act for "prevent[ing]" something. Despite Bumble's anemic attempt to distinguish it, Judge Payne rejected arguments essentially identical to Bumble's here in *Core Wireless v. LG Elecs., Inc.*, No. 2:14-CV-0911, 2015 WL 6769049, at *24 (E.D. Tex. Nov. 5, 2015). In one patent, the claim recited "automatically allowing or preventing receiving of the electronic information." *Id.* Like Bumble here, the accused infringer contended that "preventing receiving of the electronic information" required the system to "take action to reject" to fall within the scope of the claim. *Id.* The basis for this argument will look familiar. LG contended that: (1) an affirmative act was required because the claim was a "process" and a process is "defined as an 'act, or a series of acts'"; and (2) an "affirmative action" was required to ensure that "the additional claim limitation 'preventing the receiving of the electronic information' . . . ha[s] meaning." *Id.* Judge Payne, evaluating the ordinary meaning of the term "preventing the receiving of," noticed that LG "sought a construction that would, in effect, avoid systems that are set to default to reject all messages . . . but allow certain messages that have the proper filtering parameter." *Id.* He expressly concluded that "[s]uch a construction does not comport with the ordinary meaning of 'preventing the receiving of,'" and that this claim "may be accomplished through the use of preset settings or defaults and the like." *Id.*

Bumble seeks to distinguish this highly analogous case because—according to Bumble— "the present context is different . . . because there is no default assumed by the claims or provided in the intrinsic evidence." Yet Bumble makes this statement based on nothing: the

8

claim at issue in Judge Payne's opinion did not expressly "assume[]" a default, and Judge Payne did not rely on any intrinsic evidence to broaden the scope of the term. Instead, he correctly acknowledged that, under the ordinary meaning of the term, default settings can "prevent" things without an affirmative act. In any event, there *is* a default assumed by the claims; the claims recite "enabling initial communication" between the first user and the second user in response to a certain condition—meaning that communication is disabled by default. The specification also repeatedly describes embodiments that similarly assume this default. '811 Patent at 22:40-44, 22:55-58, 23:17-30. As in *Core Wireless*, the Court should reject Bumble's attempt to limit the scope of the term.

C. **"Without Allowing Communication"**

| Claim Term | Match's Proposal | Bumble's Proposal |
|---|---|---|
| "Without allowing [communication]" | Plain and ordinary meaning; no construction necessary | An affirmative act to ensure no communication between two users. |

To hide the unmistakable fact that the ordinary meaning of "without allowing" does not *require* an affirmative act, Bumble attempts to argue its "without allowing communication" position alongside the term "preventing communication." As discussed above, the ordinary meaning of "prevent" does not require an affirmative action. But this is even more clear for "without allowing."

Again, Bumble contends that "without allowing" requires an "affirmative act" because otherwise the limitation would be meaningless. But again Bumble ignores the claim's structure. The claim recites multiple groups of users. First, the claim identifies a first user who indicates a positive preference associated with the graphical representation of a second user, and the second user who indicates a positive preference concerning the first. In such a scenario, it recites

9

limitations that communication between these two users is allowed.  The claim goes on to recite the first user's preference indications concerning *different users*.  The first user indicates a negative preference concerning the third user.  The claim recites that the first user must then go on to indicate a preference of a *fourth* user and makes clear that this happens "without allowing communication between the first user and the third user."  This is not meaningless; it requires the first user to indicate a preference concerning a fourth user and requires that this happens without allowing communication between the first and the third.

Bumble also contends that Match's prosecution history arguments of "preventing" should carry over to "without allowing."  This is incorrect for two reasons.  For one, Bumble never contends that Match's arguments concerning the '811 Patent *disclaimed* claim scope.  Arguments merely bearing on the alleged ordinary meaning of "prevent" would obviously not shed light on the ordinary meaning of "without allowing" in the context of the patent.  Second, even if Bumble could argue that the inventors clearly and unmistakably surrendered claim scope for the '811 Patent, arguments concerning different claim terms generally do not apply across related applications.  *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005) ("[T]he prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application.").  Statements can apply to child applications only in two circumstances: (1) the applicant makes statements about the invention "as a whole"; or (2) the limitation in the child is only an "immaterial difference" from the disclaimed one.  *See Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) (concluding that alleged disclaimer from parent application did not apply to child because it was "not directed to the invention as a whole"); *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 944 (Fed. Cir. 2013) (noting that disclaimer carries forward only if the

