UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

MATCH GROUP, LLC ) Docket No. WA 18-CA-080 ADA
)
vs. ) Waco, Texas
)
BUMBLE TRADING, INC., )
BUMBLE HOLDING, LTD. ) June 7, 2019

TRANSCRIPT OF MARKMAN/MOTIONS HEARING
BEFORE THE HONORABLE ALAN D. ALBRIGHT

APPEARANCES:

For the Plaintiff: Mr. Bradley W. Caldwell
Mr. John F. Summers
Caldwell, Cassady & Curry, PC
2101 Cedar Springs Road,
Suite 1000
Dallas, Texas 75201

Mr. John P. Palmer
Naman, Howell, Smith & Lee
P.O. Box 1470
Waco, Texas 76703

For the Defendant: Mr. Joseph M. Drayton
Cooley, LLP
1114 Avenue of the Americas
New York, New York 10036

Ms. Rose S. Whelan
Cooley, LLP
1299 Pennsylvania Avenue, NW,
Suite 700
Washington, D.C. 20004

Mr. Matthew D. Caplan
Cooley, LLP
101 California Street, 5th Floor
San Francisco, California 94111

Court Reporter: Ms. Lily Iva Reznik, CRR, RMR
501 West 5th Street, Suite 4153
Austin, Texas 78701
(512)391-8792

Proceedings reported by computerized stenography, transcript produced by computer.

THE CLERK: The Court calls Waco case: 18-CV-80, Match Group, LLC vs. Bumble Trading, Inc., for a Markman hearing.

THE COURT: Thank you. You may be seated.

Counsel, if you would be so kind as to introduce yourselves for the record first, and then, also, tell me, on the record, who it is that you most anticipate speaking on your -- on behalf of your.

MR. CALDWELL: Good morning, your Honor.

THE COURT: Good morning.

MR. CALDWELL: Brad Caldwell on behalf of Match Group. And with me today that I anticipate will be arguing is my colleague, John Summers. And the Court will recognize Mr. John Palmer. And, your Honor, we also have a couple of summer associates that are with us. So from my firm, we have Chu Jo.

THE COURT: Where's Mr. Jo from?

MR. CALDWELL: Mr. Jo's University of Minnesota and then, originally from China.

THE COURT: Very good.

MR. CALDWELL: And then, from Mr. Palmer's firm, we have Zach Gloff from Cumberland University? That's correct? And then, we have client representatives from Match. And starting on my left back there -- or not the far left, one over is Jared Sine and Jeanette Teckman and

Ben Setnick.

THE COURT: Very good. Thank you.

I always appreciate it when clients take the time to be here. That means a great deal to the Court, very helpful.

Yes, sir. Good morning.

MR. DRAYTON: Good morning, your Honor.

Joe Drayton from Cooley, LLP on behalf of Bumble. And I have here with us Rose Whelan and Matt Caplan and Naina Soni.

For the argument, I'll take a few terms on behalf of Bumble at the Markman. And then, Rose Whelan will have some terms on behalf of Bumble for Markman. And then, Matt Caplan will argue the other motion for today.

THE COURT: Okay. And just so everyone knows, I appreciate all the hard work you've put in this for the clients who are here. The briefs were very good. I've read everything that you all have submitted, pretty carefully. I've already drafted the framework of a construction order, so I have a pretty good idea of what everyone is arguing.

I've also read pretty thoroughly the motion to -- I'm glad we could get that taken care of this morning, as well. Have you all thought about who's going to go first on whichever terms? I will tell you on at least the ones

where you are arguing that it's plain and ordinary meaning and they're arguing it's indefinite, it doesn't make much sense to me for you to go first.

And so, I know you think it's not indefinite, and so, it'd probably be good for them to go first on those. If you want to go first, or not, I'm happy to hear.

MR. CALDWELL: I was actually just going to address the order thing. I think, first of all, both parties, Mr. Drayton and I did talk about, we're just happy to go however you see fit. And we also acknowledge that you probably would want to hear from -- somewhat deviating from plain meaning or something like that.

I wanted to announce just so that we don't kind of head on down the wrong path that there is as of, I don't know, maybe 8:57 this morning, some sort of agreement on the "text area" indefiniteness term that it is a text area, and then, that's plain meaning. And we have an e-mail between us kind of establishing the basic confines of --

THE COURT: Of what that means.

MR. CALDWELL: What that plain meaning is. And I don't anticipate -- it doesn't look like there's really any lingering dispute. There's not likely to be a subsequent 02 Micro issue, or anything of that nature, but we --

THE COURT: That's the one I spent the most time thinking about.

MR. CALDWELL: I'm sure it was. That's why -- that's the reason I asked, right? So I just wanted you to know that. Otherwise, we don't really care as to order.

There is one that's a little bit unique in that on graphical representation, I think we would typically be just saying plain meaning, but it's one that looks like there will be an 02 Micro issue if we, the plaintiff, don't actually propose a construction. So we sort of have a construction there, but that doesn't mean I insist on going first on that. And so.

THE COURT: You know, it's interesting you say that because, you know, I joke a lot, I know, but I actually had thought a lot about graphical representation for that reason. I think I'm of the same like you are that graphical representation seems to me to be graphical representation. But the fact that there is -- the defendants proffered and assuming he wants me to define it -- they want me to define it, then I need to take that up.

And I get why -- I get the point of the argument. I get why the defendant is arguing that there needs to be construction. But I will tell you, I'm still not certain -- I'm not entirely certain I'm going to give you

09:07:07 one on graphical representations. I'm not entirely certain I'm not going to say that it's not just plain and ordinary meaning. And if you guys want to take that up and say I screwed up, that's fine. But it does seem -- that seems to be a hard one for me to feel like it needs to be construed. But that's why we're here.

MR. CALDWELL: I tend to agree with you. And, I mean, my slides are over there. One of my first notes in my slide is -- note to self is 999 times out of a thousand, I would just be saying it's plain meaning. The problem we have is, we know defendant is going to be pointing to a prior art reference that is just pure text to say that's a graphical representation of the potential match, simply because it appears on something like Windows or GUI.

And so, that's why we raise it to you is because whereas, I think the plain meaning's correct and worried about 02 Micro.

THE COURT: And just so you all know, as you might imagine, after having done this for 20 years, it's not lost on me why -- it's not lost on me either why the defendant is proffering a construction or why they're proffering the construction they're proffering. I've had a pretty good idea of the reason for that. And so, that doesn't mean it's not right, but I get why they're doing

it.

So why don't I hear, then, from the defendant first on graphical representation and they can explain to me why they're right.

MR. DRAYTON: Thank you, your Honor. We have a graphic for you to put up on the screen.

THE COURT: Okay.

MR. DRAYTON: And before I do that, your Honor, I do want to introduce Elizabeth Monteleone from Bumble, who's in the courtroom. If I could ask Elizabeth to stand up.

THE COURT: Pleasure having you here.

MR. DRAYTON: And she's Bumble's inhouse counsel and their sole inhouse counsel lawyer, I believe, as of today; is that correct?

MS. MONTELEONE: (Moving head up and down.)

THE COURT: Very good. Where are you from, ma'am?

MS. MONTELEONE: Originally from Virginia.

THE COURT: And where do you live now?

MS. MONTELEONE: In Austin.

THE COURT: Oh, okay. Well, good. Glad. So one of us does still live in Austin.

So proceed, please. You have the same computer skills I do in presentations.

09:09:33 MR. DRAYTON: So, your Honor, I have an overview, but I think the overview -- I could go through it now, but it may relate more to another term. But I'll just briefly go through it, if you don't mind.

09:09:43 THE COURT: Sure.

09:09:44 MR. DRAYTON: So -- and we'll hand out a copy of our slides. Sorry about that, your Honor.

09:10:06 So if we could go to the next slide in the presentation in slide 3. So, your Honor, first, we look at the background of the invention, and obviously this is a matching system. And there were matching systems that predated the -- all of the patents asserted in this case. And the inventor said they were trying to tackle some problems.

09:10:30 So one problem was limiting searches to within the matching profile system, as opposed to going outside of that system and getting profile information of potential matches from other systems. So that was one problem identified in the patent.

09:10:44 The next problem is basically having more optimal matches because in the prior art, there were too many irrelevant search entities, which in this case would be potential matches. And then, the third was unwanted or nuisance communications, and that could be remedied in multiple ways, including more optimizing with respect to

the matching algorithms. So those are the three things that at least expressed in the patents, and we have cites to them.

Go to the next slide. So then, the inventors summarized their invention in the summary of invention. And so, they talk about receiving a plurality of user profiles, that the profile is comprised of various traits that they can use to do matching and perform scoring and matching algorithms. And then, there would be preference indications used in the matching process.

And so, these were the things that in the summary of the invention, they talk about is the solutions. So now, in the detailed disclosure, they have a system and it's in figure 1, and figure 4. And so, you have the matching profile system with a server. You have users that interact with that. And then, if you look at figure 4, you have the matching system, and then, you have a separate social networking platform that can, I guess, interact with the matching profile server and system.

So that's what figures 1 and 4 talk about. Then there are additional figures in the patent, but each one of those figures are variations, or enhancements, or part of the system discussed in figure 1 and figure 4. And if you read the specification in totality, it talks about you may do this, may do that, you may do this, is one system

that they disclosed with slight variations. And that's when you read the specification in totality, that's what we walk away from.

So I thought it was important to go over the prosecution history very briefly. And so, they had originally filed a claim, and it was just receiving profiles, receiving a preference indication, determining potential matches, and presenting the matches. So that was the first thing they said. This is what we invented, this is what we want to claim.

Then they -- before the pricings got started, there was a preliminary amendment. They added basically the computer to it. The first claim didn't have a computer to it. And as a patent lawyer, you wouldn't be surprised with the timing of the dates why they would do that. And they also talked about enabling communication if a second user expressed approval. So that's added to this preliminary amendment.

Then the prior art comes into play in this act of prosecution. When they were -- when the examiner put forth prior art and he said anticipated or in combination was obvious over their claims, they amended their claims. And so, at a high level, they add the multiple devices, not just the computer; now it's more than one electronic device, and swiping is added. And there may be some other

things added, but at a high level, those things were added to overcome the prosecution -- the prior art that the PTO found.

And then, not being able to overcome the hurdle with those claim amendments, there's a second set of claim amendments. So then, they add this concept of not allowing communication. And I don't have it for you on the slide, but subsequently, they didn't overcome the prior art with those amendments, and they added initial communications to one of the -- phrases when you talk about determining to enable communications, they added determining to enable initial communications and a third round of amendments.

So I may refer back to this, so I wanted to just summarize it at the outset. Now, with regard to graphical representation, I could understand why your Honor says plain meaning. We say a summary of information that's displayed on a graphical interface. And the graphical representation is basically, it has to represent a ton of information because, number one, it represents a match, and a match could be simplistic. It's a person, you represent a person. But then, you have a graphical representation of a profile, which is an extensive amount of data. And then, they talk about the graphical representation of an item of information, which is more

data than a profile.

And so, it's our position that when you look at the claims and you look at the use of graphical representation, it's no way it could be limited to or require a picture, and the intrinsic record does not discuss or require that. And a picture is one of many things that would go into a profile, but it is not required.

And so, I won't bore you, your Honor, with the claims, but I just highlighted the claims because it talks about a graphical representation of an item of information that comprises a graphical representation of a profile. And so, that's a substantial amount of data. So we highlight in this -- what are they really talking about in a profile? And as you can see, and highlighted in red, a lot of different data points that can go into a profile: Height, weight, age, et cetera. So we spell that out for the Court.

What's not in the specification, what's not in the prosecution history is limiting graphical representation to what I call a picture or picture plus something else. And there's two examples in the patent of displaying a user profile.

THE COURT: Could --

MR. DRAYTON: Yes, your Honor.

THE COURT: I'm there. Thank you. I found what I was looking for. Thank you.

MR. DRAYTON: Understood.

There are two examples in the patent of displaying a user profile or an item of information, and one is figure 1F. And in figure 1F, there's text, there's icons, there's pictures in figure 1F. But there's no requirement in the specification, when you read about figure 1F, that you must have a picture in the profile or that you must display a picture.

And then, when you look at figure 6, it's even more informative because in figure 6, if you look at the figure, you might say, oh, it's a picture. But you can't just look at the figure, devoid of the text. And when you look at the text, it talks about what user 14, who's receiving this on their electronic device, what they may be presented with. And the intrinsic record says user 14 may be presented with a summary of information regarding a suggested user, a potential match. The summary may include one or more of the following, and picture and icon are one or more of the following.

So if you read in the intrinsic evidence, there's no support for picture or picture plus in the plain meaning of graphical representation. That doesn't mean that a picture is not a graphical representation or could

not form a part of a graphical representation. It's just there's no requirement that it be the graphical representation or be included in the graphical representation.

So then, the word "graphical" is used to modify other claim terms. "Notification" is another claim term. When I read the specification and its discussion of figure 9, there's no requirement that it has to include a picture. The system as one would think and person of ordinary skill would think it would include whatever information or a subset or summary of information that's actually in the profile. So there's no requirement to even include a picture and a profile.

