**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **MATCH GROUP, LLC** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **No. 6:18-cv-00080-ADA** |
| **v.** | § | |
| | § | |
| **BUMBLE TRADING INC., BUMBLE** | § | **JURY TRIAL DEMANDED** |
| **HOLDING, LTD., BADOO TRADING** | § | |
| **LIMITED, MAGIC LAB CO.,** | § | |
| **WORLDWIDE VISION LIMITED,** | § | |
| **BADOO LIMITED, BADOO** | § | |
| **SOFTWARE LIMITED, and BADOO** | § | |
| **TECHNOLOGIES LIMITED.** | | |
| | | |
| **Defendants.** | | |

**PLAINTIFF MATCH GROUP, LLC'S FOURTH AMENDED COMPLAINT**

## I.   INTRODUCTION

Match Group, Inc. is a worldwide leader in online dating, with multiple popular brands of matchmaking services, including Match, Plenty of Fish, OkCupid, and more.  Plaintiff Match Group, LLC, a wholly-owned subsidiary of Match Group, Inc., owns Tinder and its related intellectual property.  Tinder is one of Match's flagship brands.  When released, it launched a cultural revolution in social networking and online dating.  Tinder is famously characterized by a stack of cards containing photographs of potential matches nearby.  If a user is interested in the person shown, the user drags a card to the right.  If not, the user drags the card to the left.  If two users are interested in each other, a match has been made, and the users are permitted to communicate with one another through the app.  The app has become so well-known that an entire generation is often described as the "Tinder generation."

Match, through Tinder, spent significant time and effort developing and implementing the inventions embodied in versions of the Tinder app and claimed in a recently issued utility patent.  Match, through its Tinder team, has spent significant time and money advertising the Tinder brand, including Tinder's unique draggable-card-based design.  And Match has also spent significant time and money on confidential internal research and development, including brainstorming potential feature roll-outs.  As a result of all of these efforts, Match has significant intellectual property rights related to the Tinder application and the Tinder brand.  This is a case about infringement and misappropriation of that intellectual property.

Bumble, founded by three ex-Tinder executives, copied Tinder's world-changing, draggable-card-based, mutual opt-in premise.  As acknowledged by third-party publications upon its release, Bumble is "virtually identical" to Tinder in its functionality and general look-and-feel.  The competitive reason is obvious.  Bumble sought to mimic Tinder's functionality, trade off of Tinder's name, brand, and general look and feel, meet user expectations that Tinder itself and its brand created, and build a business entirely on a Tinder-clone, distinguished only by Bumble's women-talk-first marketing strategy.  Compounding matters, Bumble has released at least two features that its co-founders learned of and developed confidentially while at Tinder in violation of confidentiality agreements.  All of these actions infringe upon Match's valid and enforceable intellectual property rights.

To be clear, this case is not about any Bumble personnel's personal history with anyone previously at Tinder.  This case is not about feminism or a business marketed based on feminist themes; Match applauds Bumble's efforts at empowering women, both in its app and offline, and Match cares deeply both about its women users and about women's issues generally.  Rather, this case is simply about forcing Bumble to stop competing with Match and Tinder using

Match's own inventions, patented designs, trademarks, and trade secrets.  Match brings this complaint to stop Bumble's unlawful use of this intellectual property.

## II.     THE PARTIES

1.      Plaintiff Match Group, LLC ("Match") is a Delaware Corporation with a principal place of business in Dallas, Texas at 8750 N. Central Expressway, Suite 1400.

2.      Bumble Trading Inc. ("Bumble") is a Delaware corporation with a principal place of business at 1105 W 41st St., Austin, TX 78756.

3.      Bumble Holding, Ltd. is a corporation existing under the laws of the United Kingdom with a principal place of business in London, United Kingdom.

4.      Badoo Trading Limited ("Badoo Trading") is a corporation existing under the laws of the United Kingdom with a registered office at the Broadgate Tower, Third Floor, 20 Primrose Street, London EC2A 2RS United Kingdom. The immediate parent of Badoo Trading Limited is Worldwide Vision Limited.  The ultimate controlling party of Badoo Trading Limited is Andrey Ogandzhanyants, also known as Andrey Andreev.

5.      On information and belief, Magic Lab Company ("Magic Lab") is a holding company that owns at least Badoo Trading Limited and Bumble Holding, Ltd. The ultimate controlling party of Magic Lab Co. is Andrey Ogandzhanyants, also known as Andrey Andreev.

6.      Worldwide Vision Limited ("Worldwide Vision") is a company incorporated and registered in Bermuda with company number 40781, whose registered office is at H.P House, 21 Laffan Street, Hamilton, HM09, Bermuda (WVL). The ultimate parent of Worldwide Vision Limited is Rimberg International Corp., a company incorporated in the British Virgin Islands. The ultimate controlling party of Worldwide Vision Limited and Rimberg International Corp., is Andrey Ogandzhanyants, also known as Andrey Andreev.

7.      Badoo Limited is a corporation existing under the laws of the United Kingdom

with a registered office at the Broadgate Tower, Third Floor, 20 Primrose Street, London EC2A 2RS United Kingdom. The immediate parent of Badoo Limited is Worldwide Vision Limited. The ultimate controlling party of Badoo Limited is Andrey Ogandzhanyants, also known as Andrey Andreev.

8.      On information and belief, Badoo Software Limited is a corporation existing under the laws of Malta with a principal place of business in Birkirkara, Malta. The immediate parent of Badoo Software Limited is Worldwide Vision Limited.  The ultimate controlling party of Badoo Software Limited is Andrey Ogandzhanyants, also known as Andrey Andreev.

9.      Badoo Technologies Limited is a Cyprus company with a registered office at 332 Agiou Andreou Str., Patrician Chambers 3035 Limassol, Cyprus and United Kingdom tax residency.  Badoo Technologies Limited is controlled by Worldwide Vision Limited. The ultimate controlling party is Andrey Ogandzhanyants, also known as Andrey Andreev.

## III.    JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over Bumble Trading Inc. and Bumble Holding, Ltd. consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute.  Bumble[1] conducts business, maintains an established place of business, and has committed acts of patent infringement and/or has induced and/or has contributed to acts of patent infringement by others in the Western District of the Texas, the State of Texas, and elsewhere in the United States.  In addition, Bumble's headquarters and principal place of business is located in Austin, Texas, within the District.  This Court has original subject matter jurisdiction over Match's claims for patent infringement pursuant to the Federal Patent Act, 35 U.S.C. § 101 *et seq.* and 28 U.S.C. §§ 1331 and 1338(a).

---

[1] As used in this document, reference to "Bumble" should be understood to include both Bumble Trading Inc. and Bumble Holding, Ltd. unless referring to the Bumble app itself.

This Court has original subject matter jurisdiction over Match's federal trade secret claim pursuant to 18 U.S.C. §§ 1836-39 *et seq.* ("Defend Trade Secrets Act") and 28 U.S.C. §§ 1331 and 1343.  The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  The Court has ruled that it supplemental jurisdiction exists over Match's Claim 10 raising a declaratory judgment action concerning various state law claims when it declined to dismiss Bumble's allegations concerning these claims.

11.     Venue is proper in this District for Bumble Trading Inc. under 35 U.S.C. § 1400(b) because Bumble Trading Inc. has a regular and established place of business in Austin, Texas and has committed acts of infringement in the District by making, using, and selling the Bumble app in the District.  Venue is also proper as to Bumble Holding, Ltd. because it is a foreign company and is thus not subject to the patent venue statute in 35 U.S.C. § 1400(b) and is otherwise amenable to valid service of process and personal jurisdiction in this district.  To the extent that Bumble Holding, Ltd. is not a wholly foreign company and is subject to the provisions of 35 U.S.C. § 1400(b), venue is proper because it has a regular and established place of business in Austin, Texas and has committed acts of infringement in this district by making, using, and selling the Bumble app in the District.

12.     Venue is also proper for Match's remaining claims against Bumble under 28 U.S.C. § 1391 because Bumble resides in the District, has its principal place of business in the District, is subject to personal jurisdiction in this District, and a substantial part of the events or omissions giving rise to the claim(s) occurred within the District.

13.     The Waco Division of the Western District of Texas is convenient for both parties.  The Waco Federal Courthouse is less than 100 miles as the crow flies from both Bumble's Austin-based headquarters and Match's Dallas-based headquarters.

14.     Match also has a significant server deployment in the Waco area.

15.     Bumble, meanwhile, employs at least four people at Baylor University.  One campus director, along with three campus ambassadors, plan events on and around the Baylor campus to promote the Bumble app amongst Baylor University students.

16.     This Court has personal jurisdiction over Worldwide Vision Limited, Badoo Trading Limited, Magic Lab Co., Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute.  Worldwide Vision Limited, Badoo Trading Limited, Magic Lab Co., Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited have committed acts of patent infringement and/or induced and/or have contributed to acts of patent infringement by Bumble and/or others in the Western District of the Texas, the State of Texas, and elsewhere in the United States, and continue to do so.  This Court has original subject matter jurisdiction over Match's claims for patent infringement pursuant to the Federal Patent Act, 35 U.S.C. § 101 *et seq.* and 28 U.S.C. §§ 1331 and 1338(a).

17.     This Court also has personal jurisdiction over Worldwide Vision Limited, Badoo Trading Limited, Magic Lab Co., Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute related to Match's declaratory judgment of non-liability claims described in more detail herein.  Idan Wallichman, CFO of "Badoo" not otherwise defined—and director of Badoo Trading Limited, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited (on information and belief), as well as representative of Worldwide Vision—traveled to Austin, Texas in connection with acquisition discussions complained of in Bumble's counterclaims.  Idan Wallichman and Andrey Andreev, the ultimate

controlling member of the entire Worldwide Vision Group, Worldwide Vision, and Magic Labs,

engaged in numerous discussions with Match Group, Inc., a company headquartered in Texas, in

connection with a contemplated transaction that would have created a continuous and systematic

relationship with Match Group, Inc. in Texas.  These entities seek to maintain uncertainty about

whether they may in the future raise claims related to their alleged reliance on alleged

representations from Match Group, Inc. concerning Match Group, Inc.'s intentions to create this

long term, continuous relationship between itself in Texas and Worldwide Vision Group,

Worldwide Vision, and Magic Labs.

18.     Venue is also proper as to Worldwide Vision Limited, Badoo Trading Limited,

Magic Lab Co., Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited

because they are foreign companies and are thus not subject to the patent venue statute in 35

U.S.C. § 1400(b) and are otherwise amenable to valid service of process (including through

counsel for Bumble) and personal jurisdiction in this district.

## IV.     FACTUAL ALLEGATIONS

### A.     The Creation of Tinder

19.     The Tinder app was first conceived at and created by "Hatch Labs," a technology

incubator owned by Match's ultimate parent company, IAC/InterActive Corp ("IAC").  Sean

Rad, Justin Mateen, Jonathan Badeen, Joe Munoz, Chris Gulczynski, Whitney Wolfe-Herd, and

others formed the early Tinder team that conceived, designed, developed, and conducted initial

marketing efforts for the Tinder app.

20.     Chris Gulczynski's position as Tinder was "Lead Designer" or "Chief Creative."

Gulczynski was integral in designing the general look and feel of the earliest iterations of the

Tinder app.

