## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **MATCH GROUP, LLC** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | |
| **BUMBLE TRADING INC., BUMBLE** | § | |
| **HOLDING, LTD., BADOO TRADING** | § | No. 6:18-cv-00080-ADA |
| **LIMITED, MAGIC LAB CO.,** | § | |
| **WORLDWIDE VISION LIMITED,** | § | |
| **BADOO LIMITED, BADOO** | § | |
| **SOFTWARE LIMITED, and BADOO** | § | **JURY TRIAL DEMANDED** |
| **TECHNOLOGIES LIMITED,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | FILED UNDER SEAL |
| **BUMBLE TRADING INC. and BUMBLE** | § | |
| **HOLDING, LTD.,** | § | |
| | § | |
| **Cross-Plaintiffs,** | § | |
| v. | § | |
| | § | |
| | § | |
| **MATCH GROUP, LLC and** | § | |
| **IAC/INTERACTIVECORP.,** | § | |
| | § | |
| | § | |
| **Cross-Defendants.** | § | |

## MATCH GROUP, LLC'S RESPONSE TO BADOO TRADING LIMITED, BADOO LIMITED, BADOO SOFTWARE LIMITED, AND BADOO TECHNOLOGIES LIMITED'S MOTION TO DISMISS

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   THE COURT CAN EXERCISE SPECIFIC JURISDICTION OVER
      WORLDWIDE VISION ........................................................................................ 2

      A.   Legal Background ..................................................................................... 2

      B.   The Badoo Defendants Have "Minimum Contacts" Related to Match's
           Patent Claims Against Them. .................................................................... 3

           1.   Factual Background Concerning the Badoo Defendants' Relationship to the
                Bumble Application. ......................................................................... 3

           2.   The Badoo Defendants' United States Contacts Are Sufficient to Exercise
                Specific Jurisdiction. ........................................................................ 9

      C.   The Badoo Defendants Have "Minimum Contacts" Related to Match's
           Declaratory Judgment Request. ................................................................ 14

           1.   Background Regarding the Badoo Defendants' Acquisition-Related
                Texas Contacts .............................................................................. 14

           2.   The Identified Texas-Based Contacts Constitute the Required
                "Minimum Contacts" to Exercise Jurisdiction Over Match's Declaratory
                Judgment Request ........................................................................... 16

      D.   It Is Not Unreasonable to Exercise Jurisdiction over the Badoo Defendants. ............... 23

III.  THE COURT SHOULD NOT DECLINE SUPPLEMENTAL JURISDICTION
      OVER MATCH'S DECLARATORY JUDGMENT REQUEST. ....................................... 25

IV.   CONCLUSION ................................................................................................. 26

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Absolute Software, Inc. v. World Comput. Sec. Corp.*,
No. A-09-CA-142-LY, 2009 WL 10678335 (W.D. Tex. Dec. 2, 2009) .................................. 11

*Adams v. Unione Mediterranea Di Sicurta*,
364 F.3d 646 (5th Cir. 2004) ..................................................................................................... 2

*Akami Techs., Inc. v. Limelight Networks, Inc.*,
797 F.3d 1020 (Fed. Cir. 2015) .................................................................................................. 7

*Am. Bank Holdings, Inc. v. Grange Mut. Cas. Co.*,
No. CIV.A. DKC 09-2228, 2010 WL 2302356 (D. Md. June 7, 2010) ............................. 21, 22

*Astornet Techs. Inc. v. BAE Sys., Inc.*,
802 F.3d 1271 (Fed. Cir. 2015) ............................................................................................ 11, 12

*Avocent Huntsville Corp. v. Aten Int'l Co.*,
552 F.3d 1324 (Fed. Cir. 2008) ................................................................................................. 17

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ............................................................................................................... 2, 22

*Cent. Freight Lines Inc. v. APA Transp. Corp.*,
322 F.3d 376 (5th Cir. 2003) ................................................................................................ 21, 22

*Conn Appliances, Inc. v. Williams*,
2019 WL 4182851 (5th Cir. Sept. 4, 2019) ................................................................................ 2

*Electrosource, Inc. v. Horizon Battery Techs., Ltd.*,
176 F.3d 867 (5th Cir. 1999) .................................................................................................... 21

*Energetiq Tech., Inc. v. ASML Netherlands B.V.*,
113 F. Supp. 3d 461 (D. Mass. 2015) ....................................................................................... 10

*FOX Factory, Inc. v. SRAM, LLC*,
No. 3:16-CV-00506-WHO, 2017 WL 4551486 (N.D. Cal. Oct. 11, 2017) .............................. 10

*Helicopteros Nacionales de Colom, S.A. v. Hall*,
466 U.S. 408 (1984) .................................................................................................................. 22

*Hydrokinetics, Inc. v. Alaska Mech., Inc.*,
700 F.2d 1026 (5th Cir. 1983) .................................................................................................. 21

*Inmar Rx Sols., Inc. v. Devos, Ltd.*,
    No. 18-11443, 2019 WL 4440400 (5th Cir. Sept. 16, 2019) .................................................. 16

*Loyalty Conversion Sys. Corp.*,
    66 F. Supp. 3d 813 (E.D. Tex. 2014) .......................................................... 12, 24, 25

*Oakley, Inc. v. Jofa AB*,
    287 F. Supp. 2d 1111 (C.D. Cal. 2003)................................................................... 13

*Polar Electro Oy v. Suunto Oy*,
    829 F.3d 1343 (Fed. Cir. 2016)............................................................... 9, 10, 13

*Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*,
    993 F.2d 1201 (5th Cir. 1993)................................................................. 21, 24

*Prejean v. Sonatrach, Inc.*,
    652 F.2d 1260 (5th Cir. 1981)................................................................... 16

*Revell v. Lidov*,
    317 F.3d 467 (5th Cir. 2002)................................................................... 2, 3

*Rogers v. McDorman*,
    521 F.3d 381 (5th Cir. 2008)................................................................. 12, 13

*Sangha v. Navig8 ShipMgmt. Private, Ltd.*,
    882 F.3d 96 (5th Cir. 2018).................................................................... 16

*T.M. Hylwa, M.D., Inc. v. Palka*,
    823 F.2d 310 (9th Cir. 1987)................................................................... 20

*Torgeson v. Nordisk Aviation Prod., Inc.*,
    997 F.2d 881 (5th Cir. 1993)................................................................... 18

*Trinity Indus., Inc. v. Myers & Assocs., Ltd.*,
    451 F.3d 229 (5th Cir. 1995)................................................................... 20

*Wien Air Alaska, Inc. v. Brandt*,
    195 F.3d 208 (5th Cir. 1999)................................................................... 3, 24

*Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*,
    848 F.3d 1346 (Fed. Cir. 2017)................................................................. 17