differences between limitations are "immaterial"). Here, the statements in the '811 application were directed to the specific applied-for claims; they were not directed to the invention "as a whole." *See, e.g.* Dkt. 76-10 at MTCH-0000594 ("This teaches away from the **claimed manner** of enabling. . . . This again teaches away from the **claimed manner** . . ." (emphasis added)). If Bumble were correct that "preventing" requires an affirmative act, the switch from "preventing" to "without allowing" would also be a material difference, rendering Match's arguments in prosecution of the '811 Patent inapplicable.[4]

Bumble makes several arguments that it contends "strongly suggest" that "without allowing" should have similar or identical claim scope to the "preventing" limitations. Yet Bumble's conclusion that this requires a construction requiring an "affirmative act" is entirely circular. For example, Bumble points out that the '854 Examiner mapped "without allowing" to "preventing" when requiring a terminal disclaimer. Considering the intrinsic evidence, however, this mapping was because *even "preventing"* in the context of the claimed inventions *does not require* an affirmative act, not because "without allowing"—a phrase indicating a lack of particular action—requires one. The Court should reject Bumble's proposed construction and determine that no construction is necessary.

---

[4] Judge Yeakel's decision in *Absolute Software, Inc. v. World Computer Security Corp.*, 2014 WL 406879, at *8 (W.D. Tex. Feb. 6, 2014), is not inconsistent with these requirements. There, the argument described "the present invention" in a related application sharing a specification. "The present invention," unlike describing "the claimed invention," is a statement directed to the invention as a whole. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention.").

11

## D. "Social Networking Platform"

| Claim Term | Match's Proposal | Bumble's Proposal |
|---|---|---|
| "Social networking platform" | Plain and ordinary meaning; no construction necessary | "Social networking platform independent of the system for profile matching" |

Again, the full scope of the ordinary meaning of "social networking platform" is not limited to a specific type of social networking platform. Bumble must concede this. Critically, the specification expressly contemplates an embodiment of "matching server 20" utilized entirely within "social networking platform 50" using only profiles from "social networking platform 50." Dkt. 77 at 21-22. Not only does Bumble's responsive brief not dispute this, it does not even acknowledge it. The specification also describes "system 100," of which "matching server 20" can be a part, as a social networking platform. '811 Patent at 20:35-37 ("Implicit signals may be based on the behavior or user 14 either within system 100 or *other* social networking platforms 50." (emphasis added)); *see also* Dkt. 77 at 22. Beyond this, the prosecution history also indicates that the applicants contemplated other claims that expressly captured the idea of "independent" social networking platforms. At one point, Match sought claims that required the "first user [be] identified using a first social networking platform and the second user [be] identified using a second social networking platform that is different than the first social networking platform." But Match deleted that limitation. *See* Dkt. 76-10 at 5.

Despite the ordinary meaning of the term and the express teachings of the intrinsic evidence, Bumble nevertheless maintains that the social networking platform must be "independent of the system for profile matching" in "the context of the claims." Dkt. 83 at 20. Bumble's responsive brief hinges largely on the fact that "social networking platform" is recited in the preambles of independent claims 1 and 7 of the '811 Patent, which recite a "method for

12

profile matching," and a "system for profile matching," and similar preamble statements in claims 4, 7, and 10 of the '854 Patent. Thus, according to Bumble, these systems and methods "for profile matching" must be separate from the "social networking platform."

As an initial matter, preambles are generally not limiting, and Bumble has not argued that these limitations are necessary to give life, meaning, and vitality to the claims; the claims are structurally complete without them. *See, e.g. Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1318, 1358-59 (Fed. Cir. 2010) (describing circumstances in which a preamble can be limiting). Because these are not limitations of the claims, there is no need to differentiate between the system and method "for profile matching" and the "social networking platform" limitation.

Even if the preambles were limitations of the claims, however, Bumble's arguments remain meritless. Again, the written description expressly contemplates an integrated use of the claimed systems, methods, and media. A requirement that the social networking platform be "independent of" the "system for profile matching," is inconsistent with these teachings.