So our position, in short, is that a pictorial portrayal is something less that a graphical representation. It could be a graphical representation, but it doesn't define the broad scope and it doesn't have to be a part of a graphical representation. To the extent pictorial portrayal means including at least a picture, then we disagree.

So I want to -- I'll move on, but I think you get the import. And I don't want to read -- I don't want to just regurgitate what's in our brief as it relates to the claim language. But their claims that use the term "graphical representation" that don't include graphical

user interface, they're also terms like gestures and swiping gestures that imply the use of a graphical interface, and they're still used within the claim terms.

So to some extent, there's an indication that the fact that we have a summary of information in our construction.

THE COURT: Where does summary of information -- where do those words come from?

MR. DRAYTON: Well, it talks -- when you look at figure 6, it says it will be a summary of information presented to the user. And so, we're relying on intrinsic evidence with regard to that in our construction.

THE COURT: Okay.

MR. DRAYTON: So different dictionary definitions and extrinsic evidence has been offered. But my only point to the Court is that when you look at those dictionary definitions, they're consistent with the construction and the intrinsic evidence. Because if you look at graphic display device -- and this comes from the dictionary that Match had proposed as extrinsic evidence. It says, graphic display devices can display characters, but they're in the form of graphic image.

So our point is that this can include text, picture icons, and other things, and it doesn't solely require a picture. So there's a case that the plaintiffs

cite. It's Ameranth and it's Eastern District of Texas case. Judge Everingham's opinion. And interestingly, even though it wasn't cited for this proposition or any proposition related to graphical representation in the briefing, it actually construes graphical user interface.

THE COURT: I saw that.

MR. DRAYTON: All right. And in doing so, it says -- it uses the term "graphical representation," but if you look at the intrinsic evidence that the Court relies on, it talks -- it says a GUI by drawing images, graphics or texts. And so, that is consistent with the intrinsic evidence. It's consistent with Bumble's construction that graphical representation is no more than a summary of information that would be included in the profile or associated with a user of a matching system, so to speak, and displayed on a graphical user interface.

So, your Honor, that's why we'd like for you to construe the term "graphical representation" and construe it as a summary of information displayed on a graphical user interface.

THE COURT: Why isn't your proposed construction, though, just repetitive? And what I mean by that is, it says presenting on a graphical interface, a graphical representation. And if I swap in what you would like, you say, presenting on a graphical interface -- summary of

information displayed on a graphical user interface. I mean, that's --

MR. DRAYTON: Yes. I understand. And I think in our briefing, what we suggested to the Court is to the extent that the claim includes graphical user interface, you don't need to necessarily substitute. You could just have summary of information because the claims talk about it being displayed on a graphical interface. The reason that that doesn't make the term "graphical" superfluous is that it reinforces what a graphical representation actually means.

THE COURT: With all due respect, it says presenting on a graphical interface a graphical representation, and with yours, it would be saying, presenting on -- it would be like saying presenting on a graphical interface a graphical representation displayed on a user interface. I'm --

MR. DRAYTON: No. I understand.

And in our briefing, we said -- to the extent that that term is used, because it's not used in every single -- I think there's one or two that the graphical interface is not included in the claims when they say graphical representation, is just to say summary of information.

THE COURT: Okay. I got you.

MR. DRAYTON: Right. And that --

THE COURT: So if in the claim terms where it doesn't say in the claim term on a graphical interface, in claim 1, for example, summary of information would be sufficient because it's in there. In other places where that is not in there, you would want summary of information displayed on a graphical user interface if that's not articulated in the claim.

MR. DRAYTON: Correct.

THE COURT: Gotcha.

MR. DRAYTON: Correct. And part of it is, the use of a graphical interface has certain implications. There's a reason that graphical modifies user interface. And when you display things on a summary of information on a graphical interface, you get a graphical representation. And I think it's consistent with the intrinsic record, but it's also consistent with the extrinsic record, as well.

THE COURT: How does summary of information aid the jury in any way that graphical representation doesn't?

MR. DRAYTON: Well, I --

THE COURT: In other words, what wouldn't be a summary of information -- what expert comes in here and says, this is not a summary of information, therefore, it's not a graphical representation?

MR. DRAYTON: Well, I do think summary of

information would be useful to a lay jury, as opposed to the term "graphical representation." However, I do not believe -- I do believe an expert would be able to use the term "graphical representation" if your Honor held it is plain meaning.

THE COURT: Let me try a little bit differently.

MR. DRAYTON: Apologize.

THE COURT: No, no, no. Your answer's better than my question. I'm apologizing for my bad question.

I guess what I'm saying is, I think, number one, again, when I was standing in your shoes, what I would want to be doing. I think the words "summary of information" are easier to a jury than "graphical representation," even though neither one means, really, to mean more than the other. For lack of a word, the evil I'm trying to do away with is, how does it constrain and -- how is an expert constrained in either direction when they're saying it's infringing or not infringing? What expert says, oh, that's not a graphical representation because that's not a summary of information, or vice versa.

It seems to me, you're not really -- we're not really accomplishing anything, I guess is what I'm saying, if we're worried about an expert who's -- they're going to come in here and they're going to say, yeah, it infringes.

Right here, there's a graphical representation. And they're going to say, well, what does that mean? They're going to say, it's a summary of information. And your guy's going to say there's no infringement. Why not? Well, there's no graphical representation. Why not? Well, there's no summary -- that's what I'm trying to get to is, I don't see what we're accomplishing using summary of information here.

MR. DRAYTON: Well, I do think that if you use graphical representation, it could confuse a lay jury into believing that it requires a picture. I don't think it requires a picture when you look at the intrinsic evidence and the extrinsic evidence it does not.

THE COURT: Okay. Leave aside --

MR. DRAYTON: Okay.

THE COURT: I mean, you guys are, for lack of a better word, forcing them to say it means anything. And I'm certainly not convinced, I'm probably not convinced that I would limit it to what the plaintiffs have submitted because I think I agree with you that it could be more.

However, I'm trying to accom -- I don't know -- I used to think when I was sitting over there that whenever I left and the judge said plain and ordinary meaning, it was like okay, that was, you know, the last refuge to

which, you know, scoundrel claims. It's -- they're not doing it.

But what I'm finding on this side and you're going to see as I -- I'm going to say this a lot later is plain and ordinary meaning is when I'm sitting up here and I'm unpersuaded that either side's proposed constructions accomplish anything that the words in the claim term don't say themselves.

MR. DRAYTON: Well, I don't disagree with that, your Honor. I think that we would try to avoid for your Honor and avoid down the road is if the experts were sort of moving into an 02 Micro situation where they're trying to construe the plain and ordinary meaning and they're debating whether it includes a picture, or requires a picture, or doesn't require a picture.

And so, maybe the view on our part is that when we think that that's an issue, we raise it with the Court.

THE COURT: I think that's the time for it to come up. I tell you what I'm going to do and unless the plaintiff's lawyer really feels like they've gotta say something, here's -- I'm going to go with plain and ordinary meaning on this and let me explain why for the record.

I don't think summary of information is any different than graphical representation. It's just

different words. I think displayed on a graphical user interface is repetitive in at least some of the claims. If you were to come to me and argue that it needed in the claims where that -- in the claim terms where that was not said, I agree with you. I do think it has to be on a -- displayed on a graphical user interface. I'm with you.

In those claims which may not now be asserted -- they might be. I don't know. But if I've gotta take that up, I'll take that up when you're arguing whether there's infringement or not in that regard. But I also don't feel that -- I would not go in any situation with what I think on your part, on defendant's part is a limitation I don't see in the specification, which is that it has to represent potential match, online dating profile, term of information or user. I just -- I think you're going too far there.

So I think plain and ordinary meaning is the best we could do in this, and if there's a fight over that down the road, you guys come back to me.

Yes, sir.

MR. DRAYTON: Thank you, your Honor.

MR. CALDWELL: I started a long time ago that you normally don't go and argue something after the judge says that this is what my ruling is, but I'm afraid to leave it untouched, having -- them having gone first. And I'll do

my best not to be -- not to be redundant.

THE COURT: No.

I mean, what I would focus on if I'm persuaded by them that yours is incorrect, that it would -- that it means a pictorial portrayal unless you can persuade me there's somewhere in there in the specification that gives you that purchase.

MR. CALDWELL: Okay. And I think I can do that and I want to do that. But I want to make sure that I understand what it is that you think is wrong with ours.

Is it because you're thinking that it's connoting like a photograph?

THE COURT: No. I just don't -- I didn't see anywhere in your argument where you got me to a part of the specification that said it had to be a pictorial portrayal.

MR. CALDWELL: Okay.

THE COURT: That the graphical representation -- I don't like the defendant's proffered construction because I think it's limiting that they want it to say it has to be their things. And I find yours is equally unpersuasive that it has to be -- a graphical representation has to be a pictorial portrayal.

MR. CALDWELL: Okay.

THE COURT: Now, if you're worried that they're

going to come in here and argue invalidity based on something, for example, as you said, that's just text, I don't know that I would find that that would be invalid, either. I don't know that that would be sufficient, I mean, that someone wants to take up.

But I'm not going to go with yours just to avoid the invalidity arguments coming down the road for some piece of art to have.

MR. CALDWELL: Well, I totally understand if what we are saying is, this fight over whether or not text on a GUI is sufficient. If we're saying that that fight is tabled for another day and, you know, in that context that we're looking at the art, that I'm okay with. I think to say -- because if what you're saying now is that you are concluding that just text, because it happens to be on a GUI, is a graphical representation of the potential match --

THE COURT: I'm actually not saying that. No, no, no. In fact, I'm saying just the opposite. I'm saying I don't know whether that is or not. I would want to -- I think that's something that I would look at on a summary judgment basis.

MR. CALDWELL: I see.

THE COURT: I just -- I don't know -- I think, to me, that would be a motion for summary judgment that they

would file saying the patent's invalid because this piece of art does it, and I would want to look at it and decide whether or not I thought that constituted a graphical representation or not.

MR. CALDWELL: That clarity is very much appreciated because I was afraid that the record might reflect that you had already --

THE COURT: No.

MR. CALDWELL: -- weighed in on that. And, I mean, if the Court want --

THE COURT: No.

Let me make clear I've done the opposite. I'm reserving that. And I'm glad you raised that because defense counsel may have heard the way you did and come in later and say, you've already ruled on this. I've had that happen.

MR. CALDWELL: Right.

THE COURT: And I wouldn't -- I'm not smart to remember what I did.

MR. CALDWELL: I don't think that's the case.

THE COURT: It's much -- no, it is. It's much better that we make as clear as possible what it is I'm thinking out loud.

MR. CALDWELL: Yes, sir.

THE COURT: I am unhappy with the two claim

constructions that you all proffered.

MR. CALDWELL: Yes, sir.

THE COURT: I think plain and ordinary meaning is the appropriate one. But I'm not determining in any way whether or not text would be sufficient or insufficient.

MR. CALDWELL: Right.

THE COURT: To their side, I may find that it is. But I'm not making that decision today or even forecasting what I would do.

MR. CALDWELL: I understand.

Your Honor, there was one time I was in a hearing with Judge Clark and he said, hey, don't talk me out of my ruling, which is like here, sit down. What I'm afraid of is, you've gotten a -- this did start with sort of something of a high level interview that is going to be informative both for this term and to others.

And if your Honor would indulge me, I want to take maybe literally around 60 seconds to do that. But then, I want to direct you to something on this point that I think this needs to be part of the record --

THE COURT: Sure. Y'all have as much time as you want.

MR. CALDWELL: And by way of background -- I know you're super familiar with patents and prosecution. Just so you understand the way that this unfolded, there was an

application that was filed by employees of Match like old-school match.com website that was filed a long time ago. Later, there was a CIP that adds new matter.

THE COURT: Sure.

MR. CALDWELL: That becomes the whole swiping then. So whenever you see references to figures 1D and 1F, this is old-school Match. Then when you see the 6, figure 6, which, John, I don't know if we're -- so this stuff from 6, which I've annotated. And yes, Harry is female, as well, and -- but, you know, humor me for the sake of using the pictures that were in the patent.

This is when we added basically one says yes, one says no. You don't get anywhere. They both say yes. Then you get the opportunity to send the message and start communicating because both have mutually opted in and then, you can message. So that's why I really thought it was going to be 60 seconds. It was probably more like, I don't know, 10.

What I think is important -- your Honor has already hit on this -- is, you made some reference to how in the proposal -- it might have been theirs, it might have been ours -- we both have square brackets, the concepts of it being a potential match or an online dating profile. And that's just the context in which graphical representation of fill-in-the-blank occurs in the claim.

I think the best illustration and the one we both choose to use is exemplary is graphical representation of a first match. But as you discussed, and I won't go back through it, the claims or at least some of them, the fact that any of them separately require that that is on a graphical user interface is what I think is important.

So the risk here is under --

THE COURT: If you didn't put it in your claim, then it should not be there.