21.     Whitney Wolfe-Herd's position with Tinder was "Vice President of Marketing."

She assisted in promoting the app and encouraging users to sign up in the app's early days.

22.     Sarah Mick joined Tinder in 2013, after Tinder's initial launch.  Mick's title was "Vice President of Design" and she assisted Gulczynski on various design aspects of the Tinder interface.

23.     First officially released in September 2012 for iPhone devices, Tinder revolutionized online dating services.  From its earliest days, the premise of Tinder has been fundamentally the same.  Tinder users are shown other users ("potential match(es)") based on certain parameters, including age range and geographic location.  The user is shown a card with a photo of a potential match nearby.  The user is then given a choice to indicate interest (or lack thereof) in the potential match merely by swiping the card right (if interested) or left (if not).  Although the earliest iterations of Tinder did not include the ability to gesture left or right, once implemented, "swiping" on Tinder became a cultural sensation uniquely associated with the app.

24.     Tinder is now one of the most popular apps in the world.

### B.  Match's Tinder-Related Intellectual Property

25.     Match has been awarded a utility patent, U.S. Patent No. 9,733,811 (the "'811 Patent"), entitled "Matching Process System and Method," in connection with the functional innovations embodied in versions of the Tinder app.  The '811 Patent is attached as Exhibit A.

26.     Match has been awarded another utility patent, U.S. Patent No. 9,959,023 (the "'023 patent"), entitled "Matching Process System and Method," in connection with other innovations embodied in the Tinder app.  That patent issued at 12:00 AM EDT on May 1, 2018, or 11:00 PM CDT on April 30, 2018.  The '023 Patent is attached as Exhibit B.

27.     Match has been awarded another utility patent, U.S. Patent No. 10,203,854 (the "'854 patent"), entitled "Matching Process System and Method," in connection with other innovations embodied in the Tinder app.  That patent issued at 12:00 AM EDT on February 12,

2019, or 11:00 PM CDT on February 11, 2019.  The '854 Patent is attached as Exhibit C.

28.     Match also has a federally registered trademark, Reg. No. 4,465,926, for SWIPE in connection with computer application software for mobile devices, namely, software for social introduction and dating services.  Tinder first used this mark in commerce on or around March 28, 2013.  The registration for Tinder's SWIPE mark is attached as Exhibit D.

29.     Match is also currently seeking federal registration for SWIPE LEFT and SWIPE RIGHT in connection with mobile applications for social introduction and dating services.

30.     Match also has common-law trademark rights. For example, Match, through Tinder, has used the marks SWIPE LEFT and SWIPE RIGHT in connection with mobile applications for social introduction and dating services nationwide.  It first used these marks in commerce on or around March 28, 2013.

31.     SWIPE, SWIPE LEFT, and SWIPE RIGHT have become synonymous with the Tinder app.

32.     For example, the Telegraph listed "swipe" as a 2015 "word of the year," writing that its choice "reflect[ed] the popularity of the dating app Tinder, in which users can swipe their finger across the screen to approve or dismiss would-be dates."

33.     The English Oxford Dictionary also specifically defines the terms "swipe right" and "swipe left" in connection with the Tinder brand:

> **Phrases**
> **swipe right (or left)**
> *informal* (on the online dating app Tinder) indicate that one finds someone attractive (or unattractive) by moving one's finger to the right (or left) across an image of them on a touchscreen.
>
> *'I swiped right, but sadly for me, she swiped left'*

34.     The English Oxford Dictionary also indicates that "swipe right (or left) of dating app Tinder fame" was consistently one of the dictionary's most "popular look-ups" in 2017.

35.     Similarly, a recent episode of the game show "Jeopardy" indicated that SWIPE LEFT and SWIPE RIGHT were trademarks of the Tinder app.

36.     Indeed, Tinder's wordmarks have been famous since before Bumble even existed. For example, in a February 2014 article in TIME Magazine, TIME described the "swipe" in Tinder as "iconic."

37.     Similarly, in February 2015, a CIO.com article described Tinder's SWIPE RIGHT as a "trademark" of Tinder.

38.     In fact, the Atlanta Hawks, in connection with Tinder, hosted a highly publicized "Swipe Right Night" at an Atlanta Hawks game in January 2015, reflecting the then-existing fame of the mark.

39.     Match, through Tinder, also has legally protectable trade dress.  For example, the ornamental design claimed in US D798,314 is a non-functional design element with source-identifying significance, either because it is inherently distinctive or has acquired secondary meaning.

40.     Match, through Tinder, regularly advertises this design, showing a user's card in the process of a "swipe right" or "swipe left."

 

41.     Third-party Internet publications have recognized that this design is synonymous with Tinder, describing the "Tinder swipable cards interface" as "famous" and as taking "the app store by storm."

42.     This card-stack interface has also been described as "iconic."

43.     Indeed, this card-stack interface is so well-known and iconic that, when other businesses use similar interfaces in connection with non-social network, non-dating apps, third-party publications describe such uses as making the app look like Tinder.

44.     As reflected by the United States Patent and Trademark Office's decision to grant the '314 Patent, this design is non-functional.

45.     Similarly, Match has protectable trade dress in its "It's a Match!" screen, shown below:




46.     As with the card-stack interface, this screen has distinctive trade dress source-identifying significance.

47.     Match, through Tinder, also regularly uses this screen as a source-identifier in various advertising materials, including in the Apple App Store, the Google Play Store, and on YouTube.

48.     Finally, Match, like most companies, has trade secrets related to confidential business planning and research and development efforts.

49.     Match Group, LLC owns all rights to the intellectual property identified above.

**C.     Whitney Wolfe-Herd, Chris Gulczynski, and Sarah Mick Leave Tinder and Create a Tinder Copycat, Bumble.**

50.     As discussed above, the early Tinder team included Sean Rad, Justin Mateen, Jonathan Badeen, Joe Munoz, Chris Gulczynski, Whitney Wolfe-Herd, and others.  In December 2013, Chris Gulczynski and Sarah Mick left Tinder.  Wolfe-Herd left Tinder shortly thereafter. Exactly one year after the effective date of Chris Gulczynski and Sarah Mick's severance agreements, Gulczynski, Mick, Wolfe-Herd, and Andrey Andreev, the founder and CEO of

Badoo, another online dating competitor, launched "Bumble."

51.     Like Tinder, Bumble is a mobile dating app that relies on a card-stack interface and a mutual opt-in premise before users communicate.  For those seeking opposite gender relationships, Bumble requires the female user to send the first message.

52.     In the words of the publication TechCrunch, Bumble is "almost *identical* to Tinder, complete with the design of the profile pages, setting, and swipe functionality." (emphasis in original).

53.     Texas Monthly recently wrote of Bumble: "the app looked suspiciously like Tinder. . . . [I]t has that famous swipe-right-to-match function, a piece of game play so brilliant it had become a cultural reference point."

54.     Multiple other publications, such as BGR and the Los Angeles Business Journal, have described Bumble as a "Tinder-lookalike."

55.     Like Tinder, Bumble users interact with "cards" containing photos of other users, as shown below.



56.     Like Tinder, Bumble users gesture left and right on cards containing user photos

to indicate whether or not the user is interested in the person shown.

 

57.   Like Tinder, gesturing left indicates a user is not interested in the person shown while gesturing right indicates that the user is interested in the person.

58.   Like Tinder, two users cannot communicate over Bumble until they both indicate interest in one another.

59.   Like Tinder, if two users both indicate interest, a screen is shown indicating a "match."

60.   Bumble's "match" screen is nearly identical to Tinder's.  At the top of the screen is a large exclamatory phrase set off in a font other than the app's default font.  Below that, text indicating that the users have expressed a mutual interest is displayed in the app's default font. Below that, two circles, enclosed in white borders, display the photographs of the matched users. Below that, both apps include similarly sized and shaped buttons first presenting the option to either send a message and then, below that, giving the option to return to the preference-indication screen.  Both "match screens" are placed against a dark background.  These similarities are shown in the pictures below:

14




61.    The "match queue" screen, where users can find new matches and ongoing conversations with other matches, is also essentially identical.  The screens include circle contacts of various users at the top indicating matches for which no messages have been sent. These contacts can be scrolled through horizontally.  Below that is a "messages" or "conversations" navigation menu, situated for vertical scrolling, where ongoing conversations are selectable:




62.    One third-party publication noted when reviewing Bumble's user interface that this "match queue" is "mostly lifted from Tinder."

63. The look and feel within the chat screen is also nearly identical, as shown below:



64. Compounding the confusion from the copycat looks of the Bumble app, Bumble also makes extensive use of Tinder's registered SWIPE mark as well as its SWIPE LEFT and SWIPE RIGHT word marks.

65. For example, in its "About Us" section of its website, Bumble describes itself as an app that "shows you the people you want to see and lets you connect by a mutual opt in by swiping right."

66. On its preview in the Apple App Store and Google Play Store, Bumble indicates that it is an "industry-leading app [that] empowers users to swipe through potential connections across three different modes . . . ."

67. Bumble's "July 2017 Press Stats Visual," located on its website, describes the number of "swipes per month" Bumble receives in its app.

68. Bumble's "the Beehive" blog also contains dozens of instances of Bumble using the "swipe" term in connection with online or mobile matchmaking services.

69. Additionally, Bumble includes a section of "Frequently Asked Questions"

16

inquiring as to (1) why a user "r[a]n out of people to swipe on"; (2) why a user can't "start a conversation with somebody [the user has] swiped right on"; and (3) whether a user can "go back" if the user "swiped the wrong way."  Bumble describes its "Backtrack" feature as a way to deal with the situation where a user "accidentally swiped left."

70.    Bumble's "backtrack" screen also makes prominent use of the SWIPE and SWIPE LEFT marks, asking a user to "confirm below to bring someone back that you swiped left on" and to "swipe to backtrack":



71.    In press interviews, Bumble's CEO repeatedly references "swipes," "swipe lefts" and "swipe rights."  For example, in a CNBC interview, located at https://www.youtube.com/watch?v=jyOMHVrVrZo, Bumble's CEO discusses "swiping for opportunity," "swiping to network," "swipe left for no," "swipe right for yes," and that Bumble was getting "a lot of swipes."

72.    Similarly, Bumble's CEO described in a Fox Business interview on November 23, 2015, located at https://www.youtube.com/watch?v=m5Ej92-mKkg, that on Bumble "you swipe on one another, and so if you both mutually opt in to have a match . . . you swipe right on her, she swipes right on you, it's a connection."

73.     In another interview, from CNN Money on February 11, 2016, Bumble's CEO described Bumble's app as "swip[ing] right or left on potential matches."

74.     Bumble's official advertising also makes use of the "swipe right" term.  In an advertisement where two Bumble personnel provide tips for writing dating "bios," one of the "doctors" indicates that she would "swipe right" on a bio she found particularly clever.

75.     In fact, it appears Bumble has taken additional, affirmative steps since its initial release to co-opt Match's trademarks and trade dress and trade off of Tinder's powerful brand. As discussed, in both apps, when two users express a mutual preference, a "match screen is shown."