**Statutes**

28 U.S.C. § 1367(a) ............................................................................................ 26

28 U.S.C. § 1367(c) ............................................................................................ 25

35 U.S.C. § 271(c) ............................................................................................. 13

**Rules**

Fed R. Civ. P. 4(k)(2) ........................................................................................... 2

## I.    INTRODUCTION

Badoo Trading Limited, Badoo Software Limited, Badoo Limited, and Badoo Technologies Limited (collectively "the Badoo Defendants") created the technology that, when deployed, infringes the patents-in-suit in the Bumble application; they "operate" the application accused of infringement; control the servers running the application accused of infringement; and are in charge of whether that functionality changes or the Bumble application continues to infringe. And they collectively work together to make this app, ███████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████ Ex. A at 4. Further, as described in Match's Response to Worldwide Vision's Motion to Dismiss on the same issue, all of the Badoo Defendants are represented by the same decisionmakers—decisionmakers who also act on behalf of Worldwide Vision. The evidence establishes that these overlapping agents—Andrey Andreev, Idan Wallichman, and Mariko O'Shea—availed themselves of Texas in connection with soliciting a Texas-based company to pay them more than a billion dollars for the Worldwide Vision Group, including "Badoo." Then, when the contemplated acquisition fell through, they spearheaded a misleading, incomplete counterclaim related to that acquisition in Texas. The totality of the circumstances makes clear that the Badoo Defendants should reasonably anticipate being hauled to Court into Texas in connection with Bumble's infringement and these acquisition discussions. The Court should deny the Badoo Defendants' motion.

## II.     THE COURT CAN EXERCISE SPECIFIC JURISDICTION OVER WORLDWIDE VISION.

### A.  Legal Background

A federal court may exercise personal jurisdiction where (1) a nonresident defendant purposefully avails himself of the benefits and protections of the forum and (2) where exercising jurisdiction does not offend "notions of fair play and substantial justice." *See, e.g.*, *Conn Appliances, Inc. v. Williams*, 2019 WL 4182851, at *1 (5th Cir. Sept. 4, 2019).

To satisfy the purposeful-availment requirement, plaintiff must make a *prima facie* case that the nonresident defendant has "minimum contacts" with the forum. *Id.* There are two types of minimum contacts: general and specific. Specific jurisdiction is the only category of jurisdiction at issue here. A court can exercise specific jurisdiction where a defendant's contacts with the forum arise from or relate to the plaintiff's claim. *Id.* at *2. Minimum contacts do not require a nonresident's actual physical presence in the state if the act giving rise to the claim is purposefully directed at the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). "So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Id.* And because the Badoo Defendants have not identified another United States forum in which they are amenable to jurisdiction, the relevant "forum" for Match's federal patent claims is the United States generally rather than Texas alone. *See* Fed R. Civ. P. 4(k)(2); *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 650-51 (5th Cir. 2004).

In evaluating whether a nonresident defendant has minimum contacts, a plaintiff need only make a *prima facie* case that jurisdiction exists. *Revell v. Lidov*, 317 F.3d 467, 470 (5th Cir. 2002). The Court is required to accept all uncontroverted allegations in plaintiff's complaint as true. *Id.* In addition to the plaintiff's pleadings, the Court may consider evidence from both the plaintiff and a nonresident defendant. However, the court must "accept the plaintiff's

uncontroverted allegations, and resolve in [its] favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Id.* (citations and quotations omitted).

Where a plaintiff has made a *prima facie* case of minimum contacts, the burden shifts to the nonresident defendant to show that exercise of jurisdiction is unfair. Discharging this burden upon a finding of minimum contacts is "rare," and requires the nonresident defendant to present a "compelling case." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999).

**B. The Badoo Defendants Have "Minimum Contacts" Related to Match's Patent Claims Against Them.**

Match's first category of claim against the Badoo Defendants is patent infringement related to those entities' joint role in the creation, operation, and distribution of the Bumble application. The claim also arises from the Badoo Defendants' encouragement of Bumble to infringe via distribution of the Bumble application.

1. Factual Background Concerning the Badoo Defendants' Relationship to the Bumble Application.

Although the Court could never guess from reading their motion, the Badoo Defendants are not merely affiliated with the Bumble application; they created it.

As Bumble's interrogatory responses have admitted, ███████████████████

████████████████████████████████████████████████

████████████████████ Ex. B at 12. ███████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████ Ex. A at 2.1. ███████████████████████

████████████████████████████████████████████

███████████████████████ " *Id.*



Ex. A at 6.1 (emphasis added).

*See* Dkt. 128-1, Wallichman Decl. ¶ 17 ("Badoo Trading does not **retain** any revenue from the Bumble app." (emphasis added)). Badoo Trading's most recent public accounts indicate that <u>48%</u> of all Badoo Trading's revenues are attributable to the "product" "Bumble."[1] Ex. C at Note 10 (revenue) to the Consolidated Financial Statements. Moreover,

Ex. A at 6.2.

Ex. A at 8.1.

, Badoo Trading currently controls the operation of the app itself.[2] Ex. C at "Business Review" ("Badoo Trading

---

[1] In 2018, Bumble Holding also paid a £20,000,000 dividend to its shareholders; i.e., it paid Badoo Trading £16,000,000 pounds or almost $20,000,000. Ex. C at Note 23 "Issued Capital and Reserves to Notes to the Consolidate Financial Statements.

[2] Indeed, Bumble likely claimed not to "possess" the source code to its own application because it is "possessed" by Badoo Trading. (Inexplicably, counsel for Defendants has still refused to admit that to be the case.)

Limited . . . and its subsidiaries . . . is [sic] a leading provider of online dating and social

networking products and **operates** the following brands: Badoo, **Bumble**, Chappy, Lumen, and

Quack." (emphasis added)); c*ompare also* Dkt. 128-2 Kornilovski Decl. ¶ 16 ("Badoo Limited

does not operate, market, or manage distribution of the Bumble app."); Dkt. 128-3 Kornilovski

Decl. ¶ 16 ("Badoo Technologies does not operate, market, or manage distribution of the Bumble

app"); *with* Dkt. 128-1 Wallichman Decl. ¶ 16 (averring that Badoo Trading does not "market, or

manage distribution of the Bumble app," but deleting the word "operate" from the other

otherwise identical declaration); *see also* Ex. A at 2.3 ████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

    Indeed, even Mr. Wallichman's statement t that Badoo Trading does not "manage

distribution" of the Bumble app is misleading. ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ Ex. A 2.2 (emphasis added).

    The Badoo Trading/Bumble Holding agreement also establishes beyond doubt that Badoo

Trading availed itself of the United States in connection with its Bumble-related work. Despite

the implication the Badoo Trading has no or limited connection to the United States, ████

████████████████████████████████████████████████

████████████████████████████████████████ Ex. A at 4 (emphasis added).