Bumble nevertheless contends that its construction is dictated by the claims' language. Bumble contends that in the '811 Patent, the "associated with a social networking platform" limitation is superfluous if the system and method "for profile matching" itself is a social networking platform. Bumble contends that in the '854 Patent, claim differentiation dictates independence of the social networking platform and the system and method "for profile matching." Bumble is wrong in both cases.

The "associated with a social networking platform" limitation is meaningful without a requirement that the social networking platform be "independent of the system of profile matching." Even when matching server 20 and system 100 are appropriately considered a social networking platform (as the written description makes clear they can be, *see* '811 Patent at

20:35-37), requiring the profiles to be "associated with a social networking platform" excludes profiles unassociated with a social networking platform from the purview of the claim analysis. The limitation makes clear that the profiles must either come from system 100 (i.e., the overarching system that performs or creates the capabilities to perform the functionalities recited in the claims) or from another "social networking platform 50." The independent claims of the '854 do not have this requirement and would be infringed even where profiles are retrieved from non-social networking sources. They are thus are differentiated from the dependent claims, which require at least one profile to come from a social networking platform.[5]

In asking for its unwarranted construction, Bumble also appears to conflate the system and method "for profile matching" recited in certain preambles with the application or general software suite performing the claims. For example, it justifies its construction of "social networking platform" as a platform "independent of the system for profile matching" by implying that it is an "improper and confusing broadening argument" to show that Bumble itself is a social networking platform and the Bumble app includes functionality that performs all of the limitations of the claims, including receiving profiles associated with Bumble. But the system and method "for profile matching" is not whatever the accused product happens to be; it is the system and method defined by the limitations of the claims. And the portions of code performing those functionalities or creating the capabilities to perform those functionalities will pull profiles from other portions of software code in the overall system, regardless of whether the

---

[5] Even if Bumble's differentiation argument were logically valid, claim differentiation is merely a rebuttable presumption. *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1323 (Fed. Cir. 2016). In light of the teachings that the system 100 including matching server 20 is a social networking platform and the teaching that an embodiment of the invention could be performed entirely within social networking platform 50, any differentiation presumption is rebutted.

14

profiles come from within the overall system (i.e., system 100) or from a different social networking platform 50.

Simply put, the patent expressly contemplates (1) systems using profiles from system 100, which it describes as a social networking platform; and (2) the use of matching server 20 to use profiles only within social networking platform 50 and "present the results of this search from within social networking platform 50." '811 Patent at 16:14-19. Both categories contemplate an embodiment where the profiles come from the same overarching matchmaking system that also performs the limitations of the claims. Here, the claims simply require profiles "associated with a social networking platform," not a social networking platform different from whatever overall software system includes functionality that performs the claims. Bumble's proposal seeks to exclude expressly contemplated embodiments within the ordinary meaning of the claims. The Court should reject it.

## III.   ARGUMENT CONCERNING INDEFINITENESS

In part because Bumble's actual indefiniteness positions were hidden until Opening Briefs, Bumble's responsive brief poses no new arguments from those offered in its opening brief. Match has fully addressed those positions in its responsive brief. For the reasons stated in that brief, Bumble has failed to show by clear and convincing evidence that any of the "associated" terms or "text area" are indefinite.

## IV.   CONCLUSION

For the reasons stated above and in Match's Opening and Responsive Claim Construction Briefs, the Court should adopt Match's proposed constructions and deny Bumble's motion for summary judgment.

DATED:  May 24, 2019

Respectfully submitted,

Caldwell Cassady & Curry

/s/ *Bradley W. Caldwell*
Bradley W. Caldwell
Texas State Bar No. 24040630
Email:  bcaldwell@caldwellcc.com
John F. Summers
Texas State Bar No. 24079417
Email: jsummers@caldwellcc.com
Warren J. McCarty, III
Texas State Bar No. 24107857
Email: wmccarty@caldwellcc.com
Caldwell Cassady Curry P.C.
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

John P. Palmer
State Bar. 15430600
Email: palmer@namanhowell.com
Naman, Howell, Smith & Lee, PLLC
400 Austin Avenue, 8th Floor
P.O. Box 1470
Waco, TX 76701
Telephone: (254) 755-4100
Facsimile: (254) 754-6331

**ATTORNEYS FOR PLAINTIFF
MATCH GROUP, LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel registered as Filing Users on this 24th day of May, 2019.

/s/ *Bradley W. Caldwell*
Bradley W. Caldwell