MR. CALDWELL: I mean, that's right. I think we're running the risk of completely obliterating any meaning on graphical and resulting in this simply saying, "representation of a first match on a graphical user interface" if we don't give some meaning to graphical.

I understand you may not like pictorial portrayal, and Mr. Summers and I have healthy debate about that, but it just is trying to find a dictionary definition. In other words, not trying to deviate from a plain meaning, but trying to actually give some meaning to graphical if someone's going to turn around and contend that graphical has no meaning, as long as you're separately already on a graphical user interface.

So we're not wed to pictorial. It could be image. It could be anything when you look up what a graphic is, or graphical, that kind of thing is the

concept. But the word "graphical" has meaning. It's not just a representation.

And I'll scoot forward --

THE COURT: Well, because -- and your point is, and leaving aside whether or not they have a patent or not, for a second, the magic of this is that when Harry sends Sally something, they're not just getting back a text message, they're getting back something that graphically represents two Sally is. And that's part of the secret sauce of the way this works.

MR. CALDWELL: A slight variation of that. It's not when Harry and Sally are communicating per se, at least in that example. It's more that when the Tinder servers or the Bumble servers, right, or the hypothetical one that's in the patent is proposing -- I remember from our first hearing, you said you had a general understanding of how this works. Not that you had used it. You were careful to note that. But if it --

THE COURT: I would have used it, believe me. I have nothing against using it.

MR. CALDWELL: The hypothetical Judge Albright.

THE COURT: I wound up meeting my fiance the old-fashioned way. We just met. But I have nothing against this. I would have used this like mad if I would have known it existed.

MR. CALDWELL: I appreciate that. So does the client. So the hypothetical Judge Albright is in college and just single as can be, and you're getting profiles from -- it's when that profile comes to you of a proposed -- some girl that you might be interested in. It's that is the graphical representation of a first potential match.

So it's not text representation presented on a GUI. It's not just representation presented on a GUI. It is a graphical representation of the match that is presented on the GUI. And so, it's a graphical representation of Sally that -- and that's the problem with their construction is, they are reading out that the representation of Sally would be graphical and saying it doesn't matter what the representation of her is as long as it's displayed on a GUI.

So you're just giving no meaning to graphical as a modifier for representation. That is our fundamental problem.

And when you actually look at the new matter that was added and claimed and once it became a Tinder app and not just the old Match system, that's when you get all these figures, which I won't belabor. But it's the ones here's the picture, likes, likes, no, you have a match. It's -- it is part of the secret sauce, quite frankly,

that you're sending these pictures, people swipe and you get matches.

And I don't mean to belabor that, but I think it is very important that --

THE COURT: Well, then, why are you unhappy with their construction -- their proposed construction?

MR. CALDWELL: Well, because they simply say -- they simply want it to be a summary of information that is displayed on a GUI. It's not -- that's not a graphical representation of Sally. And I made a -- John, would you go to.

THE COURT: Well, it sounds to me like, with all due respect, that you want something and I get what you want. And I'm not even sure you're wrong and I'm not even sure that the defendant would argue with it. But it sounds to me like you want something better than pictorial portrayal. Because pictorial portrayal, to me, isn't -- I don't think is exactly what you're saying, either. It's insufficient. It's not the graphical representation that you're talking about here, I don't think.

MR. CALDWELL: I'm not following your Honor.

THE COURT: I don't think that -- I think what you're saying, too, is that the graphical representation that comes back is more than just the pictorial portrayal, as well. It's Sally's profile -- I mean, it's a graphical

representation of Sally, right? It's not just the pictorial that's coming back.

MR. CALDWELL: No. It can be just a picture. It can be more. I think the claim is met by -- the first potential match is Sally.

THE COURT: Yes.

MR. CALDWELL: It can be met by a graphical representation of Sally. It could be a picture. It could, I guess, be a stick figure. I mean, it's a --

THE COURT: Well, no. And you're actually making my point. Claim 1 says, a method of navigating a user interface comprising, presenting on a graphical interface a graphical representation of a first item of information. But it could be many things other than just -- what happens in y'all's system is, it turns out to be a pictorial portrayal. But that isn't what it necessary -- the graphical representation necessarily has to be, is it? It could be -- as you say, it could be a number of things.

MR. CALDWELL: Well, I think that whatever item of information is presented has to be a graphical representation of it. Because my point is, it's not the case that whatever they send you is inherently a graphical representation because it's on a graphical user interface because that is entirely redundant.

THE COURT: I got you.

MR. CALDWELL: And so, I'm simply saying -- and I'm -- this is we're fundamentally fine with the plain language but we -- maybe you're saying it's not a dispute that's ripe for today. But our problem was, we could foresee that this looked like it was going to be an 02 Micro problem. And we're in this situation where I would be happy to propose plain meaning because I don't think we have to redefine it for the jury. But I'm worried that we are acquiescing in what we believe to be a misunderstanding that they have.

So I think whether it's the item of information, or what have you, it has to be represented graphically and I think that -- if I could go to slide 16. Again, I'm not wed to the word "pictorial," but we've provided dictionary definitions and whatnot. I mean, I don't know that graphical really needs defined, but we just took pictorial from a dictionary to try to elucidate that idea.

And I have had this debate as to whether does that mean, a photograph? No.

THE COURT: I think here's what I'm going to do. I'm going to order plain meaning. At some point in the future, your side -- I'm pointing this -- defendant's side is going to say -- it might say or it might not say there's no -- we'll just see how it comes out. It may be an infringement context. It may be an invalidity context.

09:44:45 Y'all do your reports, you frame it up. One side or the other could file a motion for summary judgment, and by the time you do, I have a really, really smart law clerk who will be able to read it and get it correct.

MR. CALDWELL: Yes, sir. If I'm not testing your patience, may I note something on the record that I don't know that we said it the way I'd like to kind of in our brief, and I just think it might be helpful if you have to look at this particular issue?

THE COURT: Sure.

MR. CALDWELL: This what I've put on the screen here and do you know which -- this is slide No. 21. What this is on slide No. 21 is the declaration of defendant's expert when -- and I want to respond to your question to Mr. Drayton where you asked, where did you get the word "summary of information," if you'll recall that.

THE COURT: I do.

MR. CALDWELL: What their expert did to come up with the summary of information -- I mean, my colors don't mean a lot in this picture. But there's the first sentence where he points to the specification and cites lines 8 through 10 of column 21. You'll see that. Then he goes to his next sentence. He skips over eight lines of the spec, and he cites lines 18 to 22 of the spec, which is where summary of the invention comes up.

So directly to your point as to where summary of the invention comes up and to your original question to me as to where do I go to this imagery stuff in the spec, when we look at column 21, what I've highlighted in sort of a very pale purple here is the portion of the spec he skips over to try to be able to point to --

THE COURT: He wouldn't do that.

MR. CALDWELL: He might. He did. He point -- he skips over to jump to the summary of the invention. He skips over the display may show an image of a suggested user and one or more aspects of the suggested user's profile information. In some embodiments, the combination of image, and whatnot, is displayed as a card representing a set of users.

And I just wanted to note that because I think that we -- to get the words "summary of the information," we literally skipped over the description of the graphical representation, which is this image on the card. And anyway, I understand your Honor's ruling. I think that --

THE COURT: You all -- like I said, you all have -- are enormously lucky because by the time you all have to deal with this, I have someone really, really smart that will be able to read all this, and between the two of us, we'll get it right.

MR. CALDWELL: Yes, sir.

THE COURT: But I think I'm happy with plain and ordinary meaning for the pictorial portrayal -- I'm sorry, for graphical representation.

Let's move on to "without allowing communication."

MR. DRAYTON: Your Honor, may I proceed?

THE COURT: Absolutely. Yes, sir.

MR. DRAYTON: And as you can imagine, your Honor, I appreciate your ruling and I won't say another word, but when the day comes, we will have appropriate answers for some of the things counsel mentioned to you.

THE COURT: I understand. And I will have forgotten by then what he said.

MR. DRAYTON: Okay. So "preventing communication" is a term in the 811 patent, and then, "without allowing" or "without allowing communication" is a term in the 854 patent. And as your Honor may know, the 854 patent, those claims were filed post-litigation, after this case was actually in federal court.

So our construction is an affirmative action showing no communication between two users. We shifted that so that it could be inserted to a claim construction but not materially shifted to performing an affirmative act to ensure no communication between two users.

Match's construction is plain meaning.

When we look at the specification, the specification uses the word "allow," and in the specification, in figure 10, which is not devoid, as I mentioned to you, from the overall server of figure 1 and the system of figure 1 in combination with figure 4, it says that the matching server 20 will not allow communication between two users. That is part of the support for the term "preventing communications" that were put into the claims to overcome prior art.

Now, there's a flowchart or an algorithm in part or an excerpt of an algorithm that's used to describe figure 10. And in that algorithm, it doesn't talk about a default state of any kind. It just says that under certain circumstances, it will not allow communication. Doesn't talk about within that box, how it happens; it does talk about it within the specification.

So I want to take a step back because the patent talks about enabling communication. And we just have on this particular slide, your Honor, examples of what it means to enable communication between two users. I won't belabor that point. And then, there's preventing and allowing communication. And we have the excerpts from the specification that could support this concept of preventing without allowing communication. And it talks about this matching server 20 will not allow communication

between two users, and also talks about matching server 20 does not allow communication between two users.

Now, this is when one of the two users says it does not want to communicate with the other user when they're presented with some information about the user as a potential match.

In the prosecution history, when they added "preventing communication" as a claim element, after a user rejected another user, they had to defend it, and they tried to explain why it was different from a prior art, a Janssens reference. They said enabling and disabling communication is what they were talking about. Disabling communication. That's an affirmative act. That's not a passive act. And that's in the prosecution history as the patentee described their invention to the patent office to overcome prior art.

So I won't belabor that point, but I think it is significant because it's part of the intrinsic record and it's giving life to the words that were in the specification, before they inserted the claim element into play in the patent office.

So I do think it's important at a high level when we talked earlier about the summary of invention, you won't see anything about disabling or preventing communication in the summary of invention. So -- and

then, when they started the prosecution of the 811, you didn't see anything about preventing communication, or disabling, or anything of that notion, or the things that talk -- or the parts of the specification that talk about not allowing communication. They're not in those claims.

So why is disabling necessary? So that came up in the briefing. Well, the specification discloses various instances where the system enables communication. So it's not just because I was showed a match, I rejected the match, and it said no to communications. There's other aspects, other ways -- I say yes to a match. So, your Honor, if you wanted to match me up with somebody, the specification talks about you being able to do that as a user of the system and enabling communication.

So 101 matching is not the only description of how communication is enabled in the patent. It's just one of many ways. The claims disclose one instance where you can have communication between two users if there's a mutual match between them. The claims don't suggest and don't require that that be the only way in a matching system that communication is enabled. And the specification also does not support that, so the claims are consistent with the specification.

And then, the claims require that if a person affirmatively says no, then all communication is basically

not -- is always of enabling communication, but no longer in play. So the disabling term used in the prosecution history makes sense when you read the system in its totality, and that's why they inherently told the patent office, this is about enabling and disabling communication.

Because if you didn't enable the communication, after I said no, you could still enable communication, right? So the specification talks about not allowing communication. The patentee said that that not allowing meant disabling. They insert "preventing communication," and they say, in talking about disabling communication.

THE COURT: Can you tell me where in the specification you're referring to in that slide? And tell me which slide you're on, also, please.

MR. DRAYTON: I can't see the slide, your Honor. So slide 30 -- well, not slide. Just want to make sure I get you -- so when we talk about not allowing communication, your Honor, it's on slide 30, and it has the cite in the specification to the disclosure that talks about not allowing communication. So that would be column 23, lines 14 to 17, and column 23, lines 52 to 55.

THE COURT: Okay. But what I want to see is where does not allow communication in the specification is -- it requires an affirmative act.

MR. DRAYTON: Well, that's -- I wouldn't say that that is in the specification. That's in the prosecution history.

THE COURT: Where in the prosecution history?

MR. DRAYTON: Okay. So I think we have a cite.

THE COURT: Tell me what page you're on, please.

MS. SONI: Slide 31.

THE COURT: Thirty-one.

MR. DRAYTON: So slide 31, your Honor, but I believe in our briefing, we produced Match's copy of the prosecution history and it's Match 593.

THE COURT: Okay.

MR. DRAYTON: So in 594 and 595 would be the pages in the prosecution history. We could confirm that we actually provided the Court with the production copy of the prosecution histories.

So the prosecution history is Exhibit 8 to the Whelan declaration in Bumble's opening brief, and that has the prosecution history, your Honor.

THE COURT: And can you show me one of the claims that includes "without allowing communications" in it?

MR. DRAYTON: Well, your Honor, if you look at -- it's the 854 patent, but it's slide 36. I think you can see it from --

THE COURT: Not on my slide 36.

09:58:15 MR. DRAYTON: Are you in the presentation, your Honor?

09:58:19 THE COURT: I'm in your presentation. I would like --

09:58:21 MR. DRAYTON: I'll show you slide 36. So it's a side-by-side comparison from the patent office of the 811 patent claim and the --

09:58:30 THE COURT: I gotcha.