76.     Bumble's *original* match screen looked similar to Tinder's match screen, but it had some notable differences, including the location of the of the message and "keep playing" buttons:



77.     Moreover, the screen previously animated the circle photographs to pop out and drop below the "keep playing" and "start a chat" buttons, a feature not included in Tinder's match screen.

78.     Bumble has since updated to its app to mirror Tinder's.  Moreover, Bumble decided to change the phrase "you both liked each other" to "you both swiped each other."



79.     In July 2017, Bumble also released a paid feature, the "SuperSwipe."

**D.      Bumble's Technical Infrastructure Was Developed and Controlled by the Worldwide Vision Group of Companies.**

80.     Bumble was founded with the assistance of its parent company Badoo Trading and continues to operate under the direction and control of the Worldwide Vision Group, which was founded by Andrey Andreev a co-founder of Bumble.  Mr. Andreev used Badoo Trading and Worldwide Vision Group resources to provide "the infrastructure . . . product development and engineering"[2] for the Bumble app.  And Mr. Andreev is credited with "push[ing] for a woman-driven dating app (on Bumble, the woman makes the first move), rather than the social network Wolfe Herd initially proposed."[3]

81.     On information and belief, the Badoo app and the Bumble app share technical development teams, technical resources (such as servers), and portions of source code.

82.     The corporate structure that develops, controls, and operates and owns various portions of the Badoo app have been referred to by former employees as "Byzantine."[4] Within this corporate structure, the Worldwide Vision Limited group of companies ("Worldwide Vision Group") includes Worldwide Vision Limited and all subsidiaries whether directly held or

---

[2] *Id.*
[3] https://www.forbes.com/sites/angelauyeung/2019/07/08/exclusive-investigation-sex-drugs-misogyny-and-sleaze-at-the-hq-of-bumbles-owner/#66a5d3c36308.
[4] *Id.*

indirectly held (such as by a subsidiary undertaking), including at least Bumble Trading Inc., Bumble Holding, Ltd., Badoo Trading Limited, Magic Lab Co., Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited.  The ultimate controlling party of the Worldwide Vision Group is Andrey Andreev.

83.     Through at least fiscal year 2018, Badoo Trading Limited was the majority owner and immediate parent of Bumble Holding, Ltd.  Because Bumble Holding, Ltd. owned the majority of Bumble, Badoo Trading Limited was the majority owner of Bumble.  On information and belief, this structure remains the same today.

84.     Badoo Technologies Limited's principal activity is the provision of technology and other services to related companies, including Badoo Trading Limited.  On information and belief, at least some of the services provided by Badoo Technologies Limited are related to the Bumble app.

85.     Badoo Limited's principal activity is to provide mobile development services to Badoo Software Limited.  On information and belief, at least some of the services provided by Badoo Limited and Badoo Software Limited are related to the Bumble app.

86.     In 2019, Andrey Andreev founded Magic Lab Co. as a holding company for the dating apps Badoo, Bumble, Chappy, and Lumen. Magic Lab Co. purports to be the company that "built, owns, and operates" these apps.[5]

### FIRST CAUSE OF ACTION: INFRINGEMENT OF THE '811 PATENT

87.     Match incorporates by reference the preceding paragraphs as if fully set forth herein.

88.     Bumble directly infringes the '811 patent by making and using a system that practices the claims of Tinder's patent.

---

[5] https://magiclab.co/about.

89.      Claim 1 of the '811 Patent claims:

A computer implemented method of profile matching, comprising:

electronically receiving a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform;

electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device;

determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

determining that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface;

in response to determining that the first user expressed the positive preference indication regarding the first potential match, automatically causing the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match;

determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match;

determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;

in response to determining to enable initial communication between the first user and the second user, causing the graphical user interface to display to the first user the graphical representation of the first potential match;

determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential

match corresponding to a third user;

preventing communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user;

determining that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and

preventing communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user.

90.     Claim 4 of the '811 Patent claims:

A non-transitory computer-readable medium comprising instructions that, when executed by a processor, are configured to:

electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform;

electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device;

determine a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

cause the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

determine that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface;

in response to the determination that the first user expressed the positive preference indication regarding the first potential match, automatically cause the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match;

determine that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match;

determine to enable initial communication between the first user and the second user in response to the determination that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;

in response to the determination to enable initial communication between the first user and the second user, cause the graphical user interface to display to the first user the graphical representation of the first potential match; determine that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user;

prevent communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding third user;

determine that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and

prevent communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user.

91.     Claim 7 of the '811 Patent claims:

A system for profile matching, comprising:

an interface operable to:

electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user associated with a social networking platform;

electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device; and

a processor coupled to the interface and operable to:

determine a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request;

cause the interface to display a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

determine that the interface has received a positive preference indication from the first user regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphical user interface;

automatically cause the interface to remove the presentation of the first potential match from the graphical user interface in response to detecting the gesture and cause the interface to present, on the graphical user interface, a second potential match of the set of potential matches to the first user;

determine that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match; and

determine to enable initial communication between the first user and the second user in response to the determination that both the first user has expressed the positive preference indication regarding the second user and the second user has expressed the positive preference indication regarding the first user;

in response to the determination to enable initial communication between the first user and the second user, cause the graphical user interface to display to the first user the graphical representation of the first potential match;

determine that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a

second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding to a third user;

prevent communication between the first user and the third user after determining that the first user has expressed the negative preference indication regarding the third user;

determine that the first user expressed a positive preference indication regarding a fourth potential match of the set of potential matches at least by determining that the first user performed the first swiping gesture associated with a graphical representation of the fourth potential match on the graphical user interface, the fourth potential match corresponding to a fourth user; and prevent communication between the first user and the fourth user in response to determining that the fourth user has expressed a negative preference indication regarding the first user.

92.     Bumble Holding, Ltd. is the listed distributing company for the Bumble app on the Apple App Store and the Google Play Store.  Bumble Trading Inc. also markets and distributes the Bumble app.  Thus, Bumble Holding, Ltd. and Bumble Trading Inc. are directly infringing the '811 Patent by making and/or using the Bumble system.

93.     In at least one version of the Bumble app,[6] Bumble's servers practice all of the limitations of these claims, as set forth in the example below.  For example, Bumble's servers electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user and associated with a social networking platform.  When a Bumble app user downloads and initially accesses the application, the user device is required to set up a Bumble account that is associated with the user's Facebook account:

---

[6] Bumble recently redesigned its user interface.  The analysis contained in this claim relates to the prior version of the app.  Differences have been addressed in the infringement contentions already served on Bumble.



94.     Through the account setup process, Bumble receives from each user an online profile comprising traits of respective users.  For example, as of March 15, 2018, the Frequently Asked Questions on Bumble's website indicates that Bumble "use[s] Facebook to help build your profile by importing your name, age, school, and/or occupation."  Today, Bumble's FAQs "suggest[] using Facebook to help build your profile by importing your name, age, etc."

95.     Bumble's servers also perform the step of electronically receiving a first request for matching, the first request electronically submitted by a first user using a first electronic device.  For example, after authorizing his or her Facebook account, the Bumble user is taken to the screen where he or she can indicate positive and negative preferences for various potential matches.  At a point before those potential matches are shown, Bumble has received a request for matching.

96.     Bumble's servers also perform the step of determining a set of potential matches from the plurality of user online-dating profiles for the first user in response to receiving the first request.  In response to receiving the parameters set forth in the request for matching contained in the Bumble app user request, Bumble determines a set of potential matches for the requesting

user based on parameters such as location, age, and gender:



97.    Bumble's servers also perform the step of causing the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user.  Bumble causes the display of potential matches of other Bumble app users to appear on the first Bumble app user's graphical user interface.  The potential matches shown correspond with the determination of potential matches described in ¶ 78 above:



98.     Bumble's servers also perform the step of determining that the first user expressed a positive preference indication regarding the first potential match at least by determining that the first user performed a first swiping gesture associated with the graphical representation of the first potential match on the graphic user interface.  A Bumble app user may affirmatively select (or reject) another Bumble app user by swiping gestures.  Bumble makes a determination based on this Bumble app user indication (e.g., swiping right or swiping left).  Bumble determines whether a first Bumble app user has made a positive preference indication in the form of a first swiping gesture:



99.     Bumble's servers also perform the step of, in response to determining that the first

user expressed the positive preference indication regarding the first potential match, automatically causing the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match.  After determining that the first Bumble app user has expressed a positive preference via a swiping gesture (swipe right), Bumble automatically presents a second potential match:



100.    Bumble's servers also perform the step of determining that the second user has expressed a positive preference indication regarding the first user after determining that the first user expressed the positive preference indication regarding the first potential match.  Bumble compares the selected preference of each potential match (i.e., of a first Bumble app user and a second Bumble app user), including making a determination whether the first Bumble app user and the second Bumble app user each expressed a positive preference for each other.

101.    Bumble's servers also perform the step of determining to enable initial communication between the first user and the second user in response to determining that both the first user has expressed the positive preference indication regarding the second user and the

second user has expressed the positive preference indication regarding the first user.  In the event that the determination described in the immediately preceding paragraph results in a mutual positive preference indication, Bumble determines to enable initial communication between the first Bumble app user and the second Bumble app user.  In the same-gender case, either participant may communicate.  In an opposite-gender case, Bumble makes the determination to enable initial communication by allowing the female user to message the male user.

102.    Bumble's servers also perform the step of, in response to determining to enable initial communication between the first user and the second user, causing the graphical user interface to display to the first user the graphical representation of the first potential match.  For example, upon determining that mutual positive preference gestures have been made, Bumble presents the following graphical representation of the first potential match:




103.    Bumble's servers also perform the step of determining that the first user expressed a negative preference indication regarding a third potential match of the set of potential matches at least by determining that the first user performed a second swiping gesture associated with a graphical representation of the third potential match on the graphical user interface, the second swiping gesture different than the first swiping gesture, the third potential match corresponding

to a third user.  Bumble determines whether the first Bumble app user expressed a negative

preference for a third Bumble app user by determining whether the first Bumble app user swiped

left:



104.    Bumble's servers also perform the step of preventing communication between the

first user and the third user after determining that the first user has expressed the negative

preference indication regarding the third user.  For example, if the first Bumble app user

expressed a negative preference for a third Bumble app user, the Bumble app will not allow the

first and third Bumble app users to communicate through the app.

105.    Bumble's servers also perform the step of determining that the first user expressed

a positive preference indication regarding a fourth potential match of the set of potential matches

at least by determining that the first user performed the first swiping gesture associated with a

graphical representation of the fourth potential match on the graphical user interface, the fourth

potential match corresponding to a fourth user.  A Bumble user may affirmatively select (or

reject) another Bumble app user by swiping gestures.  Bumble makes a determination based on

this Bumble user indication (i.e., swipe right or swipe left).  Bumble determines whether a first

Bumble app user has made a positive preference indication in the form of a first swiping gesture.

106.    Finally, Bumble's servers perform the step of preventing communication between the first user and the fourth user after determining that the fourth user has expressed a negative preference indication regarding the first user.  Upon a determination that a fourth Bumble app user expressed a negative preference for a first Bumble app user, Bumble will prevent communication between those users.