Finally, it appears that Badoo Trading is indemnifying the Bumble Defendants' for their infringement. Badoo Trading's most recent U.K. accounts list this lawsuit as a contingent liability. Ex. C at Note 29 to the Consolidated Financial Statements. Bumble Holding accounts, however, do not. Ex. D at Note 24.

The remaining Defendants are also intimately connected with the Bumble application. Badoo Technologies controls the servers that run the Bumble application. Badoo Technologies is principally active in "the provision of technology and other services to related companies" (like Badoo Trading). Ex. E at 2. This "provision of technology services" includes a large payment to another affiliated company, Greysom Limited, for "leasing of servers." *Id.* at 17. Public evidence indicates that "Greysom Limited" hosts the bumble.com, badoo.com, and magiclab.co domains and that servers to access these domains are located in Miami, Florida. Ex. F. These same servers almost certainly host Bumble application server functionality as well; Badoo Trading, the company "operating" the Bumble application, pays Badoo Technologies for "technology services," *i.e.*, the use of the leased Greysom Limited servers. Ex. C at Note 27 (showing £8 and £9-million payments). As the Court is aware, one of Match's infringement theories relies exclusively on the Bumble application's server functionality. *E.g.,* Dkt. 100 at ¶93 ("Bumble's servers practice all of the limitations of these claims . . .").[3] And because Badoo Technologies leases those servers, it controls those servers, likely in the United States, giving

---

[3] Badoo Technologies' information filed with U.K. tax authorities also admits that it is "controlled by Worldwide Vision." Ex. E at 17. This provides additional evidence that Worldwide Vision has purposefully availed itself of United States laws, including Texas, since it controls the companies that controls the servers with which the Bumble application operates.

rise to a direct infringement claim against it.  *See, e.g.*, *Akami Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (noting entities are liable for performance they control).

The evidence further shows that Badoo Software Limited and Badoo Limited are also intimately involved in Badoo Trading's creation and ownership of the infringing Bumble application. ████████████████████████████████████████████

████████████  Ex. A at Recital (c).  Badoo Limited's records indicate that its "principal activity" is "to provide mobile development services to Badoo Software Limited, another entity in the Worldwide Vision group."  Ex. G at 3.  Public evidence indicates that Badoo Software Limited is the company where the Worldwide Vision group "develops intellectual property." Ex. H.[4]  Badoo Software "receives its revenue from Badoo Trading," Dkt. 128-4 at ¶17, ████

██████████████████████████████████████████████████████████████

████████  Ex. A at 8.1 (describing Badoo Trading's "licensors").  In other words, this corporate evidence shows the following workflow: Badoo Limited develops the code under contract from Badoo Software, which sells or licenses that "intellectual property" to Badoo Trading for operation and distribution.

This inference is confirmed by other public evidence.  Badoo Limited, for example, has dozens of employees working in development for "mobile," consistent with its principal activity of selling such services to Badoo Software.  Ex. G at 21 (listing 73 mobile employees in 2018). Neither Bumble Holding nor Badoo Trading currently have technical employees at all, *see* Ex. G, Ex. C at Note 13 (listing only "billing and operations, administration, and marketing").  Given

---

[4] Badoo Software is not mentioned in the Forbes article, but Badoo Software is located in Malta; the article indicates that Malta is where the company's intellectual property is allegedly "developed."  Ex. H.

that Badoo Trading "operates" these applications, it must get the technical work from somewhere; since Badoo Trading is Badoo Software's customer and Badoo Software purchased "mobile development services" from Badoo Limited, Badoo Limited must actually perform the mobile development services for the Bumble app under contract from Badoo Software, which licenses that software to Badoo Trading. Badoo Trading then operates the application in collaboration with its subsidiary Badoo Technologies through its lease of Greysom Limited's servers. This software that Badoo Limited and Badoo Software jointly create is the software that infringes via the Bumble application.

The Badoo Defendants' four declarations deny none of these facts about these entities. Indeed, although those declarations are largely copied near-verbatim from Worldwide Vision's Insley declaration, the Badoo Defendants' all intentionally omit the paragraph disclaiming involvement in "the development and design of the Bumble app." *Compare* Dkt. 128-1 through 128-4 *with* Dkt. 116-1. Instead, the unrebutted pleadings and evidence highlight that these four companies are an intricate international scheme to code mobile applications, including Bumble, for Badoo Trading to then upload for distribution, "primarily" for the United States.

Match notes that it asked Defendants to answer discovery about facts concerning "what entity developed the relevant software or created that [infringing] functionality, what entity possesses or deploys that [infringing] functionality, all locations that [infringing] functionality is deployed (for non-client functionality), and any agreements between or among Defendants or their affiliates for performance of those [infringing] functionalities in the Bumble application."

Ex. I.  All Defendants but the Bumble Defendants have refused to answer the question, and

Match has had to discern the facts itself.[5]

> 2.  <u>The Badoo Defendants' United States Contacts Are Sufficient to Exercise
> Specific Jurisdiction.</u>

*Badoo Trading.*



Exs. B-C.

Ex. A at 6.1; Wallichman Decl. ¶ 17.

Ex. A at 4.

Ex. A at

2.2.  And Badoo Trading knows (and approves) that the Bumble application is headquartered in

Texas.  This is far more than the minimum contacts needed to sustain jurisdiction even if Bumble

Holding nominally "manages distribution" of the application in the United States.

For example, in *Polar Electro Oy v. Suunto Oy*, 829 F.3d 1343 (Fed. Cir. 2016), the

Federal Circuit reversed the district court's dismissal for lack and jurisdiction and concluded that

a Finnish product manufacturer purposefully availed itself of the relevant forum.  *Id.* at 1350-51.

In that case, the product manufacturer did not deliver the alleged infringing products to the

relevant forum itself.  *Id.* at 1346-47.  Instead, it contracted with its sibling company to take

delivery of the products and ship them to the forum.  *Id.*  Nevertheless, the Finnish manufacturer

---

[5] At an October 14, 2019 meet-and-confer, Defendants' counsel indicated that the Bumble
Defendants' current response reflects the Bumble Defendants' total knowledge concerning the
inquiry requested.
*See* Ex. I.  Essentially, each of the
Bumble Defendants, the Badoo Defendants, and Worldwide Vision appear to claim to know
nothing about technology that is the Bumble application.  This is obviously false.

prepared the products for shipment and knew where the products would be shipped. *Id.* at 1350-51. Although evidence indicated that the Finnish manufacturer did not technically "control marketing, distribution, or sales in the United States" or the relevant forum, the Court held that minimum contacts existed. *Id.* at 1350. In light of the Finnish manufacturer's preparation of the products and knowledge of their destination, the manufacturer purposefully availed itself of the forum by "acting in consort" with its affiliate to ship the accused products into the forum. *Id.* at 1351. *See also*, e.g., *FOX Factory, Inc. v. SRAM, LLC*, No. 3:16-CV-00506-WHO, 2017 WL 4551486, at *5 (N.D. Cal. Oct. 11, 2017) (finding minimum contacts where Taiwanese company manufactured accused product, transferred title to a different distributor, and the distributor sold products in the relevant forum). Here, evidence plainly shows that Badoo Trading has "acted in consort" with at least Bumble Holding to avail itself of the United States market; it "operates" the Bumble application, contracts with every Bumble user, and owns all of the valuable personal data the application obtains.[6]