09:58:31 MR. DRAYTON: -- 854 patent.

09:58:33 THE COURT: Thank you.

09:58:33 MR. DRAYTON: The 854 patent claim is on the right.

09:58:37 THE COURT: Okay. And what you're saying is, in the prosecution history, the way they distinguished over the prior art was by saying the prior art is different because it didn't have enabling and disabling communications.

09:58:59 MR. DRAYTON: Correct. And I'm saying, also, that in the specification, that they submitted, the only concepts are this -- is not allowing communication.

09:59:08 THE COURT: I got that.

09:59:09 MR. DRAYTON: Right. And then, they interpreted to the patent office that that means disabling.

09:59:13 THE COURT: As opposed -- but it said but our system is different than what you -- and then, the art

we're reading over because our patent allows enabling and disabling. So why wouldn't a construction that would be consistent with the specification here for these two claim terms, "without allowing communication" and "preventing communication," be the terms "disabling communications"?

MR. DRAYTON: I think that would be appropriate.

THE COURT: Let me hear from the plaintiffs on that because -- and then -- I'm going to give you another chance to speak in just a second. But let me --

MR. DRAYTON: I understand, your Honor. Thank you.

THE COURT: I'll tell you what -- and the reason I asked you to jump up is because until I was looking at that reference, it seemed to me that I was pretty persuaded that the defendants were correct on preventing communication was an affirmative act like the disabling, but that without allowing communications was not necessarily an affirmative act. But it does appear to me if they're correct about the prosecution history that you all told the examiner that you all -- your patent did allow for disabling of communication, and that's what "without allowing communication" meant. Am I right?

MR. SUMMERS: That's not at all what happened, your Honor.

THE COURT: Okay.

MR. SUMMERS: John Summers on behalf of Match Group.

So I think the best place to start is where your Honor is thinking about, and it's this prosecution history issue. But before I get into that, the full scope of the word "prevent," putting aside the specification, which I'll get into, putting aside the prosecution history, which I'll get into, I think it's pretty clear that you can prevent something without doing something. You can uproot, you can just not schedule something.

THE COURT: All right. I get that.

MR. SUMMERS: Okay.

THE COURT: I will tell you, though, I still find preventing communication to be more of an affirmative act than without allowing communication.

MR. SUMMERS: Well, I certainly think that there is more room for disagreement. So without allowing clearly to not do something doesn't mean to do something. So I think your Honor and I are on -- and Match are on the same page on that. So I'd like to focus on this prevent aspect.

And one thing I don't believe your Honor has a copy of our slides.

THE COURT: I don't.

MR. SUMMERS: Before I get into that, maybe we'll

pass those up.

Okay. Your Honor, and so, I'm on -- this is slide 26, and this is a more fulsome showing of what actually happened in the prosecution history.

THE COURT: I like that word. I use "fulsome" a lot.

MR. SUMMERS: Well, I'll be sure to note to use it more often, at least in this case.

So what actually happened here -- so the Janssens reference is something -- to go back to Mr. Caldwell's kind of high level overview, how this invention works is you start and you can't talk to anybody, and then, people indicate preferences, and under one scenario, when two people say yes, then you can communicate.

The Janssens reference, unlike how Tinder just generally works and unlike the disclosures in the patent, the Janssens reference didn't have that, you know, you have to mutually opt in to speak. You could speak at any time. And then, there was, you know, specific, additional ways that you could potentially speak if there was a match, there was a different part of Janssens. It's the speed-dating part where throw you -- you know, throw you into a chat with somebody else and you'd have 30 seconds or something -- I don't know what the time is -- but then, it would turn off.

10:04:14 And so, we're talking about the examiner's initial rejections. And what Match said when we were using this enabling and disabling communication language that Bumble was arguing so heavily about, we say Janssens suggests that users can freely communicate unless they are prevented once a user requests. This teaches away from the claimed manner of enabling and disabling communications as users are prevented from communicating until the conditions specified in the claim are met.

So what we were saying there is, as claimed in this enable initial communication upon mutual positive preference, prevent communication if there's not a mutual positive preference, we specifically argued, our claimed manner is that users are prevented from communicating until the conditions specified in the claim are met. And so, what that's referring to the mutual positive preference for enabling an initial communication.

It's not saying that there's an affirmative step later in the claim that you start with no communication and then, you enable initial communication for these two people, and then, you reach out, you perform an affirmative act as to these two people. We're specifically saying there's no communication until there is upon this one specific condition.

Again, as you go on to the bottom, the claimed

manner of enabling and disabling communication requires a particular set of factors to allow for communication between users. So there was never -- never in the prosecution history did Match ever say what we mean by prevent is disable. And certainly never what we mean by prevent in the context of, you know, between the first user and the second user enable an initial communication and then, the first user and the third user prevent communication. There's never anything that says -- anything even arguably that that prevent means the server has to reach out and do something.

And I think to make this clear, it's worth looking at figure 10, which, you know, in Bumble's brief, they say, well, you know, in this bottom right, it says do not allow communication, and that's a step and you have to perform it and that there's no default in this figure. But there has to be a default in the figure. You either can communicate or you can't.

And so, what this figure is showing is, you have allow communication and do not allow communication. Before you start the flowchart, you either can or you can't. In the context of what we said in the prosecution history and, you know, Mr. Drayton showed all those disclosures about mutual positive preference, then you enable direct communication between two users. What

that's showing is very clearly that in this flowchart as between whether communication is on at the beginning or whether it's off at the beginning, you know it's off. And then, when you know it's off at the beginning, you can go through all the flowcharts, and you can realize that, okay, on one specific condition where the first user likes the second user and the second user likes the first user, then you allow communication; otherwise, you don't.

And the other part of this slide that I think really makes clear that an affirmative act requirement would just be -- it's just not what's disclosed here is, it talks about what happens when the first user likes the second user and the second user hasn't done a thing. Hasn't even logged in. And it goes down to this do not allow communication issue.

And so, the idea that it would perform an affirmative act when one person has said yes and the other person hasn't said anything, that no one would design a system that way. A skilled artisan wouldn't look at the specification's teachings, wouldn't look at the prosecution history and think that anybody designed a system that way.

And that's particularly true when you go back to the claim language, and every time the word "prevent" is used, it's in a claim that says determining to enable

initial communication between the first user and the second user, and then, when it uses the term "prevent," it says, preventing communication between the first user and the third user after a negative preference, right?

So every time you recite enable initial communication, you know that the first user and the second user can't speak because you say enable initial communication. That obviously would tell the skilled artisan, well, if we're enabling initial communication, communication is not initially enabled. And so, since the full scope of the meaning of the word "preventing," you know, can include maintaining a default, or something like that, we just don't think the affirmative act construction which would certainly give fertile ground for arguments of, well, no, maintaining a default is not an affirmative act, that that would be inappropriate.

One thing I just -- I do want to note to make sure it's not lost in the weeds here and I know, you know, the intrinsic evidence is the most important thing, but Bumble did retain an expert, Mr. Schmandt, and he --

THE COURT: You don't need to spend a lot of time on that.

MR. SUMMER: Okay. I just --

THE COURT: Or any time.

MR. SUMMERS: Thank you, your Honor.

MR. DRAYTON: Do I now, your Honor?

THE COURT: Yes. Please. Of course.

MR. DRAYTON: So, your Honor, the first thing that I've heard throughout the presentation today is talk about their product. Their product is obviously, as we know, totally irrelevant to the claim construction process.

THE COURT: But it's interesting.

MR. DRAYTON: It's interesting and so is our client's product. But nonetheless. And so, they talk about this concept of default. And it seems to be Match's position that the claims require some kind of default position, and I thought about this a lot and the claims don't require a default position at all. It -- basically when you read the specification, there are multiple ways to enable communication between users, that is part of the matching system.

So mutuality among two people is not the only way to enable communications. So that is just -- that premise is contradicted by the specification when you read about the matching system. And figure 10 is part of that matching system. Figure 10 is just an algorithm, one aspect that is disclosed. And I want to go to figure 10 for a second and answer one question, or at least respond to one remark. And here's figure 10.

And so, in figure -- in the claims, they don't talk about in the claims, a user that doesn't say no. The claims have two examples: Users that say yes and users that say no. And so, the concept of what goes on in this black box of do not allow communication, what we focused on in the intrinsic record is what is related to the claim limitations, plural -- limitations, plural, that are in the asserted claims.

There is not a limitation in the claims to the extent that someone doesn't make a choice. That's not in the claims. So that's why we focused on the two areas of the specification that talk about not allowing communication.

And I think that puts in context that you can have multiple ways of enabling communication. To the extent that a person does not want to be matched, then the system must prevent communication, it disables always a communication. And so, that's how we read the claim based upon the specification and the prosecution history. So I did want to point that out to your Honor.

The other thing is the black box, in my opinion, is what's described in the claim, in the specification. And we've shown that to your Honor, so I won't repeat that. I will note one thing about initial communication. That is not at play. That's the last step to try to have

the patent invalid in the patent office when they were trying to overcome Janssens.

So the concept of preventing communication was actually inserted and put into play when it didn't say initial -- determine to enable initial communications. So I do think that's a fine point. I think it's relevant to how you interpret the claim "preventing communications." But either way, it still works, your Honor, when you read the claims in light of the specification, in light of the prosecution history.

The other point that I think is important is this "without allowing." And so, the reason that "without allowing" and "preventing" have the same support in the specification, and it's Bumble's position that that support was characterized by the patentee during the 811 prosecution history. And then, after they do research on our product, sue us in court, they filed new claims, and they file them with purpose.

THE COURT: I've seen it happen.

MR. DRAYTON: Right. So that's the "with allowing," right, "without allowing." And it's almost an identical claim and the patent office -- and that's what this slide that we showed you and it's -- I'm getting old, your Honor -- 36.

THE COURT: Thirty-six is not old.

MR. DRAYTON: Right. I'm not 36. I wish I was 36. But at any rate, that's when the patent said it's the same invention and put it side-by-side and put in italics "prevent" and put in italics "without."

And then, this is about public notice because what is Bumble going to do, what do the other competitors do when they look at this, right? They look at the claims, they look at the prosecution history, they look at the specification. And that's why we say that disable language and how they characterize "not allow" applies to "without allowing" as equally as it allows to prevent it. You can't change your mind midstream when you've given public notice like that.

And so, your Honor, those are the points I wanted to emphasize. Thank you.

THE COURT: Anything else?

MR. SUMMERS: Thank you. Just two quick points, your Honor, on this "without allowing" term on disclaimer issue. And it's not on the screen anymore, but that's an entirely circular argument.

What Mr. Drayton just said is without allowing has to mean preventing because the examiner thought they were the same thing. It is much more likely, in light of how we described it in the 811 patent and in the intrinsic evidence, that the examiner actually recognized as a

skilled artisan would that preventing in the context of the claims in the 811 patent was not an affirmative act, was similar to without allowing, and so, that's why there was a terminal disclaimer.

In terms of changing the language, you know, people do that because they know the kinds of arguments that accused infringers are going to make. And so -- well, we'll be real sure on this one, even though we're right on this other one. And so, at the end of the day, that's all that was.

And I just want to -- if I could go back to plaintiff's slides, please. I want to go to Mr. Drayton's point about, you know, there are a lot of ways to enable initial communication in the spec. What does the claim say? Enable initial communication in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user --

THE COURT: Slow down.

MR. SUMMERS: Oh, sorry.

THE COURT: Say that again, please.

MR. SUMMERS: In response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding

the first user.

So the claim says, enable initial communication in response to a mutual positive preference. When you look at the flow chat and how it has to be on or off, the claim indicates very clearly that as between the first and second user, it has to start off. And given the full scope of the meaning of the word "prevent," a skilled artisan would look at that and say, oh, okay, that can be met because the system was designed to start with off and if you don't turn it on, it's prevented.

Thank you, your Honor.

THE COURT: Anything else?

MR. DRAYTON: I just want to clarify one thing, your Honor.

THE COURT: Anything.

MR. DRAYTON: So I didn't say that there was -- I didn't think I said, anyway. You never know what you say. But the specification talks about multiple ways of enabling communication between two users. I did not say --

THE COURT: I didn't hear you say that.

MR. DRAYTON: Right. Okay.

And then, the other thing that I think is important is, there's a focus on this figure. And what Bumble is focused on is the claims in light of the

specification and the prosecution history, not just that figure 10.

THE COURT: I got it.

MR. DRAYTON: Thank you, your Honor.

THE COURT: Okay. We're going to take a five, 10-minute recess. We'll be back around 10:30 and I'll have a -- I'll tell you what I'm going to do on those claim terms. And then, we just have two claim terms left, correct?

MR. DRAYTON: Yes, your Honor.

THE COURT: Okay. So we're -- no rush. But did y'all have anything else you wanted to say on this particular claim here?

MR. DRAYTON: No, your Honor.

MR. SUMMERS: Nothing further.

THE COURT: Okay. Good. Thanks.

(Recess.)

THE COURT: Do y'all have another copy of your PowerPoint? I can have someone run back to the office if y'all don't. Thanks.