107.    At least some servers perform this method in the United States.

108.    Bumble also indirectly infringes the '811 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging and instructing end-user customers to install and use the Bumble app in the United States.

109.    Bumble took the above actions intending to cause infringing acts by others.

110.    Bumble was also aware of the '811 Patent.  For example, on a February 7, 2018 earnings call, Match Group, Inc. CEO Mandy Ginsberg discussed the '811 Patent.

111.    That same day, the online publication Axios indicated that it had reached out to Bumble for a comment about the '811 Patent.

112.    Additionally, it was well-publicized that Tinder was seeking a patent related to its "swipe" functionality.  For example, a June 22, 2015 article in Adweek indicated that Tinder was prosecuting a patent related to "swipe" functionality.

113.    Moreover, Whitney Wolfe-Herd, Chris Gulcznyski, and Sarah Mick were all still at Tinder when the application maturing into the '811 Patent was filed in October 2013.

114.    If Bumble did not know that the actions it encouraged constituted infringement of the '811 Patent, Bumble nevertheless subjectively believed there was a high probability that others would infringe the '811 patent but took deliberate steps to avoid confirming that it was

actively inducing infringement by others.

115.    Bumble also indirectly infringes the '811 Patent by contributing to infringement by others, such as end-users, by providing within the United States software components for operating Bumble's app and interacting with the servers associated with Bumble's app.  These software components are, for example, the Bumble app, and the download package that contains the Bumble app for interacting with Bumble's servers.  Bumble's end-users directly infringed the '811 Patent by, for example, installing and using the Bumble app in the United States to use the Bumble system in the United States and Bumble servers in the United States.  These software components are known by Bumble to be especially made or adapted for use in Bumble's infringing system.

116.    Bumble has known these components to be especially made or especially adapted for use in infringement of the '811 patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Bumble subjectively believed there was a high probability that these components were especially made or especially adapted for use in an infringement of the '811 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use but took deliberate steps to avoid confirming the same.

117.    Bumble's infringement of the '811 Patent is and has been willful.  Bumble at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '811 Patent.  For example, as discussed above, Bumble is and has been aware of the '811 Patent.  To Match's knowledge, Bumble has not attempted to avoid infringement of the patent or to design around it. Bumble designed its app to mirror Tinder and its functionality specifically to compete with

33

Tinder and avoid a barrier to entry in the market by mimicking Tinder's functionality in connection with an online matchmaking app.

118.     The inventions claimed in the '811 patent are not directed to an abstract idea. Instead, the claims are directed to an improvement in computer and user interface functionality as well as in online social networking.

119.     Specifically, the inventors of the continuation-in-part aspect of the '811 patent set out to improve the user interface functionality in dating and other matchmaking apps.  The swipe on a graphical representation of a user to denote positive, and of a different swipe on the graphical representation to denote negative, in connection with a mutual opt-in matchmaking app, was a non-conventional, concrete improvement in how touch screen user interfaces interact with users sifting through and making binary choices, such as indicating positive or negative preferences related to potential matches.  Although the general gesture of swiping may have been known in the prior art, the specific application to a graphical representation of a user in the specific matchmaking context claimed, in order to make binary choices expressing a preference or lack thereof regarding potential matches, was unknown and unconventional.

120.     This interface improvement allows users to sift through more information, more quickly than previous interfaces addressing similar binary choice user decisions.  These efficiencies to user interaction revolutionized the world of online dating.

121.     That the inventions are directed toward new computer-specific user interface technology is confirmed by the surrounding limitations.  The inventions claim a specific computer method, system, and computer-readable medium of matchmaking where parties are not permitted to communicate unless and until a match is made, user profiles are specifically "online-dating profiles" and those profiles must be "associated with a social networking

platform," a type of platform that is itself computer specific.  The claims further describe various actions of a graphical user interface that provide certain information at certain times in response to certain types of inputs.  This is not conventional post-solution activity in order to monopolize an abstract idea of matchmaking or even mutual opt-in matchmaking.  Instead, these limitations recite a particularly advantageous computer embodiment of a matchmaking process that also solves computer-specific problems related to the ease of creating fake accounts and profiles, the inconvenience of filling out profiles, and the problem of certain online dating users being inundated with messages.  This particularly advantageous online matchmaking method may have been known prior to the inventions claimed.  However, this method was not so pervasive as to be "conventional."

122.     Moreover, even if that matchmaking method was conventional, the inventions are directed to an improved interface for that method.

123.     To the extent that any Bumble's servers are owned or controlled by any company in the Worldwide Vision Group, including Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, or Magic Lab, that company also directly infringes.

124.     Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision also indirectly infringe the '811 Patent by inducing infringement by others, such as Bumble and Bumble's end-user customers, by, for example, encouraging, instructing, directing, controlling, and/or assisting Bumble with the technical implantation of the Bumble app, and/or encouraging and instructing end-user customers to install and use the Bumble app in the United States.

125.     Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision took the above actions intending to cause infringing

acts by others.  Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software
Limited, Magic Lab, and Worldwide Vision were aware of the '811 in the same ways as
described above with respect to Bumble.

126.    If Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software
Limited, Magic Lab, and Worldwide Vision did not know that the actions it encouraged
constituted infringement of the '811 Patent, Badoo Trading, Badoo Limited, Badoo Technologies
Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision nevertheless subjectively
believed there was a high probability that others would infringe the '811 patent but took
deliberate steps to avoid confirming that it was actively inducing infringement by others.

127.    Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software
Limited, Magic Lab, and Worldwide Vision also indirectly infringe the '811 Patent by
contributing to infringement by others, such as Bumble and Bumble's end-users, by directing,
controlling, or assisting Bumble with the technical implantation of the Bumble app, providing
within the United States software components for operating Bumble's app and interacting with
the servers associated with Bumble's app.  These software components are, for example, the
Bumble app, and the download package that contains the Bumble app for interacting with
Bumble's servers.  These software components are known by Badoo Trading, Badoo Limited,
Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision to be
especially made or adapted for use in Bumble's infringing system.

128.    Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software
Limited, Magic Lab, and Worldwide Vision have known these components to be especially
made or especially adapted for use in infringement of the '811 patent and that these components
are not a staple article or commodity of commerce suitable for substantial non-infringing use.

36

Alternatively, Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software

Limited, Magic Lab, and Worldwide Vision subjectively believed there was a high probability

that these components were especially made or especially adapted for use in an infringement of

the '811 Patent and that these components are not a staple article or commodity of commerce

suitable for substantial non-infringing use but took deliberate steps to avoid confirming the same.

129.    Badoo's and Worldwide Vision's infringement of the '811 Patent is and has been

willful.  Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited,

Magic Lab, and Worldwide Vision at a minimum knew or had reason to know of certain facts

which would lead a reasonable person to realize their actions were unreasonably risky with

respect to infringement of the '811 Patent.  For example, Badoo Trading, Badoo Limited, Badoo

Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision are and have

been aware of the '811 Patent in the same ways as discussed above with respect to Bumble.

Additionally, Chris Grose of JP Morgan Chase admitted to Gary Swidler prior to the filing of

Match Group LLC's original complaint in this case that "Badoo" was already aware of the '811

Patent.  On information and belief, and based on Andrey Andreev's status as ultimate

decisionmaker as to all of Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo

Software Limited, Magic Lab, and Worldwide Vision, Chris Grose's admissions reflects

knowledge on behalf of Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo

Software Limited, Magic Lab, Worldwide Vision, and Bumble.  To Match's knowledge, Badoo

Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab,

and Worldwide Vision have not attempted to avoid infringement of the patent or to design

around it.  Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software

Limited, Magic Lab, and Worldwide Vision assisted Bumble in designing its app to mirror

Tinder and its functionality specifically to compete with Tinder and avoid a barrier to entry in the market by mimicking Tinder's functionality in connection with an online matchmaking app.

### SECOND CAUSE OF ACTION: INFRINGEMENT OF THE '023 PATENT

130.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

131.    Bumble directly infringes the '023 Patent at least by making and using a system that practices the claims of Tinder's patent.

132.    For example, independent claim 3 of the '023 Patent recites:

A system, comprising:

an interface operable to:

present a graphical representation of a first item of information of a plurality of items of information, the first item of information comprising a graphical representation of a first online dating profile associated with a first user, wherein the interface is further operable to present the graphical representation of the first item of information of the plurality of items of information as a first card of a stack of cards;

a processor coupled to the interface and operable to:

detect a gesture associated with the graphical representation of the first item of information, the gesture corresponding to a positive preference indication associated with the first item of information, the positive preference indication associated with the first item of information comprising an expression of approval for the first user associated with the first online dating profile, wherein the processor is further operable to detect a right swiping direction associated with the gesture;

store the positive preference indication associated with the first item of information in response to detecting the gesture; and

the interface further operable to:

automatically present a graphical representation of a second item of information of the plurality of items of information in response to the processor detecting the gesture, the second item of information comprising a graphical representation of a second online dating profile associated with a second user; and

automatically remove the graphical representation of the first item of information in response to detecting the gesture.

133.    Bumble Holding, Ltd. is the listed distributing company for the Bumble app on the Apple App Store and the Google Play Store.  Bumble Trading Inc. also markets and distributes the Bumble app.  Thus, Bumble Holding, Ltd. and Bumble Trading Inc. are directly infringing the '811 Patent by making and/or using the Bumble system.

134.    In at least one version of the Bumble app,[7] a user device running the Bumble app comprises the claimed system.  The Bumble app comprises an interface.  When in operation, the app presents a graphical representation of a first item of information of a plurality of items of information, the first item of information comprising a graphical representation of a first online dating profile associated with a first user.  Specifically, the app presents a graphical representation of a first online dating profile at least by showing a picture of a user associated with an online dating profile:

---

[7] Bumble recently redesigned its user interface.  The analysis contained in this claim relates to the prior version of the app.  Differences have been addressed in the infringement contentions already served on Bumble.



135.    Bumble's interface is further operable to present the graphical representation of the first item of information (i.e., the graphical representation of the online dating profile) as a first card of a stack of cards.  Specifically, Bumble's graphical interface presents dating profiles in a stacked, card-based format:



136.    User devices compatible with the Bumble app include processors.

40

137.    When the Bumble app is downloaded and installed, those processors are operable to detect a gesture associated with the graphical representation of the first item of information, the gesture corresponding to a positive preference indication associated with the first item of information, the positive preference indication associated with the first item of information comprising an expression of approval for the first user associated with the first online dating profile.  Specifically, when the Bumble app is operating on a device, it detects a gesture—a right swiping gesture—performed on the graphical representation of the online dating profile to indicate a positive preference for the user associated with that profile:



138.    As shown above, the code comprising the Bumble app, when downloaded, installed, and operating on a user device renders the device's processor operable to detect a right swiping direction associated with the positive preference indication gesture.

139.    The code comprising the Bumble app also renders the device's processor operable to store that positive preference indication associated with the first item of information in response to detecting the gesture.  Specifically, after the app detects that a user has swiped right on the graphical representation of the dating profile, it stores data in memory indicating a positive preference before transmitting that data to Bumble's servers.