Badoo Trading also has minimum contacts for Match's claim of induced infringement. For indirect infringement claims, the locations of both the encouragement and the ultimate infringing activity are relevant jurisdictional contacts. *See Energetiq Tech., Inc. v. ASML Netherlands B.V.*, 113 F. Supp. 3d 461, 467 (D. Mass. 2015). Here, there is no legitimate debate that Badoo Trading is encouraging Bumble and Bumble's users to infringe via distribution and

---

[6] For purposes of this Motion, Match describes the Badoo Defendants' contacts with the United States because the Badoo Defendants have not identified another U.S. forum in which they are amenable to jurisdiction. However, even if the Badoo Defendants did identify a U.S.-based forum, jurisdiction would still exist in Texas at least because Bumble is headquartered in Texas and has a highly significant Texas market presence. Although the Badoo Defendants have not produced state-specific discovery, such discovery would reveal that significant market presence if the Badoo Defendants denied it.

use of the Bumble application.[7]  Badoo Trading "operates" the app and ensures that client

software can communicate and interact with the relevant server software—paid for by Badoo

Trading through Badoo Technologies and Greysom Limited.  Ex. C.  ████████████████

█████████████████████████████████████████████████████████████████████████

Ex. A at 2.3 and 2.6.  As the Bumble Defendants' direct corporate parent, Badoo Trading also

has an indirect financial interest in Bumble's success through its infringing application.  And as

the operator of the app itself, Badoo Trading could change its application to avoid infringement;

it has not done so.  Badoo Trading took all these actions despite knowing about the patents-in-

suit prior to the filing of Match's lawsuit against it.  Dkt. 100 at ¶ 129.  These are all undisputed

contacts arising from or related to Match's claim of patent infringement against Badoo Trading

directed to the United States, the relevant forum.

Similarly, Badoo Trading's action since this litigation was filed also supports jurisdiction.

Match's complaint alleges the continuous tort of induced patent infringement.  Given Badoo

Trading's "operat[ion]" of the app itself, its decisions not to redesign the app in the United States

after Match's original March 2018 complaint is also purposeful availment to the forum.  *See*

*Absolute Software, Inc. v. World Comput. Sec. Corp.*, No. A-09-CA-142-LY, 2009 WL

10678335, at \*5 (W.D. Tex. Dec. 2, 2009) (noting that even post-suit contacts with forum are

relevant to jurisdiction).  In all of these circumstances described, such contacts are not attributing

a subsidiary's actions to a corporate parent.  Instead, these are actions of the corporate parent

---

[7] In Reply in Support of Worldwide Vision's Motion to Dismiss, the Badoo Defendants' attorneys implied that "encouraging" infringement, "whatever that might mean," was insufficient for personal jurisdiction.  Dkt. 127 at 3.  But "encouraging" infringement is the Federal Circuit test for inducement liability.  *Astornet Techs.*, 802 F.3d at 1279.

itself. *See Astornet Techs. Inc. v. BAE Sys., Inc.*, 802 F.3d 1271, 1279 (Fed. Cir. 2015) (concluding that district court was incorrect to focus on veil-piercing because "veil-piercing standards do not govern the separate issue of direct liability for one's own wrongful acts" and a corporate parent can be "directly liable for its own wrongful acts of inducement").

**Badoo Technologies Limited.**  As discussed above, Badoo Technologies leases the servers from Greysom Limited and sells use of those servers back through Badoo Trading for purposes of Badoo Trading's operation of the Bumble application.  Given that one infringement theory asserted in this case as early as Match's March 2018 original complaint involves server functionality *alone*, Badoo Technologies is a pleaded direct infringer in the United States.  This alone suffices for specific jurisdiction.  *Cf. Loyalty Conversion Sys. Corp.*, 66 F. Supp. 3d 813, 828 (E.D. Tex. 2014) (nonresident defendants that sell products nationwide "are subject to specific jurisdiction in any district in which they sell their infringing product).

In addition, because Mr. Wallichman is a director of Badoo Technologies Limited and also knew of the patents-in-suit, Ex. E and Dkt. 100 at ¶ 129, Badoo Technologies' control of infringing servers knowing of the patents-in-suit is also induced infringement; by providing access to the servers that communicate with and interact with Bumble client devices to infringe the patents-in-suit to the Bumble application, those Badoo Technologies-controlled servers encourage infringement by Bumble End Users.  *See Rogers v. McDorman*, 521 F.3d 381, 394 (5th Cir. 2008) (noting that director knowledge is imputed to the corporation); *see also* Dkt. 100 at ¶ 127.  At least because Mr. Wallichman is a director and CFO of Badoo Trading as well as a director of Badoo Technologies, Badoo Technologies is also unequivocally aware that Bumble was designed primarily to attract U.S.-based users.  By leasing servers to function with an app

directed toward U.S.-based users, Badoo Technologies clearly availed itself of the privileges of United States laws.

*Badoo Limited and Badoo Software Limited.* Badoo Limited and Badoo Software Limited are subject to jurisdiction for reasons similar to Badoo Trading Limited. Based on public records, Badoo Limited and Badoo Software Limited collectively code and license the intellectual property that is the Bumble application in order for Badoo Trading to upload that application to the relevant marketplaces for distribution. Exs. E, H, A. In this way Badoo Limited and Badoo Software Limited each are "manufacturers" of the Bumble application to the same extent Badoo Trading is. They create the source code and IP that is the Bumble app and then distribute it through established distribution channels (*i.e.*, through Badoo Trading for purposes of uploading to the relevant marketplaces in the name of Bumble Holding) knowing that Bumble will be distributed primarily into the United States.[8] Thus, they work "in concert" with Badoo Trading and Bumble Holding to knowingly distribute the Bumble app in the United States, giving rise to personal jurisdiction. *See Polar Electro Oy*, 829 F.3d at 1351. Even if some portion of the Bumble application does not pass through Badoo Limited and Badoo Software, portions of code with no substantial non-infringing use pass through these entities through established distribution channels to be imported into the United States. 35 U.S.C. § 271(c) (providing that this act is contributory infringement); *Oakley, Inc. v. Jofa AB*, 287 F. Supp. 2d 1111, 1116 (C.D. Cal. 2003) (applying "stream of commerce" jurisprudence to contributory and induced infringement). Further, these entities encourage Bumble's infringement and infringement by Bumble's End Users by creating that source code knowing and

---

[8] Mr. Wallichman is a director of these entities as well. Ex. G; Dkt. 100 at ¶ 17. Because of his knowledge of the Bumble Holding/Bumble Trading agreement and of the patents-in-suit, that knowledge is imputed to these companies as well. *Rogers*, 521 F.3d at 394

intending that it is to be used primarily in the United States.  These are clearly jurisdictionally sufficient contacts.