The Court is going to define for the claim terms of "preventing communication" and "without allowing communication" that there's no construction needed. Plain and ordinary meaning will be acceptable. What I mean by that, however, is what I anticipate happening is

defendants making -- in terms of infringement and invalidity arguments, I'm not telling you that you can't make the arguments you made with respect to the proposed claim terms you had on the basis that you did, but I'm not going to use those as claim constructions.

And the plaintiff is free to argue there's infringement and the patents are valid based on your understanding of what an expert would say a person skill in the art would believe "without allowing communication" and "preventing communication" means.

Moving on to the next claim term of "social networking platform." I have to say, I have a hard time believing this one needs to be construed, either. However, I look forward to having someone try to persuade me. Whose job is that?

MR. DRAYTON: Ms. Whelan.

THE COURT: They must not like you if they gave you this claim term.

MS. WHELAN: Good morning, your Honor.

So just quickly to address your Honor's concern about why this claim term needs to be construed. The reason it needs to be construed is because within the context of the claim, social networking platform is ambiguous, and it's actually plaintiff's interpretation of it in the infringement contentions that has introduced

that ambiguity in the claim. So Bumble would propose a construction of social networking platform independent of the system for social -- for file matching.

And I think an important point is that Bumble's not tied to the specific word "independent." There is other words such as the "distinct," "different from," "not coextensive with" that would express the same principle.

And the reason why it's important to construe this term is that the way that plaintiffs are interpreting it in the claim -- in their infringement contentions really would render the term "social networking platform" superfluous and meaningless. And as your Honor knows, claim construction that gives meaning to all the claims of the term is preferred.

THE COURT: But how is -- when you start off by saying that, how -- your construction for social networking platform is telling me what it -- I think where we have an issue here is, I have a fundamental, I guess, disagreement with what I think a claim construction Markman hearing is supposed to be. I think what you want to tell me is -- and I get why. You think that what they say infringing is is incorrect, but you're not really construing social networking platform here.

Your construction is social networking platform independent of the system for profile matching. In other

words, you're trying to put a limitation on what social networking platform is. You're not construing it in my opinion.

MS. WHELAN: Well, your Honor --

THE COURT: It seems to me like this is a motion for summary judgment, not a claim that your motion for summary judgment or your engineer's argument ought to be the plaintiffs got it wrong, the way they used social networking platform, because a social networking platform is this or that. And I don't see how when I tell the jury -- I can't imagine you explaining someone when they say, oh, I don't know what social networking platform is. Actually, sadly for you in this particular argument, even I know what a social networking platform is, which means it's harder for you to make this argument. Even at 60, I know what a social networking platform is.

And so, it seems to me that you're not really construing social networking platform with your proposed construction. You're trying to limit what they say a social networking platform can be or how it can function, and that's not the purpose -- that may be fine and I'm not expressing, again, anything about whether there's infringement or not.

You may make this argument at summary judgment or on infringement and win, but I don't think the role of --

and I'm not lecturing you as much as just trying to help you out why I'm -- where I'm coming from is, it doesn't explain what a social networking platform is to say that the social networking platform is independent of the system for profile matching.

MS. WHELAN: Well, your Honor, if you'd just permit me to talk briefly about the claim.

So I think our point would be is that the context of the claim itself makes clear that the social networking platform is distinct from the system for profile matching. So we're not trying to add anything into the claim. We're just simply trying to give meaning to all the terms in the claim.

In addition, you'll see that claim 7 of the 811 patent requires that the system for profile matching electronically receive a plurality of online dating profiles and that those profiles must each be associated with a social networking platform. And the way that plaintiffs are trying to read the claim is -- just wouldn't make any sense because if a social networking -- if the system for profile matching is receiving online dating profiles that are associated with the social networking platform, but the system for profile matching itself could be the social networking platform, it just wouldn't make sense because when they're received, if they

became part of the -- associated with the social networking platform by virtue of being received, it would essentially render that term meaningless.

THE COURT: Again, your problem is, your predicate doesn't help me because I don't know how they're doing it. I haven't read their infringement contentions. I don't know whether they're right or wrong. I don't think that's a role I would even have at this point. It seems to me, if -- again, I'm trying to help you out here. If you want to tell me that you want to construe social networking platform, I invite you to do that.

But to say social networking platform means social networking platform independent of the system for profile matching, all that tells me you're doing is putting a restriction on the use of the phrases "social networking platform." You're not construing it. You're not offering me, in my opinion, a construction, and if you can, I invite you to do that.

But I'm not very open to persuasion that what you guys are suggesting here is a construction for social networking platform. It is a limitation on the way you guys think it can be used. You can use that down the road. But I don't know how or why -- I don't even think I would have the power -- everyone tells me I could do whatever I want. Not that kind of I can do what I want.

10:38:17 But I don't think in terms of what my real role as a -- trying to construe the claim term, I don't see how yours accomplishes it. Let me give you one more chance to persuade me.

MS. WHELAN: Sure. Well, I think that a case General American Transportation Corp that we cited in our brief is actually quite instructive here. So in that case, the claim term was openings through said ceiling means adjacent to each of the said side walls and end walls. And in that case, the court determined that the claim language itself suggested that the openings adjacent to the side walls and the end walls were structurally distinct.

We see that as analogous to the claim term here because the claim term here also suggests that the social networking platform is distinct from the system for profile matching. And so, the Court rejected a construction that was inconsistent with the specification and the drawings and renders superfluous the claim requirement that the openings were adjacent to the end walls.

I think that the doctrine of claim differentiation is also very instructive here. If you look at claims 4 and 5 of the 854 patent, in that claim, it's actually the term "a social networking platform"

appears only in the dependent claim. In the independent claim, it was directed to that system for profile matching.

Now, under the doctrine of claim differentiation, if social networking platform wasn't distinct from the system for profile matching, which we believe the structure of the claim itself already includes that limitation, then claim 5 would essentially be not add any additional limitation which would be contrary to the patent statute, which requires that dependent claims actually provide a further limitation.

And I won't belabor the point, but I'd also just point out that the specification consistently talks about the social networking platform and the matching server as two distinct entities. Although they may interact with each other, they are always discussed as distinct. For example, they have to interact through an application programming interface. As I mentioned before, your Honor, there is some ambiguity here about what this claim term means. And so, we think it's appropriate to look at the specification in this case.

THE COURT: Okay. Thank you. I'm good. I'm going to do a plain and ordinary meaning.

MR. SUMMERS: Thank you, your Honor.

THE COURT: And the final claim term is

"associated."

MR. CALDWELL: Does your Honor have a preference who you hear from on "associated"?

THE COURT: I am looking forward to hearing at 60 -- at the age of 60 why I need to know what the word "associated" -- why it needs to be construed. So I'm --

MR. CALDWELL: I'll probably sit down.

THE COURT: I'm going to give the defendant an opportunity to explain that to me.

MR. CALDWELL: Thank you.

MS. WHELAN: So moving on to "associated," so defendant's position is that the claim term does not need to be construed and, in fact, cannot because the claim term is indefinite. And now, what's unique about this case is that associated is pervasive throughout the claims. For example, in claim 1 of the 023 patent, it appears nine times alone.

In fact, throughout the three patents, there is 14 different ways and -- or contexts in which this claim is used. So the patent doesn't provide notice of how the elements that are connected with associated are actually connected. There's no plain consistent meaning in the contexts of the claims that fits for associated here, and the intrinsic evidence here is not helpful.

You may have noted in plaintiff's briefs that

there was a kind of laundry list of intrinsic evidence that they contended was somewhat helpful in construing associated, but they didn't really talk about how that helped and that's not a coincidence. It wasn't helpful because in those cases, either it didn't even relate to the term "associated," the term "associated" wasn't used, it was just used in the same manner as it was used in the claim terms. Or it was -- the term "associated" was used in a context that was not in the same context as it was in the claims.

And this just does not fulfill the public notice requirement. Juries and alleged infringers are given no guidance about how the numerous elements in the claims that are connected by associated are actually connected, and it just doesn't provide reasonable certainty regarding the scope of the invention.

Now, I think it's important to note that Match has declined to provide a construction for associated, either alone or in the context of the claims. Instead, they point to the general dictionary definitions to say that associated has a clear ordinary meaning, but that's not really the point here. The question is whether the claim is definite when the word "associated" is used, and here, it's not.

And one thing that we noted is that associated

here has some sort -- implies some sort of measure or degree. Kind of like the terms "about," "near" or "proximate." All of those words have clear meaning, but they lack sufficient precision when relied on to clearly define what's inside and outside of the claim boundary. And that's how we would see "associated" here.

Now, perhaps an attempt to get around this, Match has pointed to just "associated" meaning any sort of relationship between two elements. Essentially no matter what relationship anyone can conjure between two elements, it falls within the scope of the claim. But this fails to draw a boundary line and renders the claim term indefinite.

Now, we spent a lot of time in our brief talking about a few specific terms.

THE COURT: Let me just suggest to you, I'm looking at claim 1 in the final sentence -- the final line of claim 1 is, storing the positive preference indication associated with the first item of information in response to detecting the gesture. When I read that, the word I most likely -- I'm most likely to understand is "associated" out of that whole line.

And as I've said before, one of my very closest friends who was the technical lawyer I worked with the most referred to my technical skills on patent cases as

10:45:39 that of being a dog watching a television. You know, he can see the television's on, but he really can't figure out what show is being played.

So I'm always cautious about these things, but I have a really hard time -- I'm not getting there with believing that I need to construe -- that the word "associated" is indefinite. As I read through here, I feel like -- and I'm not a person of skill in the art, but a graphical representation of a first online dating profile associated with the first user.

If I were reading that in preparation to cross-examine an expert, I think I would know what that means. I think I could ask him: Dr. Smith, tell me where there's a gesture that's detected here that's associated with the graphical representation, and I think he would know what that means and I think the jury would know what that means. I'm not -- I'm having a really hard time saying that the word "associated" is indefinite. I'm not getting there. So I'll give you a little bit more time, but I'm not -- I'm not getting there.

MS. WHELAN: Sure. If you'll permit me, your Honor, to talk about a couple of terms that we didn't focus extensively on in the brief that I think are a good illustration of why this claim term is indefinite.

The first term is a geographic location

10:47:12 associated with the first user. So it's unclear just based on the use of the term "associated" what that connection is. Is the first user within a certain distance of the location? Does the first user reside at the location? Did the first user work at the location? Were they originally from the location?

THE COURT: I'm willing to bet you that if you gave me an hour, I could find an expert at the University of Texas who could read the patent in 15 minutes and give me an answer to every one of those questions. Someone who's skilled in the art. I don't know who you were saying is skilled in the art here, but I am absolutely certain I could find Dr. Somebody or one of their students who would be able to answer every one of those questions using the word "associated." It may or may not be right, but it's not indefinite in my opinion.

So I'm going to find that the claim term is just plain and ordinary meaning.

MS. WHELAN: Thank you, your Honor.

THE COURT: And I don't mean any disrespect. I mean, I don't -- I don't think anyone else could have persuaded me of that, either. So I thought you did a great job, and I think coming up with something like that is as persuasive as you're going to get. And maybe a different judge would decide differently, but I think

associated is subject to understanding by a POSITA.

So let's turn to the motion. If someone could -- I have -- I've read the motion. I've read everything about it. And so, who's going to take up arguing that?

MR. SUMMERS: Thank you, your Honor. John Summers, again, for Match Group.

One administrative issue is, there are -- there is some evidence cited in the brief that is not public information. I haven't talked to Bumble or Mr. Caplan about this, but I think that they might want the courtroom to be sealed. So I'll let them speak on that.

THE COURT: Do we need to bring that up during the hearing?

MR. CAPLAN: I don't think so, but that's his call. If it's just about whether or not the Court's going to consider the materials, we can do that without getting into the substance of them. But I'm not sure if Mr. Summers' argument is going to touch on the contents of certain of the documents that have been sealed.

MR. SUMMERS: Your Honor, I would -- intend to touch on those documents.

THE COURT: Why don't we go into -- when you get to the point where you think you need to do that, let me know.

MR. SUMMERS: Okay. Thank you, your Honor.

So the Match Group's motion to dismiss here kind of has two large facets, as the Court is aware of. There's the issue of Bumble's most recent iteration of their state law counterclaims and that's sort of the one group, and then, there's the issue of the denial of registration trademark counterclaims.

And so, I'll take the state law counterclaims first. That is the issue that will potentially implicate the confidential information, but I'll stop before I get into --

THE COURT: I've read all -- I don't think you need to go into what the information is.

MR. SUMMERS: Okay.

THE COURT: I'm pretty familiar with it. I'm certainly familiar with anything you put in the brief.

MR. SUMMERS: Thank you, your Honor. Sure. If there's anything I'll add, I'll be sure to let you know. But, otherwise, I'll steer clear as much as I can.

So just as a reminder, the general state law claims and these are just paragraphs from those counterclaims. The theory is now that in January of 2018, Match pretended to be -- excuse me, your Honor. Match pretended to be interested in an acquisition. The allegation is that they were not, in fact, interested in the acquisition and the purpose of that was just to --

THE COURT: To delay.