140.    Bumble's app also comprises an interface that automatically presents a graphical representation of a second item of information of the plurality of items of information in response to the processor detecting the gesture, the second item of information comprising a

41

graphical representation of a second online dating profile associated with a second user.  In the Bumble app, in response to the processor detecting the positive indication gesture, the Bumble app automatically presents the entire graphical representation of a second online dating profile associated with a second user:

 

141.    As shown above, the Bumble app also automatically removes the graphical representation of the first item of information in response to detecting the gesture.

142.    Bumble also indirectly infringes the '023 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging and instructing end-user customers to install and use the Bumble app in the United States.

143.    Bumble took the above actions intending to cause infringing acts by others.

144.    If Bumble did not know that the actions it has encouraged and continues to encourage constitute infringement of the '023 Patent, Bumble nevertheless subjectively believes there was and is a high probability that others have and will infringe the '023 Patent but has taken and is taking deliberate steps to avoid confirming that it is actively inducing infringement by others.

145.    Bumble also indirectly infringes the '023 Patent by contributing to infringement

42

by others, such as end-users, by providing within the United States software components for operating Bumble's app.  These software components are, for example, the Bumble app, and the download package that contains the Bumble app.  Bumble's end-users directly infringed the '023 Patent by, for example, installing and using the Bumble app in the United States to use the Bumble system in the United States.  These software components are known by Bumble to be especially made or adapted for use in Bumble's infringing system.

146.    Bumble has known these components to be especially made or especially adapted for use in infringement of the '023 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Bumble subjectively believes there was and is a high probability that these components were especially made or especially adapted for use in an infringement of the '023 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use but has taken and is taking deliberate steps to avoid confirming the same.

147.    Bumble's infringement of the '023 Patent is and has been willful at least as of the filing of this complaint.  At that point, Bumble at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '023 Patent.  Bumble has not attempted to avoid infringement of the patent or to design around it.  And Bumble designed its app to mirror Tinder and its functionality specifically to compete with Tinder and avoid a barrier to entry in the market.

148.    The inventions claimed in the '023 Patent are not directed to an abstract idea. Instead, the claims are directed to an improvement in computer and user interface functionality as well as in online social networking.

43

149.     Specifically, the inventors of the continuation-in-part aspect of the '023 Patent set out to improve the user-interface functionality in online dating apps.  Far from claiming the general concept of matchmaking or even mutual opt-in matchmaking on a computer or over the Internet, the '023 Patent recites a new, innovative interface design that reflects a non-conventional, concrete improvement in graphical interfaces for online dating.

150.     For example, claim 3 recites multiple specific, concrete aspects related to an improved interface.  The claim requires that the graphical representation of a dating profile be represented as the first card of a stack of cards, that the system be operable to detect a gesture corresponding to a positive preference indication of the dating profile, that the interface be operable to detect a right swiping direction associated with that positive preference gesture, that a graphical representation of a second online dating profile is automatically presented in response to detecting the positive preference gesture, and that the graphical representation of the first data profile is automatically removed.

151.     As with the '811 Patent, the requirements of this claim reflect a non-conventional, concrete improvement in how touch screen user interfaces interact with users sifting through and making binary choices.  Even if the general gesture of swiping was known in the prior art, the specific application of the swiping gesture to indicate a preference on a card-based online dating interface was unknown and unconventional and provides specific, concrete improvements to the interface.

152.     This interface improvement allows users to sift through more information, more quickly than previous interfaces addressing similar binary choice user decisions.  These efficiencies to user interaction revolutionized the world of online dating.

153.     To the extent that any Bumble's servers are owned or controlled by any company

44

in the Worldwide Vision Group, including Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, or Magic Lab, that company also directly infringes.

154.    Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision also indirectly infringes the '023 Patent by inducing infringement by others, such as Bumble and Bumble's end-user customers, by, for example, encouraging, instructing directing, controlling, and/or assisting Bumble with the technical implantation of the Bumble app, and/or encouraging and instructing end-user customers to install and use the Bumble app in the United States.

155.    Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision took the above actions intending to cause infringing acts by others.  Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision were aware of the '023 in the same ways as described above with respect to Bumble.

156.    If Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision did not know that the actions it encouraged constituted infringement of the '023 Patent, Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision nevertheless subjectively believed there was a high probability that others would infringe the '023 patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

157.    Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision also indirectly infringe the '023 Patent by contributing to infringement by others, such as Bumble and Bumble's end-users, by directing, controlling, or assisting Bumble with the technical implantation of the Bumble app, providing

within the United States software components for operating Bumble's app and interacting with the servers associated with Bumble's app.  These software components are, for example, the Bumble app, and the download package that contains the Bumble app for interacting with Bumble's servers.  These software components are known by Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision to be especially made or adapted for use in Bumble's infringing system.

158.    Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision have known these components to be especially made or especially adapted for use in infringement of the '023 patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision subjectively believed there was a high probability that these components were especially made or especially adapted for use in an infringement of the '023 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use but took deliberate steps to avoid confirming the same.

159.    Badoo's and Worldwide Vision's infringement of the '023 Patent is and has been willful.  Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '023 Patent.  For example, Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision are and have been aware of the '023 Patent in the same ways as discussed above with respect to Bumble.  To Match's knowledge, Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo

Software Limited, Magic Lab, and Worldwide Vision have not attempted to avoid infringement of the patent or to design around it. Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision assisted Bumble in designing its app to mirror Tinder and its functionality specifically to compete with Tinder and avoid a barrier to entry in the market by mimicking Tinder's functionality in connection with an online matchmaking app.

### THIRD CAUSE OF ACTION: INFRINGEMENT OF THE '854 PATENT

160. Match incorporates by reference the preceding paragraphs as if fully set forth herein.

161. Bumble directly infringes the '854 Patent at least by making and using a system that practices the claims of Match's patent.

162. For example, independent claim 1 of the '854 Patent recites:

A non-transitory computer-readable medium comprising instructions that, when executed by a processor, are configured to:

electronically receive a plurality of user online-dating profiles, each profile comprising traits of a respective user;

electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device;

determine from the plurality of user online-dating profiles a set of potential matches for the first user;

cause the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user;

receive from the first electronic device of the first user a first positive preference indication associated with the graphical representation of the second user on the graphical user interface, the first positive preference indication associated with a first gesture performed on the graphical user interface, wherein the first gesture comprises a first swiping gesture;

cause the graphical user interface to display a graphical representation of a second

potential match of the set of potential matches instead of the graphical representation of the first potential match;

receive from a second electronic device of the second user a positive preference indication regarding the first user;

determine to allow the first user to communicate with the second user in response to receiving from the first electronic device of the first user the first positive preference indication regarding the second user and receiving from the second electronic device of the second user the positive preference indication regarding the first user;

receive from the first electronic device of the first user a first negative preference indication associated with a graphical representation of a third potential match on the graphical user interface, the first negative preference indication associated with a second gesture performed on the graphical user interface, the third potential match corresponding to a third user, wherein the second gesture comprises a second swiping gesture different than the first swiping gesture;

without allowing communication between the first user and the third user, receive from the first electronic device of the first user a second positive preference indication associated with a graphical representation of a fourth potential match on the graphical user interface, the second positive preference indication associated with the first gesture performed on the graphical user interface, the fourth potential match corresponding to a fourth user;

receive from a third electronic device of the fourth user a second negative preference indication associated with a graphical representation of the first user; and

without allowing communication between the first user and the fourth user, receive from the first electronic device of the first user a third positive preference indication associated with a graphical representation of a fifth potential match on the graphical user interface, the third positive preference indication associated with the first gesture performed on the graphical user interface, the fifth potential match corresponding to a fifth user.

163.    Bumble Holding, Ltd. is the listed distributing company for the Bumble app on the Apple App Store and the Google Play Store.  Bumble Trading Inc. also markets and distributes the Bumble app.  Thus, Bumble Holding, Ltd. and Bumble Trading Inc. are directly infringing the '811 Patent by making and/or using the Bumble system.

164.     In at least one version of the Bumble app,[8] Bumble directly infringes the '854 Patent at least by making and using a system that practices the claims of Match's patent. Bumble's servers practice all of the limitations of these claims, as set forth in the example below. For example, one or more non-transitory computer-readable media reside on Bumble's servers that contain instructions that, when executed by one or more processors, are configured to perform the operations recited in the claim.

165.     Through the account-setup process, Bumble receives from each user an online profile comprising traits of respective users.  For example, the Frequently Asked Questions on Bumble's website indicates that Bumble "use[s] Facebook to help build your profile by importing your name, age, school, and/or occupation."

166.     Bumble's servers are configured to electronically receive a first request for matching, the first request electronically submitted by a first user using a first electronic device. For example, after authorizing his or her account (via Facebook or via phone number authentication), the Bumble user is taken to the screen where he or she can indicate positive and negative preferences for various potential matches.  At a point before those potential matches are shown, Bumble has received a request for matching.

---

[8] Because the Bumble app was modified prior to the issuance of the '854 Patent, these allegations relate to the current version of the Bumble app.

 

167.    Bumble's servers are configured to determine from the plurality of user online-dating profiles a set of potential matches for the first user.  For example, in response to receiving the parameters set forth in the request for matching contained in the Bumble app user request, Bumble determines a set of potential matches for the requesting user based on parameters such as location, age, and gender.



168.    Bumble's servers are configured to cause the display of a graphical representation of a first potential match of the set of potential matches to the first user on a graphical user interface of the first electronic device, the first potential match corresponding to a second user. For example, Bumble causes the display of potential matches of other bumble app users to appear on the first Bumble app user's graphical user interface.



169.    Bumble's servers are configured to receive from the first electronic device of the first user a first positive preference indication associated with the graphical representation of the second user on the graphical user interface, the first positive preference indication associated with a first gesture performed on the graphical user interface, wherein the first gesture comprises a first swiping gesture.  For example, a Bumble app user may affirmatively select (or reject) another Bumble app user by using "swiping" gestures (i.e., sliding the potential match left or right).

 

170.    Bumble's servers are configured to cause the graphical user interface to display a graphical representation of a second potential match of the set of potential matches instead of the graphical representation of the first potential match.  For example, after the first user expressed the positive indication regarding the first potential match, Bumble displays a second potential match from the set of potential matches.

 

171.    Bumble's servers are configured to receive from a second electronic device of the

second user a positive preference indication regarding the first user.  Bumble compares the

selected preference of each potential match (i.e., of a first Bumble app user and a second Bumble

app user), including making a determination whether the first Bumble app user and the second

Bumble app user each expressed a positive preference for each other.  In this example, both users

"Olivia" and "Brandon" have expressed a positive preference for each other. Bumble's Accused

Instrumentalities determines that this occurs and indicates it to the users via the "BOOM! It's a

match!" screen.



172.    Bumble's servers determine to allow the first user to communicate with the

second user in response to receiving from the first electronic device of the first user the first

positive preference indication regarding the second user and receiving from the second electronic

device of the second user the positive preference indication regarding the first user.  In the event

that there is a mutual positive preference indication between the first user and the second user, Bumble determines to allow the first user to communicate with the second user in response to receiving from the first electronic device of the first user the first positive preference indication regarding the second user and receiving from the second electronic device of the second user the positive preference indication regarding the first user.  In the opposite-gender case, Bumble determines to allow the communication by allowing the female user to message the male user. The phone on the right, in this example, corresponding to user "Olivia" is allowed to communicate with the user Brandon.  The phone on the left, in this example, corresponding to the user "Brandon," is also allowed to communicate with the user "Olivia" as long as "Olivia" messages first.