### C. The Badoo Defendants Have "Minimum Contacts" Related to Match's Declaratory Judgment Request.

The second category of claim Match raised against the Badoo Defendants relates to their role in the acquisition talks underpinning the Bumble Defendants' allegations that Match misrepresented its interest in acquiring a group of Bumble-affiliated companies.  Match seeks a declaration that it is not liable to the Badoo Defendants' for Match's conduct during these acquisition talks.

1. Background Regarding the Badoo Defendants' Acquisition-Related Texas Contacts

Andrey Andreev is the "CEO" of "Badoo."  Exs. J (describing Mr. Andreev as CEO of Badoo); K (Mr. Andreev's LinkedIn page claiming to "lead" the "team at Badoo").  Mr. Wallichman is a director each of the Badoo Defendants and "CFO" of "Badoo."  Dkt. 100 ¶ 17; Exs. C, G, and L.  These agents of the Badoo Defendants engaged in a significant year-long discussion with representatives of a Texas company in connection with a potential acquisition of members of the Worldwide Vision group, including the Badoo Defendants.  Dkt. 100 ¶¶ 289-300.  As the Bumble Defendants made abundantly clear in prior briefing, these discussions all involved Match Group, Inc., a Texas company, seeking to acquire a group of companies including some headquartered in Austin.  *See, e.g.*, Dkt. 85 (Bumble's argument: "[T]he alleged fraudulent scheme is centered around the business relationship and sham negotiations between two Texas entities, giving rise to personal jurisdiction over IAC in Texas.").  This included dozens of e-mails and phone calls between these agents of the Badoo Defendants and Match Group, Inc. ("MGI").  *E.g.,* Dkt. 100 ¶¶ 289-300l; Dkts. 121-3, 121-10, 121-12, 121-13.  These discussions also included a trip in which Idan Wallichman, in his capacity of agent for the Badoo

Defendants and Worldwide Vision, traveled to Texas to meet with Gary Swidler and Mandy Ginsberg, MGI's CEO. Dkt. 100 ¶ 17; Dkt. 126-4; Dkt. 100 ¶ 17. It further included Worldwide Vision, the Badoo Defendants' parent, reaching out to Match-affiliated persons in January 2018 to re-engage in negotiations on behalf of itself, the Bumble Defendants, and the Badoo Defendants. These discussions continued through the spring and summer of 2018. Dkt. 100 ¶¶ 294, 299. Because Messrs. Andreev and Wallichman are also agents of the Badoo Defendants and the discussions between Match Group, Inc. and Worldwide Vision Ltd. included *both* "Bumble" *and* "Badoo," it is a more than reasonable inference to conclude that Messrs. Andreev and Wallichman engaged in these acquisition discussions in their capacities as agents of both Worldwide Vision and all of the Badoo Defendants.[9]

Mariko O'Shea is another agent of the Badoo Defendants and to Worldwide Vision; she is "Head of Legal" for "Badoo." *E.g.* Dkt. 121-15. Even when Bumble Trading was the only defendant, settlement discussions were held with her. Dkt. 113-1 ¶6. Ms. O'Shea has communicated with Jared Sine, Match's General Counsel, about the litigation numerous times. Dkt. 121-15. She has also continued to be an active participant, reaching out to Mr. Sine as recently as May and July 2019, before Match added the Badoo Defendants to the case. *Id.* In

---

[9] The Badoo Defendants complain that Match failed to plead "on what basis Match knows that Mr. Wallichman acted on behalf of all of these myriad entities." Dkt. 128 at 20 n.7. But Mr. Wallichman *is* an officer of the Badoo Defendants' (CFO) and a *director* of them. Given that the acquisition discussions involved the entire Worldwide Vision Group, it is reasonable inference that Mr. Wallichman acted on behalf of all the Badoo Defendants, who were all contemplated in the transaction and part of the Worldwide Vision Group. The Badoo Defendants elsewhere complain that references to "Andrey Andreev" do not "implicate the Badoo Defendants." Dkt. 128 at 21. Again, Mr. Andreev is the CEO of "Badoo," Exs J-K, and also the ultimate controlling party of all the Badoo Defendants. *See, e.g.*, Dkt. 100 ¶¶ 4-9. Given his discussions implicating all of the Badoo Defendants, it is reasonable to infer that his actions in connection with the acquisition discussions involving the Badoo Defendants were on behalf of those Defendants (as well as Worldwide Vision). The Badoo Defendants' affidavits fail to deny that any of these contacts were done on behalf of the Badoo Defendants.

fact, despite her position with the Badoo Defendants and not any Bumble entity, Ms. O'Shea has been the only in-house attorney involved in any discussions with Match. In light of this evidence and these allegations, the Bumble Defendants' actions in this litigation are properly attributable to the Badoo Defendants (in addition to Worldwide Vision). This includes the Worldwide Vision Group's strategic choice, alongside the Badoo Defendants, to litigate the acquisition-related claims (in Texas) in Bumble's name alone, rather than the entire group.

2. The Identified Texas-Based Contacts Constitute the Required "Minimum Contacts" to Exercise Jurisdiction Over Match's Declaratory Judgment Request.

These Texas contacts are more than sufficient to show a *prima facie* case of minimum contacts related to Match's declaratory judgment request. For specific jurisdiction, the contacts must "arise out of" or "relate to" the injury alleged in the claim against the nonresident defendant. *Sangha v. Navig8 ShipMgmt. Private, Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018).

Specific jurisdiction exists as to all Badoo Defendants because Match's declaratory judgment request concerning them at least "relates to" Match's pleaded injury. In the Fifth Circuit, a contact is jurisdictionally relevant when it is a "but for" reason for the alleged injury. For example, a forum contact based on a contract that caused two entities to be within "striking distance" of the tort claim ultimately sued upon is a jurisdictionally relevant "but for" contact. *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n.21 (5th Cir. 1981). *But see Inmar Rx Sols., Inc. v. Devos, Ltd.*, No. 18-11443, 2019 WL 4440400, at *3 (5th Cir. Sept. 16, 2019) (noting that "but for" test has not been "formally" adopted). Here, the pervasive Texas contacts between the Badoo Defendants and Texas-based MGI all at least "relate to" Match's declaratory judgment request because Match seeks a declaratory judgment of non-liability arising from those acquisition discussions that Bumble concedes were Texas-centric. Dkt. 85 (Bumble: "Texas is the 'focal point' of the [allegedly fraudulent acquisition] scheme in every meaningful sense.").