MR. SUMMERS: To delay.

THE COURT: What I'm most interested in you articulating specifically for me is -- and on the record is what any affirmative -- anything that was affirmatively stated by them that they -- that you relied on. Does that make sense? That, you know, in other words, where it shows they knew -- that they knew other offers were out.

MR. SUMMERS: Uh-huh.

THE COURT: And that their goal was -- that they should be held liable, not just for not going through the deal, which I don't think they could be found liable for, but that they said something, did something. What were the acts that they committed that you -- and they could say there was -- didn't happen or they're wrong. But what would you say they did that was -- that you all relied on, to your detriment, in making the decision to believe that they were going to go through and not to move forward with other people?

MR. SUMMERS: Right. So I think Mr. Caplan will probably answer the question of what Bumble believes that Match told them that they relied on. But in terms of --

THE COURT: Yeah. I have that backwards. Yeah.

MR. SUMMERS: In terms of what the pleadings say, it's all about you said you were interested. You told us

you were looking at this due diligence. You indicated that you were preparing a higher offer. Those are -- that's all that is there.

And so, in terms of what that reliance is, you can characterize it differently. You can say, well, we relied on, you know, the fact that you didn't tell us that you weren't interested, or we relied on something like that. But what the actual action they took in reliance on these statements, that reliance is reliance that a deal would go through. When you don't go through with another deal and you wait on this.

THE COURT: Right.

MR. SUMMERS: That reliance is that a deal would not go through.

One thing I would like to touch on, your Honor, before we get into the merits is this subject matter jurisdiction --

THE COURT: Yes, sir.

MR. SUMMERS: -- issue.

THE COURT: Okay.

MR. SUMMERS: Because I just didn't want to get past that.

So on the supplemental jurisdiction, we talked about this a little bit in February over the different state law counterclaims. And just as a reminder, the

first iteration of these state law counterclaims were that Match filed a bogus lawsuit.

THE COURT: Y'all have squared away on that.

MR. SUMMERS: Those are gone. Yes, your Honor.

Match filed a bogus lawsuit and that Match, you know, made similar representations for purposes of acquiring Bumble confidential information. Both of those claims are gone. It's in the 18-CV-350 case that is a final judgment, closed.

These claims don't have that. There's nothing that the patent lawsuit is frivolous. There's nothing that the patent lawsuit is wrong. There's nothing that we misappropriated trade secrets. And that's important because those counterclaims raised federal questions or at least were interrelated with the federal questions, and now, it's just not there anymore.

And so, even if, you know, there were some efficiency benefits for doing everything in federal court, just as an academic notion, the Court doesn't have authority because there's no nexus here. I think the AngioScore case that we cited pretty lengthily in our brief kind of sets forth the narrowness of supplemental jurisdiction in kind of the intellectual property context.

So the patent case depends on how Bumble works. The trademark case depends on, you know, their using the

marks and whether there's likelihood of confusion. Our trade secret case depends on whether they took the business idea and what they've done with it. That has nothing to do with the acquisition discussions. There's just no -- there's no operative fact. They're not going to prove their claims. They would not have to offer evidence of anything related to the 18-CV-80 lawsuit, which is -- actually when we were litigating this issue in the 18-CV-350 case, Bumble actually specifically said that these exact state law counterclaims had no nexus at all with the 18-CV-80 case.

THE COURT: And I should know this and I don't. Is there no diversity between the parties?

MR. SUMMERS: There's no -- not complete diversity between the parties. Yes.

THE COURT: Okay. Well, on -- are you done on that subject?

MR. SUMMERS: On that subject, yes, your Honor.

THE COURT: Let me hear from opposing counsel on that particular subject.

MR. SUMMERS: Okay. Thank you, your Honor.

THE COURT: Yes, sir. Good morning.

MR. CAPLAN: Good morning, your Honor. Matt Caplan on behalf of Bumble Holding and Bumble Trading.

With respect to subject matter jurisdiction, I

think there's a few things to consider. The first is, when we were litigating this issue in the context of the separate action, the question there that Bumble was taking was, if we had filed these new claims in Texas state court, there would not be original jurisdiction in federal court because there was no federal claims raised by what's currently including the counterclaims here, nor was there complete diversity. Supplemental jurisdiction isn't a basis to remove a case.

Match, at the same time, was arguing that there was supplemental jurisdiction over these exact claims.

THE COURT: To get them into federal court.

MR. CAPLAN: To get them into federal court. And that was part of their opposition of our motion for leave to file these exact claims in state court. So that's the position that they had previously taken in this litigation. We were arguing that there wouldn't be original jurisdiction over these claims. So I think in fairness to the decision that was made in the prior case to file these here, Match had already staked out the position that these should be heard together.

And in terms of the authority of this court to hear these using the supplemental jurisdiction statute, we cited to a Supreme Court case, United Mine Workers, and at 725 in that case, they talk about how it's important to

consider the context of the entire litigation and the relationship between the parties in deciding whether or not a federal court can exercise subject matter jurisdiction.

And what they said that if it's such that you would ordinarily expect to have all of those claims heard and tried together, then the federal court has power under the supplemental jurisdiction statute to do that. I think that's exactly what we have here. Match has filed a wide-ranging complaint against Bumble that includes a variety of different claims against them, and some of them do reach beyond patent and trademark issues. They have a trade secret claim that essentially puts Bumble's entire operations at issue in this case, and that reflects essentially the relationship between the parties and that is exactly what these counterclaims also address.

THE COURT: Do you realize that if I go in your direction, it's your company that's at peril of me getting it wrong? Because they get to raise this on appeal.

MR. CAPLAN: Yes. I do, your Honor. And I understand that the parties via our agreement cannot consent to subject matter jurisdiction. I know it's a decision that you have to make. And Bumble is prepared to accept that if you exercise subject matter jurisdiction of the counterclaims, understanding that it's an appealable

issue.

THE COURT: Counsel, do you have anything you'd like to add?

MR. SUMMERS: Very briefly, your Honor.

The law is clear that just having a business relationship or a commercial relationship for two companies being in a dispute with one another is -- that doesn't provide the operative fact that you have to have a nexus between.

I don't want to go too much into the cases, but this AngioScore case, to go into the facts, it was the two claims were patent infringement of this device called the chocolate device and it was a medical device, and then, there was a state law claim of loss of corporate opportunity, and the corporate opportunity was the chocolate device. And the Federal Circuit reversed after a jury verdict and said, there was no common nucleus of operative fact because even though there was this relationship between the chocolate device and how it worked and how valuable it was, that the patent infringement aspect just depended on whether or not the claims, the corporate opportunity aspect of it depended on whether it was a corporate opportunity.

And so, that reflects that, you know, even facially close circumstances don't necessarily have a

nexus if what you have to prove doesn't link up.

THE COURT: Okay.

MR. SUMMERS: And here, what you have to prove doesn't link up. I think I addressed this point about the Match's previous position.

THE COURT: No. You did.

MR. SUMMERS: There was a link there and that's why there's a difference.

THE COURT: Okay. I'm not going to decide that issue today, but you'll have a decision next week.

MR. SUMMERS: Okay. Thank you, your Honor. Would you like me to continue on the other issues?

THE COURT: Sure. Yes. Uh-huh. You have next up personal jurisdiction over IAC.

MR. SUMMERS: Yes, your Honor.

THE COURT: And I think I've -- I know I've disclosed to you before, I think -- I can't be certain. I think I had a case for IAC once, many years ago, and I think we answered and it settled. I mean, I don't -- I can't sufficiently even tell you if I -- I mean, I've taken in consideration I don't think I have a conflict but that's -- at some point, I know I had some relationship with IAC, but it didn't go beyond, I think, maybe filing an answer. I don't even remember if I filed an answer.

MR. CALDWELL: You did tell us, your Honor, and I

think the way that it played out was basically that Bumble's side took a week, or something like that, to figure out if they had any issue or were going to raise any sort of issue, and then, everybody agreed there wasn't a problem. I think you did raise before you had worked --

THE COURT: Okay. I just remembered again when I saw IAC.

MR. CALDWELL: You definitely brought that to our attention in Waco.

MR. DRAYTON: You did, your Honor. It was ten years ago, you said, somewhere along those lines.

THE COURT: Right. It was a long time.

MR. DRAYTON: Right. There's no problem, your Honor. Thank you.

THE COURT: Yeah. It was a long time ago. So at any rate, I just want to put that on the record. So go ahead with respect to IAC.

MR. SUMMERS: Thank you, your Honor.

So the issue here is that in these new counterclaims, unlike previous counterclaims, Bumble has added IAC, which is a majority owner in Match Group, Inc. which is the sole owner of Match Group, LLC. So the grandparent company of the Match Group, LLC.

And as to personal jurisdiction issue, there are two non-conclusory allegations concerning IAC. One in

paragraph 63, IAC's CEO told Bumble's team that JP Morgan. So didn't tell Bumble, told Bumble's team at JP Morgan that it would support an acquisition. And in paragraph 67, 11, the CEO explained to JP Morgan, again, not Bumble, that Match and IAC strongly desired additional due diligence. Those are the only two actions other than kind of inferential IAC and Match agreed to do all this, you know, all this bad stuff. Those are the only two actions that IAC is pleaded to have done.

And so, in terms of the specific jurisdiction, there's general jurisdiction. We weren't totally sure whether they were saying general or specific. I don't think general jurisdiction is at issue. It shouldn't be because that's a very stringent test. So the specific jurisdiction is the only issue. And to get specific jurisdiction over IAC, the contacts with the forum, not with the Texas company, the contacts with the forum.

THE COURT: Are nonexistent.

MR. SUMMERS: Exactly. They're nonexistent. So obviously the claim doesn't arise out of contacts with the forum because there are no contacts with the forum. The only arguable kind of point of law that Bumble can reach back to is the Calder kind of effects test, which is supposed to be a narrow test that if you specific -- you can do something outside the forum if you specifically

directed to the forum and the claim arises out of that direction to the forum, then there can be specific jurisdiction. And there's just -- there's no "there" there. IAC made representations not in Texas concerning an acquisition which -- and this goes into -- that doesn't necessarily involve only the Texas company or primarily the Texas company.

So there are cases about tortious interference and what you need to know and how you can do acts outside the forum that are directed to the forum. But you have to know that you're interfering with something with a focus, you know, a contract that's going to be performable in Texas.

THE COURT: Your position is not that the allegations IAC should be dismissed on the basis of anything other than they should be filed somewhere else.

MR. SUMMERS: If it's going to be filed, it should be filed somewhere else on this specific issue.

THE COURT: Yes, sir.

MR. SUMMERS: Obviously on the merits, totally different, but on this specific issue, yes.

THE COURT: All right. Got it.

MR. SUMMERS: And to make that last point clear, there is evidence, but the Court can rely on evidence for specific jurisdiction issues. They're not restricted to

the pleadings. But with the understanding that the Court is aware of the evidence, I won't show it in the -- how the Court indicating that it's not -- we're not just talking about Texas, and there's no allegation that we're just talking about Texas.

So that's the specific jurisdiction issue. We can -- I can stop there and let Bumble speak.

THE COURT: Let me hear from opposing counsel.

MR. SUMMERS: Okay. Thank you, your Honor.

THE COURT: Thank you. Yes, sir.

MR. CAPLAN: Matt Caplan on behalf of Bumble.

With the respect to the Court's ability to exercise personal jurisdiction over IAC, we look to what's called the effects test, and that was established by the United States Supreme Court in Calder and has been interpreted by the Fifth Circuit in a number of cases. And the ones that we think are instructive are Mullins and the Central Freight Lines cases that we cited in the brief.

And, again, if you take a look at the entire context and the whole of the allegations, we have IAC and Match participating or claiming to participate in an auction-like process to either invest in or acquire a Bumble entity that's based in Texas that includes communications with and about an entity, meetings, which,

to be fair, were just Match officials in Texas and they made representations to Bumble's representatives that were intended to be relied upon in Texas.

So if you're directing conduct --

THE COURT: Relied upon by who?

MR. CAPLAN: By Bumble in Texas. And part of the injury that was felt, if we prove these allegations, is directed and injury in Texas. And I think if you take all of the --

THE COURT: The communications that took place outside of Texas.

MR. CAPLAN: The communications between IAC and Bumble's representatives, those took place outside of Texas. Correct.

THE COURT: But JP Morgan was your agent.

MR. CAPLAN: Yes. JP Morgan was Bumble's agent, acting on Bumble's behalf of as part of the sale or investment process.

THE COURT: And do you think that that means by IAB --

MR. CAPLAN: IAC.

THE COURT: IAC. By IAC engaging in a meeting with a Texas company's agent in New York, that IAC meant to subject themselves to jurisdiction?

MR. CAPLAN: It's not that. It's that the

effects of IAC's actions were directed towards Texas, and any injury and part of the injury would be felt in Texas, and it would be inflicted upon a Texas entity. So you look at the effects of the actions to determine whether or not there's specific context in -- contacts in this context, not necessarily just the specific actions and whether or not they were in Texas. You look beyond to see the effects and the injury, and there, we do have a connection to Texas through Bumble's presence here.