173.    Bumble's servers are configured to receive from the first electronic device of the

first user a first negative preference indication associated with a graphical representation of a
third potential match on the graphical user interface, the first negative preference indication
associated with a second gesture performed on the graphical user interface, the third potential
match corresponding to a third user, wherein the second gesture comprises a second swiping
gesture different than the first swiping gesture.  For example, Bumble receives from the first
electronic device of the first user a first negative preference indication when the first user
performs a "swiping" gesture in the left direction.

 

174.     Bumble's servers are configured to, without allowing communication between the
first user and the third user, receive from the first electronic device of the first user a second
positive preference indication associated with the first gesture performed on the graphical user
interface, the fourth potential match corresponding to a fourth user.  For example, if the first
Bumble app user expressed a negative preference for a third Bumble app user, Bumble's
Accused Instrumentalities do not allow the first and third Bumble app users to communicate
through the app.  After indicating a negative preference on a user, a Bumble user can continue to
indicate preferences on additional users by use of "swiping" gestures.  When a user indicates
another positive preference by a "swiping" in the right direction, Bumble receives from the first
electronic device that second positive preference indication, which is associated with a graphical

representation of a fourth potential match corresponding to a fourth user. For example, the earlier example used with Olivia and Brandon could involve additional users, such as "Eric," and would operate in the same manner. The positive preference again is a "swipe" gesture in the same direction as the previously identified positive preference.

175.    Bumble's servers are configured to receive from a third electronic device of the fourth user a second negative preference indication associated with a graphical representation of the first user. For example, a Bumble user may affirmatively reject another Bumble app user by swiping gestures. Bumble receives these user indications (i.e., sliding the potential match left or tapping the X button).

 

176.    Bumble's servers are configured to, without allowing communication between the first user and the fourth user, receive from the first electronic device of the first user a third positive preference indication associated with a graphical representation of a fifth potential match on the graphical user interface, the third positive preference indication associated with the first gesture performed on the graphical user interface, the fifth potential match corresponding to a fifth user. For example, after a first user has another user express a negative preference for the first user, the user can continue to indicate preferences on additional users by use of "swiping" gestures.

177.    Bumble also indirectly infringes the '854 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging and instructing end-user customers to install and use the Bumble app in the United States.

178.    Bumble took the above actions intending to cause infringing acts by others.

179.    If Bumble did not know that the actions it has encouraged and continues to encourage constitute infringement of the '854 Patent, Bumble nevertheless subjectively believes there was and is a high probability that others have and will infringe the '854 Patent but has taken and is taking deliberate steps to avoid confirming that it is actively inducing infringement by others.

180.    Bumble also indirectly infringes the '854 Patent by contributing to infringement by others, such as end-users, by providing within the United States software components for operating Bumble's app.  These software components are, for example, the Bumble app, and the download package that contains the Bumble app.  Bumble's end-users directly infringed the '854 Patent by, for example, installing and using the Bumble app in the United States to use the Bumble system in the United States.  These software components are known by Bumble to be especially made or adapted for use in Bumble's infringing system.

181.    Bumble has known these components to be especially made or especially adapted for use in infringement of the '854 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Alternatively, Bumble subjectively believes there was and is a high probability that these components were especially made or especially adapted for use in an infringement of the '854 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use but has taken and is taking deliberate steps to avoid confirming the same.

182.    Bumble's infringement of the '854 Patent is and has been willful at least as of the filing of this complaint.  At that point, Bumble at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '854 Patent.  Bumble has not attempted to avoid infringement of the patent or to design around it.  And Bumble designed its app to mirror Tinder and its functionality specifically to compete with Tinder and avoid a barrier to entry in the market.

183.    The inventions claimed in the '854 Patent are not directed to an abstract idea.  Instead, the claims are directed to an improvement in computer and user interface functionality as well as in online social networking.

184.    Specifically, the inventors of the continuation-in-part aspect of the '854 Patent set out to improve the functionality in online dating apps.  Far from claiming the general concept of matchmaking or even mutual opt-in matchmaking on a computer or over the Internet, the '854 Patent recites a new, innovative configuration that reflects a non-conventional, concrete improvement in process related to online dating.

185.    For example, claim 1 recites multiple specific, concrete aspects related to an improved configuration.  The claim requires that online profiles be tied to traits of respective users, that sets of potential matches be presented to the users, that the system is operable to detect a gesture corresponding to a positive and negative preference indications regarding the dating profile dependent upon different swiping gestures, that the system determines that communications are allowed between two users who have indicated a positive preference for each other, that the system does not allow communications where at least one user has indicated a negative preference, and that the users are presented with multiple additional potential matches

following each preference indication.

186.     As with the '811 and '023 Patents, the requirements of this claim reflect a non-conventional, concrete improvement in how touch screen user interfaces interact with users sifting through and making binary choices.  The specific directional dragging-gesture on a graphical representation of a user to denote positive, and of a dragging gesture in a different direction  on the graphical representation to denote negative, in connection with a mutual opt-in matchmaking app, was a non-conventional, concrete improvement in how touch screen user interfaces interact with users sifting through and making binary choices, such as indicating positive or negative preferences related to potential matches.  As with the '811 and '023 patents, although the general gesture of "swiping" may have been known in the prior art, the specific application to a graphical representation of a user in the specific matchmaking context claimed, in order to make binary choices expressing a preference or lack thereof regarding potential matches, was unknown and unconventional.

187.     This interface improvement allows users to sift through more information, more quickly than previous interfaces addressing similar binary choice user decisions.  These efficiencies to user interaction revolutionized the world of online dating.  Scroll-based interfaces were prevalent and ubiquitous in the online dating world at the time of the inventions claimed in the '854 Patent.

188.     Although these interfaces were generally fine for their intended purposes, they suffered from drawbacks.

189.     For example, many users feel like scrolling can be difficult, particularly when scrolling on devices with small screens.

190.    Additionally, scroll-based systems tend to hinder the ability to show large photographs.  In the dating context, many users believe that viewing photographs of potential matches is one of the most significant aspects of making preference decisions.

191.    The innovations claimed in the CIP aspects of the '854 patent solve these problems by providing an improved, non-scroll-based interface thereby fostering more binary choice decisions and increased user engagement with the application.

192.    The innovations do this by describing the one-at-time, dragging-gesture based interface claimed in the '854 Patent.

193.    By requiring profiles to be viewed one-at-a-time, the interface precludes users from deferring preference choices, which enables the system to obtain additional preferences concerning users than it might otherwise.

194.    Further, by allowing preference indications to be received by virtue of a dragging-gesture known in the patent as a "swipe," the interface minimizes user movement, thus also fostering user engagement and more potential matches to be made.

195.    In the wake of Tinder's release, multiple third-party publications lauded Tinder's innovative card-based format.

196.    For example, a public project published in connection with a class at Davidson College describes Tinder's card-based interface as "[t]he most important and innovating [*sic*] aspect of the design of Tinder."  It further contrasts the interface as "an alternative to the traditional scrolling interface" and describes various advantages of the Tinder interface to scroll-based interfaces.  For example, it describes that "Tinder requires extremely little movement from its user in order to function" and that it "require[s] far less effort than other interfaces, which makes it more appealing to its users," which is particularly advantageous "[i]n a culture where

speed and ease are paramount."  The article goes on to describe Bumble as "almost identical" to Tinder and recognized that "[t]he fact that Bumble is almost identical to Tinder displays the genius of Tinder's concept and design."  *See* Ex. E.

197.     In another 2015 article from growthhackers.com, the author praised Tinder's "novel user experience," and "novel interface and interaction design."  The author acknowledged that "the way Tinder is built has everything to do with how it caught fire."  It describes "the big difference between Tinder and other mobile apps is how you navigate through potential matches. Matches are presented like a virtual deck of cards that the user 'swipes' through," noting that the interface makes it "easy to do with one hand, making it perfect for moving quickly" while also providing "more screen real estate . . . for large pictures and more information," which "isn't feasible in a list format or on a small screen with lots of navigation options."  *See* Ex. F.

198.     In a 2017 article from innovationiseverywhere.com, describing Tinder's rise to success, Tinder's user interface was described as what "was different" from competitor applications at the time.  The article further describes that "Tinder's UI simplified the selection process of finding potential suitors to a binary option . . . .  Unlike other dating apps that require the user to plough through cumbersome lists, Tinder required only an input that registered as a 'Yes' or 'No' from the user."  *See* Ex. G.

199.     To the extent that any Bumble's servers are owned or controlled by any company in the Worldwide Vision Group, including Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, or Magic Lab, that company also directly infringes.

200.     Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision also indirectly infringe the '854 Patent by inducing infringement by others, such as Bumble and Bumble's end-user customers, by, for example,

encouraging, instructing directing, controlling, and/or assisting Bumble with the technical implantation of the Bumble app, and/or encouraging and instructing end-user customers to install and use the Bumble app in the United States.

201.    Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision took the above actions intending to cause infringing acts by others.  Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision were aware of the '854 in the same ways as described above with respect to Bumble.

202.    If Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision did not know that the actions it encouraged constituted infringement of the '854 Patent, Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision nevertheless subjectively believed there was a high probability that others would infringe the '854 patent but took deliberate steps to avoid confirming that it was actively inducing infringement by others.

203.    Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision also indirectly infringe the '854 Patent by contributing to infringement by others, such as Bumble and Bumble's end-users, by directing, controlling, or assisting Bumble with the technical implantation of the Bumble app, providing within the United States software components for operating Bumble's app and interacting with the servers associated with Bumble's app.  These software components are, for example, the Bumble app, and the download package that contains the Bumble app for interacting with Bumble's servers.  These software components are known by Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision to be

especially made or adapted for use in Bumble's infringing system.

204.    Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision have known these components to be especially made or especially adapted for use in infringement of the '854 patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use. Alternatively, Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision subjectively believed there was a high probability that these components were especially made or especially adapted for use in an infringement of the '854 Patent and that these components are not a staple article or commodity of commerce suitable for substantial non-infringing use but took deliberate steps to avoid confirming the same.

205.    Badoo's and Worldwide Vision's infringement of the '854 Patent is and has been willful.  Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision at a minimum knew or had reason to know of certain facts which would lead a reasonable person to realize their actions were unreasonably risky with respect to infringement of the '854 Patent.  For example, Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision are and have been aware of the '854 Patent in the same ways as discussed above with respect to Bumble.  To Match's knowledge, Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision have not attempted to avoid infringement of the patent or to design around it.  Badoo Trading, Badoo Limited, Badoo Technologies Limited, Badoo Software Limited, Magic Lab, and Worldwide Vision assisted Bumble in designing its app to mirror Tinder and its functionality specifically to compete with Tinder and avoid a barrier to entry in the market by mimicking Tinder's functionality in connection with an

online matchmaking app.

### FOURTH CAUSE OF ACTION: TRADEMARK INFRINGEMENT
### UNDER 15 U.S.C. § 1114(a)

206.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

207.    Match has received a federal registration for the mark SWIPE in connection with computer application software for mobile devices—software for social introduction and dating services.