This includes the Badoo Defendants' physical presence in Texas both in connection with Mr. Wallichman's trip, as well as the Badoo Defendants' role in assisting the Austin-based Bumble itself. *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1354 (Fed. Cir. 2017) ("[I]n-person visits to the forum are significant contacts in the declaratory judgment context.").

Match's declaratory judgment request against the Badoo Defendants' also arises from the Badoo Defendants' purposeful Texas contacts. In a declaratory judgment action, the alleged injury generally "arises out of" the uncertainty created by the declaratory judgment defendant's refusal to resolve a claim for which it has threatened suit but declined to file. *See, e.g.*, *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1333 (Fed. Cir. 2008). Where, for example, a DJ plaintiff receives an enforcement letter in a forum from the DJ defendant, the DJ defendant has sufficient "minimum contacts" with the forum in an action arising out of that enforcement letter (although, for policy reasons, the letter alone may not comport with principles of fairness). *Id.* Here, the Badoo Defendants decided that, despite their relationship with the Bumble Defendants and their equivalent or greater involvement in the Match Group, Inc./Worldwide Vision Group discussions, they would not agree to be bound by any adverse judgment against Bumble on the claims it brought. This constitutes reaching out to Texas to cloud Match's reputation while still maintaining the right to attempt to file a similar claim against Match in the future and impose future liability on Match.[10]

---

[10] Without citation to any facts—evidentiary or pleaded—the Badoo Defendants' make the claim that it is possible that the Bumble Defendants declined for the Badoo Defendants to be bound by an adverse judgment against the Bumble Defendants because Cooley was only "counsel of record" for the Bumble Defendants at the time. Dkt. 128 at 20. However, Match pleads that Andrey Andreev—through the entities he controls, including the Badoo Defendants—is the decisionmaker in the litigation. Dkt. 100 at ¶¶ 286; 4-9. Further, when Match inquired about the impact of a judgment against the Bumble Defendants, the attorneys at Cooley did not say that they did not represent the Badoo Defendants or could not otherwise speak for whether or not they would agree

This availment is even greater for Badoo Trading. The pleadings and evidence indicate that Badoo Trading collectively controls this litigation with Worldwide Vision Ltd. Badoo Trading is the only U.K. member of the Worldwide Vision Group that listed this lawsuit as a potential liability in 2018 (*i.e.*, before the Badoo Defendants and Worldwide Vision were added). Ex. C. Mariko O'Shea operates at least on behalf of Badoo Trading (although likely all Badoo Defendants). Dkt. 121-15. Based on Badoo Trading's control of the litigation, Badoo Trading, alongside its parent Worldwide Vision, reached out to Texas to file a lawsuit in Texas state court on behalf of Bumble and file counterclaims (in Bumble's name) that, in fact, appropriately belong to Worldwide Vision or alternatively the entire Worldwide Vision Group. Match's injury—the uncertainty created by the Badoo Defendants' refusal to be bound by an adverse judgment against Bumble, Dkt. 100 ¶¶ 17, 288—directly arises out of these contacts. It is simply not debatable that the Badoo Defendants' could have "reasonably anticipat[ed] being hailed into court" in Texas for claims arising from the negotiations involving Texas-based Match and Texas-based Bumble. *See, e.g., Torgeson v. Nordisk Aviation Prod., Inc.*, 997 F.2d 881 (5th Cir. 1993).

Notwithstanding these contacts, the Badoo Defendants contest specific jurisdiction for Match's declaratory judgment on four grounds. None of these negate specific jurisdiction as to this claim.

1. Match has alleged an injury arising out of the Badoo Defendants' contacts with Texas. Match alleged an injury arising out of the uncertainty created by the Badoo Defendants' concerted actions to have Bumble litigate a claim against Match related to the MGI/Worldwide

---

to be bound. Instead, Cooley indicated that it would "check," before later confirming that the Badoo Defendants refused to be bound. Summers Decl. ¶ 2.

Vision Group acquisition discussions but subsequent refusal to be bound by an adverse judgment against Bumble. This is an injury that causes both reputational harm as well as the potential for additional litigation costs. Dkt. 100 ¶¶ 17, 288.[11]

2. Match alleges the Badoo Defendants initiated contacts with Texas. Defendants' argument simply ignores that (1) agents of the Badoo Defendants' made the decision to sue in Bumble's name in this Texas-based action; (2) the Badoo Defendants (and Worldwide Vision) arranged a meeting in which they traveled to Austin, Texas in connection with acquisition discussions; (3) Worldwide Vision reached out to Texas on behalf of itself and the Badoo Defendants to re-engage with Match Group, Inc. in January 2018; and (4) the Badoo Defendants' agents engaged in a year-long discussion about the Texas-based acquisition, which included those entities.

The Badoo Defendants also overstate the law when implying that discussions concerning a contract with a forum resident are always irrelevant for specific jurisdiction unless the nonresident defendant initiated them. Here, however, the Badoo Defendants' own actions give rise and relate to Match's declaratory judgment request. The Badoo Defendants were for sale in an "auction-related process." Dkt. 78-5 at Background ("Match is one of a number of parties participating in an auction process."). Although Match Group, Inc. preliminarily engaged in discussions with Finam Investments, a minority shareholder of Worldwide Vision, Mr. Andreev (on behalf of Worldwide Vision and the Badoo Defendants, for whom he acts as CEO) reached out to introduce himself, suggest a call, and followed up on that call with a proposal for

---

[11] This is also not asking that the Badoo Defendants "should be bound by" a judgment against Bumble, as the Badoo Defendants contend. Dkt. 128 at 19. Rather, regardless of any judgment against Bumble, Match asks the Court to declare that Match did not act unlawfully as to the Badoo Defendants in connection with the acquisition discussions.

continued discussions.  Ex. M.  Mr. Andreev also made clear that—regardless of who initiated

the calls as between Finam Investments and Match Group, Inc.—Finam could not speak for the

Worldwide Vision Group.  *Id.*  ("I would like to state that Finam Capital is not representing all of

the shareholders but only it's stake in the company.").  In other words, the first discussions

officially with the Worldwide Vision Group (including the Badoo Defendants) were initiated by

Mr. Andreev.  Ex. M.  The Badoo Defendants then actively and continuously communicated

with Texas-based MGI agents in hopes of obtaining ten-figure sums from MGI in connection

with that contemplated auction.[12]  This includes transmitting Badoo-related data to the Texas

entity MGI for purposes of facilitating a transaction and Mr. Wallichman traveling to Texas on

behalf of the Badoo Defendants.  Ex. N (discussing Badoo data).  And after discussions

terminated initially, Worldwide Vision, on behalf of its group, solicited new discussions on

behalf of its continuing auction.  Dkt. 100 at ¶ 294.  None of these contacts are the "unilateral

activity" of MGI.  Instead, they reflect the Badoo Defendants and Worldwide Vision's

purposeful availment of Texas for purposes of closing a billion-dollar sale to a Texas entity and

involving Texas entities of their own.