THE COURT: If I'm a football player and I send my agent to another state to negotiate a contract and they do something inappropriate and the effect is on me, even if I'm in Texas and the meeting takes place somewhere else.

MR. CAPLAN: Yes, it could be. And that's essentially what the Calder case says. You had a defamation case where the plaintiff was based in California, but the defamatory statements and what went into those were all done in Florida. And the United States Supreme Court said in that instance, you could exercise personal jurisdiction in California because those actions in Florida were directed at a California resident, and the effects of them were felt in California. And that's analogous to the situation we have here.

THE COURT: Okay. Thank you. Yes, sir.

MR. SUMMERS: Two points on this, your Honor. And I don't need to show the document, but this idea that JP Morgan was Bumble's agent is not true. Not necessarily true. And so, I could approach your Honor or we can seal the courtroom. Or we can talk about --

THE COURT: Is it in your brief?

MR. SUMMERS: It is in -- or the documents are in the brief. It's maybe not culled out in this specific -- in this specific way about whether JP Morgan is Bumble's agent or things like that. I do think it's important for this specific issue that we don't continue to conflate everything that's actually happened.

THE COURT: Why don't you send me and copy counsel, let me know what specific parts of the brief you're talking about and I'll look at those.

MR. SUMMERS: Okay. Thank you, your Honor.

And I do want to mention on this, this Calder effects test, it's -- Mr. Caplan is mostly right about the actions in Florida and things like that. But there were -- it's a newspaper. They wrote it in Florida. They sent it to California where the person was and where most of their readership was.

There's actually a Fifth Circuit case about -- I don't know if your Honor is a baseball fan, but Roger Clemens had a defamation case related to McNamee -- I

forget his first name -- and the steroids scandal, and that was very similar to the Calder effects test. But what actually happened is, there was no personal jurisdiction because the statements were made -- even though Roger Clemens was in Texas, they were made in D.C. to the steroid committee, or something like that. And so, even though, you know, people in Texas could read that and Roger Clemens was in Texas, the statements were in Washington D.C., and so, the focus of that was in D.C., and there wasn't specific jurisdiction in Texas.

And I know that case wasn't cited in the brief. It's just one I know about and it became relevant based on that argument.

THE COURT: Yes, sir.

MR. CAPLAN: With respect to who JP Morgan was representing, there is an allegation that is included in our pleadings, the counterclaims, and it's in paragraph 62 where Bumble alleges that Bumble's representative is JP Morgan Chase, and that is what's in front of the Court. Not extrinsic evidence that's beyond the pleadings at this stage. So I understand they might have a defense or disagree with that allegation, but at this point in the case, the Court has the allegations to go on in the context of a motion to dismiss.

THE COURT: Next up would be Bumble's state law

claims.

MR. SUMMERS: Thank you, your Honor.

One final point.

THE COURT: Sure.

MR. SUMMERS: On personal jurisdiction, the Court is not limited to the pleadings. So you can rely on evidence. You could even have an evidentiary hearing, if you wanted to, on that issue. So we don't have to take Bumble at its word as to those particular issues. There is evidence in the briefs; the Court can rely on that evidence for this specific issue, regardless of the judicial notice point.

Okay. So on the merits -- and, your Honor, when we started, talked about what is it that Bumble alleges that they relied on. I touched on this a little bit that, you know, their reliance was, if it's just based on the delay, which is what the allegation is and what the allegation has to be because of the previous final judgment. If the allegation is just delay, then not moving forward with other investors in a particular time is reliance that a deal is going to close. And that's just -- it's not justified based on the pleadings. And to the extent judicial notice -- the Court takes judicial notice of certain documents, it's definitely not justifiable in light of that evidence.

So the Court's probably well aware of all of this, but the Twombly standard, what is plausibility, the pleadings can't just be this is -- these facts don't prove that you didn't do fraud. You have to actually have facts raising the inference. And in terms of how you figure out whether a conclusion is one where you can reasonably infer that it was false, you have to show more than what would be consistent with business as usual. There have to be some facts indicating that the statements were, in fact, false.

And so, when you look at what's in their pleadings, they admit a lot of reasons why this wouldn't have gone through just business as usual. So paragraph 54, Match's -- Bumble believed its true valuation was way higher than Match could afford. They admit that in the pre-2018 timeframe. They admit that Match, Mr. Swidler made -- there's this issue about Match Group, LLC and Match Group, Inc. and all of these representations happened on behalf of Match Group, Inc. If the Court relies on that evidence, the fact that they alleged that it's Match Group, LLC, we think, is an inference. But I don't want to spend too much time on that particular issue because I want to focus on the actual merits of the pleadings.

So Mr. Swidler is the CFO of Match Group, Inc.

This is Bumble's own pleading, told Bumble we're going to talk about it at the board meeting. Told Bumble, we're going to make a proposal to the board. We are having an internal discussion about the proposed acquisition, an intentional discussion with the board. These are corporations. This is a -- Match Group, Inc. is a publicly traded corporation.

Mr. Swidler can make representations, he can do things, he can sign contracts, but for something of this scope and size, you're going to have to get board approval.

So the idea that, one, that any of these statements were even false when they're made with "I'm going to make a proposal to the board" is not a plausible inference; and, two, even if it was, that wouldn't be a reasonable thing to hold off other offers on because you've got board approval. You have to do that before you can even think about any of this stuff.

And then, the second point is, they admit that Match repeatedly asked them, well, give us more information so we can figure out, you know, if this is something we want to do. We need to look at this stuff.

And so, in light of those admissions, what is in the pleading to indicate that there was anything nefarious going on? And the only thing, the only thing in the

pleading that isn't a conclusion based on the fact that a deal didn't happen is that Match never gave a higher offer. And that's not enough. We know that from Texas law, failure to perform, standing alone, is no evidence of the promisor's intent not to perform when they made the promise. So obviously if it's not evidence of an intent not to perform when they made the promise, it would also not be evidence of any other previous representations indicating, you know, we think we're going to get a deal done, we're working on a proposal.

You can't just rely on that. And that's the only thing Bumble has other than Match and Bumble are competitors and so, therefore, Match would want to do something bad to their competitor. And that's also not something you can infer falsity or infer fraud from.

So you can't infer that these were wrong and you can't infer that they justifiably relied on them without, you know, discussing the specific evidence and the written record indicating that this would not be a reasonable thing to do. Even the pleadings themselves indicate that this is not a reasonable thing. Because if you've got other offers, a nonnegligent business would move forward with them all at the same time, especially if by their own admissions this is an option process. Why would you wait around for one when you're having an option?

And so, even based on the pleadings, this would not be a nonnegligent thing to do. And we think this is negligence as a matter of law, and so, it would not be justifiable reliance.

In the briefs, there are these documents indicating that that would not be justified. Bumble doesn't want the Court to look at them. I want to focus on -- and this is slide 21 and 22 for the Court's edification. I won't show it on the screen.

But on slide 22, you could see that they are saying that Exhibit C is a fraudulent statement, is part of a fraudulent scheme. So that is central to the claim and attached to the motion to dismiss, and it's something that the Court can obviously rely on. Exhibit D, the Court can also rely on just because it's legally operative and that it, you know, was the operative agreement between the parties.

There's some weird factual issues that Bumble doesn't want you to, you know, think that or know that. And so, to the extent that the Court gets concerned about D, C gets where -- we would contend that Exhibit C gets you where you need to go, anyway. So I wouldn't worry about that too much.

But so, there's no justifiable reliance. There's no indication -- reasonable inference that any of these

statements were false. All there is is that no deal was made. No offer was made. That's as consistent with business as usual, and so, there's no "there" there. And so, if the Court takes jurisdiction over this issue, we think they're properly dismissible on the pleadings.

And that's the end of that piece. I assume we want Bumble to speak. Thank you, your Honor.

THE COURT: Thank you.

MR. CAPLAN: Matt Caplan on behalf of Bumble.

With respect to reliance, it's usually a fact-intensive inquiry that's hard to decide at a motion to dismiss stage. And here, we have a lot of competing facts, some that are alleged in the counterclaim against Bumble and others outside the pleadings that Match and IAC have brought up.

But I think the one important thing that's been missing so far in the discussion this morning is that the reliance and the claims that Bumble is making are not based on consummating a deal specifically with Match or IAC. It was Match and IAC committing to participate in this option-like process after they knew that there were others that were involved, reinserting themselves in the situation and then, functionally misleading and leading Bumble on over a period of months. And if Match had been honest from the start, after they initially dropped out in

December of 2017, that they were never interested in actually acquiring or investing in Bumble, it would have been a different scenario.

THE COURT: What evidence do you have that they were never actually interested?

MR. CAPLAN: The evidence -- so we lay out over between paragraphs 55 and 75, in pretty good detail, the interactions that were happening between Bumble, Match and IAC in the January through March 2018 timeframe. And the fact that they were asking for more information, they never actually provided and updated a bid and then, eventually filed this lawsuit would indicate to us, based on the allegations, that there was not a genuine interest despite what they were representing, they being IAC and Match, to representatives of Bumble.

THE COURT: Anything else?

MR. CAPLAN: No, your Honor.

THE COURT: Anything else? Let's move on to Match's asserted marks.

MR. SUMMERS: Thank you, your Honor.

Now, for something totally different. So these -- the issue here with these counterclaims is Match alleged infringement of three word marks in connection with particular goods and services: Swipe, which in class nine is registered; swipe, which in class 45 is pending

registration; and then, swipe right in class 45 and class 9 pending registration; swipe left and class 45 and class 9 pending registration.

If these counterclaims, Bumble seeks to cancel the trademark -- the registered trademark. That's not at issue in this motion. They're entitled to do that. They seek to deny registration of swipe in class 45, and for purposes of this motion, we're not contesting that they can ask for that. We think there's a sufficient nexus between the registered mark and that to deal with that.

The issue is for the swipe left and swipe right, both in the asserted context. So class 9 and class 45, which is, you know, internet dating essentially and social networking and social introduction. So for those and then for, I guess, on slide 26, there's this whole host of -- whole host of marks that are not at issue in this case. So swipe right in connection with video distribution, swipe right in connection with clothing, swipe up in connection with match making, swipe life in connection with web pages, and then, swipe sessions, entertainment services and dating services.

So those are not asserted in this case, but Bumble is asking the Court to kind of short circuit the application process and inject these issues into this case, complicate this case, and order the PTO to deny

registration on all of these marks.

So the kind of relevant framework is Section 1119 of the Lanham Act and how this plays out in the case law is, 1119 is you have to have a close nexus between the registered mark and the application for the Court to have authority over it, and the reason for that is Section 1119 is a remedy. It's something that, you know, whatever's at issue in the case, the Court will -- there will be a trial, facts will be resolved, and based on whatever those facts are, to the extent the Court can remedy the PTO register, based on those facts, then obviously the Court is permitted to do that.

But here, all of these marks, the pending registration marks, but particularly the unasserted pending registration marks, the swipe life and the swipe sessions and swipe right in connection with the stuff like T-shirts, that has nothing to do with what this case is about. This case is going to be about swipe left, swipe right, swipe in connection with dating services. We just think that -- we don't need to complicate this case.

The Court under 1119 can't do it. Even if the Court could do it under 1119 the Court shouldn't do it because it's, you know, just mucking things up, and we'll have a trial about marks that aren't asserted for infringement based on totally distinct analysis about

whether swipe right is generic for a T-shirt, which obviously is a different question than swipe right in connection with dating apps.

So if there's jurisdiction, the Court should decline declaratory judgment jurisdiction over these questions. And, in fact, for the unasserted marks, there is no case in controversy. We haven't accused Bumble of infringement. They say that because we asked for rights -- you know, an injunction for rights under the Lanham Act that they reasonably apprehended, that we were alleging swipe right over T-shirts and swipe sessions, and stuff like that. That that's -- just not true. And when you look at their affirmative defense, they never mentioned that.

And they obviously don't mention that they think we accuse them of infringing the Tinder mark. So there's really for the unasserted marks, there's just no case in controversy that the Nike case that talked about the Supreme Court specifically said like just because you don't want them to get this mark at the trademark office, doesn't give the Court jurisdiction to kind of resolve that particular issue.

And so, all of the jurisdictional pieces could be quite complicated, but it's really just a matter of do we want to be doing stuff that we don't need to be doing.

The case is going to resolve genericism and descriptiveness for swipe and swipe left and swipe right in connection with, you know, the services that are at issue in this case, these dating apps. We don't need to deal with the other stuff, and we don't think the Court should and for the unasserted marks, we don't think the Court can.

THE COURT: Counsel.

MR. CAPLAN: Matt Caplan on behalf of Bumble.

I'll make this quick because I think most of that was in the papers. And, suffice to say, if there is a nexus or close relation between the unasserted marks and the marks that are at issue in the case, the Court does have authority to hear Bumble's counterclaims. That's reflected by the Amy's Ice Crime and the Gucci cases we cited in here and we saw up on the screen.