208.    Match, through Tinder, first used the mark SWIPE in commerce on or around March 28, 2013 and continues to do so.

209.    Bumble, by using Match's SWIPE mark to compete with Tinder in the market for software for social introduction and dating services," violated 15 U.S.C. § 1114.  As discussed above, Bumble is prominently using Match's SWIPE mark throughout its app and promotional activities.  Bumble's activities are causing, and, unless enjoined, will continue to cause, a likelihood of confusion and deception of members of the public, and, additionally, injury to Match and Tinder's reputation and goodwill as reflected in the SWIPE mark.  Bumble's use of the SWIPE mark will also actually deceive the public or is at least likely to deceive the public regarding the source, sponsorship, and/or affiliation of Bumble's app.

210.    These actions have also materially damaged the value of Match's registered SWIPE mark.

211.    As a proximate result of Bumble's actions, Match has suffered damages, including, but not limited to, lost revenue and loss of goodwill associated with its Tinder app.

212.    At least because of the prior affiliation of Bumble officers with Tinder and because of Bumble's competition with Tinder, Bumble's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with Match and Tinder's SWIPE mark.

## FIFTH CAUSE OF ACTION: TRADEMARK INFRINGEMENT
## UNDER 15 U.S.C. § 1125(a)

213.     Match incorporates by reference the preceding paragraphs as if fully set forth herein.

214.     Match is the owner of word marks SWIPE LEFT and SWIPE RIGHT in connection with internet-based dating and matchmaking and similar services since at least on around March 28, 2013.  Match has used and continues to use these marks throughout the United States.

215.     These marks are valid and enforceable and in full force and effort.

216.     As described above, Bumble uses Match's SWIPE LEFT and SWIPE RIGHT marks prominently.  Bumble's doing so is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Bumble app.

217.     At least because of the prior affiliation of Bumble officers with Tinder and because of Bumble's competition with Tinder, Bumble's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with the SWIPE RIGHT and SWIPE RIGHT word marks.

218.     These actions have caused damages to Match, including lost Tinder revenue as well as damages to Tinder's brand and associated goodwill.

## SIXTH CAUSE OF ACTION: INFRINGEMENT OF TRADE DRESS
## UNDER 15 U.S.C. § 1125(a)

219.     Match incorporates by reference the preceding paragraphs as if fully set forth herein.

220.     Match is also the owner of legally protectable trade dress.  For example, the non-functional, design and appearance of Tinder's card stack, namely the appearance of a profile

picture as a card on top of a stack of profile pictures being dragged at an angle off a screen, is either inherently distinctive or has acquired secondary meaning designating Match and Tinder as the source of the product.

221.    Match has protectable trade dress in the non-functional, ornamental design of cards showing photographs tilted both left and right, as shown below:

 

222.    This is because the visual impression of the Tinder app is of cards being dragged off the screen in the exact same way.

 

223.   As described above, the appearance of this interface has been described as "famous" or "iconic" by multiple third-party publications.

224.   This interface was first used in commerce some time before September 1, 2012.

225.   By including this same non-functional ornamental design, Bumble's app is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Bumble app.

226.   Match is also the owner of trade dress related to Tinder's "It's a Match!" screen, shown here:

 

227.   The Tinder app has included this same or similar design since it was initially released.

228.   The "It's a Match Screen!" was first used in commerce on August 2, 2012.

229.   As described above, Tinder uses this screen in various advertising materials, including on the App Store, Google Play Store, and on YouTube.

230.   This overall design is non-functional.

231.   By including this same non-functional design, Bumble's app is likely to cause

confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Bumble app.

232.    As also discussed above, Bumble's similar screen is virtually identical to Tinder's.

233.    By including this same non-functional design, Bumble's app is likely to cause confusion or mistake or deceive the public as to the origin, sponsorship, or approval of the Bumble app.

234.    At least because of the prior affiliation of Bumble officers with Tinder and because of Bumble's competition with Tinder, Bumble's actions also demonstrate an intentional, willful, and malicious intent to trade on goodwill associated with Match's trade dress.

235.    These actions have caused damages to Match in the form of lost Tinder revenue as well as damages to Tinder's brand and associated goodwill.

## SEVENTH CAUSE OF ACTION: TRADEMARK DILUTION

236.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

237.    Certain of Bumble's actions also constitute trademark and trade dress dilution by blurring under 15 U.S.C. § 1125(c).

238.    Match's wordmark SWIPE RIGHT is famous to the general public.

239.    As discussed above, the phrase "swipe right" is included in the Oxford English Dictionary, specifically associated with the Tinder app.

240.    "Swipe right," especially in the connection with "swipe left," is often described by third parties as a famous "cultural phenomenon."

241.    These third parties describe the cultural phenomenon specifically in reference to Tinder and the Tinder app.

69

242.    In light of Tinder's own extensive marketing as well as the descriptions of third-parties, SWIPE RIGHT has become effectively a "household name" identifying the Tinder brand and Tinder app.

243.    After Tinder's SWIPE RIGHT mark became famous, Bumble began using SWIPE RIGHT in connection with its app.  Bumble's routine use of the mark SWIPE RIGHT in connection with a direct competitor mobile dating service has caused and is likely to cause dilution by blurring, diluting the distinctiveness of SWIPE RIGHT as a brand signifier for Tinder and/or Match.

244.    These actions have harmed the reputation of goodwill associated with Tinder.

245.    Bumble's dilution of Tinder's SWIPE RIGHT mark has been willful and intentional.

**EIGHTH CAUSE OF ACTION: TEXAS UNFAIR COMPETITION.**

246.    Match incorporates by reference the preceding paragraphs as if fully set forth herein.

247.    As discussed above, Match's trademarks and trade dress are valid marks in full force and effect.

248.    Bumble knowingly and willfully used these marks and this trade dress in commerce through the promotion of its app and in the app itself.

249.    Bumble's actions are likely to cause consumer confusion, cause consumer mistake, and/or deceive ordinarily prudent consumers as to the affiliation, connection, association, sponsorship, or approval of Match and/or Tinder products because Bumble's actions suggest that its own app originates form, is sponsored by, is authorized by, or is otherwise connected with Tinder and/or Match.

250.    These actions have materially damaged the value of Match's Tinder marks and

trade dress.

251.    As a result, Match has suffered damages, including lost Tinder revenue and

damage to goodwill associated with Tinder.

252.    Bumble's actions have caused injury to Match, and Match is entitled to damages

caused thereby, including punitive damages as a result of Bumble's malicious and willful

actions.

**NINTH CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT AND THE TEXAS UNIFORM TRADE SECRETS ACT**

253.    Match incorporates by reference the preceding paragraphs as if fully set forth

herein.

254.    In connection with their employment at Hatch Labs/Tinder/Match, at least Chris

Gulczynski and Sarah Mick were given access to certain confidential information related to

proposed Tinder features.

255.    Gulczynski and Mick agreed as part of their employment to keep confidential all

confidential information and to not disclose such information to anyone or to use such

information for anyone's benefit other than Hatch Labs/Tinder/Match.

256.    While at Tinder, Gulcynski and Mick were involved in development for a

potential "undo" function for the Tinder app.

257.    The concept of the "undo," as discussed internally at Tinder, involved allowing all

users three "undos."  Once an "undo" was used, it would take a certain period of time for that

"undo" to replenish.  If the user did not want to wait that time period for the undo to replenish,

the user could speed up the process by promoting that app via social media.

258.    For example, the image below reflects an internal Tinder mock-up of the "undo"

idea in which Gulcynski and Mick were involved:



259.    In March of 2015, Bumble implemented a nearly, if not literally, identical concept

in its "Backtrack" feature.  In Bumble's own words on its website:

**Can I go back if I swiped the wrong way?** 

If you've accidentally swiped left, you can shake your phone to Backtrack on your last decision. Keep in mind you only get three Backtracks at a time. Each Backtrack you use is restored after 3 hours. You can get more Backtracks by sharing your Bumble love on Facebook, Instagram, and Twitter.

260.    To be sure, Tinder had previously announced its "rewind" functionality before

Bumble released its rewind feature.  But Tinder's "rewind" feature was different and remains

different from this confidential concept misappropriated from Gulcyzsnki and Mick's time at

Tinder.

261.    Tinder's rewind allows for "Tinder Plus" users to "rewind" errant left "swipes" in

connection with a paid subscription.

262.    Bumble's backtrack feature, in contrast, plainly mirrors the three "undos" that

replenish over time and/or with promoting the app on social media outlets.

263.    At least because of their confidentiality agreements, Gulczysnki and/or Mick

knew or had reason to know at the time they began using these concepts that they were acquired by improper means or under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the secret.

264.     Additionally, because Gulczysnki and Mick were co-founders and executives at Bumble, Bumble used this trade secret knowing or with reason to know that the secret was acquired by improper means, acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or was derived from a person (Gulczynski and/or Mick) who owed a duty to Match and Tinder to maintain the secrecy of the idea.

265.     Bumble's app, which uses this trade secret, is used in interstate commerce.

266.     In light of the totality of the circumstances between Match/Tinder and Bumble, this misappropriation was willful and malicious misappropriation, made with conscious disregard of the rights of Match and Tinder in the trade secret.

267.     Indeed, Bumble's misappropriation related to "backtrack" appears to reflect a pattern of disregard for Match's trade secret rights.

268.     While Gulczynski and Mick were still at Tinder, Sean Rad came up with an idea to implement picture messaging within the Tinder app.

269.     Although dating apps had been reluctant to include a direct picture messaging function because of concerns related to unsolicited lewd photographs, Rad conceived the idea of allowing direct photograph messaging but sending only a deliberately blurred photo that the photo recipient would be required to click before viewing an unblurred image.  In this way, anyone looking over your shoulder could not see the message unless the recipient clicked it. Further, the user recipient could, based on context, determine whether the sent picture was one the recipient was comfortable viewing in public (or ever).

270.     After Rad conceived of the idea, he asked Gulczynski to perform a mock-up of

the concept.  Below is a PDF screenshot of Gulczynski's design mock-up at Tinder:



271.     The two icons with the hands over them would, once clicked, display the full

photo.

272.     In February 2015, after Gulczynski and Mick left Tinder to work at Bumble,

Bumble implemented the identical concept, complete with same white hand surrounded by a

white circle over the blurred image:



273.    When Bumble released the feature, Bumble indicated that it was implementing a "Snapchat-like" feature, implying that Bumble was co-opting a feature from Snapchat.

274.    The truth is that Gulczynski and/or Mick took the idea from confidential development discussions at Tinder.

275.    These co-founders of Bumble that previously worked with Tinder have inappropriately used confidential information related to Bumble's backtrack function.

276.    It is currently unknown and unknowable to Match whether Bumble is using any algorithms or source code acquired at Tinder from Gulczysnki, Mick, and/or Wolfe-Herd's time at Tinder.  It is also unknown and unknowable to Match whether Bumble acquired or is using other confidential information acquired from Gulczysnki, Mick, and/or Wolfe-Herd's time at Tinder.

277.    Bumble's use of the backtrack/undo trade secret constitutes a misappropriation of trade secrets in violation of the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act.