These facts are far more analogous to controlling authorities finding jurisdiction than

those that do not.  This is not a case where a forum resident approached a nonresident defendant

for purposes of entering into a contract governed by non-forum law and shipping a product to a

---

[12] Even if the Badoo Defendants' are not considered to have "reached out" initially, the length of the discussions and their repeated purposeful actions still constitute purposeful availment.  *See T.M. Hylwa, M.D., Inc. v. Palka*, 823 F.2d 310, 314–15 (9th Cir. 1987) ("While arguably Palka's *initial* contact with California was created by Hylwa's unilateral decision to move there, Palka's decision to *continue serving as an accountant* for Hylwa's California practice . . . arose not from Hylwa's unexpected relocation but from Palka's continuing desire to benefit from the contractual relationship."), *cited favorably by Trinity Indus., Inc. v. Myers & Assocs., Ltd.*, 451 F.3d 229, 231 (5th Cir. 1995).

non-forum state where "all foreseeable contacts were to cease after delivery." *Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 873 (5th Cir. 1999) (describing rationale of *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026 (5th Cir. 1983)). Instead, the case involves the Badoo Defendants' active solicitation (as part of the Worldwide Vision Group) of an acquisition bid from MGI, a Texas company, for the equity interests in the Badoo and the Texas-based Bumble Defendants—a bid which would have transmitted these interests for future control by MGI in Texas. *See Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 382 (5th Cir. 2003) (finding specific jurisdiction where nonresident defendant "[could] not really dispute the fact that, during the course of negotiations, [it] specifically and deliberately 'reached out' to a Texas corporation . . . with the deliberate aim of entering into a long-standing contractual relationship. . . ."); *Am. Bank Holdings, Inc. v. Grange Mut. Cas. Co.*, No. CIV.A. DKC 09-2228, 2010 WL 2302356, at *4 (D. Md. June 7, 2010) (evidence that nonresident defendant "courted" plaintiff "strongly militates in favor of" jurisdiction); *see also Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1206 (5th Cir. 1993) (finding specific jurisdiction over plaintiff's request for declaratory judgment that its product was not defective where, despite the fact that the allegedly defective product was used exclusively in Maryland, it was made in forum). These are not "Match-initiated" contacts, contract to the Badoo Defendants' contention.

3. The purpose of Mr. Wallichman's trip was to negotiate on behalf of the Badoo Defendants with a Texas company. The Badoo Defendants claim this trip is "unrelated" to Bumble's claim. Dkt. 128 at 21. But this trip to Texas in connection with the auction-related discussions occurred only two months prior to the January 2018 re-ignited deal talks expressly subject to Bumble's counterclaim, in the midst of total negotiations that spanned over a year.

XXXX XXXXX XXXX XXXXXXXX XX XXXXXXXXXX XXXXX

Dkt. 121-13. The Badoo Defendants' claim that this trip is totally "unrelated" to the claim is simply not credible.[13] A trip to Texas to facilitate the same acquisition talks as those that make up Bumble's counterclaim certainly indicates that the Badoo Defendants could "reasonably anticipate" being hailed into this forum in connection with a dispute concerning those very discussions.

In any event, the Badoo Defendants' motion is internally inconsistent on this point. On the one hand, the Badoo Defendants' incorrectly imply that Match Group, Inc.—rather than the Badoo Defendants or Worldwide Vision—began acquisition related discussions. On the other hand, the Badoo Defendants ask the Court to pretend nothing happened at all before January 2018. Putting aside for the moment that the Badoo Defendants' agents *did* reach out to MGI in May 2017, there is no dispute that the acquisition-related talks were reinvigorated by Worldwide Vision, the Badoo Defendants, and the Bumble Defendants in January 2018. *See* Dkt. 100 ¶ 294. This reaching out is significant to the Court's analysis. *See, e.g.*, *Cent. Freight Lines Inc*322 F.3d at 382; *Am. Bank Holdings, Inc.* 2010 WL 2302356, at *4.

4. Match sufficiently plead that Mr. Andreev, Mr. Wallichman, and Ms. O'Shea acted on the Bumble Defendants' behalf. Yet again, the evidence indicates that Mr. Andreev is the CEO of "Badoo" and the ultimate controlling member of the Worldwide Vision Group. Exs C, G, J, and K; Dkt. 100 ¶¶ 4-9. Mr. Wallichman is a director of all of the Badoo Defendants and CFO of "Badoo." Ex. C, G; Dkt. 100 at ¶ 17. And while the Badoo Defendants' lawyers have refused

---

[13] The Badoo Defendants also cit to *Helicopteros Nacionales de Colom, S.A. v. Hall*, 466 U.S. 408 (1984) to imply that Mr. Wallichman's trip to Texas is insufficient to create jurisdiction. *Helicopteros* is distinguishable on two grounds: One, the case is about *general* jurisdiction. It is well-settled that a single forum contact can give rise to specific jurisdiction. *Burger King*, 471 U.S. 462 at 476. And two, the Badoo Defendants' forum contacts involve far more than just Mr. Wallichman's trip to Texas in connection with acquisition discussions.

to answer questions about Ms. O'Shea's roles, she is "Head of Legal" for Badoo, and almost certainly represents all of the Badoo Defendants. Dkt. 121-15. Further, Match pleads that these actions are attributable to these Defendants; the Badoo Defendants' affidavits do not rebut those assertions except to say that the respective Boards did not specifically approve Mr. Wallichman's travel to Texas—despite the fact that Mr. Wallichman is *on* all of the Badoo Defendants' Boards.

The Badoo Defendants' argument is particularly remarkable in light of prior arguments that Gary Swidler's representations were attributable to Match Group, LLC (as opposed to Match Group, Inc.) Without the slightest allegation that Gary Swidler, CFO of Match Group, Inc., is even employed by Match Group, LLC or was otherwise speaking on behalf of Match Group, LLC, the Badoo Defendants' same attorneys argued that the Court had to credit those allegations and called Match "brazen" to suggest otherwise. Dkt. 85 at 9. The Court ultimately credited these arguments. Dkt. 98 at 11. Here, Match offers evidence and pleads that these actions were taken on behalf of the Badoo Defendants; these entities are members of Worldwide Vision Group, they shared officers with Worldwide Vision, and the potential acquisition included all Badoo and Bumble-affiliated members of the Worldwide Vision Group. In these circumstances, Match has made a *prima facie* showing that these agents acted on behalf of the Badoo Defendants (and Worldwide Vision).

**D. It Is Not Unreasonable to Exercise Jurisdiction over the Badoo Defendants.**

Match has discharged its burden to make a *prima facie* case. Assertion of jurisdiction would also not be "unfair."