Every last one of the marks that have been implicated by our counterclaims involves swipe, how that is used in the Tinder app, and it relates to how people use Tinder, and if that is -- term is going to be found generic or descriptive in the mobile dating context, the Court should also use its authority and render a decision as to whether or not it's going to be generic or descriptive in other related instances.

THE COURT: Okay.

MR. SUMMERS: I have nothing further other than the point that swipe right for T-shirts is different than swipe right for online dating. And then, the -- there was one last portion about striking the affirmative defenses. I think we can rest on the papers on that particular issue.

THE COURT: Okay.

MR. CAPLAN: That's fine, your Honor.

THE COURT: Okay. We will -- I'll take a look at that this afternoon. We'll have an order out on this probably next week.

Anything else we need to take up?

MR. DRAYTON: Your Honor, I just wanted to say thank you for giving us the insights you gave us today with regard to claim construction. As you know, some courts may differ in their approach. So it was helpful guides and we thank you for that.

THE COURT: Well, and I'm trying to become a better known commodity. You know, it's -- and I want to be careful, for example, since your client's here because she's thinking, you know, who did we wind up with. But, for example, I don't have -- I have a bias against indefinite arguments, pretty much. I just do. I also have a bias against relying on extrinsic evidence through experts. And so -- and that's not something that could be

that widely known because there are plenty of -- as I was reading your briefs, I realized there are many people who -- many judges who would have specifically wanted reliance on the kind of expert evidence that you proffered as to why something was indefinite.

So I don't want your client to think, you know, why did we do this? It was -- for many judges, it would have been -- there are judges in this building, it would have been a very -- the perfectly right way to do it. So I'm -- the more hearings I conduct, hopefully with the internet, people will know what I care about and what I don't.

But my goal is to be as interactive at these as I can be to try and get to the right conclusion on Markman constructions and -- but, also, you know, again, to be as active as possible going down the road. There are judges who carry motions for summary judgment through trial. That won't happen here. If you file a motion for summary judgment, you'll get a ruling on your motion for summary judgment.

At the Daubert, we're going to have a real Daubert. We'll take all that stuff up and I'll -- we'll be blessed. I've got a very -- an amazing law clerk coming in, my own experience. But, you know, I think it's important for you all to come here and expect me to have

read everything and, also, at least try and understand what it is that you submitted.

And I'm the luckiest person on the planet. This is the greatest job any human could have. And the reason I like patent cases so much are in every single case I've had, the quality of the lawyers is as great as it could get. I mean, you just never get lawyers who aren't unbelievably well-prepared and haven't done an unbelievably great job in preparing me in doing what you do. I'm glad I'm not doing it anymore. It was a lot of work.

But as usual, you guys did a phenomenal job. I just hope that I appear to be understanding everything that you all were arguing to me. And so, we will get -- I will try and get out an order on the claim construction as quickly as I can, even though I don't know with what -- the way I've ruled, how much of an order there is to be said about plain and ordinary meaning. I'll have to go look at that. But you all have the claim constructions now.

Do we have a trial date?

MR. CALDWELL: No, sir. That's what I was about to raise. I understand sometimes at these hearings, that comes up.

THE COURT: So that's what we need to do now. My

deputy clerk is not here, but what we should do is -- why don't we do this. It's June. Be looking at your calendars. We'll be going to trial somewhere next year, May, June. Not later than July, but hopefully sooner. And let me say this. Look at your calendars, come up with some dates.

I'll just start with plaintiff, because you're the plaintiff, how many days are you estimating you'll need, or hours, or however you want to tell me?

MR. CALDWELL: I think that obviously a little bit of it depends on the motion to dismiss. So that's kind of a vague issue. And there may be certain things that are -- makes sense for some sort of bifurcation, or whatever. But I think we're guessing on the order of seven to eight days, I think.

THE COURT: Okay. Does that sound about right?

MR. DRAYTON: Your Honor, I would say if everything's in the case, maybe two weeks, because that -- issues about a week, and then, we have the trademark issues and the other issues.

THE COURT: Okay. So that will make it harder only in that to get you two weeks is harder than to get you a week of availability. However, we will -- we'll get you the very soonest we can. I'll presume it will take two weeks. And you know what I may do in that two-week

period is, if I need to take a half day off and do sentencings, I'll just work that stuff in. Because I can usually get that stuff done in a half day, and I can work around y'all's schedule.

And when I was trying these cases, if you had a half day off here or there, it never really made anyone that unhappy. I mean, I'm not going to stretch this out -- I had a trial that should have taken two weeks that took eight weeks. That was not what I plan to do. But, you know, if I gave you two weeks, I think I can work everything else I'm doing into those two weeks and not screw up y'all's trial.

So we will -- I'll look at my calendar, and then, we'll get on a phone call with you next week hopefully. But be looking at approximately a year from today and be looking at a two-week -- to having two weeks.

MR. CALDWELL: Thank you, your Honor.

THE COURT: Yes, sir.

MR. CALDWELL: I'm just acknowledging what you said. Thank you, your Honor.

THE COURT: And couple of other quick things. Again, the way -- what you'll be in for, I almost for sure will have eight jurors if it's a trial that will take two weeks. We can get down to six. You know, we've gotta have at least six, but we'll probably have eight. All

11:39:14 eight will -- if all eight make it through the trial, all eight will deliberate. You will have four strikes per side.

Basically what we'll do in Waco is have enough -- we'll bring in a panel probably of 30-ish, 32, 33 people. At random, we'll select probably 17 of them to sit on one side of the courtroom. You will voir dire those 17. If someone gets lost for cause during the voir dire -- and you guys will be doing the voir dire -- we'll swap them out with someone on that side and come back in. And then, you'll have four strikes per side, leaving you with however we do it, we'll want eight. So I'm not going to do the math now. I'll screw it up. But I guess we'll want 16 people sitting on this side that y'all will be voir diring.

Yes, sir.

MR. DRAYTON: Your Honor, I do know a little bit about our availability as a team.

THE COURT: Okay. Tell me.

MR. DRAYTON: And I could share that. So --

THE COURT: And I want -- by the way, I want to make it clear, I want to be as accommodating as I can be. Or is there an IPR that we're worried about? Is there an IPR going on?

MR. CALDWELL: There's not one that we're worried

about.

THE COURT: Let me try that.

MR. CALDWELL: There are IPRs that about have filed.

THE COURT: Oh. Would they be concluded before next summer?

MR. DRAYTON: I don't think so. I think that it will be close, but I don't believe that -- I think --

THE COURT: Let me just say this. We will go to trial before that happens. So that's my -- that is your -- other than that, I will do whatever I can to accommodate you all in terms of making sure all of our schedules work.

MR. DRAYTON: So, I mean, just from what I know about our availability, your Honor.

THE COURT: Yes, sir.

MR. DRAYTON: This is not intentional, but the last two weeks in July would be ideal. Obviously, we have to look at Match's counsel's schedule and your schedule, your Honor, but we have three trials. We have a May trial and June trial and a July trial. And that's -- when I say that "we," meaning one or more of the core team of about six people have the three different -- are on three different trials.

THE COURT: How many trials?

THE CLERK: You have trials set on the 13th, the 20th and 27th.

THE COURT: Okay. So we can do the second half of July, if Match can.

MR. CALDWELL: I mean, I certainly think our preference would be to aim for something in June. I think, you know, this case has been pending a very long time, even before your Honor got involved, but, you know, it is what it is and your Honor's going to accommodate that.

THE COURT: Well, if they're in trial --

MR. CALDWELL: I understand.

THE COURT: If they're in trial then.

MR. CALDWELL: I understand. It seems like I often kind of double-booked a year out and then, things have kind of gone away. But I understand. I think that the second half of July would work for us. We'll just check with our witnesses.

THE COURT: I would think the last thing you would want me to do is set them in June and then, have them not be able to attend.

MR. CALDWELL: I understand.

THE COURT: Have to start over.

MR. CALDWELL: I understand.

THE COURT: So, you know, I think the safest

thing for all of us would be to have the last two weeks in July.

MR. CALDWELL: Yes, sir. I would like -- I'll check with our witnesses and whatnot. I totally understand, and I'm not trying to talk you out of that. It's just our preference would be obviously to get to some sort of finality on -- this case has been around. But I understand.

We'll just check with our team of witnesses, but I think late July is going to work. I don't know. Does your Honor want to decide all this now? Or did you still want to just get on the phone next week to finalize it?

THE COURT: I think if we can come to a time now, that's always best for you all.

MR. DRAYTON: That would work wonderful because I was just informed we have an April, May, June and before that, two weeks of July trial. So if it works, it's helpful.

MR. CALDWELL: Your Honor, we believe that late July or that second half of July, I think, that you were just talking about, would work for Match.

THE COURT: Okay. So we are going to -- is it the 20th that would start? We'll start it on the 20th.

MR. PALMER: July 20th, your Honor?

THE COURT: Now, I will get you a date -- a

pretrial date that will be a couple of weeks before that. Your whole team doesn't have to be there for that. You need to find someone that can be. What we'll do at -- one of the primary things we'll do at the pretrial conference is at that time, you all will come in and plead your case for the number of hours I'm going to give you.

If you come in and say, I need 16 hours, that doesn't include opening, that doesn't include voir dire. It doesn't include closing. Whatever number you give me, I'm going to -- you're going to have to explain to me based on the -- we'll know then who your witnesses are going to be. We'll know what's in the case. And if you can show me that between the fact witnesses, deposition testimony and the experts on both sides to cross and direct, you need whatever you need, I'm going to give you whatever you need, whatever I perceive you need.

It's not a -- I'm not going to say it's 11 hours and squeeze everything in. I'm going to want -- but I am going to have time limits because unless you've tried a case without time limits, you just really can't understand how awful that is. So we'll have time limits, but by and large, I'm going to allow you all to persuade me what the time limits need be.

And I'm thinking, you know, something around -- you know, I think 20 hours per side would probably we

could get done in two weeks. And that seems like a lot of time to me but, you know.

MR. CALDWELL: A lot of time.

THE COURT: And so -- but two weeks -- and what we may want -- again, let me just give this only warning. We will probably have somewhere in the trial where we'll spend a half day -- I will give you back a half day because I've just got too many sentencings to not -- to not do that.

But what I'll try and do, with your permission, is work with you guys to figure out when the -- well, at the pretrial conference, let's -- we'll discuss when -- I may just have to pick a morning. You know, I've got -- I do a dozen settings at a time and I've just gotta pick a time to do them. So y'all are going to have -- I'll let you know when that's going to be. I can't get around that. I wish I didn't have to do them, but I do.

So other than that, that's my only -- that would be the only -- that will be the only scheduling conflict I'll have. And so, yes, Mr. Palmer.

MR. PALMER: Your Honor, John Palmer on behalf Match.

I'm trying to -- I anticipate some questions about what we're going to be doing next week in our telephone call.

THE COURT: We won't need a call.

MR. PALMER: We're not going to do it now? All right. And so -- and we'll work on a scheduling order to see if we can agree on it, submit it to the Court.

THE COURT: I would certainly assume if I've given you until late July, that you guys can come up with a scheduling order that you can -- you know, that gets everything done.

MR. DRAYTON: Yeah. We already talked about a schedule for getting you a scheduling order.

THE COURT: But let me be as clear as I can be. You know, I would walk by and hear associates on our side talking to associates on the other side about whether or not they were going to agree to this 41 hours for expert depositions or 42 hours, whatever, it just drove me crazy.

So if you guys have any issues along those lines, just call, tell me -- you tell me why you want what you want, you tell me why you want what you want, I'll make a decision. I'll save your clients a lot of money. I really don't want there to be hours and hours spent coming up with protective orders and everything elsewhere you're fighting over things that I can resolve. I'm not saying you will. You may work it out fine.

But if someone says let's just call the Court, they mean you can just right then call me, and I will take

11:48:18 it up right then. And I promise you, I will pick a number
11:48:21 of hours that works because I won't care how many number
11:48:27 of hours.

11:48:28 But I don't want you all fighting and I don't
11:48:32 want you to be afraid to call. Call me because I want to
11:48:34 help you all keep things moving along. I don't -- I won't
11:48:38 be angry about it. I know you are each representing your
11:48:41 clients and everything you do, and if you can't come to an
11:48:44 agreement, just let me know and I'll help you resolve it.

11:48:49 MR. DRAYTON: Thank you, your Honor.

11:48:49 THE COURT: Anything else we need to take up?

11:48:51 MR. CALDWELL: Not for the plaintiff.

11:48:52 THE COURT: Great job, everyone. Thank you very
11:48:55 much.

(End of proceedings.)

                          * * * * * *

UNITED STATES DISTRICT COURT )
WESTERN DISTRICT OF TEXAS)

I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 15th day of June, 2019.

*/s/Lily I. Reznik*
LILY I. REZNIK, CRR, RMR
Official Court Reporter
United States District Court
Austin Division
501 W. 5th Street,
Suite 4153
Austin, Texas 78701
(512)391-8792
Certification No. 4481
Expires: 1-31-21