278.     Bumble's misappropriation of the "undo" trade secret has caused damage to Match.  It has been forced to compete for users and revenue against a competitor implementing Match's own confidential idea, developed at Match, for Match, by personnel being paid by Match.

**TENTH CAUSE OF ACTION**

**(DECLARATORY JUDGMENT OF NO LIABILITY AGAINST MATCH GROUP, LLC FOR FRAUD, NEGLIGENT MISREPRESENTATION, UNFAIR COMPETITION, PROMISSORY ESTOPPEL, AND INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS)**

279.     Match incorporates by reference the preceding paragraphs as if fully set forth herein.

280.     Match seeks a declaration of non-liability arising out of Bumble's claims related to the alleged false and misleading representations made to Bumble during the course of Match Group, Inc.'s evaluation of a potential acquisition of Bumble and Badoo.  Match also seeks a declaration of non-liability arising out of any claims from entities in the Worldwide Vision Group related to the alleged false and misleading representations made to Bumble or any other representative of the Worldwide Vision Group during the course of Match Group, Inc.'s evaluation of a potential acquisition of Bumble and Badoo.

281.     There is a live case and controversy between Match and all members of the Worldwide Vision group.  Bumble has alleged harm from alleged Match conduct concerning discussions between Match Group, Inc. and Worldwide Vision and has sought damages based on those discussions.

282.     The only entity that was deprived of any money, however, would have been Worldwide Vision, owner of the equity interests of Badoo and its subsidiaries, including Bumble.

283.     Nevertheless, the same alleged harm that Bumble alleges it suffered from these discussions would equally apply to all members of the Worldwide Vision Group held by Worldwide Vision associated with the Bumble and Badoo applications.

284.     Like Bumble, Badoo is a competitor to Match Group, Inc.  To the extent Bumble suffered cognizable harm based on a failure for its ultimate parent to receive money from an acquisition or investment, the remaining members of the Worldwide Vision Group held by Worldwide Vision logically suffered identical alleged harm related to the Badoo application and business.

285.     In connection with seeking to resolve issues with the members of the Worldwide Vision Group concerning discovery and the merits the acquisition discussions, Match suggested that these parties would not need to be added if the Worldwide Vision Group agreed to be bound by any adverse judgment against Bumble.

286.     Andrey Andreev, through the entities he controls, is the ultimate decisionmaker in this litigation on behalf of Bumble.

287.     At a minimum, "Badoo"—including Badoo Trading Ltd, Badoo Ltd., Badoo Software, Ltd., and Badoo Technologies Ltd.—controls this litigation on behalf of Bumble.

288.     Counsel of record declined to enter an agreement in which other relevant entities such as Worldwide Vision and members of the Worldwide Vision Group agreed to be bound by an adverse judgment against Bumble.  As such, there is a case and controversy concerning whether these other entities will allege substantively similar claims against Match in the future, making these claims ripe for resolution.

289.     In or around May 2017, Match Group, Inc. began negotiations with Andrey Andreev regarding Match Group, Inc.'s potential acquisition from Worldwide Vision of all

equity interests in the various Bumble and Badoo entities in or around May 2017.  On or around May 11, 2017, Mr. Swidler, Match Group, Inc.'s CFO, exchanged a possible price range via letter, which was shared with Mr. Andreev.

290.    Mr. Swidler informally discussed a different, higher range over e-mail while expressly indicating that if Mr. Andreev sent over additional diligence information, Mr. Swidler would "review this offer with [Match Group, Inc.'s] Board."  Mr. Andreev did not accept this range and later countered with an even higher number above the top end of Mr. Swidler's informal range.

291.    In June 2017, Mr. Swidler indicated to Mr. Andreev that Match Group, Inc. would be interested in discussing an offer of $450 million to acquire the Bumble platform (alone) based on Mr. Andreev's own valuation for the Bumble platform, as stated in an email communication from Mr. Andreev to Mr. Swidler, but Mr. Andreev was not interested in negotiating for a deal that involved Match Group, Inc. acquiring the Bumble platform alone.

292.    Discussions concerning an acquisition of the Badoo and Bumble entities remained ongoing throughout the Summer and Fall of 2017.

293.    On December 21, 2017, Match Group, Inc.'s CFO, Gary Swidler, emailed Idan Wallachman, the CFO of "Badoo," to state that Match Group, Inc. did not believe it was prepared to make an offer for Bumble and Badoo that Mr. Andreev would be prepared to accept but that "if things should evolve on [Mr. Andreev's] side or [Match Group, Inc.'s]" Mr. Swidler "would hope to stay in touch."

294.    In January 2018, Match Group, Inc. was encouraged by Worldwide Vision representatives to consider continuing earlier acquisition discussions concerning the equity interests of Bumble and Badoo related entities.

295.    In his role as CFO of Match Group, Inc., Mr. Swidler expressed his own strong support for a deal on multiple occasions and asked officers of Worldwide Vision/Badoo to keep him apprised of ongoings in the negotiations with other bidders.

296.    Mr. Swidler also repeatedly mentioned, however, that he alone could not make the decision about any acquisition.

297.    Worldwide Vision, Mr. Andreev, Mr. Wallichman, JPMorgan, Badoo, and Bumble were aware that any offer would require Match Group, Inc. Board approval and support from Match Group, Inc.'s parent company, IAC.

298.    On February 9, 2018, Mr. Swidler indicated in a non-binding letter of intent a range for the possible valuation of the Bumble/Badoo acquisition and requested more information regarding performance and user metrics and financial data.

299.    Discussions concerning an acquisition of the Badoo and Bumble entities remained ongoing throughout the Spring and Summer of 2018.

300.    Match Group, Inc. eventually made an offer within the range indicated in the February 9, 2018, letter of intent.  Worldwide Vision rejected that offer.

301.    On information and belief, Worldwide Vision and Bumble never intended to accept an offer in the range that Match indicated in the February 9, 2018; nor did any other Potential Investor provide an offer to acquire Bumble or Badoo that they would have accepted.

302.    To be clear, neither Match nor IAC made any false and misleading representations to Bumble, any of the Worldwide Vision Group, or their representatives intending to delay Bumble's or the Worldwide Vision Group's acceptance of an offer from any of the Potential Investors or to cause Bumble or the Worldwide Vision Group to avoid consummating a deal with any of the Potential Investors.

303.    Match specifically denies that it made any false and misleading statements or representations to Bumble or any of the Worldwide Vision Group.  Match denies that it, Match Group, Inc., or IAC made false and misleading statements either intentionally or recklessly and denies that they did not exercise reasonable care in providing the communicated information or determining its truth.

304.    Match denies that Bumble's or the Worldwide Vision Group's reliance, if any, was reasonably justified.

305.    Match denies that Bumble has been proximately harmed from the representations or actions of Match, Match Group, Inc., or IAC during the negotiations for Match Group, Inc.'s potential acquisition of Badoo or Bumble.

306.    Match denies that Match, Match Group, Inc., or IAC committed any "conduct was malicious, deliberate, fraudulent, and willful, or grossly negligent" or that they made any improper representations or performed any improper actions during the negotiations for Match Group, Inc.'s potential acquisition of Badoo or Bumble.

307.    Match denies that the conduct of Match, Match Group, Inc., or IAC constitutes unfair competition or is independently tortious.

308.    Match denies that Match, Match Group, Inc., or IAC committed one or more unlawful and tortious acts by making the alleged false representations to Bumble or the Worldwide Vision Group.

309.    Match denies that it made any actionable representations that it would provide an offer to acquire Bumble or any of the Worldwide Vision Group.

310.    Match denies that Match Group, Inc. or IAC never intended to make an offer.

311.    Match denies there was a reasonable probability that Bumble or the Worldwide

Vision Group would have entered into an acquisition or similar transaction with one of the Potential Investors in the timeframe in which Match allegedly wrongfully delayed such a closing.

312.    Match denies that Match, Match Group, Inc., or IAC acted with a conscious desire to wrongfully or unlawfully prevent a deal with Bumble from happening.

313.    Match denies that Bumble or the Worldwide Vision Group have been damaged.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for the entry of a judgment from this Court:

1.    Judgment in Plaintiff's favor and against Defendants on all causes of action alleged herein;

2.    A preliminary and/or permanent injunction restraining Defendants, and their agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with them, from directly or indirectly violating Match Group, LLC's patent rights, its rights under the Lanham Act, its rights arising from common law unfair competition, and from any further misappropriation or unauthorized use of Match/Tinder's trade secrets.

3.    For damages in an amount to be further proven at trial, including:

    a.    Damages assessed against Defendants pursuant to the Defend Trade Secrets Act of 2016, including compensatory damages, unjust enrichment or restitution damages, reasonably royalty, and exemplary damages;

    b.    Damages assessed against Defendants pursuant to the Texas Uniform Trade Secret Act, including compensatory damages, unjust enrichment or restitution damages, reasonably royalty, and exemplary damages;

    c.    Damages assessed against Defendants pursuant to the Lanham Act, including compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits,

    d.    Damages under 35 U.S.C. § 284, including enhancement and including supplemental damages for any continuing post-verdict infringement up until entry of final judgment, with an accounting, as needed;

    e.    Damages for Defendants' common law unfair competition, including punitive damages

4.    For Plaintiff's reasonable attorney's fees;

5.    For costs of suit incurred herein, including all disbursements;

6.    For pre-judgment and post-judgment interest on the damages awarded;

7.    If an injunction is not granted, that Plaintiff be awarded an ongoing licensing fee; and

8.    For a declaratory judgment that Match has not defrauded, engaged in negligent misrepresentation, unfair competition, , or interference with prospective business relations against Bumble, and should not be promissorily estopped based on the claims and facts alleged in Bumble's Counterclaims and a declaratory judgment that Match has not defrauded, engaged in negligent misrepresentation, unfair competition, or tortious interference with prospective business relations against the entities in the Worldwide Vision Group, and should not be promissorily estopped, related to the alleged false and misleading representations made to Bumble or any other representative of the Worldwide Vision Group during the course of Match Group, Inc.'s evaluation of a potential acquisition of Bumble and Badoo based on the claims and facts alleged in Bumble's counterclaims.

9.     For such other and further relief (including any and all equitable relief) as the Court may deem to be just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues triable of right by a jury.

DATED:  August 2, 2019

Respectfully submitted,

**CALDWELL CASSADY & CURRY**

*/s/ Bradley W. Caldwell*
Bradley W. Caldwell
Texas State Bar No. 24040630
Email:  bcaldwell@caldwellcc.com
John F. Summers
Texas State Bar No. 24079417
Email: jsummers@caldwellcc.com
Warren J. McCarty, III
Illinois State Bar No. 6313452
Email: wmccarty@caldwellcc.com
**CALDWELL CASSADY CURRY P.C.**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

John P. Palmer
State Bar. 15430600
Email: palmer@namanhowell.com
Naman, Howell, Smith & Lee, PLLC
400 Austin Avenue, 8th Floor
P.O. Box 1470
Waco, TX 76701
Telephone: (254) 755-4100
Facsimile: (254) 754-6331

**ATTORNEYS FOR PLAINTIFF
MATCH GROUP, LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel registered as Filing Users on this 2nd day of August, 2019.

*/s/ Bradley W. Caldwell*
Bradley W. Caldwell