As discussed above, the Badoo Defendants work together to develop, program, and operate the Bumble application—an application *primarily* directed to the United States. Nearly half of Badoo Trading's revenue is attributable to the U.S.-directed Bumble application. Ex. C. Badoo Technologies leases United States servers for this very purpose, these servers host the

bumble.com, badoo.com, and magiclab.co domains, and likely the app server functionality as well.

Texas has an interest in this dispute because it involves multiple Texas entities, Match Group, LLC and Bumble Trading Inc. Match "assuredly ha[d] an interest in ascertaining what liability it may have" to the Badoo Defendants as well as "defending its . . . reputation" against the Badoo Defendants' possible claims. *See Polythane Sys., Inc.*, 993 F.2d at 1206. Texas and Match also have an interest in enforcing Match's Texas-based intellectual property against infringers. *See Loyalty Conversion*, 66 F. Supp. 3d at 828 ("The Federal Circuit has recognized that a state has a significant interest in discouraging injuries that occur within the state, including patent infringement."). Match Group, LLC also could not obtain recovery for its claims for direct, contributory, and induced infringement of Match's U.S. Patents against the Badoo Defendants in any foreign court. It also makes little sense to litigate its declaratory judgment request in a different forum than Bumble's related affirmative acquisition-related claim.

The Badoo Defendants cannot meet the "compelling case' burden to overcome Match's *prima facie* case. The Badoo Defendants' burden is high; the Fifth Circuit has described the situation in which a "compelling case" is made as "rare." *See Wien Air Alaska, Inc.*, 195 F.3d at 215. Attempting to make this compelling case, the Badoo Defendants cite to affidavits functionality identical to the affidavit offered in support of Worldwide Vision's earlier-filed Motion.[14] In each of these affidavits, a director of one of the various entities states in a conclusory fashion that "it would be extremely burdensome for [relevant entity] to defend this action in Texas" because "all of [relevant entity's] potential witnesses are located outside of the United States" and "none of [relevant entity's] files and records are located in Texas." Dkt. 116-

---

[14] The Badoo Defendants' argument is also verbatim identical to Worldwide Vision's.

1 ¶ 22.  That is the extent of the Badoo Defendants' attempt to bring this case into the "rare"

situation in which a "compelling case" against jurisdiction is made—despite the fact that they are

active collaborators with their Austin-based subsidiary.  Unsurprisingly, the Badoo Defendants'

cite to no case dismissing a nonresident defendant based solely on the fact that its witnesses and

evidence were remote.  This is for an obvious reason: if this were sufficient to defeat jurisdiction,

there would never be jurisdiction against a foreign defendant.

To the extent the conclusory claim is given any weight, it is overblown.  The Badoo

Defendants' "operate" two brands located in Austin, Texas, Bumble and Chappy.  Exs. O, P.

They work to jointly develop Bumble, which is and was primarily directed at the United States

market, and they distribute the products of their joint work through established distribution

channels and U.S. leased server space.  *See Loyalty Conversion*, 66 F. Supp. 3d at 828 (finding

exercise of jurisdiction would not be unfair where company distributed products nationwide).

Defending a case in Waco, Texas is no less convenient than the continuous interactions these

entities have with their Texas-based subsidiaries and affiliates on a day-to-day basis.  The Badoo

Defendants have plainly not made the required a compelling case against the fairness of

exercising jurisdiction in these circumstances

## III.  THE COURT SHOULD NOT DECLINE SUPPLEMENTAL JURISDICTION OVER MATCH'S DECLARATORY JUDGMENT REQUEST.

The Badoo Defendants also request that the Court decline supplemental jurisdiction

under ¶ 1367(c) over Match's declaratory judgment claim.  The Badoo Defendants acknowledge

that the Court has already ruled that it has the *power* to rule on Match's DJ request but merely

request that the Court, in its discretion, decline to allow the claim to proceed.  There is no basis

to do so.

For one, the Badoo Defendants' argument is premised on the notion that the Court will dismiss Match's patent allegations against them. As discussed, the Court cannot do so.

In any event, even if the patent claims were dismissed, it would make little sense to dismiss Match's declaratory judgment request against the Badoo Defendants related to acquisition discussions between Match Group, Inc. and Worldwide Vision. The relevant evidence overlaps 100% with claims already pending before the Court. Further, even absent the patent claims, the controversy "giving rise to" the Court's subject matter jurisdiction are Match's patent claims generally, not necessarily only those against the Badoo Defendants. The patent claims, generally, are not subject to dismissal here. Meanwhile, "claims that involve the joinder or intervention of additional parties" fall under supplemental jurisdiction so long as those claims "arise out of the same case and controversy" as the main action. 28 U.S.C. § 1367(a). Thus, if Bumble's Texas law counterclaims and Match's allegations of patent infringement share a common nucleus of operative facts—as the Court has ruled—Match's declaratory judgment against the Badoo Defendants does as well. *See* Dkt. 85 at 4-5 (Bumble: "[B]ecause the scheme to defraud Bumble culminated in the present lawsuit, [the parties' claims] share a common nucleus of operative facts."). And given the overlap between the claims already pending and Match's request as to Worldwide Vision, judicial efficiency dictates that those be heard in the same forum. Dkt. 85 (Bumble: "[E]fficiency is served by a single, consolidated litigation before this Court."). The Court can and should maintain jurisdiction over those theories regardless of its decision on personal jurisdiction as to Match's patent allegations against Worldwide Vision.

## IV.    CONCLUSION

For the reasons stated above, the Court should deny the Badoo Defendants' Motion to Dismiss.

DATED:  October 15, 2019                    Respectfully submitted,

                                            CALDWELL CASSADY & CURRY

                                            By: /s/ Bradley W. Caldwell
                                            Bradley W. Caldwell
                                            Texas State Bar No. 24040630
                                            Email:  bcaldwell@caldwellcc.com
                                            John F. Summers
                                            Texas State Bar No. 24079417
                                            Email: jsummers@caldwellcc.com
                                            Warren J. McCarty, III
                                            Texas State Bar No. 24107857
                                            Email: wmccarty@caldwellcc.com
                                            CALDWELL CASSADY CURRY P.C.
                                            2101 Cedar Springs Road, Suite 1000
                                            Dallas, Texas 75201
                                            Telephone: (214) 888-4848
                                            Facsimile: (214) 888-4849

                                            John P. Palmer
                                            State Bar. 15430600
                                            Email: palmer@namanhowell.com
                                            Naman, Howell, Smith & Lee, PLLC
                                            400 Austin Avenue, 8th Floor
                                            P.O. Box 1470
                                            Waco, TX 76701
                                            Telephone: (254) 755-4100
                                            Facsimile: (254) 754-6331

                                            **ATTORNEYS FOR PLAINTIFF
                                            MATCH GROUP, LLC**

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via electronic mail on October 15, 2019.

                                            *Bradley W. Caldwell*
                                            Bradley W. Caldwell